IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Rebecca Buddenberg<br>8532 Dewey Road<br>Montville, OH 44064<br><br><br>           Plaintiff,<br><br>  vs.<br><br>Robert Weisdack<br>Geauga County Health Commissioner<br>470 Center Street, Building 8<br>Chardon, OH 44024<br><br>Geauga County Health District<br>470 Center Street, Building 8<br>Chardon, OH 44024<br><br>Timothy Goergen<br>President of Geauga Cty. Board of Health<br>470 Center Street, Building 8<br>Chardon, OH 44024<br><br>David Gragg<br>Geauga County Board of Health<br>Geauga County Health District<br>470 Center Street, Building 8 | Case No.<br><br>Judge<br><br>Magistrate Judge |

Chardon, OH 44024

Catherine Whitright
Geauga County Board of Health
Geauga County Health District
470 Center Street, Building 8
Chardon, OH 44024

Christina Livers
Geauga County Board of Health
Geauga County Health District
470 Center Street, Building 8
Chardon, OH 44024

Alta Wendell
470 Center Street, Building 8
Chardon, OH 44024

    and

James Budzik
Mansour Gavin LPA
North Point Tower
1001 Lakeside Ave.
Suite 1400
Cleveland, OH 44114

       Defendants.

## COMPLAINT WITH JURY DEMAND

### NATURE OF ACTION

1.     This is a civil-rights action brought under federal and state anti-discrimination

laws including Title VII, Ohio Rev. Code § 4112, *et seq*., and the Equal Pay Act; 42 U.S.C.

§ 1983 (First and Fourteenth Amendments); and Ohio statutory and common law.

**2.**     When Plaintiff Rebecca Buddenberg, the former fiscal coordinator at the Geauga County Health District, opposed and reported unethical and discriminatory practices she discovered, Commissioner Robert Weisdack (aided by and working in concert with the Health District's Board and its outside counsel) spearheaded a vindictive and retaliatory conspiracy to drive her out of her position, creating such intolerable conditions that she had no choice but to resign. The unlawful practices Ms. Buddenberg opposed were matters of public concern that included Mr. Weisdack's unequal-pay practices; his potential ethical violations for self-dealing on a District contract; his failure to comply with the agency's own personnel policies; the retaliation Ms. Buddenberg and co-worker Dan Mix suffered for bringing this wrongdoing to light.

**PARTIES**

3.     Plaintiff Rebecca Buddenberg resides in Geauga County, Ohio.

4.     Defendant Robert Weisdack was at all relevant times the Geauga County Health Commissioner. He is sued in his personal and official capacities.

5.     Defendants Timothy Goergen, David Gragg, Catherine Whitright, and Christina Livers were at all relevant times members of the Geauga County Board of Health. Defendant Goergen was the Board's president. As Board members, these Defendants make ultimate determinations regarding employment actions such as hiring, firing, and discipline such as suspension, demotion, and reduction in pay. They thus have supervisory authority over employees and had such authority over Ms. Buddenberg. They are sued in their personal and official capacities.

6.     Defendant Alta Wendell was at all relevant times a Geauga County Health District employee and Defendant Weisdack's administrative assistant. She is sued in her personal capacity.

7.     Defendant Geauga County Health District ("Health District" or "District") is a health district organized under Ohio Rev. Code § 3709.01. The Health District formerly employed Ms. Buddenberg, currently employs Mr. Weisdack and Ms. Wendell, and is vicariously liable for acts and omissions taken under its customs, policies, or practices. The District is also responsible for training and supervising its employees in carrying out their duties in a lawful manner.

8.     Defendant James Budzik is an attorney at Mansour Gavin LPA who represented the Health District at all relevant times. His office is located in Cuyahoga County, Ohio. He is sued in his personal capacity.

### JURISDICTION AND VENUE

9.     Under 28 U.S.C. §§ 1331, 1343, and 2201, Ms. Buddenberg asserts jurisdiction over federal claims under 42 U.S.C. 2000e *et seq.* and 42 U.S.C. § 1983, which provide for attorney and expert fees. This Court has supplemental jurisdiction over Ms. Buddenberg's state-law claims under 28 U.S.C. § 1367.

10.    This Court has personal jurisdiction over the Defendants, who reside in and conduct business in this District. Venue is proper under 28 U.S.C. § 1391, because the events giving rise to Ms. Buddenberg's claims took place within this District.

**Ms. Buddenberg was an excellent employee of the Geauga County Health District, garnering positive evaluations and a merit pay raise.**

11.     Rebecca Buddenberg was fiscal coordinator (a classified employee) at the Geauga County Health District from her hiring in February 2, 2015, to her retaliatory demotion in March 21, 2017. (She was subsequently constructively discharged on May 27, 2017.)

12.     In her fiscal-coordinator role, Ms. Buddenberg was responsible for various aspects of the health department's fiscal management, including, for example, processing biweekly payroll, preparing monthly fiscal reports to the District's Board, processing weekly accounts payable, and assisting with the department's annual budgeting process.

13.     Ms. Buddenberg was also responsible for various human-resources functions, such as maintaining personnel records, overseeing FMLA processes, and acting as the liaison for employee-benefits coordination and injury-reporting between the department and the County Commissioners.

14.     Ms. Buddenberg's ordinary duties did not include reporting to the Board on the Health Commissioner's potential ethical violations or failure to adhere to policy, on unequal-pay practices, or on retaliation for opposing discrimination.

15.     Health Commissioner Robert Weisdack hired Ms. Buddenberg, and was her immediate supervisor until around April 2016, when Administrator Dan Mix became her supervisor.

16.     Mr. Mix, who reported directly to Mr. Weisdack, remained her supervisor until Mr. Mix's forced resignation in February 2017.

17.     Ms. Buddenberg did well in her position, receiving positive performance evaluations and earning her co-workers' trust. Mr. Weisdack conducted Ms. Buddenberg's first evaluation about four months into the job (2015). Among his praise for Ms. Buddenberg were the following comments: "I consider Rebecca a professional-minded person"; "Rebecca shows she is [is] very ethical"; "Rebecca's attitude is great and has a lot of motivation"; "Rebecca is very genuine in her desire to do more and has great initiative."

18.     The only area Mr. Weisdack identified as "need[ing] improvement" was that Ms. Buddenberg "not be so aggressive on policy issues" and that she "[b]ecome a little more flexible with policy administration and implementation."

19.     Mr. Mix conducted the second evaluation in June 2016, with Mr. Weisdack deciding to give Ms. Buddenberg one of the higher pay increases among those awarded. Mr. Mix's comments state that she "completes timely and accurate reports, grant statements, accounts payable[,] records[,] and payment of bills"; that she "demonstrates excellent knowledge and skills of her work and adheres to organizational policies and procedures"; that she "is punctual and organized ...[and] assists others"; that she "demonstrates high ethical standards and fiscal responsibility"; that she "has made promising suggestions to improve office moral[e]"; that she "takes a firm, non-threatening stance when situations arise amongst staff" and "adheres firmly to organizational policies when resolving problems."

20.     But things quickly changed course in October 2016 when Ms. Buddenberg opposed Mr. Weisdack's misconduct.

**Ms. Buddenberg reports Mr. Weisdack's unequal-pay practices, ethical misconduct, and non-compliance with agency personnel policies, and Mr. Weisdack immediately retaliates against her.**

21.     In fall 2016, Ms. Buddenberg learned of possible ethics violations on Mr. Weisdack's part. These did not directly affect Ms. Buddenberg. Specifically, the Health District had obtained an Ohio EPA grant for tire removal, and in the absence of competitive bids, Mr. Weisdack, along with two Health District sanitarian workers, themselves began to undertake the work themselves for pay. Ms. Buddenberg and Mr. Mix informed Mr. Weisdack, as well as at least one of the sanitarian workers, that before they did any work obligating the Health District to pay, they would need a contract—approved by the prosecutor's office—showing they were undertaking this work outside of business hours (*i.e.,* not as employees of the Health District, but rather as independent contractors), and would not obtain benefits for that time, such as workers' compensation or OPERS.

22.     But Mr. Weisdack defied this notice. He began work, even incurring injuries, and had the other two workers proceed, as well. He obligated the Health District with an expense without prior authorization, which violated policy. (It was also questionable whether he could even serve as an independent contractor, given that as Health Commissioner, he was a 24/7 employee.)

23.     Ms. Buddenberg was particularly concerned about the potential conflict of interest, as the amount of the contracts was over the $2,000 that Mr. Weisdack, under Board resolution and adopted as auditor policy, was authorized to spend for non-vaccine expenditures. Mr. Weisdack was holding meetings during the day about the evening work

activities. He did this all without seeking Board approval for any contracts and Board verification that no conflict of interest existed.

