<u>**MEMORANDUM IN SUPPORT**</u>

**I.        INTRODUCTION**

Plaintiff Rebecca Buddenberg ("Buddenberg") asserts federal and state law retaliation claims, along with a variety of other state law claims, against Defendant James Budzik, Esq. ("Budzik"), who was at all times private outside legal counsel to Defendant Geauga County Health District (the "Health District") in connection with two disciplinary matters, one of which involved Buddenberg's conduct as the Health District's Fiscal Coordinator. Buddenberg claims the Health District retaliated against her for statements she made in executive session at an October 24, 2016 meeting of the Geauga County Board of Health ("Board of Health" or "Board"), for which she also endeavors to hold Budzik liable. In particular regard to Budzik, Buddenberg seeks to impose civil liability on an attorney for his client's alleged retaliatory actions. Buddenberg's attempt to do so is without legal basis and is against public policy.

As a threshold matter, a private outside attorney retained by a governmental entity is not a state actor for purposes of § 1983 by the mere virtue of the client the lawyer represents. Additionally, as a matter of public policy and Ohio law, attorneys are generally insulated from third-party claims arising from the representation of a client, and no exception to that rule is applicable here. Such protection is vital to an attorney's ability to ethically consult with and advise clients. As an attorney, Budzik owed duties to the Health District and was obligated to advise and protect the interests of his client. He owed no duty to Buddenberg in her capacity as an employee of his client, especially considering she was adverse to the Health District relative to Budzik's representation.

1

If the law were otherwise, attorneys would owe simultaneous allegiance to their client and their client's adversary, creating an untenable conflict of interest in violation of the Ohio Rules of Professional Conduct. The rules clearly articulate:

> The principles of loyalty and independent judgment are fundamental to the attorney-client relationship and underlie the conflict of interest provisions of these rules. Neither the lawyer's personal interest, the interests of other clients, ***nor the desires of third persons*** should be permitted to dilute the lawyer's loyalty to the client.

Prof.Cond.R. 1.7, cmt. 1 (emphasis added).

Creating attorney liability based on a client's conduct would severely curtail the attorney's ability to give proper advice to his client (to whom he owes exclusive duties) regarding terminating or disciplining an employee. In short, any attorney who advises with respect to employment matters will be subject to third-party liability for such legal advice. Practically, if this were law, the Health District, or any employer, would find it impossible to retain outside counsel. As such, private outside counsel for employers should not be exposed to liability by non-client employees whose interests are directly adverse to the lawyer's client – the employer.

In this case, Buddenberg's claims against Budzik arise from four distinct actions he undertook in his capacity as outside legal counsel for the Health District:

- The preparation of Buddenberg's pre-disciplinary hearing notice;

- Conducting a pre-disciplinary hearing to which Buddenberg was entitled as a classified employee;

- Conferring with the Health District relative to the pre-disciplinary hearing; and

- Preparing a disciplinary order based on the Health District's decision to discipline Buddenberg.

There is no dispute that Budzik lacked authority to discipline Buddenberg, alter the terms of her employment, or control her work in her capacity as the Fiscal Coordinator for the Health District. Furthermore, it cannot be disputed that all of the above actions were taken by Budzik solely in his capacity as counsel for the Health District, and thus his conduct does not give rise to liability on his part as a matter of law under any of the claims asserted by Buddenberg in this lawsuit.

## II.    STATEMENT OF FACTS

### A.    Buddenberg's Employment as Fiscal Coordinator.

Buddenberg commenced her employment with the Health District as its Fiscal Coordinator on March 2, 2015. (Buddenberg Vol. I, ECF No. 203-1, PageID #8477.) In that role, Buddenberg was responsible for the department's fiscal management, processing payroll and accounts payable, preparing fiscal reports, and budgeting, but Buddenberg described her role as "data entry." (*Id.*, PageID #8487-8482; Weisdack Vol. I, ECF No. 180-1, PageID #1979-1980.) Although Buddenberg had an official job description, she did not perform many of the duties listed therein. (Job Description, ECF No. 194-38, PageID #4830-4834.) For example, she did not prepare a written report of fiscal activities, did not prepare documents required by the Auditor of the State of Ohio, and did not conduct regular audits of grant-related budgets in order to meet Ohio Department of Health fiscal accountability requirements. (Buddenberg Vol. II, ECF No. 204-1, PageID #8843-8854.)

### B.    Buddenberg Reports to the Board.

Robert Weisdack ("Weisdack") served as the Geauga County Health Commissioner for 19 years and was expected to retire at the end of 2016. However, in October of 2016, the Board of Health was considering extending his contract. (Weisdack Vol. I, ECF No. 180-1, PageID

3

#1966; Buddenberg Vol. I, ECF No. 203-1, PageID #8550, 8560.) During the relevant time period, Weisdack was dealing with a number of personal issues, including the death of his mother and son, and a cancer diagnosis.[1] (Weisdack Vol. I, ECF No. 180-1, PageID #2170.)

Buddenberg thought that Weisdack was mismanaging the Health District. (Buddenberg Vol. I, ECF No. 203-1, PageID #8561-8563.) She commiserated with her colleagues about their dislike for Weisdack and their belief that Weisdack "wants the dept to fail" and the he "is the main barrier to the departments (sic) functioning!!!!!" (Mix Texts, ECF No. 205-2, PageID #9240.) Buddenberg thought Weisdack was the "driving force" behind many of the perceived problems at the Health District. (Buddenberg Vol. I, ECF No. 203-1, PageID #8563.) In texts with colleagues, Buddenberg hoped that Weisdack would be fired. For example, prior to November 8, 2016, Buddenberg stated to fellow employee Darla Andrews ("Andrews"), "It would be lovely if Wednesday was his last day." (Andrews Texts, ECF No. 205-5, PageID #9371.) Buddenberg testified that Weisdack's general leadership style was "demoralizing" and "degrading." (Buddenberg Vol. I, ECF No. 203-1, PageID #8596.) Eventually, Weisdack was concerned that Buddenberg and another employee, Daniel Mix ("Mix"), who was Buddenberg's immediate supervisor, were "trying to force [him] out" as Health Commissioner. (11/28/2016 Email, ECF No. 196-39, PageID #5927.)

At some point prior to October 2016, Buddenberg became aware that Weisdack and another employee were going to remove abandoned tires from Health District property for a fee. (Notes, ECF No. 203-2, PageID #8769-8771.) As there was no contract for the removal, Buddenberg was concerned as either the prosecutor or auditor had to provide prior approval for an expenditure over $2,000 before she could process payment in her capacity as Fiscal

---

[1] Weisdack succumbed to his illness on December 21, 2021.

4

Coordinator. (Buddenberg Vol. I, ECF No. 203-1, PageID #8504-8505.) Also, before October 2016, Buddenberg became aware of what she perceived as gender pay disparities at the Health District through her role as Fiscal Coordinator. (*Id.*, PageID #8526-8527.)

In October of 2016, the Board of Health was considering whether to renew Weisdack's employment contract, which was set to expire at the end of the year. As a result, Buddenberg contacted the Board to raise concerns about the tire removal situation with Weisdack. (*Id.*, PageID #8540-8542.) Buddenberg met with the Board of Health on October 24, 2016 to report the issues she had with Mr. Weisdack removing the tires. (*Id.*, PageID #8483, 8508, 8521-8522.) Board Members Timothy Goergen, David Gragg, Catherine Whitright, and Christina Livers attended the meeting with Buddenberg. (*Id.*, PageID #8544.) Budzik was not present at that meeting, nor had he or his law firm been retained by the Board of Health at that point. (*Id.*, PageID #8657.)

After she reported her concerns about the tire removal, the Board asked Buddenberg, "Is there anything else we should be aware of? Is [sic] there any other concerns that you have on Mr. Weisdack's behavior or practices?" (*Id.*, PageID #8541.) The Board "wanted to know what was going on" and requested that Buddenberg tell them what other concerns she had regarding Weisdack and the Health Department. (*Id.*) Buddenberg advised that Weisdack "yells, threatens, intimidates and ignores the staff," is "demoralizing to staff," and has an "intimidating" leadership style. (11/13/2016 Email, ECF No. 194-26, PageID #4749.)

The Board of Health held a special meeting on November 9, 2016 to discuss a "General Health District Review" consisting of a compliance audit to be handled by Jeffrey Embleton ("Embleton"), a partner with Mansour Gavin LPA, Budzik's employer. (11/9/2016 Minutes, ECF No. 195-1, PageID #4876-4877.) According to the meeting minutes, Embleton was retained

as special legal counsel for the purpose of conducting a personnel policy compliance audit. He, however, was not present at the meeting. (*Id.*) The Board planned to address an extension to Weisdack's contract after the review was completed. (*Id.*) Budzik was not involved in the Health District's employment audit and was not aware of the scope of Embleton's retention. (Buddenberg Vol. I, ECF No. 203-1, PageID #8659; Mix Vol. I, ECF No. 206-1, PageID #9716; Budzik Vol. I, ECF No. 183-1, PageID #2713, 2809.) The Board of Health eventually voted several times to extend Weisdack's employment contract. (11/29/2016 Minutes, ECF No. 195-31, PageID #5270; 12/18/2017 Minutes, ECF No. 195-24, PageID #5238-5250.)