24.     Also in fall 2016, Ms. Buddenberg was aware of an issue—as with the tire-contract issue, one that did not directly affect her—that had arisen earlier regarding a disparity in how a male employee (Frank Varga) and female employee (Amanda Hill) were being paid. Mr. Varga was paid a higher salary despite the two workers' identical jobs (both sanitarians-in-training) and despite the fact that Ms. Hill was more qualified.

25.     Ms. Buddenberg, as well as Mr. Mix and Environmental Health Administrator Michael Tusick, had complained to Mr. Weisdack on multiple occasions since Ms. Hill's date of hire (in or around 2015) about unequal pay between Varga and Hill. But Mr. Weisdack refused to do anything to correct the unlawful pay disparity. When Ms. Buddenberg, like the others, approached him about it, he instead disparaged her, telling her that she wasn't a lawyer, that he knew what he could do, and that he had already forgotten more that morning than she could ever learn in a lifetime.

26.     Feeling extremely concerned about the unlawfulness of Mr. Weisdack's behavior, on October 24, 2016, Ms. Buddenberg reported to the Board the tire-contract conflict-of-interest issue and unequal-pay practice, as well as other concerns about Mr. Weisdack's lack of ethical conduct and failures to adhere to policy such as the following:

    a.      He accepted and allowed the office to accept gifts from contractors to whom the District issued permits.

    b.      He failed to address concerns regarding staff's misuse of resources, ignoring Ms. Buddenberg's suggestion to install GPS units in agency vehicles to

ensure that field staff were actually working during working hours. (Ms. Buddenberg's idea ultimately was pushed through by others, and in 2017 resulted in the prosecution of two District employees for theft in office.)

c.   He failed to implement discipline in a consistent and predictable manner (he refused to implement a progressive-discipline model and stated he would take staff to coffee to solve any problems).

d.   He failed to enforce employee-attendance and paid-break policies.

e.   He failed to honor the reference-check policy for new hires (important given that Health District employees would represent the agency and sometimes enter private residences).

f.   He failed to put into place procedures to ensure public funds were handled properly (specifically, there was no system to reconcile the revenue generated by issuing birth certificates with the number of birth certificates issued).

g.   He ignored recommendations of the employees' health-and-safety committee (including a request for funds to install speakers in an area of the building that otherwise could not hear fire alarms).

h.   He "yell[ed], threaten[ed], intimidate[d], and ignore[d] the staff," including by hanging a pacifier on his door with the words "For those who disagree."

27.   Ethics violations, personnel-policy compliance, and unequal-pay practices were all operational concerns strongly affecting the public interest. They constituted matters of

concern to the public. Most of the items on which she reported had no direct effect on her.

28.     It was not within Ms. Buddenberg's ordinary job duties to report on these items to the Board. The report did not come about through any routine personnel process. Before the Board meeting, Ms. Buddenberg emailed the Board members that she had concerns about leadership that she wished to present to the Board. But she did not formally prepare. Only when a Board member came to find her did she know the Board wanted her that day to personally attend to tell them about her concerns. The meeting at which she did so was a special Board meeting. She was speaking in her capacity as a citizen.

29.     Mr. Weisdack saw Ms. Buddenberg walk into the meeting with the Board members.

30.     At the meeting with the Board members, Ms. Buddenberg expressed concern about potential retaliation. The Board members assured her that the Board would protect her.

31.     The Board members, however, failed to protect Ms. Buddenberg from Mr. Weisdack's retaliation. Instead, as described below, they participated in and ratified it.

32.     Almost immediately after reporting on October 24, 2016, and continuing on after she followed up with a written submission on November 13, Ms. Buddenberg began to face Mr. Weisdack's retaliation.

33.     Within less than 48 hours of her initial report, Mr. Weisdack instructed Ms. Buddenberg's supervisor, Mr. Mix, to change her working hours from the 7:00 am–3:30 pm she had previously negotiated to 8:00 am–4:30 pm. As Mr. Weisdack well knew

from the time of her hire, Ms. Buddenberg had negotiated the flexible hours to accommodate her going back to college, and helping care for her cancer-stricken grandson. When Mr. Weisdack ordered the change, Ms. Buddenberg was forced to quit school just a few courses from her Bachelor's of Science degree in human-resources management, and became limited in her ability to take care of her grandson.

34.     Mr. Weisdack provided no justification or explanation for why the schedule she had been working *for over a year and a half* without him raising any concerns suddenly was no longer acceptable.

35.     Two other employees, Jay Becker and Darla Andrews, continued to enjoy a flexible schedule with no change.

36.     In a March 6, 2017 text message to Ms. Buddenberg, Mr. Mix acknowledged that Mr. Weisdack had been explicit about the reason Mr. Weisdack wanted to change Ms. Buddenberg's hours: "he was mad at you for going to [the] board . . . He told me to get rid of you."

37.     Mr. Weisdack also began to disparage Ms. Buddenberg to her co-workers, telling them that she was untrustworthy, that she would be the end of the department, and that they should not talk to her. He stopped communicating with her himself. And he tried to threaten and intimidate her, including by unduly scrutinizing her hours and attendance. After Ms. Buddenberg found mistakes in Mr. Weisdack's assistant Alta Wendell's work, he also told Mr. Mix, vindictively, that "if Rebecca makes a big deal and makes a big scene we will have to let her go!"

38.     Contemporaneous text messages between Ms. Buddenberg and Mr. Mix, as well as

with Employee #1, document Mr. Weisdack's sudden hostility toward Ms. Buddenberg:

- (November 2, 2016) R. Buddenberg to Employee #1: "…Bob wanted to fire me today. I found mistakes w[h]ere Alta [Weisdack's administrative assistant] refunded/undercharged permits. He told [D]an[,] [t]his needs to just be swept under & if Rebecca makes a big deal and makes a scene we will have to let her go!" / Employee #1: "I want to say, stay away from him until he is gone. He seems viciously vindictive." / R. Buddenberg: "I stand three feet away and he pretended not to see me…"

- (November 7, 2016) R. Buddenberg to D. Mix: "Is it safe for me to come to work. He seriously scares me!"/Mix: "He made me show him your sheet today after I e[x]plained it. I said you did not have sufficient notice to make other plans. Yes[,] you can come here. He can't be threatening or you can call the police."

- (November 7, 2016) Employee #1 to R. Buddenberg: "Don't be alone with him. What time are you going in tomorrow?"/ R. Buddenberg: "8am as ordered. And leaving at 330 lol. I can't believe he made [D]an show him the pink sheet. If only he supervised his sanitariums as closely."

39.     In a statement that Mr. Mix submitted to the Board, Mr. Mix wrote: "After the

October 24, 2016 Board meeting, Bob Weisdack's behavior and demeanor changed

dramatically. He became dictator-like in his dealings with staff. Since that date, Bob has

spent most of his energy intimidating staff members, instilling a[ ] sense of fear, and

aligning staff members against one another. For example, Bob reported to me that eight

staff members wanted Rebecca Buddenberg fired. . . . "

**Ms. Buddenberg sends numerous emails to the Board about the retaliation, including retaliation against Mr. Mix, who had defended her, but the Board does nothing to correct the problem.**

40.     Dismayed by the way Mr. Weisdack was ostracizing and isolating her and by the

effect of his behavior on co-workers, Ms. Buddenberg communicated the retaliation to

and sought protection from the Board, both orally and in writing. She wrote numerous

emails to the Board or one of the Board's attorneys, Jeff Embleton, including on October 31, 2016, November 4, 2016, November 13, 2016, November 18, 2016, November 30, 2016, December 14, 2016, December 15, 2016, January 24, 2017, and February 1, 2017. Ms. Buddenberg also orally reported the retaliation to Board member Livers on November 5, 2016, and to Board president Goergen and Board member Whitright on or about November 14, 2016. (Upon information and belief, Mr. Budzik knew of these reports, including those directed to his Mansour Gavin partner, Mr. Embleton.)

41. In each of these communications, Ms. Buddenberg was opposing what she reasonably believed was unlawful retaliation and petitioning the Board for a redress of grievances. Each communication reported on the adverse acts and Mr. Weisdack's retaliatory motive. Each commented on the effect of Mr. Weisdack's conduct on the District's overall operation—which included in some cases chilling others' speech. Each communication constituted its own "whistleblower report," protected activity, and speech on a matter of public concern.

42. On October 31, 2016, for example, Ms. Buddenberg emailed all four Defendant Board members—Christina Livers, Tim Goergen, Catherine Whitright, and David Gragg—to tell them she was experiencing retaliation for having reported policy concerns to the Board. She specifically wrote about the change in hours, including that Mr. Mix informed her that Mr. Weisdack had ordered the change, and stated,

> I believe this may be an act of retaliation for addressing the board with operational concerns on Monday [October 24,] based on:
>
> - I have worked the 7-3:30pm schedule for over a year with no issue. My direct supervisor had no objection to [the] schedule.