### C.    The Health District Retains Budzik in Two Civil Service Matters.

Budzik represents public sector employers in negotiations, contract administration, grievances and arbitrations, and civil service matters. (Budzik Vol. I, ECF No. 183-1, PageID #2697.) In January 2017, Budzik was retained as the Health District's outside legal counsel in connection with civil service matters pertaining to the appointment, retention, and discipline of public employees, including Mix and Buddenberg. (Budzik Vol. I, ECF No. 183-1, PageID #2700-2702, 2729; Goergen Vol. I, ECF No. 186-1, PageID #3881-3882; Gragg Dep., ECF No. 188-1, PageID #3756-3757, 3781; Whitright Dep., ECF No. 189-1, PageID #4068-4069.)[2]

---

[2] There is some disagreement between the various Board members as to the scope of Budzik's retention and whether he was specifically tasked with investigating retaliation allegations asserted by Buddenberg after the October 24, 2016 meeting. However, any such discrepancies are irrelevant to the instant motion. Budzik unequivocally testified that he was not retained to investigate the retaliation allegations made by Buddenberg, as such matters are often handled by the county prosecutor. (*See, e.g.*, Budzik Vol. I, ECF No. 183-1, PageID #2702-2703; Gragg Dep., ECF No. 188-1, PageID #3683-3684, 3756-3757.) Among Weisdack and the Board members, only Goergen expressed the opinion that Budzik's scope of engagement included such an investigation. However, he later testified that the Board did not delegate its authority regarding what to do about claims of retaliation to anyone at Budzik's firm and that it is the Board's responsibility to handle claims of retaliation. (Goergen Vol. I, ECF No. 186-1, PageID #3371-3372.) Even if Budzik failed to fulfill his duty to the Health District as its legal counsel, the Health District, not Buddenberg, has legal standing to assert a claim against Budzik.

6

Budzik was not a Health District employee; he was at all times a private attorney affiliated with the law firm Mansour Gavin. (Budzik Vol. I, ECF No. 183-1, PageID #2693-2702, 2729; Buddenberg Vol. I, ECF No. 203-1, PageID #8650.)

The first civil service matter involved Buddenberg's supervisor, Mix. Mix was the Health District's Fiscal Officer, and was for a time Buddenberg's supervisor. (Mix Vol. I, ECF No. 206-1, PageID #9536-9537, 9569-9570.) On January 27, 2017, Weisdack issued to Mix a notice of proposed disciplinary action stemming, in part, from Mix's involvement in an internal investigation of several registered sanitarians. (Mix Notice of Pre-Disciplinary Action, ECF No. 206-8, PageID #9786-9789.) The notice explained that, among other things, Mix had disclosed confidential information about the investigation while several sanitarians were under criminal investigation. (*Id.*) At Weisdack's request, Budzik drafted Mix's proposed notice of discipline based on information provided to him by Weisdack and Goergen. (Weisdack Vol. II, ECF No. 181-1, PageID #2372, 2734-2735.) After consulting independent legal counsel, Mix resigned without attending a pre-disciplinary hearing or offering any defense or explanation to the charges. (Mix Vol. I, ECF No. 206-1, PageID #9682-9683, 9711.) Buddenberg knew that he had signed a resignation letter as of January 2017. (Buddenberg Vol. I, ECF No. 203-1, PageID #8656, 8721; Mix 1/27/17 Email, Exhibit A.)

Just after Mix's resignation, on February 15, 2017, Buddenberg signed an EEOC intake questionnaire in which she reported retaliation by the Board. (Intake Questionnaire, ECF No. 196-49, PageID #6000-6004.) There is no record evidence that the intake questionnaire was transmitted to the Health District. Rather, on February 22, 2017, the EEOC provided a notice to the Health District without a copy of Buddenberg's charge or any document signed by Buddenberg which referenced a date of alleged retaliation (October 26, 2016), and stated that

7

"no action is required by you at this time." (Budzik Vol. III, ECF No. 185-1, PageID #3163-3166; EEOC Notice, ECF No. 197-14, PageID #6116-6118.) The notice otherwise contained no substantive information about the charge. (*Id.*) Budzik received a copy of the notice from the Health District on February 23, 2017. (Budzik Vol. II, ECF No. 184-1, PageID #3115.)

Budzik was also retained by the Health District relative to a disciplinary matter concerning Buddenberg. Budzik did not supervise Buddenberg or have any interaction with her before February 28, 2017. (Buddenberg Vol. I, ECF No. 203-1, PageID #8650; Buddenberg Vol. II, ECF No. 204-1, PageID #8942.) Budzik did not control the hours Buddenberg worked or control her pay. (Buddenberg Vol. I, ECF No. 203-1, PageID #8654-8655, 8658.) He was not involved in approving her leave requests, nor is there evidence that Budzik was involved in paying out Buddenberg's leave of absence or sick leave. (Buddenberg Vol. I, ECF No. 203-1, PageID #8664, 8684; Buddenberg Vol. II, ECF No. 204-1, PageID #8941.) Budzik did not control her access within the Health District office. (Buddenberg Vol. I, ECF No. 203-1, PageID #8664-8665.) In fact, Buddenberg was never in email communication with Budzik and had no reason to believe Budzik was involved at all in anything related to her employment. (Buddenberg Vol. I, ECF No. 203-1, PageID #8658, 8682.)

In late February, approximately four months after Buddenberg first complained to the Board of Health about Weisdack's leadership, Weisdack proposed to discipline Buddenberg for violating Health District policies, including insubordination, failing to meet deadlines, improperly storing confidential personnel records, and destroying Health District files without authorization, any of which independently justified discipline or termination. (2/28/2017 Notice of Proposed Disciplinary Action, ECF No. 195-19, PageID #5163-5166.) In his capacity as outside legal counsel for the Health District and at Weisdack's request, Budzik assisted in

preparing Buddenberg's Notice of Proposed Disciplinary Action ("Disciplinary Notice"). (Weisdack Vol. I, ECF No. 180-1, PageID #2169-2170; Gragg Dep., ECF No. 188-1, PageID #3806.) The information included in the Disciplinary Notice came from Weisdack and/or Goergen. (Weisdack Vol. II, ECF No. 181-1, PageID #2423-2426; Goergen Vol. I, ECF No. 186-1, PageID #3394.) The notice set forth eight independent bases for disciplining Buddenberg, none of which related to her complaints to the Board about Weisdack, but included:

- Acted "rude, unprofessional, and disrespectful" and "raised her voice" during an interaction with the Health Commissioner;

- Made false statements with respect to the resignation of another employee;

- Defied supervisor's directive regarding transferring contaminated furniture to the Health Department;

- Attempted to attend a meeting with the county auditor without permission;

- Failed to meet payroll deadlines;

- Improperly stored and maintained personnel files;

- Was unfamiliar with fiscal reports included in her job description; and

- Improperly shredded public documents without authority and in violation of state and local retention requirements.

Any of these actions, standing alone, could have warranted discipline.

### D.    The Health District Conducts a Pre-Disciplinary Hearing.

Budzik represented the Health District's interests at Buddenberg's pre-disciplinary hearing on March 3, 2017. (Budzik Vol. I, ECF No. 183-1, PageID #2835; Budzik Vol. II, ECF No. 184-1, PageID #3045-3046; Gragg Dep., ECF No. 188-1, PageID #3806.) According to Board member Goergen, Budzik was there to "support Bob [Weisdack] in delivering the information and making sure it was compliant with regulation and Board policy." (Goergen Vol. I, ECF No. 186-1, PageID #3395.)

Pre-disciplinary hearings for classified public employees are generally informal and do not adhere to the Rules of Evidence or Civil Service Rules. (Budzik Vol. I, ECF No. 183-1, PageID #2731, 2839-2840.) While Weisdack typically conducted pre-disciplinary hearings, he recently underwent facial surgery and was physically unable to do so. (Weisdack Vol. II, ECF No. 181-1, PageID #2376; Weisdack Vol. III, ECF No. 182-1, PageID #2567.) Thus, due to Weisdack's medical condition, Budzik conducted Buddenberg's pre-disciplinary hearing. (Goergen Vol. I, ECF No. 186-1, PageID #3395; Gragg Dep., ECF No. 188-1, PageID #3806.)

The recording of the pre-disciplinary hearing establishes, without dispute, what transpired. In particular, Budzik read each charge verbatim and provided Buddenberg the opportunity to respond to each charge, including presenting supporting documents and witness statements, which Buddenberg refused to do with respect to some of the charges. (Hearing Recording,[3] Hearing Transcript, ECF No. 195-12, PageID #4944-4995.) In rebuttal to each of the charges, Buddenberg generally claimed retaliation without further explanation. (*Id.*)[4]

Immediately following the hearing, Budzik spoke with Buddenberg privately about consenting to discipline in lieu of waiting for the Board's decision. (Budzik Vol. II, ECF No. 184-1, PageID #3033.) Budzik indicated to Buddenberg that "he didn't know what the Board would do with the results of the disciplinary action, and that they would have the option to deem what they felt was appropriate." (Buddenberg Vol. II, ECF No. 204-1, PageID #8938-8939.) "[T]he way Mr. Budzik explained it was that the Board basically takes this proposal and does what it needs to with it." (Buddenberg Vol. II, ECF No. 204-1, PageID #8939.) Buddenberg was

---

[3] The hearing audio recording is being manually filed with the Court with this Motion.

[4] Buddenberg likewise emailed several Board members, including Christina Livers, with complaints about retaliation. Thus, the Board members and Weisdack were all independently aware of Buddenberg's retaliation allegations. (*See, e.g.*, 10/31/2016 Email, ECF No. 195-28, PageID #5258-5259.)

given a few days to consider, but eventually declined to consent to discipline. (Budzik Vol. II, ECF No. 184-1, PageID #3039.)

### E.     Pursuant to its Exclusive Authority, the Board Disciplines Buddenberg.

On March 7, 2017, Budzik met with the Board in a single executive session regarding Buddenberg's disciplinary hearing. (Budzik Vol. II, ECF No. 184-1, PageID #3054; 03/07/2021 Board of Health Special Meeting Minutes, ECF No. 197-6, PageID #6056-6057.) However, no decision to discipline Buddenberg was made at that time. (*Id.*) The Board reconvened again on March 16, 2017 in executive session relative to Buddenberg's discipline; Budzik did not attend that meeting and was not consulted during the meeting. (Budzik Vol. II, ECF No. 184-1, PageID #3059.) All Board members were present except Gragg. (3/13/2017 Minutes, ECF No. 195-17, PageID #5155-5157.) After an almost hour-long executive session "to discuss discipline of an agency employee," the Board returned to the public special meeting and upon motion by Livers, voted 3 to 0 to discipline Buddenberg. (*Id.*; Order of Discipline, ECF No. 195-19, PageID #5167-5170; Weisdack Vol. III, ECF No. 182-1, PageID #2630-2631.) Weisdack further testified that he made the decision to discipline Buddenberg. (Weisdack Vol. I, ECF No. 180-1, PageID #2164-2165.)