- To my knowledge, prior to Wednesday, Mr. Weisdack had no objections to my 7-3:30pm schedule.

- The directive to change my schedule took place less than 48 hours after I presented to the board in executive session.

- It has been reported to me by coworkers that Mr. Weisdack has made known that he is angry at me for talking to the board. Mr. Weisdack has avoided all contact with me since Monday afternoon.

43.     On November 4, 2016, Ms. Buddenberg emailed Ms. Livers expressing concern about Mr. Weisdack's announcement to staff the day before that, rather than retiring, he would be held to his contract for two more years of employment. She wrote: "His response to my addressing the board has created a toxic work environment and I do not want his anger towards me to impact the ability for the agency to serve the community."

44.     On November 5, 2016, Ms. Buddenberg also reported the unlawful retaliation in a phone conversation with Ms. Livers. Ms. Buddenberg informed Ms. Livers of Mr. Weisdack's threats of termination, derogatory statements, intimidation, and the negative impact of the schedule change on her education and family commitments, of which Mr. Weisdack was aware. Ms. Livers stated that the Board was looking into it and would protect Ms. Buddenberg.

45.     On November 13, 2016, Ms. Buddenberg again emailed Ms. Livers, this time in response to Ms. Livers's request that Ms. Buddenberg provide in writing the concerns she had presented to the Board on October 24. In her cover email, Ms. Buddenberg relayed that, after hearing about upcoming "interviews in the near future by a third party" (an investigation into Ms. Buddenberg's report), many staff were "not willing to speak because [of] the retaliation that will occur. . . . They see how [Mr. Weisdack] is acting

towards me, looking for any reason to cause me difficulty and do not want that for themselves." (On November 18, 2018, Ms. Buddenberg forwarded this email to Board attorney Jeff Embleton.)

46.    On or around November 15, 2016, Ms. Buddenberg also spoke to Defendant Board members Mr. Goergen and Ms. Whitright about the unlawful retaliation. She told them about Mr. Weisdack's retaliatory treatment and the resulting alienation from other employees. Mr. Mix, who was present, confirmed Ms. Buddenberg's account, and stated words to the effect that "Bob is out of control, he's put her in a corner, turned staff against her, and something needs to be done."

47.    Upon information and belief, the following day, November 16, Mr. Goergen went to coffee with Mr. Weisdack, and relayed both Ms. Buddenberg's and Mr. Mix's opposition to Mr. Weisdack—that is, right back to the retaliator.

48.    Immediately after Mr. Georgen and Mr. Weisdack's meeting, Mr. Weisdack stopped communicating with Mr. Mix, with whom he had previously eaten lunch daily. Mr. Weisdack also changed the Health Commissioner and Environmental Health Director job descriptions to make Mr. Mix ineligible for succession to the Health Commissioner position. (Mr. Mix had been employed at the District for over 14 years. Mr. Weisdack had told the Board on numerous occasions that Mr. Mix was in training to become the next Health Commissioner. All that changed, though, as part of Mr. Weisdack's scheme of retaliating against Ms. Buddenberg.)

49.    On November 17, 2016, the Board approved the revised job descriptions.

50.     Moreover, while the Board, after Ms. Buddenberg's reports, engaged Mr. Embleton of Mansour Gavin to investigate "compliance of personnel and management regulations"—supposedly to help the Board determine whether to renew Mr. Weisdack's contract—upon information and belief, this investigation did not address Ms. Buddenberg's complaints of retaliation for having brought those issues to the Board.

51.     Thus, despite Ms. Livers's promise that the Board would protect against retaliation, it failed to do so. It did nothing to correct the problem (even though, after the investigation, the Board did correct the unequal-pay issue that she reported). Instead, the Board aided and ratified Mr. Weisdack's retaliation. Indeed, on or around November 29, 2016, the Board renewed Mr. Weisdack's contract, thus enabling him to continue to retaliate against Ms. Buddenberg and Mr. Mix.

52.     Ms. Buddenberg continued to oppose the retaliation, including the Board's complicity in it. On November 30, 2016, she wrote to Mr. Embleton, stating: "I just learned the board has placed back in authority the individual who has betrayed residents['] trust, who has mismanaged this department and has verbally attacked my character, making my workplace very uncomfortable. He has verbalized a desire to terminate my employment so I imagine I will not be here much longer. . . . It is obvious by the lack of communication and protection of employees that the board is as negligent as Mr. Weisdack."

53.     On December 14, 2016, in an email to Ms. Livers, Ms. Buddenberg again objected to the Board's effective betrayal of her trust: "I do find it ironic that the ideas and concerns I had identified and were substantiated resulted in my work environment

becoming even more hostile. Perhaps I should have followed Mr. Weisdack's directive to keep my mouth shut."

54.     On December 15, 2016, in an email to Mr. Embleton, Ms. Buddenberg described the "hostile work environment" Mr. Weisdack had created in retaliation for her reports: "stat[ing] to my coworkers that I was part of setting him up," "accus[ing] me of providing false information to the board regarding the tire job," and falsely telling Ms. Hill (the female sanitarian-in-training who had improperly received a pay rate lower than a male sanitarian-in-training) that he had been unaware of the pay difference and had not been provided correct information. As Ms. Buddenberg pointed out, the truth was that "multiple parties including myself [had] vigorously attempt[ed] to convince him equal pay was necessary."

55.     She also expounded on her opposition to the Board's role in supporting Mr. Weisdack: "[The Board] provided [Mr. Weisdack] with a contract. The board has allowed him to remain in the workplace and in a position of authority in spite of my multiple report[s] of ongoing behaviors that have been detrimental to my wellbeing. He has been permitted to continue his attacks on my character and intentions. His directives that included adverse action and retaliation have been upheld."

56.     The Board members' radio silence, especially those she had trusted such as Ms. Livers, only made things worse. In the same email, Ms. Buddenberg wrote: "The actions by Mr. Weisdack and lack of action and communication by the Board have negatively impacted my employment."

57.     Ms. Buddenberg received no response to these emails. On January 12, 2017, she received a letter from Mr. Embleton informing her that many of the concerns she had raised on October 24 were being addressed. But it said nothing about the ongoing campaign of retaliation she had repeatedly reported.

58.     And the retaliation continued unabated. The lack of communication, for one, affected Ms. Buddenberg's ability to perform her essential job functions. Co-workers to whom Mr. Weisdack had disparaged Ms. Buddenberg stopped providing her information, for example:

    a.    Ms. Wendell refused to provide Ms. Buddenberg information regarding the purpose of purchase-order requests, making it difficult for Ms. Buddenberg to determine in which category the expenditure belonged and thus whether there were sufficient funds to approve the expenditure.

    b.    Employees in the Environmental Health Services department, such as Ms. Wendell, Chris Walick, and Tammy Mullin, refused to respond to Ms. Buddenberg's requests for information on expected permit revenue, making it impossible for Ms. Buddenberg to accurately determine purchase-order carryover amounts (i.e., estimates for expenditures needed for the end of the year);

    c.    The same employees refused to respond to Ms. Buddenberg's requests for information on items such as desks, lamps, calculators, etc., necessary to complete the year-end asset inventory, information regarding the District's value that would go to the auditor.

59.     Also, due to Mr. Weisdack's campaign of isolating her, Ms. Buddenberg learned only after reading Board meeting minutes in January 2017 of a deadline on a financial report for which she was in part responsible.

60.     And in January 2017, when Ms. Buddenberg discovered mistakes in Ms. Wendell's payment of refunds on a well-permit program and reported them to Mr. Weisdack, instead of investigating the matter, Mr. Weisdack berated Ms. Buddenberg.

61.     On January 24, 2017, Ms. Buddenberg attempted once again to appeal to the Board, writing to Ms. Livers and Mr. Embleton. She wrote about the lack of communication affecting her ability to perform her job, about the difficulty for staff (some of whom were county residents) created by having Board meetings during the day, and about being "punished" for "sp[eaking] up for those who had been treated poorly by Mr. Weisdack." She wrote: "I have been the victim of a personal attack by Mr. Weisdack. I have had my credibility undermined, impacting my ability to perform essential job functions." She continued, "The Board has made no visible effort to counteract Mr. Weisdack's negative actions towards me." "Please protect myself and others from the retaliation Mr. Weisdack is eager to dole out."

62.     Then, a few days later, at the end of January 2017, Ms. Buddenberg's direct supervisor, Mr. Mix, was forced to resign. By forcing him to resign, those involved, including Mr. Weisdack, Mr. Budzik, and the individual Board members, retaliated against Mr. Mix for having supported Ms. Buddenberg.