As Budzik had no independent authority over Buddenberg's employment status, the order of discipline was authorized solely by the Board of Health. (*Id.*; Budzik Vol. II, ECF No. 184-1, PageID #3048.) The order was signed on March 16, 2017 by the three Board members present at the March 13, 2017 meeting and by Weisdack in compliance with the Policy Manual's requirement that both the Commissioner and the Board make disciplinary determinations. (Policy Manual, ECF No. 195-14, PageID #5123; Order of Discipline, ECF No. 195-19, PageID #5167-5170.) Budzik lacked the authority to discipline Buddenberg himself; the Board possessed the

11

sole authority to implement such action. (*Id.*) After receiving the discipline order, Buddenberg had no further direct contact with Budzik. (Buddenberg Vol. I, ECF No. 203-1, PageID #8682.)

Buddenberg's discipline included a suspension, reduction in pay, and demotion from Fiscal Coordinator to a clerical role. (Order of Discipline, ECF No. 195-19, PageID #5167-5170.) Buddenberg did not return to work after receiving the disciplinary order. She instead requested and received unpaid leave from April 3, 2017 to April 24, 2017, extended that leave on April 25, 2017, and extended it again on May 26, 2017. (Buddenberg Vol. II, ECF No. 204-1, PageID #8892-8893; Leave Requests, ECF No. 196-51, PageID #6041-6042.) Buddenberg resigned on May 27, 2017 without ever returning to work. (Resignation Letter, ECF No. 194-4, PageID #4587-4589.)

### F. Buddenberg Files and Dismisses Several SPBR Appeals, then Files this Lawsuit.

The Policy Manual governed Buddenberg's right to appeal the discipline imposed by the Board and Weisdack. Some types of discipline could be appealed through the in-house grievance procedures, while demotions and suspensions of more than three days had to be appealed to the State Personnel Board of Review ("SPBR"). (Policy Manual, ECF No. 195-14, PageID #5134.) Buddenberg availed herself of that remedy by filing no less than seven (7) appeals to the SPBR over the matters surrounding the Board's disciplinary action and subsequent claims related to her employment with the District. However, she dismissed all of the appeals before they were adjudicated on the advice of counsel. (Mix Texts, ECF No. 205-2, PageID #9310.) Buddenberg filed her original complaint against Weisdack, the Health District, Board of Health, Board Members, Alta Wendell, and Budzik on March 6, 2018. Buddenberg amended her complaint on March 12, 2018. On June 18, 2018, Buddenberg amended her complaint a second time. The

Second Amended Complaint includes nine causes of action against the eight Co-Defendants. The claims against Budzik are as follows:

- Claim 3 – FLSA Retaliation;

- Claim 4 – State law claim for Retaliation pursuant to R.C. 4111.17(D);

- Claim 5 – First Amendment Retaliation under 42 U.S.C. § 1983;

- Claim 6 – Criminal Retaliation pursuant to R.C. 2921.05;

- Claim 7 – Criminal Intimidation pursuant to R.C. 2921.03; and

- Claim 9 – Aiding and Abetting Discrimination pursuant to R.C. 4112.99.

## III.    LAW AND ARGUMENT[5]

### A.    Claim Three for Fair Labor Standards Act ("FLSA") Retaliation Fails as a Matter of Law Because the FLSA is Only Applicable to Employers.

The FLSA's anti-retaliation provision found in 29 U.S.C. § 215(a)(3) provides:

[I]t shall be unlawful for any person … to … discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

The overall statutory scheme of the FLSA is to provide statutory protection to employees from unfair labor practices of employers. As a *prima facie* matter, a plaintiff must establish that the defendant in a FLSA claim is an "employer" subject to the provisions of the Act. Buddenberg's FLSA Retaliation claim fails because Budzik did not employ Buddenberg as a matter of law. Buddenberg's proposed reading of the statute frustrates this purpose by seeking to hold a third party private attorney, who was retained by Buddenberg's employer, liable for an

---

[5] Pursuant to this Court's Orders (ECF Nos. 178, 198) to limit duplication between parties' dispositive motions, Budzik hereby incorporates the facts, law, and arguments set forth in the motion for summary judgment filed by the Health District Defendants and Weisdack herein as if fully rewritten.

alleged retaliatory action by the employer. This is not consistent with a reading of the statute as a whole.

1. <u>Only an employer may be sued for FLSA retaliation.</u>

The purpose of the FLSA's anti-retaliation provision is to prohibit an employer from discriminating against an employee for exercising his or her rights under the Act. As noted in *Adair v. Charter Cty. of Wayne*, the anti-retaliation provision of 29 U.S.C. § 215(a)(3) provides that:

> An *employer*[6] is prohibited from discharging or in any other manner discriminating against an employee because such employee has filed a complaint or instituted any proceeding under the FLSA.

452 F.3d 482, 489 (6th Cir. 2006) (cleaned up) (emphasis added).

A court interpreting the terms "any person" as used in 29 U.S.C. § 215(a)(3) versus "employer" must not confine itself to examining the particular statutory provision in isolation. *Food and Drug Admin. v. Brown & Williamson Tobacco, Corp.*, 529 U.S. 120, 132 (2000). Specifically, "it is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.*

Courts interpreting the FLSA's retaliation provision have utilized this framework to limit retaliation claims to employers. In *Dellinger v Sci. Applications Int's Corp.*, 649 F.3d 226 (4th Cir. 2011), the court considered the scope of employees' rights to sue under the FLSA's anti-retaliation provision. The court emphasized that the FLSA "prohibits retaliation 'against any *employee'* because the employee may sue the employer to enforce the Act's substantive rights. *Id.* at 228-29 (emphasis in original). The court noted that Congress used the term "employee" because it was "referring to the employer-employee relationship, the regulation of which

---

[6] 29 U.S.C. §215(a)(3) prohibits "any person" from retaliating; however, the Sixth Circuit in *Adair* expressly limited this provision to employers. *Adair*, at 489.

14

underlies the Act as a whole." *Id.* at 229. The argument that "any person" can be sued for FLSA retaliation was expressly rejected. *Id.* The court observed that "[w]hile § 215(a)(3) does prohibit all 'persons' from engaging in certain acts, including retaliation against employees, it does not authorize employees to sue 'any person.'" *Id.*

The *Dellinger* Court concluded that "[c]onsistent with the FLSA's purpose to regulate the employer-employee relationship and the relevant text of the Act, we conclude that only employees can sue their current or former employers for retaliation under the FLSA . . . ." *Id.* at 228. Continuing, the Court summarized:

> Considering the Act more broadly, we cannot overlook the fact that the FLSA was intended at its core to provide minimum wages and maximum hours of work to ensure employees a minimum standard of living necessary for 'health, efficiency, and general well-being of workers.' 29 U.S.C. § 202(a). The anti-retaliation provision is included, not as a free-standing protection against any societal retaliation, but rather as an effort 'to foster a climate in which compliance with the substantive provisions of the [FLSA] would be enhanced.' *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 US 288, 293, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) . . . . This purpose is inherent in the employment relationship, which is the context in which the substantive provisions operate.

*Id.* at 230.

The *Dellinger* analysis has been adopted by other jurisdictions as well, including other courts within the Sixth Circuit. In *Boddy v Astec, Inc.*, No. 1:11-cv-123, 2012 WL 5507298 (E.D. Tenn. Nov. 13, 2012), the District Court was charged with deciding whether an employee of a wholly owned subsidiary could bring a FLSA retaliation suit against a parent company. Even though the parent company was directly involved in the decision to not promote the employee, the court, relying on *Dellinger*, held "the retaliation provisions of the FLSA do not apply to non-employers" and explicitly refused to extend FLSA retaliation actions to non-employers. *Boddy*, No. 1:11-cv-123, 2012 WL 5507298, *6; s*ee also Brown v. Club Assist Rd. Servs. U.S., Inc.*, No. 12CV5710, 2014 WL 188446, at *12 (N.D. Ill. May 12, 2014) (noting that in order for a plaintiff

15

to succeed on a § 215(a)(3) retaliation claim, "they also must show that they are (or were) [d]efendant's employees").

In opposing Budzik's motion to dismiss, Buddenberg relied almost exclusively on the Ninth Circuit's holding in *Arias v. Raimondo*, 860 F.3d 1185, 1187–88, 1192 (9th Cir. 2017) with respect to her FLSA claim. In denying Budzik's motion (ECF No. 14), the Court previously noted the lack of Sixth Circuit authority "on the issue of whether outside counsel can be sued by an employee as an 'employer' for retaliation under the FLSA." (June 18, 2018 Order, ECF No. 38.) Since that time, the Sixth Circuit, as well as the District Court for the Southern District of Ohio (and other courts throughout the country including the Ninth Circuit), have unequivocally answered in the negative, holding that an employee cannot maintain a FLSA claim against the employer's attorney.