63.     Mr. Weisdack's mistreatment of Mr. Mix was part of a common plan, pattern, and scheme, motivated by Mr. Weisdack's retaliatory animus against Ms. Buddenberg

(because Mr. Mix had supported her). Mr. Mix's forced resignation left Ms. Buddenberg further isolated, and directly under Mr. Weisdack's supervision.

64.    In a February 1, 2017 email to Ms. Livers and Mr. Embleton, Ms. Buddenberg expressed frustration at the Board's non-responsiveness, and reported the retaliation Mr. Mix experienced as part of Mr. Weisdack's scheme: "Is there any concern that up until my reporting to the board on October 24th the potential EEOC violation and the Ethics violation, Mr. Weisdack had no issue with my performance[?] Up until Dan defended me to Mr. Goergen, stating concern for Bob's behavior, Bob treated Dan as his best friend. I cannot help but believe Dan's dismissal was directly a result of my reporting and his defending me for reporting."

65.    But the Board members did nothing to correct the problem. Instead, they approved Mr. Mix's "resignation" in a February 1, 2017 Board meeting.

66.    In the meantime, on January 30, 2017, Ms. Buddenberg discovered that all her voicemails and call log had been deleted, upon information and belief to intimidate her and remove her communications with Mr. Mix. No other employees had this occur.

67.    On February 15, 2017, Ms. Buddenberg reported the retaliation to the EEOC.

68.    On February 24, 2017, the Health District received notice of her EEOC filing.

69.    Upon receiving the notice, Mr. Weisdack made no effort to mask his anger at Ms. Buddenberg for having complained, telling employees that Ms. Buddenberg was "out to get [him]." Ms. Buddenberg learned of this from an employee.

**After Ms. Buddenberg files with the EEOC, Mr. Weisdack, along with Mr. Budzik, ratchets up the retaliation with bogus allegations of policy infractions. After a grueling sham hearing, Mr. Weisdack and Mr. Budzik find Ms. Buddenberg "guilty" of trumped-up and baseless allegations. The Board members approve, imposing a three-day suspension, demoting her to a clerical position, and reducing her pay to $10.25/hour.**

70.     Mr. Mix's departure gave Mr. Weisdack additional opportunities to retaliate against Ms. Buddenberg. On or around February 17, 2017, Mr. Weisdack—who was now in charge of approving Ms. Buddenberg's leave requests—sat on her leave request for at least an entire day, whereas normally, he would handle such requests right away. Ms. Buddenberg was forced to go to Ms. Andrews to obtain a signature (as a manager, Ms. Andrews could sign approval in Mr. Weisdack's absence).

71.     Mr. Weisdack also limited Ms. Buddenberg's access within the office. On or around February 28, 2017, Ms. Buddenberg was going to assist Ms. Andrews with a task in Mr. Mix's former office. But Ms. Andrews told Ms. Buddenberg that, per Mr. Weisdack, Ms. Buddenberg was not permitted to enter Mr. Mix's former office. Ms. Buddenberg never received any explanation for this abrupt limitation, and based on her experience at the District, could not conceive of one.

72.     On February 28, 2017, a mere four days after receiving notice of Ms. Buddenberg's EEOC filing, and a few weeks after her email to the Board reporting Mr. Weisdack's retaliation against Mr. Mix, Weisdack issued Ms. Buddenberg a "Notice of Proposed Disciplinary Action." The "notice" alleged that "[with]in the last forty-five (45) days, [Ms. Buddenberg had] engaged in a repeated pattern of violating Agency policies," and it set

forth eight allegations of policy violations against which she would have to defend herself at a March 3, 2017 hearing:

- That she was "rude, unprofessional, and disrespectful" and "raised her voice" during an interaction regarding a private-water-well permit refund;

- That she sent an email to a Board member on February 1, 2017 stating that Mr. Mix was dismissed as a result of Ms. Buddenberg's report (as opposed to that he "resigned");

- That she attempted to "mandate [her] attendance" at a meeting with the Auditor to demand a revision to the 2017 budget appropriation without basis;

- That she defied Mr. Weisdack's directive not to transfer "contaminated" furniture from the county Maintenance Department to the Health Department;

- That she failed to complete payroll by the required "deadline" of February 10, 2017;

- That she had personnel files in her office without authorization and had failed to place documents into other personnel files;

- That she stated she was unfamiliar with the annual Ohio Department of Health subsidy and when Mr. Weisdack asked for previous reports, she stated they could not be located;

- That she shredded documents without authorization.

73. Upon information and belief, Mr. Weisdack drafted the "notice" in conjunction with attorney Jim Budzik of Mansour Gavin.

74. Upon information and belief, Mr. Weisdack also consulted with one or more Board members regarding the proposed disciplinary action, and shared this "notice" with them.

75.     Ms. Buddenberg had previously received only positive performance reviews—in fact, Mr. Weisdack's sole "criticism" of her in her 2015 evaluation had been that she adhered to policy too closely.

76.     The Health District disciplinary policy states that "[d]iscipline shall be progressive as outlined in this manual." The policy applied to Ms. Buddenberg as a classified employee. But in issuing the "notice" to Ms. Buddenberg, the District did not follow its own progressive-discipline policy.

77.     The disciplinary policy also states that "[i]mmediate attention shall be given to policy infractions," and "[d]iscipline shall be applied uniformly and consistently throughout the agency, and any deviation from standard procedures must be well justified and documented."

78.     But the "allegations" in the "notice" did not follow these standards. They were petty and/or baseless, applied in a non-uniform way, and even expressly retaliatory.

79.     Some of the allegations involved events much earlier than 45 days before the "notice," such as the nonsensical allegation that she requested from the Maintenance Department "contaminated" furniture.

80.     Some were downright bizarre and obviously pretextual, like the allegation that she tried to attend a meeting.

81.     Some involved alleged conduct for which others were not disciplined, or not disciplined as harshly as Ms. Buddenberg would be, such as requesting the furniture (Christie Gigliotti had also been involved but received no discipline) or allegedly raising

her voice (Nancy Tvergyak had had a verbal confrontation with Mr. Mix and Mr. Weisdack simply took her out to coffee to address the problem).

82.     Some skewed facts to make something unobjectionable appear objectionable, such as

    a.      alleging that Ms. Buddenberg shredded documents outside the District's document-retention schedule, among them allegedly a report that Mr. Weisdack had requested. In fact, the documents were old quotes for purchases, working budget drafts, copies of old medical-intake forms, and other documents that had piled up over the course of years, none of which the retention schedule required to be preserved. And Ms. Buddenberg had had a shredder in her office since she started employment at the District and had previously shredded documents regularly without concerns.

    b.      alleging that she "willful[ly]" missed payroll on the alleged deadline of February 10 and was absent from work skews facts. In fact, the deadline was not February 10. And Ms. Buddenberg had simply inadvertently failed to attach payroll information to an email. Her absence was due to sickness, but she still offered to come in to help with the payroll. (The allegation admits that she had processed payroll correctly on 48 other occasions, and fails to explain why she would "willfully" do it on this occasion.)

    c.      alleging that she was "rude" and "unprofessional" when she was asked questions about the private-water-well permit refund. In fact, this had to do with Ms. Buddenberg's discovery that Ms. Wendell had overpaid refunds,

costing the District unnecessary money. Ms. Buddenberg had written an

email stating that before she made such a refund, she would need to verify

the process for its approval. Yet in the meeting, Mr. Weisdack, without

hearing these facts, immediately began berating her about not

communicating such information. (Ultimately, this was just intimidation

for Ms. Buddenberg's reporting on government waste.)

83.     Some were flat-out lies, like the allegation that she requested the furniture in

defiance of Mr. Weisdack's directive, when he never issued such a directive; or that she

failed to locate certain financial reports that Mr. Weisdack requested, when in fact he

never asked; or that she moved personnel files to her office without authorization, when

Mr. Weisdack himself had authorized the move. (This was so she could separate

employees' confidential medical records from the remainder of their personnel files—

which attorney Embleton had told Ms. Buddenberg was appropriate and complied with

governing privacy requirements.)

84.     All of the allegations either falsely stated or falsely insinuated that she had willfully

neglected her duty or acted insubordinately.

85.     One of the "allegations" admitted to unlawful retaliation: Ms. Buddenberg had

stated in a February 1 email to Board member Livers that she believed Mr. Mix had been

dismissed "as a result of my reporting and his defending me for reporting." In other

words, Ms. Buddenberg was opposing what she reasonably believed had been unlawful

retaliation against Mr. Mix, and likewise speaking out on an issue of value and concern to

the public. The notice, in classic retaliatory form, ripped her apart for the statement,

claiming that Mr. Mix had really "resigned" and accusing Ms. Buddenberg of "willfully demeaning and verbally abusing the Health Commissioner," engaging in "repeated failure of good behavior and malfeasance," and making the statement "in defiance of the Health Commissioner's authority and/or making a false claim in order to obtain a benefit." Threatening (and subsequently meting out) discipline expressly for such activity—i.e., for engaging in constitutionally protected speech and statutorily protected activity—is blatant, unlawful retaliation.