Since *Arias* was issued, courts in this Circuit have applied *Dellinger* and rejected *Arias* in FLSA cases. *See, e.g.*, *Diaz v. Longcore*, No. 1:17-CV-00460, 2017 WL 8790954 (W.D. Mich. Nov. 22, 2017); later affirmed by the Sixth Circuit Court of Appeals, 751 F. App'x 755 (6th Cir. 2018). The question presented in *Diaz* was whether an employee may sue her employer's outside legal counsel for FLSA retaliation. *Diaz*, 751 F. App'x at 756. The trial court responded in the negative and granted the attorney/defendant's motion to dismiss. *Id.* at 757. The Michigan District Court stated:

> The Court agrees with the *Dellinger* analysis and finds that the term "employer" as used in the anti-retaliation provision does not extend to outside counsel here. The statute prohibits "any person" from retaliating, but ultimately only an employer is accountable for any proven retaliation, just as the statute makes it unlawful for "any person" to violate wage and hour provisions, even though only an employer is accountable for any proven wage or hour violation. 29 U.S.C. § 215(a)(2), (a)(3.) . . . The statute has a broad definition of "employer," but the definition does not necessarily include every professional an employer hires to deal with the employment side of the business.

16

*Diaz*, No. 1:17-CV-00460, 2017 WL 8790954, * 1.

In its decision affirming dismissal, the Sixth Circuit squarely rejected *Arias*, which it aptly summed up as "bad facts make bad law." *Diaz*, 751 F. App'x at 759. After examining the word "employer" as set forth in the FLSA, the Sixth Circuit held:

> FLSA 'employer' liability for retaliation claims does not extend to [outside legal counsel] because he was not a person acting on behalf of the actual employer, Latinos Take Out, with respect to the employment relationship, such as by hiring, supervising, paying, and managing employees on behalf of Latinos Take Out. [The attorney] did not hire, supervise, pay, or manage [Plaintiffs] Diaz and Cruz, and Diaz and Cruz have not argued otherwise. Rather, they have argued only that [the attorney] acted on behalf of Latinos Take Out with respect to a legal matter.

*Id*.

The Southern District of Ohio has also rejected *Arias v. Raimondo* in dismissing FLSA claims against legal counsel. In *Kelly v. First Data Corp*., 1:19-CV-372, 2020 WL 419440, at *9 (S.D. Ohio Jan. 27, 2020), report and recommendation adopted, 1:19-CV-372, 2020 WL 3528653 (S.D. Ohio June 30, 2020), the court noted the Sixth Circuit's express rejection of *Arias* and other cases dismissing claims brought against non-employer attorneys. (*See generally, Hofmann v. Fermilab Nal/Ura*, 205 F. Supp.2d 900, 905 (N.D. Ill. 2002) (holding that plaintiff may not sue former employer's lawyers because they were not her employer); *Tolar v. Bradley Arant Boult Cummings*, No. 2:13-CV-00132-JEO, 2014 WL 12836011, at *6 (N.D. Ala. Nov. 18, 2014), report and recommendation adopted sub nom, *Tolar v. Bradley Arant Boult Cummings LLP*, No. 2:13-CV-00132-JEO, 2016 WL 611921 (N.D. Ala. Feb. 16, 2016) (holding that Title VII does not reach conduct allegedly taken by law firm defendant that had no employment relationship with aggrieved party). Indeed, even a district court in the Ninth Circuit disregarded *Arias* and instead relied on *Diaz* to dismiss a FLSA claim against a corporate

attorney. *See Cramton v. Grabbagreen Fran. LLC*, CV-17-04663-PHX-DWL, 2019 WL 7048773, at *25 (D. Ariz. Dec. 23, 2019).

This Court should likewise reject *Arias v. Raimondo* as unpersuasive and inapposite to the facts of this case. The egregious facts in *Arias* bear no resemblance to the instant case with Budzik. In *Arias*, the employer intentionally failed to file a Form I-9 on the plaintiff's behalf and then threatened to report him to federal immigration authorities as a means of assuring that he would not find other employment. *Arias*, 860 F.3d at 1187. Then outside counsel had the plaintiff deported from a scheduled deposition in his subsequent wage action. *Id.* The Ninth Circuit, faced with the parties' egregious behavior and based on the particular facts of the case, reversed the attorney's dismissal, noting that the attorney had reported other plaintiffs to ICE on no less than five occasions and admitted that he routinely checked plaintiffs' immigration status when defending employment lawsuits to see if he could have them deported. Based on that nefarious conduct, the court extended the FLSA retaliation provision to the employer's attorney. *Id.* at 1190. The *Arias* case demonstrates the axiom that bad facts make bad law; but the facts here are not the least bit analogous.

Finally, from a public policy standpoint, should Buddenberg be permitted to maintain an action against the attorney retained to represent her employer in an action alleging a violation of the FLSA, vicarious claims of retaliation under § 215(a)(3) would be employed to force resolution and suppress appropriate advocacy. Extending liability in such a way would severely curtail the attorney's ability to give proper advice to his client (to whom he owes exclusive duties) regarding wages, hours, or discipline for fear that the employee will sue for retaliation. In short, any attorney who advises, recommends, or supports discipline or termination could be subject to vicarious third-party liability for independent legal advice provided to his or her client.

This would create a perpetual conflict of interest under Ohio Rule of Professional Conduct 1.7, which prohibits lawyers from representing parties with adverse interests. As stated in Comment 1 to Prof.Cond.R. 1.7:

> The principles of loyalty and independent judgment are fundamental to the attorney-client relationship and underlie the conflict of interest provisions of these rules. Neither the lawyer's personal interest, the interests of other clients, ***nor the desires of third persons*** should be permitted to dilute the lawyer's loyalty to the client.

Prof.Cond.R. 1.7, cmt. 1 (emphasis added). Indeed, as a matter of professional responsibility, an attorney owes an exclusive duty of loyalty to his client. "This duty encompasses an obligation to defer to the client's wishes on major litigation decisions, not to divulge confidential communications from the client, and not to accept representation of a person whose interests are opposed to those of the client." *Dietz-Britton v. Smythe, Cramer Co*., 139 Ohio App.3d 337, 352–53, 743 N.E.2d 960, 971–72 (8th Dist. 2000) (citing *In re Agent Orange Prod. Liab. Litig*., 800 F.2d 14, 16 (2d Cir. 1986)). If outside legal counsel is held liable as an employer for their client's employment decisions, the chilling effect this would have on independent members of the Bar would be incalculable. Accordingly, summary judgment should be granted in favor of Budzik on Buddenberg's claim for FLSA retaliation.

    2. <u>Budzik was not Buddenberg's "employer" as there is no record evidence that he exercised operational control over Buddenberg's employment.</u>

  29 U.S.C. § 203(d) provides that an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." While the definitions of the terms "employer," "employee," and "employ" in the FLSA are broad, they are not limitless and do not apply to Budzik here. *Solis v Laurelbrook Sanitarium and School, Inc.*, 642 F.3d 518, 522 (6th Cir. 2011). Relevant factors to consider in determining employer status include:

> [W]hether the plaintiff is an integral part of the operations of the putative
> employer; the extent of the plaintiff's economic dependence on the
> defendant; the defendant's 'substantial control of the terms and conditions
> of the work' of the plaintiff; the defendant's authority to hire or fire the
> plaintiff; and whether the defendant maintains the plaintiff's employment
> records and establishes the rate and method of payment.

*Id.* at 555 (internal citations omitted). "[T]he determination of whether a particular factual setting gives rise to coverage under the FLSA is a matter of law." *Donovan v Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984).

In analyzing employer liability under the FLSA as applied to the employer's legal counsel, the Sixth Circuit held that liability does not extend to the employer's attorney unless the attorney acted on behalf of the actual employer "*with respect to the employment relationship, such as by hiring, supervising, paying, and managing employees.*" *Diaz*, 751 F. App'x at 758 (emphasis in original). It was not enough that the attorney acted on behalf of the employer "*with respect to a legal matter.*" *Id.* (emphasis in original).

The *Diaz* factors do not support an employment relationship here as a matter of law. Budzik represented Buddenberg's employer in an underlying legal matter that did not include hiring, supervising, paying, or managing Buddenberg, and Buddenberg's contact with Budzik was very limited. Budzik did not supervise Buddenberg or have any interaction with her before the pre-disciplinary notice was issued on February 28, 2017. (Buddenberg Vol. I, ECF No. 203-1, PageID #8650; Buddenberg Vol. II, ECF No. 204-1, PageID #8942.) They had two conversations following the pre-disciplinary hearing. (Buddenberg Vol. II, ECF No. 204-1, PageID #8938.) Buddenberg never corresponded with Budzik via email. (Buddenberg Vol. I, ECF No. 203-1, PageID #8658.) Nor did she communicate with him in any way after the disciplinary order was issued by the Board of Health. (*Id.*, PageID #8682.)

Budzik exercised no control over Buddenberg and had no authority with respect to her employment such that he could be considered an employer under the FLSA. Budzik did not control the hours Buddenberg worked or control her pay. (*Id.*, PageID #8654-8655, 8658.) He was not involved in approving her leave requests, nor is there evidence that Budzik was involved in paying out Buddenberg's leave of absence or sick leave. (*Id.*, PageID #8664, 8684; Buddenberg Vol. II, ECF No. 204-1, PageID #8941.) Budzik did not control her access within the Health District office. (Buddenberg Vol. I, ECF No. 203-1, PageID #8664-8665.) In fact, Buddenberg was never in direct email communication with Budzik and had no reason to believe Budzik was involved at all in anything related to her employment. (*Id.*, PageID #8658, 8682.)

Indeed, as the Health District's outside legal counsel, Budzik fundamentally lacked authority over the terms of Buddenberg's employment. The Board of Health maintained the "ultimate right to establish policies governing the workforce of [the Health District] . . . . These policies may include, but are not limited to: determination of methods and procedures; size of workforce; assignment of duties; hours of employment; compensation of personnel; hiring; discipline; promotion; transfer; and the right to lay off employees for lack of work, lack of funds or due to job abolishment." (Policy Manual, ECF No. 195-14, PageID #5009; *see also* Buddenberg Vol. II, ECF No. 204-1, PageID #8941-8942.) Weisdack, not Budzik, approved and later altered Buddenberg's work hours in October 2016 before Budzik had even been retained. (10/31/2016 Letter, ECF No. 194-47, PageID #4870.) Buddenberg sent leave requests to Weisdack and/or Board members, not Budzik. (Leave Request Letters, ECF No. 196-51, PageID #6041-6042; Buddenberg Vol. I, ECF No. 203-1, PageID #8658, 8664; Buddenberg Vol. II, ECF No. 204-1, PageID #8936, 8941.) And Budzik did not sign Buddenberg's performance

evaluations, both of which were prepared before he was retained. (Performance Evaluations, ECF No. 194-39, PageID #4835-4840.)