86.     At the "hearing," Mr. Budzik played the leading role in grilling Ms. Buddenberg, with Mr. Weisdack present but saying very little. (On information and belief, Mr. Budzik also actively participated in the subsequent determination that Ms. Buddenberg was "guilty" of most of the allegations). Mr. Budzik subjected Ms. Buddenberg to this treatment knowing that she had engaged in protected activity, knowing that the allegations were baseless, and knowing that they were retaliatory.

87.     At the "hearing"—which she recorded—Ms. Buddenberg refuted the charges, providing logical explanations and documentation, and emphasizing the charges' retaliatory nature.

88.     For example, rebutting the charge that her email reporting on Mr. Mix's termination was a "false claim [made] in order to obtain a benefit," Ms. Buddenberg asked what kind of benefit could she derive exactly. Mr. Budzik gave a bumbling answer about how it could be inferred she was trying to improve her working conditions. But Mr. Mix, no longer being employed at the District, had no control over her working conditions. The charge was bogus, and on information and belief, Mr. Budzik knew it was bogus.

89.     Similarly, Ms. Buddenberg rebutted the charge that her report of Mr. Mix's dismissal was false by explaining why she believed that Mr. Mix's "resignation" was involuntary: a day or so before the email, Mr. Budzik or his associate had left a document open on a computer visible and accessible to a number of Health District personnel. The document was a notice of Mr. Mix's proposed *termination*. Coworkers including Danielle Pearson, Becky Kelly, and Robin Maynard informed Ms. Buddenberg that they had seen this notice, leading her to conclude that his "resignation" was not voluntary. Again, Mr. Budzik knew the charge against Ms. Buddenberg was baseless.

90.     Immediately after the grueling, nearly two-hour hearing, Mr. Budzik called Ms. Buddenberg back to a conference room. She asked to have a witness present, and he refused. He offered her the option to supposedly "settle" the matter if she would accept a demotion and salary-pay reduction of nearly $1,000/month and drop all claims of retaliation (including her EEOC charge). He gave her until Tuesday, March 7, to make a decision. On that day, Ms. Buddenberg asked to present a statement about the hearing to the Board directly, but Mr. Budzik stated she could do so only if she agreed to discuss settlement. Ms. Buddenberg refused to accept the proposed "settlement." In short, Mr. Budzik tried to intimidate Ms. Buddenberg into dropping her EEOC charges and accepting adverse action, when he knew that the allegations against her were false.

91.     Ms. Buddenberg recounted this series of events in a March 10, 2017 email to Board member Livers, in which she once again asked for help and reported on the retaliation: "I have been humiliated and threatened with disciplinary action, which I demonstrated to

be unfounded, excessive and retaliatory during a grueling, nearly 2 hour, hearing." She also reported that she "felt intimidated by Mr. Budzik to settle."

92.     In the meantime, if there was any doubt that the "hearing" was a sham with a predetermined outcome, the following resolved it: the "hearing" occurred on Friday, March 3, 2017; on Monday, March 6, 2017, before any official determination about Ms. Buddenberg's alleged conduct had been made, Mr. Weisdack already had a co-worker performing some of Ms. Buddenberg's duties.

93.     Being stripped of her duties in this manner was humiliating for Ms. Buddenberg. Ms. Buddenberg also reported this in her March 10, 2017 email to Ms. Livers. Once again, she received no response.

94.     On information and belief, at the Board's March 7, 2017 meeting, Mr. Budzik recommended that the Board take disciplinary action against Ms. Buddenberg based on allegations that he knew were false and that Ms. Buddenberg had rebutted.

95.     Then, despite Ms. Buddenberg's strong rebuttal at the hearing and supporting evidence, on March 16, 2017, the Health District issued an Ohio Rev. Code § 124.34 order against her ("Order"), further retaliating against her for her reports.

96.     The Order on its face found her guilty of nearly all of the bogus allegations in the "notice" and suspended her for three days, demoted her to a clerical position, and reduced her pay by nearly half: from $19.75/hour to $10.25/hour.

97.     Upon information and belief, Mr. Weisdack and Mr. Budzik drafted the Order with its list of "disciplinary offenses."

98.     Individual Defendant Board members Tim Goergen (president), Christina Livers, Catherine Whitright, and David Gragg all signed the Order.

99.     At the March 13, 2017 Board meeting addressing the discipline, Ms. Livers—the one to whom Ms. Buddenberg had written repeatedly regarding the retaliation—is the one who moved to suspend Ms. Buddenberg without pay and to reassign her to a clerical position at a reduced pay rate. (All Board members present at the meeting—Ms. Livers, Ms. Whitright, and Mr. Goergen—voted in favor of these actions.)

100.    On March 17, the day after receiving the order, Ms. Buddenberg discovered she had been denied access to the District's accounting software, any of the ledgers, and her email.

101.    For the next two business days, until her suspension was to begin, all she was able to do was organize her office and write instructions to others regarding how to do her job.

102.    It was as if she had been terminated.

103.    Ms. Buddenberg served the retaliatory suspension from March 21 to March 23, 2017.

104.    On March 21, 2017, Ms. Buddenberg appealed the Order to the State Personnel Board of Review.

105.    Also on March 21, 2017, Ms. Buddenberg submitted a supplemental complaint to the EEOC regarding this additional retaliation.

106.    Meanwhile, on March 24, 2017, the Board renewed Mr. Weisdack's contract until December 31, 2017.

107.    Rather than discipline Mr. Weisdack for his discriminatory and retaliatory conduct, the Board rewarded him. In doing so, the Board made clear that it was siding with Mr. Weisdack despite his extensive and documented misconduct.

108.    Defendants lacked any legitimate interest in acting or supporting actions *against* Ms. Buddenberg for her many reports, including authorizing her retaliatory suspension, demotion, and reduction in pay. In fact, her interest in revealing Mr. Weisdack's wrongdoing and wanting a properly functioning organization aligned with what should have been the Board's interest as well.[1] Her reports in no way hindered the District's operations or legitimate goals or mission; in fact, her speech was intended to improve those operations and that mission.

### Mr. Weisdack continues his campaign of retaliation even after the Ohio Rev. Code § 124.34 disciplinary order, making things so intolerable that Ms. Buddenberg has no choice but to resign.

109.    The retaliation continued when, during her suspension, Ms. Buddenberg learned that she was to be placed—not in the PHS clerical service as the Order stated, but instead in the Environmental Health Division. This meant Ms. Buddenberg would be forced to work directly under Mr. Weisdack's own administrative assistant, Ms. Wendell, who had been hostile to Ms. Buddenberg ever since Mr. Weisdack began disparaging her in fall 2016. The new position would effectively be continuing under Mr. Weisdack's supervision. Thus, the change was itself further retaliation and also showed that Mr. Weisdack intended to continue retaliating against Ms. Buddenberg.

---

[1] *See Mahronic*, 800 F.2d at 616 ("[W]hen an employee exposes unscrupulous behavior in the workplace, his interests are co-extensive with those of his employer; both want the organization to function in a proper manner.").

110.    Ms. Buddenberg expressed her concern about the hostile, retaliatory nature of this change in an April 3, 2017 email to both the Board and Mr. Weisdack.

111.    She received no response to the email. No one disavowed her understanding of the shift.

112.    A re-worked organization chart, dated March 24, 2017, *eliminated* her Fiscal Coordinator position (which had been present on February 2017 organizational charts). The Board adopted the change in the organizational chart on the same day it renewed Mr. Weisdack's contract.

113.    Staff meeting notes from March 29, 2017 similarly reflect that Ms. Buddenberg's duties were now going to be split between Ms. Wendell and another clerk, Nancy Tvergyak.

114.    This job abolishment was further retaliation, making it impossible for Ms. Buddenberg to return to her position if she were to win her SPBR appeal.

115.    These actions were distressing to Ms. Buddenberg, making it increasingly difficult for her to return to work (which she never did).

116.    On March 23, April 3, and April 25, 2017, Ms. Buddenberg sent in leave requests, with supporting documentation on April 27, 2017 and May 26, 2017 from her health provider noting that workplace stress was the reason for her continued absence. Yet Mr. Weisdack and the Health District ignored these communications. They never responded. This silent treatment was further retaliation.

117.    The only communication came on May 23, 2017, in response to Ms. Buddenberg's counsel writing to request pay documentation. Even here, Mr. Weisdack had another

opportunity to move Ms. Buddenberg back to the PHS clerk position to which she had originally been demoted, which would have been under Darla Andrews's supervision and not Ms. Wendell's. Mr. Weisdack did not do so, instead opting to keep Ms. Buddenberg under his thumb.