Because the FLSA is enforceable against employers only, Buddenberg's FLSA claim necessarily fails because Budzik, the Health District's outside legal counsel, was not Buddenberg's employer under the FLSA.

**B.    Claim Five for First Amendment Retaliation Under 42 U.S.C. § 1983 Fails as a Matter of Law Because Budzik was Not a State Actor and Lacked Authority to Discipline Buddenberg. Alternatively, Budzik is Entitled to Qualified Immunity.**

In order to establish a claim under 42 U.S.C. § 1983, a plaintiff must sufficiently show two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that this conduct deprived her of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). To prevail on a First Amendment retaliation claim, a plaintiff must first establish his *prima facie* case: 1) that his or her speech is protected, 2) that the employer's adverse action would chill an ordinary person in the exercise of his First Amendment rights, and 3) that the speech was a substantial or motivating factor in the employer's decision to discipline or dismiss. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007). If a plaintiff is able to do so, the burden shifts to the defendant to show "that it would have reached the same decision . . . even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977).

    1.    Budzik is not a state actor as a matter of law.

Budzik is being sued in his individual capacity as a private citizen for actions taken on behalf of and in the course of representing his client, the Geauga County Health District. But federal courts have "emphatically rejected" claims that attorneys may be considered state actors

against whom an allegation of deprivation of constitutional rights under color of law can be properly lodged. *Catz v. Chalker*, 142 F.3d 279, 289 (6th Cir. 1998) (citing *Polk County v. Dodson*, 454 U.S. 312, 318 (1981)); *Cooper v. Wilson*, 309 F.2d 153 (6th Cir. 1962); *Smith v. Hilltop Basic Res., Inc.*, 99 F. App'x 644, 648 (6th Cir. 2004) (holding that the "vast weight of authority [is] that private attorneys . . . do not act under color of state law within the meaning of Section 1983"); *Cox v. Hausmann*, No. 3:17-cv-2420, 2018 WL 5013833, at *3 (N.D. Ohio Oct. 16, 2018) ("[A]ttorneys who are acting within the traditional role of a lawyer do not become state actors simply because they are paid by a public agency"). Section 1983 does not create a cause of action against a private actor "'no matter how discriminatory or wrongful' the party's conduct." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

The Northern District of Ohio in *Horen v. Bd. of Educ. of the Toledo City Sch. Dist.*, 594 F.Supp.2d 833 (N.D. Ohio 2009), has applied this principle to a private attorney's representation of a school board. The Sixth Circuit explained that "[g]enerally plaintiffs can file § 1983 claims against public officers in their official capacity as 'another way of pleading an action against an entity of which an officer is an agent.'" *Id*. at 844 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). But because the attorneys involved were private parties engaged in the practice of law they were "far from being an official or even a government employee." *Id.* Therefore, they were not agents of the state and could not be sued in their official capacities. *See also Freshwater v. Mt. Vernon City Sch. Dist. Bd. of Educ.*, 2:09-CV-464, 2010 WL 1434314, at *2 (S.D. Ohio Apr. 8, 2010) (granting motion to dismiss against private attorney representing public employer in matters relating to plaintiff's employment termination, including conducting investigation into plaintiff's disciplinary charges).

The Supreme Court has developed three tests for determining the existence of state action in a particular case: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

> a. *Budzik is not a state actor under the public function test.*

The public function test has been interpreted narrowly. *Chapman v. Higbee Co.*, 319 F.3d 825, 833–34 (6th Cir. 2003). Only functions like holding elections, *see Flagg Bros. v. Brooks*, 436 U.S. 149 (1978), exercising eminent domain, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352–53 (1974), and operating a company-owned town, *see Marsh v. Alabama*, 326 U.S. 501, 505–09 (1946), fall under this category of state action.

Here, providing legal advice concerning civil service issues and employee discipline has not been a power traditionally exclusively reserved to the state. Indeed, providing legal advice in employment matters is a traditional role of private attorneys in stark contrast to holding elections or exercising eminent domain, which can *only* be performed by the state. Moreover, Budzik lacked authority to impose actual discipline. His role was limited to advising the Health District regarding disciplinary matters and drafting documents related to same without actual authority to impose discipline himself. To hold that providing legal advice on employment matters, drafting a disciplinary notice based on information provided by the client, collecting information at a pre-disciplinary hearing, and transcribing the Board's final decision into a disciplinary order transforms a private attorney into a state actor would create blanket liability for every private attorney representing a public entity in employment matters. Budzik is not a state actor under the public function test.

> b. *Budzik is not a state actor under the compulsion test.*

The compulsion test requires the state to exercise such coercive power or provide such

significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Bier v. Fleming*, 717 F.2d 308, 311 (6th Cir.1983). More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives. *Blum*, 457 U.S. at 1004.

Here, there is no evidence that the Health District encouraged or coerced Budzik to draft a notice of pre-disciplinary hearing, conduct the hearing, or transcribe the disciplinary order after the Board's final decision—this was all necessarily within the scope of Budzik's role as the Health District's legal counsel concerning civil service matters. And again the Board, not Budzik, had the authority to make disciplinary decisions. Nothing in the record suggests that the Health District exercised such coercive power or provided such encouragement to Budzik as to render his conduct state action. Indeed, there is no evidence that Budzik ever made a decision, or if he recommended a course of action, what that advice entailed or whether it was followed.

### c.      Budzik is not a state actor under the nexus test.

Finally, under the nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself. *See Jackson*, 419 U.S. at 351; *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724-725 (1961). A private attorney is not a state actor under the nexus test when he or she performs a traditional function within the attorney-client relationship, such as representing or providing legal advice to a municipality. *Dubuc v. Green Oak Tp.*, 482 F. App'x 128 (6th Cir. 2012).

In *Dubuc,* the plaintiff sued a township and its private attorney arguing that the plaintiff experienced retaliation based on the attorney's legal advice to deny plaintiff's building permit

application. 482 F. App'x 128 (6th Cir. 2012). The plaintiff alleged that the attorney "was delegated the authority to control the [permit] application process." *Id.* The nexus test was not met because, even though the Township attorney may have had a close relationship with the Township, there was simply no evidence the attorney took any action. According to the Sixth Circuit, "providing legal advice is not an action that can be attributed to the state. It is by its nature separate from and outside the state." *Id.* That is precisely what Budzik did here.

Budzik's authority to discipline Buddenberg is also a factor to consider. A defendant does not act "jointly" with the state with respect to employment decisions where the defendant lacked the authority to actually fire the employee and the final decision was ultimately made by the state. In *Campbell v. Republican Cent. Exec. Comm.*, CIV A 05-293-KSF, 2006 WL 3390428, at *5 (E.D. Ky. Nov. 22, 2006), the court found the defendant was not a state actor and did not act jointly with the state when she merely recommended that the plaintiff be terminated and the final decision rested with the state. The complaint in *Campbell* alleged that the defendant was empowered to make "recommendations" regarding employment decisions. *Id.* The court found:

> However, this is also insufficient to meet the "joint activity" standard. Even if it can be read as an allegation that a state actor delegated to the Republican Party, through Lacy, actual hiring and firing authority (a proposition the Court questions), the plaintiff states later in the complaint that it was actually defendant Hazelett who terminated her employment. Thus, while the plaintiff argues in her brief that employment decisions had been "surrendered" to defendant Lacy, her complaint ultimately alleges that Lacy simply made recommendations in that regard and that someone *other than Lacy* did the actual firing. In alleging that someone other than the Republican Party fired her, she has not sufficiently alleged that the Republican Party engaged in joint activity with the Commonwealth or its agents . . . . As here, where the final decision maker retains authority to reject Lacy's and the Republican Party's recommendations, Lacy's recommendations cannot rise to the level of state action.

*Id.* (emphasis in original) (internal citations omitted).

Here, there is no record evidence that Budzik made any "recommendations" concerning Buddenberg's discipline, although he generally provided advice during the disciplinary process. (Budzik Vol. 2, ECF No. 184-1, PageID #3062.) Even if he did, it is clear that the Health District, not Budzik, had the sole authority to impose discipline. The Health District's Policy Manual clearly states that "[a]n employee's immediate supervisor and/or the Health Commissioner shall be responsible for administering discipline." (Policy Manual, ECF 195-14, PageID #5120.) Budzik was neither Buddenberg's immediate supervisor nor the Health Commissioner. Whether Budzik made recommendations or what he advised the Board and/or Weisdack is of no moment, as the ultimate decision to discipline Buddenberg rested solely with the Board and/or Weisdack. Weisdack confirmed that he made the final decision to discipline Buddenberg irrespective of any legal advice or recommendations of Budzik. (Weisdack Vol. I, ECF No. 180-1, PageID #2165-2168.) And the Board members confirmed that the ultimate decision to discipline Buddenberg rested with the Board. (*See, e.g.*, Goergen Vol. I, ECF No. 186-1, PageID #3265-3268.)