118.    Nor did he deny that upon return to work, Ms. Buddenberg would in fact be under Ms. Wendell's supervision and thus under Mr. Weisdack's control as before.

119.    Also part of the continuing retaliation was the way in which Ms. Buddenberg's leave time was paid out: the District paid her earned sick leave and vacation time at the reduced-pay rate of $10.25—despite her having accrued these benefits at her previous $19.75 hourly rate.

120.    Given that the clerical position to which she was assigned was under Mr. Weisdack's assistant Ms. Wendell; that Mr. Weisdack had abolished Ms. Buddenberg's fiscal-coordinator position (upon information and belief to prevent her return should she win the SPBR appeal); that Mr. Weisdack denied her access to electronic files even before her suspension, thus treating her as if she had been terminated; and that the Health District Board twice renewed Mr. Weisdack's contract, allowing him to stay in leadership despite knowing of his retaliatory conduct and unethical practices, Ms. Buddenberg reasonably believed that the retaliatory conduct would only continue if she stayed.

121.    The unchecked retaliatory conduct negatively impacted Ms. Buddenberg's health and created unbearable stress for her and her family.

122.    She has suffered from depression due to the retaliation. She has also had physical effects, including sleeplessness, nausea, and high blood pressure.

123.    Many months of the hostility had their intended effect. Mr. Weisdack and the

Board made it unbearable for Ms. Buddenberg to return to work. Although it was against

her wishes to leave, the hostile, retaliatory conditions became so intolerable that Ms.

Buddenberg was forced to resign, that is, constructively discharged. She wrote as much in

a letter to the Board on May 27, 2017. As she noted in the letter, as far she was concerned,

she had been fired. A choice between returning to work under the same intolerable

conditions and not returning was not a choice.

124.    Ms. Buddenberg thought she had found her dream job and expected to stay at the

Health District until retirement (she had 17 years in county employment and had 13 years

to go). The effect of Mr. Weisdack's retaliatory actions has been devastating, financially

and emotionally. Ms. Buddenberg's trauma continues to this day. Despite her sustained

efforts from the date of her constructive discharge, it took her months to find a new

position. As a result, she had no medical insurance during that time. Her children remain

without insurance.

125.    Ms. Buddenberg also remains ostracized by former colleagues who still work at the

Health District. Employees have been instructed not to speak to Ms. Buddenberg. Ms.

Buddenberg and Mr. Mix are made out to be "monsters," in the words of one current

employee (who was thus concerned about being seen with Ms. Buddenberg as recently as

January 2018).

126.    Ms. Buddenberg received her right-to-sue letter from the EEOC on January 25,

2018.

127.     Plaintiff incorporates all previous allegations.

128.     Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), it is an

unlawful employment practice for an employer to discriminate (i.e., retaliate) against its

employees because she opposed an unlawful discriminatory practice or because she made

a charge or participated in any manner in an EEOC proceeding.

129.     Under 42 U.S.C. § 1981a and 42 U.S.C. § 2000e *et seq.*, whoever violates the above-

described legal obligation is subject to a civil action for damages, injunctive relief, or any

other appropriate relief.

130.     Ms. Buddenberg had a reasonable, good-faith belief that the District had

discriminated against a female employee on the basis of her gender, and complained

about this unlawful practice.

131.     Ms. Buddenberg had a reasonable, good-faith belief that she and Mr. Mix were

being retaliated against for her opposition to this unlawful pay disparity.

132.     Ms. Buddenberg engaged in protected activity under Title VII by opposing

discrimination (sex discrimination in pay) internally and by filing a charge of

discrimination with the EEOC reporting that a female employee had been paid less than a

male employee for identical jobs.

133.     Ms. Buddenberg engaged in protected activity under Title VII by opposing

discrimination (retaliation for opposing sex discrimination) internally and by filing a

charge of discrimination with the EEOC regarding the retaliation she faced for opposing discrimination.

134.     The District was aware that Ms. Buddenberg engaged in protected activities.

135.     The District intentionally and maliciously discriminated against Ms. Buddenberg after she opposed an unlawful discriminatory practice, i.e., gender discrimination against a female employee by failing to compensate her equally with her male counterpart in an identical position.

136.     The District, Mr. Weisdack, and/or the individual Board members Mr. Goergen, Mr. Gragg, Ms. Livers, and Ms. Whitright, retaliated against Ms. Buddenberg in numerous ways including, but not limited to, the following:

   a.  Changing her working hours (forcing her to quit school and interfering with her ability to help care for her grandson with cancer);

   b.  Engaging in heightened scrutiny of her attendance and performance, and threatening her with termination;

   c.  Cutting off communication with her (making it more difficult for her to perform her duties);

   d.  Disparaging her to co-workers and making it clear that she was *persona non grata* with Mr. Weisdack and accusing her of being "out to get him" (resulting in co-workers ignoring her and making it more difficult to perform her duties);

   e.  Berating her for identifying Ms. Wendell's overpayment of refunds on a well-permit program instead of investigating the matter;

f.   Shutting down communication with Mr. Mix, changing job descriptions to make Mr. Mix ineligible for succession to Health Commissioner, and forcing Mr. Mix to resign due to his support of Ms. Buddenberg;

g.   Delaying responding to Ms. Buddenberg's leave requests, deleting her voicemails and call log, denying her access to Mr. Mix's office;

h.   Lodging false and baseless accusations against her;

i.   Forcing her to defend herself against the false and baseless allegations in a pre-deprivation hearing;

j.   Causing the false and baseless allegations to be used to pressure her to drop her EEOC charge in a so-called offer to "settle."

k.   Using the false and baseless allegations as a basis for unwarranted disciplinary action including suspension, demotion, and pay reduction;

l.   Stripping her of her duties before any official determination was made or implemented regarding the bogus accusations against her;

m.   Removing her access to electronic files including email, accounting software, and ledgers even before her suspension started;

n.   Ignoring her numerous emails reporting retaliation and asking for help;

o.   Renewing Mr. Weisdack's contract not once but twice despite his ongoing campaign of retaliation against her;

p.   Changing her post-demotion assignment from the Personal Health Services division to the Environmental Health division (where she would have to report to Mr. Weisdack's assistant—who had proved to be one of Mr. Weisdack's most

ardent supporters and consequently one of Ms. Buddenberg's most hostile co-workers);

q. Ignoring her requests for medical leave when she began to experience depression, anxiety, nausea, and high blood pressure as a result of the workplace stress that the retaliation was causing;

r. Compensating her for paid leave at the demoted rated of $10.25 rather than at the $19.75 rate at which she had accrued the leave time;

s. Eliminating her position as fiscal coordinator; and

t. Constructively discharging her from employment.

137. The retaliation changed the terms and conditions of Ms. Buddenberg's employment and subjected her to adverse employment actions.

138. The retaliation Ms. Buddenberg suffered would dissuade a reasonable worker from opposing discrimination.

139. The District is vicariously liable for its agents' acts toward Ms. Buddenberg.

140. As a direct and proximate result of this unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which the District is liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

### CLAIM 2
#### OHIO REV. CODE § 4112.02(I) – RETALIATION BY REBECCA BUDDENBERG AGAINST THE DISTRICT, WEISDACK, GOERGEN, WHITRIGHT, LIVERS, GRAGG

141. Plaintiff incorporates all previous allegations.

142.     Under Ohio law including R.C. 4112.02(I), it is an unlawful employment practice for any person to discriminate in any manner (i.e., retaliate) against any other person because that person has opposed an unlawful discriminatory practice.

143.     R.C. 4112.01(A) defines "person" to include "individuals," "legal representatives," "agent[s]," "the state and all political subdivisions," "authorities," "agencies," "boards."

144.     As detailed in the preceding claim, Ms. Buddenberg engaged in protected oppositional activity and suffered retaliation as a result.

145.     The District is vicariously liable for its agents' acts.

146.     Under *Genaro v. Central Transport*,[2] Mr. Weisdack and the individual Board members (all of whom had supervisory authority, including the ultimate determination on her suspension, demotion, reduction in pay, and constructive discharge) are jointly and severally liable for damages Ms. Buddenberg suffered as a result of his campaign of retaliation.

147.     As a direct and proximate result of this unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which the District, Mr. Weisdack, and the individual Board members are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

148.     Mr. Weisdack's and the individual Board members' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

---

[2] 84 Ohio St. 3d 293; 703 N.E.2d 782 (1999).

149.    Plaintiff incorporates all previous allegations.

150.    The Equal Pay Act, 29 U.S.C. § 215(a)(3), makes it unlawful for any person to discharge or otherwise discriminate against an employee because that employee has filed a complaint related to that chapter, which includes a prohibition on sex discrimination in pay rates under 29 U.S.C. § 206(d).