As to the pre-disciplinary hearing, Plaintiff will likely ask this Court to make a leap in logic—that because the Health District's Personnel Policy Manual permitted the Health Commissioner's "designee" to conduct a pre-disciplinary hearing, Budzik was therefore a public official acting jointly with the public entity. (Policy Manual, ECF 195-14, PageID #5123.) But there is nothing in the Policy Manual to support this dubious legal theory. It is well settled that public boards have the authority to contract with (as opposed to appoint) private legal counsel. Ohio Atty. Gen. Op. No. 70-081; *Knepper v. French*, 125 Ohio St. 613, 183 N.E. 869 (1932). "It is permissible for a city board of education to contract with private law firms to provide specific legal services…." Ohio Atty. Gen. Op. No. 70-081 (emphasis added). Similarly, counties and

villages also have this authority; however, that does not make their private counsel a public official. *See, e.g.*, *Rose v. Wellsville*, 63 Ohio Misc.2d 9, 613 N.E.2d 262 (C.P. 1993): "A general plan village obtains its legal counsel by contract only (R.C. 733.48) rather than by the appointment process." (citations omitted). "Village legal counsel hired pursuant to statute authorizing a general plan village to obtain legal counsel by contract is not 'public official' nor is his position an 'office.'" *Id*. at 266; *see also Pullin v. Village of Hiram*, 11th Dist. Portage No. 2001-P-0146, 2003-Ohio-1973 ("[T]he nature of the village solicitor's position is that of contractual employee and not of a public office.").

Thus, when a public entity retains private legal counsel, it is no different than any other private citizen hiring a lawyer. Budzik is certainly subject to ethics and disciplinary rules of the Ohio Supreme Court; however, his representation of the Health District in an employment proceeding did not magically elevate him to public office or bestow him with authority otherwise unavailable. Therefore, he cannot be subject to liability under 42 U.S.C. § 1983, and Buddenberg's claim must be dismissed.

### 2. Plaintiff cannot establish a *prima facie* retaliation claim for lack of an adverse action by Budzik.

An adverse employment action occurs when there is a serious and material change in the terms, conditions, or privileges of employment. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). "Not everything that makes an employee unhappy is an actionable adverse employment action." *Id.*[7]

---

[7] *See also Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) ("For a retaliation claim under Title VII, an adverse employment action is something that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' This standard is analogous to the standard used in First Amendment retaliation cases like this one"); *Akins v. Fulton Cnty, Ga.*, 420 F.3d 1293, 1300–01 & n. 2 (11th Cir. 2005) (action must tend to chill free speech and alter

Beyond the mere existence of some adverse action, the defendant must have the authority to take the adverse action(s) about which plaintiff complains. *Poppy v. City of Willoughby Hills*, 96 F. App'x 292 (6th Cir. 2004). In *Poppy*, the Sixth Circuit considered the defendant-mayor's authority to modify the plaintiff's employment status, which was alleged to be an adverse action imposed as a result of the plaintiff's protected speech. *Id.* at 294. The plaintiff alleged that the mayor attempted to persuade City Council to fire her and to deny her full-time status, raises, and other benefits. *Id.* The court of appeals noted that these actions could satisfy the second element of a retaliation claim *if the mayor had the authority to take any of these adverse actions himself*. But since only the City Council had the authority to hire and fire the plaintiff and set her work hours, salary, and benefits, and because the mayor was not the decision maker, the mayor could not be held liable under § 1983 for the City Council's decisions including: denying her full-time status, denying in full her requested salary increases and health benefits, and declining to fund the continuing education courses she wished to attend. *Id.*; *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999) (retaliation claim failed where defendant did not have the ability to terminate plaintiff).

Here, even assuming Buddenberg's demotion and suspension were adverse actions, Budzik lacked authority to actually bring disciplinary charges against Buddenberg or impose any discipline himself. And all preliminary actions, such as drafting the pre-disciplinary hearing notice and disciplinary order and conducting the pre-disciplinary hearing in light of Weisdack's health condition, were done on behalf of his client, the Health District, within the course and scope of that representation. The Board and/or Weisdack, not Budzik, had the inherent authority to discipline Buddenberg.

---

some important condition of employment to be adverse; but also observing that the First Amendment and Title VII standards are "consonant").

Both Ohio R.C. 124 and the Health District's Policy Manual have detailed procedures to be followed in disciplinary matters of classified civil service employees, like Buddenberg, and they clearly set forth the authority of the Board in such matters. The Policy Manual, Section G:3:f, unambiguously states: "The Health Commissioner and Board will decide what discipline, if any, is appropriate." (Policy Manual, ECF No. 195-14, PageID #5123.) As in *Poppy*, even if Budzik recommended discipline to his clients or was otherwise involved as legal counsel in the procedural steps leading to her discipline,[8] he was not, as a matter of law, the final decision maker—the Board was. Indeed Budzik was not even present when the Board made its final decision to discipline Buddenberg in executive session.[9]

Buddenberg seeks to hold public entity attorneys vicariously liable for their client's conduct and decisions, should that conduct ultimately be found to be improper. But attorneys do not control the conduct of their clients—an attorney's role is to provide advice, counsel, and perhaps recommendations and risk assessments to facilitate the client's ultimate decisions. To hold Budzik vicariously liable for his client's employment decisions, which he lacked authority to make, or to view him as a guarantor of his client's actions is not supported by the law. To hold otherwise would create a perpetual conflict of interest arising under Prof.Cond.R. 1.7 between a public entity attorney and his or her client, as the attorney would owe duties of care to a third party with whom he or she lacks an attorney-client relationship. The ability of an attorney to provide candid legal advice and risk assessment would be eviscerated in light of the attorney's

---

[8] The record does not reflect the actual advice or recommendations made by Budzik concerning Buddenberg's disciplinary matters. Such communications are protected by the attorney-client privilege. Buddenberg's attempt to draw adverse inferences as a result of the Health District's decision to maintain privilege is improper.

[9] As noted in the Report of R. Todd Hunt, clients are free to take or disregard the advice of legal counsel. (Report of R. Todd Hunt, pg. 19, Exhibit B.)

own interests should this Court find an attorney liable for employment decisions made by his client.

    **C.**    **Budzik is Entitled to Immunity. Plaintiff's First Amendment Retaliation Claim Fails as a Matter of Law Because if Budzik was a State Actor he is Entitled to Qualified Immunity. In the Alternative, Plaintiff's Claims Fail as a Result of the Litigation Privilege.**

        1.    <u>If Budzik is a state actor, he is entitled to qualified immunity.</u>

If Budzik is considered a state actor, Buddenberg's § 1983 claim fails because he is entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit has held that a private attorney hired by a city is entitled to qualified immunity, seeing no good reason to provide such immunity to inside counsel but not to outside counsel. *Cullinan v. Abramson*, 128 F.3d 301, R.I.C.O. Bus. Disp. Guide (CCH) P 9340, 1997 F. App. 0307P (6th Cir. 1997). The burden of proof in qualified immunity cases is on the plaintiff. *McCloud v. Testa*, 97 F.3d 1536, 1542 (6th Cir. 1996).

The test for qualified immunity turns on "the objective reasonableness of an official's conduct, as measured by deference to clearly established law." *Harlow*, 457 U.S. at 818. Qualified immunity gives ample room for mistaken judgments, protecting "all but the plainly incompetent or those who knowingly violate the law." *O'Malley v. Briggs*, 475 U.S. 335, 341 (1986). If officials of reasonable competence could disagree about the lawfulness of an action, the defendant is entitled to qualified immunity. *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 544-45 (6th Cir. 2013). Bare allegations of malice do not suffice to subject government officials

31

either to the costs of trial or to the burdens of broad-reaching discovery. *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982).

> 2.    <u>Budzik's conduct was not objectively unreasonable based on Buddenberg's admitted policy violations.</u>

Here, it was not objectively unreasonable for Budzik, as the Health District's outside legal counsel, to provide legal advice to his client regarding civil service and disciplinary matters to public-employer clients, including preparing a pre-disciplinary notice, conducting a hearing regarding same on behalf of the Health District, and drafting a disciplinary order based on the Board's decision to implement discipline. (*See* Expert Report of R. Todd Hunt, pp. 11-19, Exhibit B.) Nor was it objectively unreasonable for Budzik to confer with or rely on his client regarding the factual basis for the discipline or to limit the scope of his representation on certain matters. (*Id.*)

Regardless of Buddenberg's many allegations of retaliation, she could still be subjected to discipline for violating the Health District's rules, regulations, and policies and/or improper conduct or omissions in the workplace. Budzik had no obligation or authority to halt the disciplinary proceedings because Buddenberg alleged retaliation. When an employee makes such claims after engaging in protected activity, however valid, that fact does not insulate the employee from being disciplined for violating rules, regulations, and policies and/or improper conduct or omissions that occurred before or after the purportedly protected activity. *Michael v. Caterpillar Financial Serv. Corp*., 496 F.3d 584, 596 (6th Cir. 2007).

While Buddenberg proclaims that her discipline was "bogus" and "baseless," even Buddenberg conceded the underlying factual basis for several of the disciplinary charges during the pre-disciplinary hearing. Certainly, a determination as to the merits of the discipline would have been rendered if Buddenberg had not voluntarily withdrawn her SPBR appeals before a

final decision was rendered. However, the basis for each charge, along with evidentiary support, is outlined in the Health District's October 20, 2017 response to Buddenberg's EEOC claim, which is incorporated herein. (10/20/2017 EEOC Position Statement, ECF No. 195-36, PageID #5278-5321.)

While Buddenberg argues that discipline was improper, she confirmed at the March 3 pre-disciplinary hearing the factual basis of most of the Health District's charges.

- **<u>Charge 1: Rude and Unprofessional</u>**. Buddenberg admitted that she "stated in raised voice, after listening to [Weisdack's] directives, that I was pissed. I was, and I will fully admit I raised my voice." (Hearing Recording, at 5:15-7:12;[10] Hearing Transcript, ECF No. 195-12.) This behavior was corroborated by Health District employee written statements. (Zach Myers Statement, ECF No. 195-36, PageID #5315; Weisdack Affidavit, ECF No. 195-36, PageID #5317-5320; Eric Robb Affidavit, ECF No. 195-36, PageID #5321.)