151.    "Person" under the Equal Pay Act, 29 U.S.C. § 203(a), means "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."[3]

152.    "Employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency . . ." 29 U.S.C. § 203(a).

153.    As detailed in Claim 1, Ms. Buddenberg made both oral and written complaints to her employer and to the EEOC regarding a gender-discriminatory pay disparity and was retaliated against for doing so by the District, Mr. Weisdack, and the individual Board members. In addition to violating Title VII and Ohio Rev. Code § 4112, *et seq.*, this conduct also violated the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3).

---

[3] *See Meek v. United States*, 136 F.2d 679, 679–80 (6th Cir. 1943) ("It is immaterial whether Meek, at the time, was Crutcher's employer, . . . since the prohibitions of the statute are directed to 'any person.'"); *Arias v. Raimondo*, 860 F.3d 1185, 1189–92 (9th Cir. 2017) (holding that plaintiff could sue employer's attorney under FLSA's anti-retaliation provision, 29 U.S.C. 215(a)(3), given the statute's plain language and purpose).

154. Mr. Budzik also retaliated against Ms. Buddenberg for her oral and written complaints to her employer and to the EEOC regarding a gender-discriminatory pay disparity. He retaliated in many ways, including but not limited to the following:

    a. Lodging false and baseless accusations against her;

    b. Using the false and baseless allegations to pressure her to drop her EEOC charge in a so-called offer to "settle";

    c. Recommending to the Board that it discipline Ms. Buddenberg based on the false and baseless allegations;

    d. Drafting the "disciplinary offenses" that formed the basis for the R.C. 124.34 Order.

    e. Forcing Mr. Mix to resign, because Mr. Mix had supported Ms. Buddenberg.

This conduct violated the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3).

155. As a direct and proximate result of this unlawful conduct by the District, Mr. Weisdack, Mr. Budzik, Mr. Goergen, Mr. Gragg, Ms. Livers, and Ms. Whitright, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which the District is liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

### CLAIM 4
### RETALIATION UNDER OHIO REV. CODE § 4111.17(D) BY REBECCA BUDDENBERG AGAINST THE DISTRICT, WEISDACK, BUDZIK

156. Plaintiff incorporates all previous allegations.

157.     Under Ohio Rev. Code § 4111.17(D), no employer shall discriminate against any employee for making a complaint addressing pay discrimination.

158.     Under Chapter 4111 and Section 34a of Article II, Ohio Constitution, "employer" has the same meaning as in the federal Fair Labor Standards Act. That definition states in relevant part, "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency..." 29 U.S.C. § 203(d).

159.     "Person" under the Equal Pay Act, 29 U.S.C. § 203(a), means "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."

160.     As detailed in Claims 1 and 3, Ms. Buddenberg made both oral and written complaints to her employer and to the EEOC regarding a gender-discriminatory pay disparity and was retaliated against for doing so. In addition to violating Title VII, Ohio Rev. Code § 4112, *et seq*., and the Fair Labor Standards Act, this conduct also violated Ohio fair-wage protections in Ohio Rev. Code § 4111.17(D).

161.     As a direct and proximate result of this unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which the District, Mr. Weisdack, and Mr. Budzik are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

162.     Mr. Weisdack and Mr. Budzik are jointly and severally liable for damages Ms. Buddenberg suffered as a result of his campaign of retaliation.

163.    Mr. Weisdack's and Mr. Budzik's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 5**

**FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983 BY REBECCA BUDDENBERG AGAINST THE DISTRICT, WEISDACK, GOERGEN, GRAGG, LIVERS, WHITRIGHT, BUDZIK**

164.    Plaintiff incorporates all previous allegations.

165.    Ms. Buddenberg was a public employee who engaged in protected activity by petitioning the Board for a redress of grievances and speaking out on matters of public concern when that speech was not part of her ordinary job duties—namely, reporting to the Board and communicating publicly regarding (1) Mr. Weisdack's unethical conduct in obligating the District to pay him and others with the Ohio EPA grant without proper prior authorization; (2) Mr. Weisdack's failure to address misuse of public resources and to implement adequate personnel policies, including background checks; (3) Mr. Weisdack's implementation of unequal-pay practices at the District and failure to correct such practices when urged to do so; and (4) retaliation she and Mr. Mix faced because of her opposition to discrimination and other speech regarding matters of public concern.

166.    Mr. Weisdack's conduct vis-à-vis the Ohio EPA tire grant involved potential wrongdoing or breach of the public trust and showed that he failed to discharge his responsibilities ethically and properly. It was thus a classic matter of public concern.[4]

---

[4] *See, e.g., Kindle v. City of Jeffersontown, Ky.*, 374 F. App'x 562, 568 (6th Cir. 2010) ("This court has consistently held that speech on the same topics as the report at issue—the efficacy and operations of public agencies and allegations of misconduct by public officials—addresses a matter of public concern.").

167.     Reporting to the Board on the District's contracts was not part of Ms.

Buddenberg's ordinary job duties. She was speaking as a citizen in bringing this potential

wrongdoing or breach of the public trust to light.

168.     Mr. Weisdack's failures to address misuse of public resources (ultimately deemed

theft in office) and to implement adequate personnel policies, such as a reference check

for new hires—of particular public interest given that some employees would be entering

residences—were also matters of public concern,[5] especially given that he was not

following the District's own practices.[6]

169.     Reporting to the Board on Mr. Weisdack's failures to follow the District's

personnel policies and to address misuse of public resources was not part of Ms.

Buddenberg's ordinary job duties. She was speaking as a citizen in bring these failures to

light.

170.     Allegations of discrimination likewise involve a classic matter of public concern,[7]

as do allegations of violations of law,[8] such as retaliating for opposing such

discrimination.

---

[5] *See, e.g., Boulton v. Swanson*, 795 F.3d 526, 532 (2015) ("speech addresses a matter of public concern when it alleges corruption and misuse of public funds" (citing *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 576–77 (6th Cir.1997)).

[6] *Banks v. Wolfe Cty Bd. of Educ.*, 330 F.3d 888, 897 (2003) ("The community has an interest in knowing how the district's teachers are hired and when the district does not follow state law or its own hiring practices.").

[7] *See, e.g., Whitney v. City of Milan*, 677 F.3d 292, 298 (6th Cir. 2012) ("Allegations of racial discrimination by a public entity 'inherently' involve a matter of public concern.") (quoting *Miller v. City of Canton*, 319 F. App'x 411, 416 (6th Cir. 2009)).

[8] *See, e.g., Banks v. Wolfe Cty Bd. of Educ.*, 330 F.3d 888, 896 (6th Cir. 2003) ("Defendants' failure to follow state law is a 'concern to the community.'"); *Mahronic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.").

171.     Reporting to the Board on gender-based pay disparity affecting others and on unlawful retaliation (directed both at herself and at Mr. Mix) for opposing such discrimination was not part of Ms. Buddenberg's ordinary job duties. She was speaking as a citizen in bringing this activity to light.

172.     In speaking out, Ms. Buddenberg engaged in constitutionally protected conduct or activity under the First and Fourteenth Amendments.

173.     Mr. Weisdack, Mr. Goergen, Mr. Gragg, Ms. Livers, Ms. Whitright, and Mr. Budzik knew Ms. Buddenberg had engaged in protected conduct or activity.

174.     Mr. Weisdack, Mr. Goergen, Mr. Gragg, Ms. Livers, Ms. Whitright, and Mr. Budzik took adverse actions against her—including all the retaliatory acts in the factual narrative and Claims 1 and 3 detailed above—that would deter a person of ordinary firmness from continuing to engage in that conduct. These included, for example, suspending and demoting her, and reducing her pay by nearly one-half, based on false allegations.

175.     Ms. Buddenberg's First-Amendment protected speech was a substantial or motivating factor[9] in the adverse actions she suffered at the hands of Mr. Weisdack, Mr. Goergen, Mr. Gragg, Ms. Livers, Ms. Whitright, and Mr. Budzik.

176.     Defendants lack any countervailing interest that outweighs Ms. Buddenberg's interest in speaking out on the above-mentioned matters.

177.     The contours of Ms. Buddenberg's rights to petition the Board for a redress of grievances and to speak on matters of public concern as a private citizen were sufficiently

---

[9] *See, e.g., Laster v. City of Kalamazoo*, 746 F.3d 714, 733 (6th Cir. 2014).

clearly established at the time she exercised them to apprise any health commissioner, Board member, and lawyer, that retaliating against her for exercising those rights was unlawful.