- **<u>Charge 2: Mix's Resignation</u>**. Buddenberg also admitted that she was aware that Mix resigned, despite stating in the February 1st email that he had been terminated. (Hearing Recording, at 00:12:00.)

- **<u>Charge 4: Contaminated Furniture</u>**. Buddenberg admitted that she requested furniture from the Health District's maintenance department without approval from the Health Commissioner. (Hearing Recording, at 00:22:12-00:23:29.)

- **<u>Charge 5: Payroll</u>**. Buddenberg confirmed that she failed to attach payroll documentation, stating: "I sent the email on Friday, February 10th, after Mr. Weisdack signed it. But the payroll file was not attached. I failed to double-check, and that is my error." (Hearing Recording, at 00:30:40.)

- **<u>Charge 6: Personnel Files</u>**. Buddenberg confirmed that personnel files were stored in her office and that she had documents in her office that needed to be filed. (Hearing Recording, at 00:48:26, 00:56:05.)

- **<u>Charge 7: ODH Report</u>**. Buddenberg admits she was "unfamiliar" with the Ohio Department of Health report. (Hearing Recording, at 01:04:00.)

- **<u>Charge 8: Shredding</u>**. Buddenberg confirmed that an intern shredded Health District documents at Buddenberg's direction. (Hearing Recording, at 01:20:00.)

---

[10] The hearing audio recording is being manually filed with this Motion.

Buddenberg argues that Budzik's conduct during the pre-disciplinary hearing was "aggressive," "unfair," "condescending," and "intimidating," among other descriptors. However, the hearing recording and transcript speak for themselves as to Budzik's professional demeanor and conduct. In light of the actual record evidence, Buddenberg's hyperbole and rhetoric are unsupported as a matter of law. Budzik's role in conducting the pre-disciplinary hearing when Weisdack could not do so because of his medical condition, reciting the charges, requesting exculpatory information, and asking follow up questions—all part of the scope of Budzik's legal representation—was not so objectively unreasonable as to abrogate his entitlement to qualified immunity. (Expert Report of R. Todd Hunt, pp. 11-13, Exhibit B.)

As Budzik explained, the pre-disciplinary hearing was Buddenberg's opportunity to defend or rebut the Health District's disciplinary charges. (Hearing Recording, at 00:15:35, 01:29:28.) Budzik asked Buddenberg to provide statements or documents verifying her side of the story, asked several follow up questions, and provided Buddenberg with ample opportunity to explain her rebuttal to the disciplinary charges. Certainly, reasonable minds could disagree as to whether Buddenberg's discipline was warranted. However, the record evidence does not show that Budzik was "plainly incompetent" in representing the Health District with respect to the underlying employment matter. And the qualified immunity doctrine leaves "ample room for mistaken judgments" because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *McCleary v. Navarro*, 504 U.S. 966, 967 (1992).

Here, it is not "sufficiently clear that every reasonable official would understand that [Budzik's conduct was] unlawful." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Moreover, allegations that Budzik breached the standard of care owed to his client in rendering advice on disciplinary matters do not support Buddenberg's claims, as Budzik owed no clear duty to

34

Buddenberg. Attorney loyalty to clients is considered a cornerstone of the attorney-client relationship. Should the standard for qualified immunity be lowered to hold private attorneys representing public entities liable for actions taken within the scope of the attorney-client relationship and in connection with the provision of legal services, attorney loyalty would be divided, as every action taken on behalf of their client could potentially adversely affect a third party. *See* Prof.Cond.R. 1.7. Buddenberg has not met her burden as a matter of law to overcome Budzik's entitlement to qualified immunity here.

3. Budzik's actions are protected by the litigation privilege.

Federal Courts have "recognized litigation privilege as a bar to some federal causes of action, especially when the actions at issue implicate an attorney's ability to advocate and conduct discovery on behalf of their clients." *Magnesium Machine, LLC v. Terves LLC*, N.D. Ohio No. 1:19 CV 2818, 2020 WL 3977689, *4 (N.D. Ohio July 14, 2020), aff'd, No. 20-3779, 2021 WL 5772533 (6th Cir. Dec. 6, 2021). There is no federal litigation privilege, but federal courts apply the litigation privilege rules of the state. *See Kramer v. Midamco, Inc.*, No. 1:07 CV 3164, 2009 WL 3428822 (N.D. Ohio Oct. 20, 2009).

In Ohio, the litigation privilege "is designed to protect 'the integrity of the judicial process' by affording participants in litigation with immunity from future lawsuits over relevant statements made during judicial proceedings." *Reister v. Gardner*, 164 Ohio St.3d 546, 2020-Ohio-5484, ¶ 14 (quoting *Willitzer v. McCloud*, 6 Ohio St.3d 447, 453 N.E.2d 693 (1983)). The privilege often bars defamation claims, but the "reasoning of the state courts suggests the potential for broader application." *Willis & Linnen Co., L.P.A. v. Linnen*, 9th Dist. No. 22452, 163 Ohio App.3d 400, 2005-Ohio-4934, 837 N.E.2d 1263, 1266 (applying litigation privilege to abuse of process and malicious prosecution claims); *Kramer*, 2009 WL 3428822 at *2.

The litigation privilege applies in both litigation and in quasi-judicial proceedings. In *Savoy v. Univ. of Akron*, 10th Dist. No. 13AP-696, 2014-Ohio-3043, for example, statements made by the University during the plaintiff-student's disciplinary hearing were protected by the litigation privilege. The court found the disciplinary hearing was a "quasi-judicial proceeding" and applied the litigation privilege because the university's student code and conduct sections required notice, a hearing, and provided the student with an opportunity to present evidence. *Id.* at 435 n. 3 (citing *Gaines v. Columbus Civ. Serv. Comm.*, 10th Dist. No. 08AP-971, 182 Ohio App.3d 576, 2009-Ohio-2662, 913 N.E.2d 1039, ¶ 9). The litigation privilege also applies to statements made in termination notices as well as grievance proceedings. *Stiles v. Chrysler Motors Corp.*, 89 Ohio App.3d 256, 624 N.E.2d 238 (6th Dist. 1993). In *Stiles* the court classified employee grievance proceedings as quasi-judicial, thereby giving rise to an absolute privilege for statements made by a party if the matter has some relationship to the proceeding. *Id.* at 242 (citing Restatement of the Law 2d, Torts (1977) 248, § 587).

Here, Budzik began representing the Health District with respect to Buddenberg's civil service matters in early 2017 to assist the Health District in applying the personnel policies and procedures as set forth in the Policy Manual. Putting aside Buddenberg's hyperbole and embellishment, the unvarnished facts are that Budzik prepared a notice of pre-disciplinary hearing (to which Buddenberg was entitled under the terms of the Health District's policies), conducted the pre-disciplinary hearing due to Weisdack's health restrictions, and prepared a R.C. 124.34 disciplinary order based on the Board of Health's decision to discipline her. All of this conduct occurred within Budzik's discrete role as the Health District's outside legal counsel and in connection with the disciplinary process afforded to Buddenberg as a classified employee. All of Budzik's purportedly retaliatory statements were made in the context of Buddenberg's

disciplinary proceeding or were directly related to that process. Budzik is entitled to immunity for the statements made during and incidental to Buddenberg's pre-disciplinary hearing and statements contained in the pre-disciplinary notice and R.C. 124.34 order.

### D. Buddenberg's State-Law Claims Four, Six, Seven, and Nine Fail as a Matter of Law Because She Lacks Standing to Pursue State Law Claims Against a Third-Party Attorney.

Whether, and to what extent, Budzik is immune from suit on Plaintiff's state law claims is a question that turns on state law. *See Marrical v. Detroit News, Inc.*, 805 F.2d 169 (6th Cir. 1986). It is well-established that "[a]ttorneys in Ohio enjoy a qualified immunity from liability to a third party arising out of acts he or she takes while representing a client." *Ryan v. Wright*, 10th Dist. Franklin No. 06AP-962, 2007-Ohio-942, ¶ 8.

### 1. Under Ohio law, all claims against an attorney arising from the provision of legal services must be construed as malpractice.

Under Ohio law, all claims against an attorney relating to legal representation or advice are claims for legal malpractice, whether brought by a client or a third party. *Illinois Natl. Ins. Co. v. Wiles, Boyle, Burkholder & Bringardner Co., L.P.A.*, 10th Dist. Franklin No. 10AP-290, 2010-Ohio-5872, ¶ 15; *Sandor v. Marks*, 9th Dist. Summit No. 26951, 2014-Ohio-685, ¶ 10 ("Claims arising out of an attorney's representation, regardless of their phrasing or framing, constitute legal malpractice claims . . . When the gist of a complaint sounds in malpractice, other duplicative claims are subsumed within the legal malpractice claim").

Against this backdrop, any cause of action will be treated as a malpractice claim if it arises out of "the manner in which the attorney represented the client." *Dottore v. Vorys, Sater, Seymour & Pease, L.L.P.*, 8th Dist. Cuyahoga No. 98861, 2014-Ohio-25, ¶ 33 (citing *Muir v. Hadler Real Est. Mgt. Co.*, 4 Ohio App. 3d 89, 446 N.E.2d 820 (10th Dist. 1982)). It makes no difference if plaintiffs try to classify their claims as those for contract, negligence, recklessness,

or intentional tort – all such claims will be merged into the legal malpractice claim. *Muir*, 4 Ohio App. 3d at 89. Here, Buddenberg's various state law claims must be treated as legal malpractice because they entirely arise from Budzik's representation of the Health District.

### 2. Third-parties to the attorney-client relationship such as Buddenberg lack standing under Ohio law to assert claims against an attorney.