178.    Mr. Weisdack, Mr. Goergen, Mr. Gragg, Ms. Livers, and Ms. Whitright are sufficiently empowered District officials that their acts constitute the customs, practice, and practices of the District. Moreover, Ms. Buddenberg complained about the retaliation to Mr. Goergen, Mr. Gragg, Ms. Livers, and Ms. Whitright (through Ms. Livers and through the Board's attorney Mr. Embleton), but they took no steps to end Mr. Weisdack's vendetta or even investigate Ms. Buddenberg's complaints, and Mr. Weisdack's policy became the District's policy.

179.    As a direct and proximate result of this unlawful campaign of retaliation that the District endorsed and adopted as its own unwritten policy, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which the District, Mr. Weisdack, Mr. Goergen, Mr. Gragg, Ms. Livers, Ms. Whitright, and Mr. Budzik are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

180.    Mr. Weisdack, Mr. Goergen, Mr. Gragg, Ms. Livers, Ms. Whitright, and Mr. Budzik's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 6
## (ALTERNATIVE CLAIM)
### RETALIATION BECAUSE PUBLIC SERVANT DISCHARGED HER DUTIES
### (UNDER OHIO REV. CODE §§ 2921.05 AND 2307.60) BY REBECCA BUDDENBERG
### AGAINST THE DISTRICT, WEISDACK, BUDZIK, GOERGEN, GRAGG, LIVERS, WHITRIGHT

181.    Plaintiff incorporates all previous allegations.

182.    Under Ohio Rev. Code § 2921.05, no person, purposely and by unlawful threat of harm to any person or property, shall retaliate against a public servant because the public servant discharged her duties. The provision carries a criminal penalty.

183.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

184.    To the extent that the Court determines that, in reporting to the Board on the gender-based pay disparity, Mr. Weisdack's potential conflict of interest on the tire-grant issue, and/or the retaliation she and Mr. Mix endured from Mr. Weisdack, that Ms. Buddenberg was in fact discharging her duties and not speaking in her capacity as a citizen, then the District, Mr. Weisdack, Mr. Budzik, and the individual Board members retaliated against Ms. Buddenberg for discharging her duties.

185.    This retaliation involved both threatening and eventually imposing economic harm on Ms. Buddenberg for complaining about the gender-discriminatory pay disparities she discovered in the course and scope of her duties.

186.    As a direct and proximate result of this unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which the District, Mr. Weisdack, the individual Board members, and Mr. Budzik are liable,

including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

### CLAIM 7
### INTIMIDATION USING A FALSE WRITING UNDER OHIO REV. CODE §§ 2921.03 AND 2307.60 BY REBECCA BUDDENBERG AGAINST WEISDACK, BUDZIK

187.    Plaintiff incorporates all previous allegations.

188.    Under Ohio Rev. Code § 2921.03, no person, knowingly and by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant in the discharge of the person's duty. The provision carries a criminal penalty.

189.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

190.    The February 28, 2017 Notice of Disciplinary Action was a materially false and fraudulent writing.

191.    The March 16, 2017 Ohio Rev. Code § 124.34 Order was a materially false and fraudulent writing.

192.    Mr. Weisdack and Mr. Budzik drafted and/or used these materially false and fraudulent writings with malicious purpose in bad faith, or in a wanton and reckless manner, to attempt to hinder her in carrying out her job duties, by subjecting her to unwarranted discipline as a public employee.

193. Mr. Weisdack and Mr. Budzik also used the Notice of Disciplinary Action to influence the Board members to approve unwarranted and retaliatory discipline against Ms. Buddenberg and sign the Ohio Rev. Code § 124.34 Order.

194. As a direct and proximate result of this unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which Mr. Weisdack and Mr. Budzik are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

195. Mr. Weisdack's and Mr. Budzik's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 8
### INTERFERING WITH CIVIL RIGHTS UNDER OHIO REV. CODE § 2921.45 AND § 2307.60 BY REBECCA BUDDENBERG AGAINST WEISDACK, GOERGEN, GRAGG, LIVERS, WHITRIGHT

196. Plaintiff incorporates all previous allegations.

197. Under Ohio Rev. code § 2921.45, no public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right. This provision carries a criminal penalty.

198. Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

199. Mr. Weisdack and the individual Board members are public servants. Under color of their office, employment, or authority, each knowingly deprived Ms. Buddenberg of her

constitutional and statutory rights as detailed above, including her right to be free from retaliation for opposing discrimination and her constitutional right to freedom of speech.

200.    As a direct and proximate result of this unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which Mr. Weisdack and the individual Board members are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

201.    Mr. Weisdack's and the individual Board members' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 9
### OHIO REV. CODE §§ 4112.02(J) AND 4112.99 – AIDING AND ABETTING DISCRIMINATION BY REBECCA BUDDENBERG AGAINST THE DISTRICT, WEISDACK, BUDZIK, GRAGG, LIVERS, WHITRIGHT, GOERGEN, WENDELL

202.    Plaintiff incorporates all previous allegations.

203.    Under Ohio law, including R.C. 4112.02(J), it is an unlawful employment practice for any person to aid, abet, incite, compel, or coerce the doing of any act declared an unlawful discriminatory practice under R.C. 4112.02.

204.    Under Ohio law, including R.C. 4112.99, whoever violates the above-described legal obligation is subject to civil action for damages, injunctive relief, or any other appropriate relief.

205.    Under Ohio law including R.C. 4112.02(I), it is an unlawful employment practice to discriminate in any manner (i.e., retaliate) against any person because he opposed an unlawful discriminatory practice.

206.    To aid or abet in discrimination, a person need only knowingly do something he ought not to do, or omit to do something he ought to do, that "assists or tends in some way to affect the doing of the thing which the law forbids."[10]

207.    The District, Mr. Budzik, the individual Board members, and Alta Wendell aided Mr. Weisdack in an unlawful discriminatory practice, i.e., retaliating against Ms. Buddenberg.

208.    Mr. Weisdack similarly aided the others in retaliating against Ms. Buddenberg.

209.    As a direct and proximate result of this unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which the District, Mr. Budzik, Mr. Weisdack, Ms. Wendell, and the individual Board members are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

210.    The District's, Mr. Budzik's, Mr. Weisdack's, Ms. Wendell's, and the individual Board members' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

---

[10] *State v. Stepp,* 117 Ohio App.3d, 569, 690 N.E.2d 1342 (4th Dist.1997) (quoting *Smith v. State,* 41 Ohio App. 64, 67-68, 179 N.E. 696 (9th Dist. Dec. 9, 1931)), cited in *Luke v. City of Cleveland,* No. 1:02CV1225, 2005 U.S. Dist. LEXIS 49630 (N.D. Ohio Aug. 22, 2005); *see also Woodworth v. Time Warner Cable, Inc.,* N.D. Ohio No. 1:15-CV-1685, 2015 U.S. Dist. LEXIS 148832 (N.D. Ohio Nov. 2, 2015) (citations omitted).

## CLAIM 10
### CIVIL CONSPIRACY UNDER OHIO COMMON LAW BY REBECCA BUDDENBERG AGAINST ALL DEFENDANTS

211.    Plaintiff incorporates all previous allegations.

212.    Defendants maliciously worked together to injure Ms. Buddenberg by creating, implementing, and/or otherwise supporting Mr. Weisdack's campaign of retaliation against her.

213.    As described above, one or more Defendants committed overt acts in furtherance of the conspiracy.

214.    Defendants acted purposefully, without reasonable or lawful excuse.

215.    As a direct and proximate result of Defendants' unlawful conduct, Ms. Buddenberg has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other privileges and conditions of employment.

216.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

    A.    Declare that Defendants' acts and conduct constitute violations of federal and state law and the United States Constitution;

    B.    Enjoin Defendants from further retaliating against Ms. Buddenberg and from further implementing any previous acts of retaliation;

C.    Enter judgment in Ms. Buddenberg's favor on all claims for relief;

D.    Award Ms. Buddenberg full compensatory damages, economic and non-economic, including, but not limited to, damages for back pay, front pay, pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that she has suffered and is reasonably certain to suffer in the future;

E.    Award Ms. Buddenberg punitive damages as appropriate for all intentional and malicious violations of federal and state law and constitutional rights;

F.    Award pre-judgment and post-judgment interest at the highest lawful rate;

G.    Award Ms. Buddenberg her reasonable attorneys' fees (including expert fees) and all other costs of this suit;

H.    Award all other relief in law or equity to which Ms. Buddenberg is entitled and that the Court deems equitable just, or proper.

### Jury Demand

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/ Sandhya Gupta*
Subodh Chandra (0069233)
Donald P. Screen (0044070)
Sandhya Gupta (0086052)
THE CHANDRA LAW FIRM, LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Sandhya.Gupta@ChandraLaw.com

*Attorneys for Plaintiff Rebecca Buddenberg*