Under Ohio law, third parties to the attorney-client relationship cannot state a claim against an attorney for conduct related to the legal representation. *Ryan v. Wright*, 10th Dist. Franklin No. 06AP-962, 2007-Ohio-942, ¶ 8 (citing *Scholler v. Scholler*, 10 Ohio St.3d 98, 462 N.E.2d 158 (1984), paragraph one of the syllabus). The Supreme Court of Ohio reiterated *Scholler*'s clear rationale, confirming "the obligation of an attorney is to direct his attention to the needs of the client, not to the needs of a third party not in privity with the client." *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987). This rule, known as the strict privity rule, ensures that attorneys may represent their clients without the threat of suit from third parties who may have contrary interests. *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, ¶ 14-15.

"The rationale for this posture is clear: the obligation of an attorney is to direct his attention to the needs of the client, not to the needs of a third party not in privity with the client." *Simon v. Zipperstein*, 32 Ohio St.3d 74, 512 N.E.2d 636, 637 (1987). "To allow indiscriminate third-party actions against attorneys of necessity would create a conflict of interest at all times, so that the attorney might well be reluctant to offer proper representation to his client in fear of some third-party action against the attorney himself." *Swiss Reinsurance Am. Corp. v. Roetzel & Andress*, 163 Ohio App.3d 336, 2005-Ohio-4799, 837 N.E.2d 1215, ¶ 33. Thus, Ohio's strict privity rule "ensures that attorneys may represent their clients without the threat of suit from third parties who may compromise that representation." *Shoemaker*, 118 Ohio St.3d at ¶ 13.

Under Ohio law, an attorney's qualified immunity can be overcome only by a showing that the attorney acted with malice, which is defined by Ohio courts as "tak[ing] actions with an ulterior motive separate and apart from the good-faith representation of the client's interests." *Sprouse v. Eisenman*, 10th Dist. Franklin No. 04AP-416, 2005-Ohio-463, ¶ 12. Here, all of Budzik's alleged conduct occurred exclusively within the scope of the attorney-client relationship and in furtherance of his client's interests. Budzik's role was limited to:

- The preparation of a pre-disciplinary hearing notice;

- Conducting a pre-disciplinary hearing to which Buddenberg was entitled as a classified employee;

- Conferring with the Health District relative to the pre-disciplinary hearing; and

- Preparing a disciplinary order based on the Health District's decision to discipline Buddenberg.

Buddenberg has not alleged or established that Budzik engaged in any of the above conduct with an ulterior motive separate from the interests of his client, the Health District. The only actions for which Buddenberg claims a right of recovery against Budzik are those taken during the course and scope of Budzik's legal representation of the Health District. Buddenberg's claims, therefore, are precisely the type of third-party, non-client actions that Ohio courts have repeatedly rejected which, if permitted, would compromise the attorney-client relationship and create a chilling effect on client representation.

Budzik's duties and obligations were owed to the Health District, not Buddenberg. Ohio law does not permit a litigant to drag opposing counsel into pending litigation merely because of disapproval of the strategy pursued or representation provided. Even if one assumes for argument that Budzik had provided substandard advice to the Health District, no cause of action or remedy for the breach of the standard of care lies with Buddenberg. Thus, independent of all other legal

39

deficiencies, Buddenberg as a non-client cannot sue Budzik under Ohio law for actions taken by virtue of the attorney-client relationship with the Health District and/or Weisdack. Summary judgment should be granted in favor of Budzik on all of Buddenberg's state law claims because Budzik is immune as a matter of law from claims by third parties arising from his representation of the Health District.

### E. Claim Four for Retaliation Arising Under Ohio R.C. 4111.17(D) Fails as a Matter of Law Because Budzik was not Buddenberg's Employer.

Even though Budzik is immune from Buddenberg's third-party state law claims, the state law retaliation claim additionally fails because Budzik is not an employer as explicitly required by R.C. 4111. Ohio's anti-retaliation provision, R.C. 4111.17, is not analogous to the federal statute. Specifically, R.C. 4111.17 does not include the "any person" language found in 29 U.S.C. § 215(a)(3). The Ohio law prohibits "employers" from discriminating in the payment of wages on the basis of race, color, religion, sex, age, national origin, or ancestry. R.C. 4111.17(A). The Ohio law's anti-retaliation provision is expressly limited to "employers." The statute provides:

> *No employer* shall discriminate against any employee because such employee makes a complaint or institutes, or testifies in, any proceeding under this section.

R.C. 4111.17(D) (emphasis added).

While the federal statute prohibits "any person" from retaliating against an employee who has filed a complaint under the FLSA, Ohio's law contains no such provision. Ohio law is clear — claims arising under R.C. 4111.17 may only be stated against an employer. Summary judgment should be granted in favor Budzik on Buddenberg's claim for retaliation under R.C. 4111.17(D).

### F.     Buddenberg's Criminal Claims Six, Seven, and Nine Fail as a Matter of Law.

1.     <u>Claim 6: State Law Criminal Retaliation for Discharge of Duties – R.C. 2921.05.</u>

R.C. 2921.05(A) states: "No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness *who was involved in a civil or criminal action or proceeding* because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness." R.C. 2921.05(A) (emphasis added).

Buddenberg has not alleged or established that she was involved in a civil or criminal action or proceeding because she discharged her duties. *See Hensley v. Wester Chester Township*, 1:21CV373, 2022 WL 4621432, at *15 (S.D. Ohio Sept. 30, 2022) (dismissing plaintiff's claim under R.C. 2307.60 based on an alleged violation of R.C. 2921.05 because there were no allegations that the plaintiffs were involved in a civil or criminal action or proceeding). Therefore, Buddenberg's claim under R.C. 2307.60 for an alleged violation of R.C. 2921.05 must be dismissed. To the extent Buddenberg's First Amendment Retaliation claim is based on her contention that her October 24, 2016 report to the Board was not part of her job duties, this claim must also fail as a matter of law.

2.     <u>Claim 7: State Law Criminal Intimidation Using a False Writing – R.C. 2921.03.</u>

Ohio Courts have held that R.C. 2921.03 "was designed to protect those people who saw, heard or otherwise knew, or were supposed to know, material facts about a criminal proceeding." *State v. Crider*, 21 Ohio App.3d 268, 487 N.E.2d 911 (9th Dist.1984). This statute applies to overt threats of violence that constitute intimidation. For example, a defendant's throat-slashing hand gesture from the backseat of a police cruiser to indicate that the defendant intended to slash

witnesses' throats if they cooperated with police. *State v. Rivera-Rodriguez*, 9th Dist. No. 07CA009154, 2008-Ohio-1461. Courts have found sufficient evidence of a threat of unlawful harm when the offender swerved his truck across the center line toward the victim's oncoming car and thus forced the victim onto the grass alongside the road. *State v. Miller*, 11th Dist. No. 2004-P-0049, 2005-Ohio-6708; *see also State v. Turner*, 3rd Dist. No. 9-04-21, 2004-Ohio-6489 (inmate banged his handcuffs against a window and yelled that the inmate would kill anyone who came near him); *State v. Simms*, 4th Dist. No. 05CA10, 165 Ohio App.3d 83, 2005-Ohio-5681, 844 N.E.2d 1212 (threatening to use a weapon).  It is Buddenberg's burden to establish that in utilizing a false or fraudulent writing, the defendant knowingly attempted to influence, intimidate, or hinder the plaintiff.

Here, there is no evidence that Budzik threatened Buddenberg with any violence or was violent toward Buddenberg in any way. As for Buddenberg's reference to a false writing, Buddenberg conceded during her pre-disciplinary hearing that the general facts underlying the disciplinary charges were true, although she offered rebuttals as to whether discipline was proper under the circumstances. As a matter of law, neither the notice of pre-disciplinary hearing nor the R.C. 124.34 order was false as to the underlying facts. And, as discussed above, Budzik lacked authority to impose discipline or make a final determination as to the Board's decision. To the extent he advised the Board with respect to their decision, that advice is protected by the attorney-client privilege and cannot support Buddenberg's claim for criminal intimidation here, nor should this Court expand Ohio criminal law to apply here.

3.  Claim 9: Aiding and Abetting Criminal Discrimination – R.C. 4112.02(J) and 4112.99.

R.C. 4112.02(J) prohibits aiding, abetting, inciting, compelling, or coercing an act that is unlawful under R.C. Chapter 4112. "But more than a failure to act is required to establish an

aiding and abetting claim. In particular, federal courts in Ohio have interpreted R.C. 4112.02(J) to provide for individual liability where an employee was involved in or actually made the company's decision to discriminate or retaliate against the plaintiff." *Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1088 (S.D. Ohio 2022) (cleaned up) (dismissing claim under R.C. 4112.02(J) where the only allegation against the employer was that it failed to discipline an employee once the plaintiff reported him). Here, as discussed above, Budzik lacked the authority to discipline Buddenberg as a matter of law. Her claim for criminal aiding and abetting fails for this reason.

## IV.  CONCLUSION

Buddenberg's FLSA and R.C. 4111.17(D) retaliation claims fail because Budzik was not her employer. Buddenberg's First Amendment retaliation claim fails because Budzik is not a state actor, lacked authority to impose an adverse employment action, and alternatively is entitled to immunity. Finally, all of Buddenberg's state law claims fail for lack of standing to assert any state law claim against Budzik in his capacity as the Health District's private outside legal counsel. Buddenberg falls short on every single element of her claims. For each and all of these reasons, Budzik is entitled to judgment as a matter of law.

Respectfully submitted,

/s/Maia E. Jerin
**MONICA A. SANSALONE (0065143)**
**MAIA E. JERIN (0092403)**
**GALLAGHER SHARP LLP**
1215 Superior Avenue, 7th Floor
Cleveland, Ohio 44114
(216) 241-5310 Telephone
(216) 241-1608 Facsimile
E-Mail: msansalone@gallaghersharp.com
        mjerin@gallaghersharp.com
*Attorneys for Defendant James Budzik, Esq.*

43