IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Rebecca Buddenberg,<br><br>      Plaintiff,<br><br>  vs.<br><br>Carolyn E. Weisdack, Administrator of the Estate of Robert K. Weisdack, *et al.*,<br><br>      Defendants | Case No. 1:18-cv-00522<br><br>Judge J. Philip Calabrese |

**PLAINTIFF BUDDENBERG'S CORRECTED MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56(a) AGAINST ALL DEFENDANTS (ORAL ARGUMENT REQUESTED UNDER JUDGE'S STANDING ORDER ON CIVIL PROCEDURES ¶ 15)**

Plaintiff Rebecca Buddenberg respectfully moves—based on undisputed material facts—for partial summary judgment against all Defendants on the elements of those claims that require *legally protected activity* by Buddenberg and *adverse actions* against Buddenberg, namely, **Claim 1** (Title VII–retaliation), **Claim 2** (Ohio Rev. Code § 4112.02(I)–retaliation), **Claim 3** (Equal Pay Act–retaliation), **Claim 4** (Ohio Rev. Code § 4111.17(D)–retaliation), **Claim 5** (First Amendment–retaliation), and **Claim 8** (Interfering with civil rights under Ohio Rev. Code §§ 2921.45, 2307.60). (The argument below will lead off with a discussion of First Amendment–retaliation (Claim 5).) Relying on Defendants' own admissions, she also seeks judgment on the causal connection/retaliatory motive for certain adverse actions that transpired in admitted response to her February 1, 2017 email protesting retaliation against her former supervisor Dan Mix for his having tried to defend her. Remaining causal-connection/retaliatory-motive issues, elements, and other claims, as Buddenberg's oppositions to Defendants' summary-judgment motions will show, are fact questions for a jury.

By deciding these issues as a matter of law as warranted, the Court will significantly narrow the issues for trial and forthcoming dispositive motions. *Wuliger v. Christie*, 310 F.Supp.2d 897, 901(N.D. Ohio 2004) ("effect of a partial judgment ruling is to narrow the issues for further disposition"). The Court will be able to instruct the jury that it has already decided that Buddenberg engaged in protected activity and endured adverse actions, and the causal connection on one issue. The jury need only decide whether there is a causal connection as to remaining adverse actions, and decide the intimidation—false writing and (if applicable) retaliation because a public servant discharged her duties claims, and, of course, damages.

Because of the vast record and complexity of issues, Ms. Buddenberg respectfully requests oral argument under the Court's Standing Order ¶ 15, which expresses the Court's commitment to giving newer attorneys the opportunity to develop their experiences. Attorney Obodzinski qualifies under the section and will handle oral argument, with a request that Attorney Chandra be afforded up to five minutes to clarify any issues or add any points, if in his professional judgment for the client he deems it necessary.

A memorandum in support follows.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ vii

MEMORANDUM IN SUPPORT ..................................................................................1

I.      Issues Presented ..............................................................................................1

II.     Statement of Undisputed Material Facts ................................................... 2

    A.  Rebecca Buddenberg garnered positive evaluations and a merit-pay raise for her performance as the Geauga County Health District's fiscal coordinator. ............. 2

    B.  Buddenberg goes over Weisdack's head to report to the board Weisdack's gender-based pay discrimination against another employee, unethical self-dealing, and failure to comply with District policies; Defendant board members promise to protect her from retaliation. .................................................................. 5

    C.  Buddenberg's reports about gender-based pay inequity, unethical practices, and policy violations aren't in her job duties.. ................................................... 9

    D.  Right after Buddenberg's board report, Weisdack changes her work schedule and makes it known officewide that he's upset with her for going to the board. ........ 11

    E.  Buddenberg repeatedly reports retaliation to the board, but the board members who promised to protect her freeze her out, stop responding, and do nothing to investigate or correct the problem. .........................................................13

    F.  Days after learning Buddenberg filed an EEOC retaliation charge, Weisdack and Budzik ratchet-up adverse actions with policy-infraction allegations— including a supposed violation *explicitly* based on her having reported retaliation about her supervisor Dan Mix. .................................................................................20

    G.  Budzik aggressively interrogates Buddenberg in a March 3, 2017 pre-disciplinary hearing, fails to address her protests that the charges against her are baseless and retaliatory, and meets with her privately to cajole her to accept a demotion, pay cut, suspension, and reassignment. .....................................................24

    H.  Buddenberg is found supposedly "guilty" of all but one of the allegations. The board members approve, suspend her, demote her to a clerical position, and slash her pay almost in half. ...........................................................................28

    I.  Weisdack continues adverse actions even after the disciplinary order, making things so intolerable that Buddenberg has no choice but to resign......................30

III.    Law & Argument ...........................................................................................33

A. The Court should grant partial summary judgment those elements of claims regarding which, as here, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. ...............................33

B. Affirmative summary judgment for plaintiffs in retaliation cases is appropriate when, as here, there is no genuine dispute on key elements like whether the plaintiff engaged in legally protected activity and suffered adverse actions.........33

C. Based on their admissions, Defendants District, Weisdack, Budzik, Goergen, Gragg, Livers, and Whitright are liable on the protected-activity and adverse-actions elements of First Amendment Retaliation, and on the causation/retaliatory motive element are liable for the adverse actions against Buddenberg they admit are causally connected to her February 1, 2017 email protesting retaliation against Mix. ........................................................................34

   1. Buddenberg engaged in First Amendment–protected activity by reporting Weisdack's unlawful and unethical conduct to the board. ..............................35

      a. Buddenberg's speech about Weisdack's unlawful and unethical conduct— including retaliation—touched upon matters of public concern..............35

      b. Buddenberg's ordinary job duties didn't include reporting to the board Weisdack's unlawful and unethical conduct. .............................................37

      c. Because the employer's side of the scale is empty when it comes to illegal conduct and public corruption, the District had no legitimate interest that outweighed Buddenberg's constitutional right to speak about that misconduct and corruption. ......................................................................40

   2. The District, Weisdack, Budzik, Goergen, Gragg, Livers, and Whitright subjected Buddenberg to a barrage of adverse actions (e.g., freezing her out, threatening and carrying out disciplinary charges against her, interrogating her, gaslighting her, demoting her, suspending her without pay, and slashing her pay nearly in half) that would deter a person of ordinary firmness from engaging in free speech...................................................................................41

   3. Defendants admit a causal connection between disciplining Buddenberg for sending her February 1, 2017 email reporting retaliation—that is, they punished her for her speech. ..........................................................................44

   4. Defendant District is liable under 42 U.S.C. § 1983 and *Monell* because the First Amendment retaliation against Buddenberg resulted from a policy and practice, driven by officials with final decision-making authority; a policy of inadequate training and supervision; and a custom of tolerance of or acquiescence to federal rights violations. .......................................................45

      a. The District's actions against Buddenberg were taken by, among others, officials with final decision-making authority—board members,

Commissioner Weisdack, and Budzik because Weisdack made him a designee, implementing agency policies. ..................................................45

    b.   The District failed to train, supervise, and discipline Weisdack for his serial retaliation. ......................................................................................46

    c.   The District had a custom of tolerance or acquiescence to serial civil-rights violations over seven months against Buddenberg. ........................47

D. The District is liable on three Title VII–, Ohio Rev. Code § 4112–, Equal Pay Act– and Ohio Rev. Code § 4111.17(D))–retaliation elements (protected activity, Defendant's knowledge of that activity, and adverse employment actions)—and, on the fourth (causation), is liable for retaliatory motive for the adverse actions against Buddenberg Defendants admit are causally connected to her February 1, 2017 email protesting retaliation against Mix. Weisdack, Goergen, Gragg, Livers, and Whitright are likewise liable on the same Equal Pay Act– and Ohio Rev. Code § 4112–retaliation elements, as is Budzik on the same Equal Pay Act– retaliation elements. ..............................................................................................48

    1.   Buddenberg engaged in Title VII–, Ohio Rev. Code § 4112–, and Equal Pay Act–protected activity by reporting gender-discrimination, equal-pay concerns to Weisdack, the board, and its agents, filing her February 2017 EEOC retaliation charge, and repeatedly complaining about retaliation against herself and the supervisor protecting her, Dan Mix. .........................49

        a.   Buddenberg engaged in Title VII–protected opposition activity by reporting to the board her concern that a man and a woman were being paid differently for the same work, retaliation for having reported about the gender-pay-equity issue, and filing an EEOC retaliation charge........49

        b.   Buddenberg engaged in Ohio Rev. Code § 4112–protected opposition by reporting to the board her concern that a man and a woman were being paid differently for the same work, and retaliation she was facing for telling the board about it. .........................................................................52

        c.   Buddenberg engaged in Equal Pay Act– and Ohio Rev. Code § 1111.17(D)–protected activity by reporting to the board about the gender-based pay disparity between Hill and Varga, retaliation she was facing for reporting this inequity, and filing an EEOC retaliation charge. ...............53

    2.   Defendants knew Buddenberg had engaged in protected activity by reporting to the board about the gender-based disparity between Hill and Varga, retaliation for having reported about the inequity, and filing an EEOC retaliation charge. ............................................................................................54

    3.   After Buddenberg engaged in protected activity, Defendants subjected her to materially adverse actions (e.g., charging her, gaslighting her in a hearing, threatening and carrying out a litany of disciplinary charges against her,

demoting her, suspending her without pay, and slashing her pay nearly in half) that would dissuade a reasonable worker from making or supporting a discrimination or retaliation charge. .................................................................55

4.  Defendants' admissions establish as a matter of law the causal connection between Defendants' adverse actions that followed Buddenberg's February 1, 2017 email and the protected-activity email itself. ...........................................58

E.  The retaliation elements established above are also elements of the Ohio Rev. Code § 2921.45 (interfering with civil and statutory rights) and § 2307.60 (civil liability for criminal acts) claim, so Defendants Weisdack, Goergen, Gragg, Livers, and Whitright are just as liable for that claim.............................................59

F.  Defendants District, Weisdack, Budzik, Gragg, Livers, Whitright, Goergen, and Wendell's admissions should cause the Court to also enter summary judgment on Ohio Rev. Code § 4112.02(J) aiding-and-abetting elements and claims. ..............61

IV.   Conclusion ....................................................................................................................63

TABLE OF AUTHORITIES

**Cases**

*Abbott v. Crown Motor Co., Inc.,*
   348 F.3d 537 (6th Cir. 2003) .................................................................................48, 58

*Adair v. Charter Cnty. Of Wayne,*
   452 F.3d 482 (6th Cir. 2006) ............................................................................. 48

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .......................................................................................33, 34

*Arnett v. Myers,*
   281 F.3d 552 (6th Cir. 2002) .............................................................................. 34

*Baar v. Jefferson Cnty. Bd. of Educ.,*
   476 F. App'x 621 (6th Cir. 2012) ........................................................................ 46

*Baker v. Buschman Co.,*
   127 Ohio App.3d 561, 713 N.E.2d 487 (Ohio Ct. App. 1998) ............................. 52

*Birch v. Cuyahoga Cnty. Prob. Ct.,*
   392 F.3d 151 (6th Cir. 2004) ..........................................................................48, 54

*Bonnell v. Lorenzo,*
   241 F.3d 800 ...................................................................................................... 37

*Booker v. Brown & Williamson Tobacco Co., Inc.,*
   879 F.2d 1304 (6th Cir. 1989) ............................................................................. 52

*Bowman v. Shawnee State Univ.,*
   220 F.3d 456 (6th Cir. 200) ................................................................................ 56

*Brack v. Budish,*
   2022 WL 1192784 (N.D. Ohio Apr. 21, 2022) .................................................... 38

*Braun v. Ultimate Jetcharters*, LLC,
   828 F.3d 501 (6th Cir. 2016) .............................................................................. 52

*Brown v. Crowley,*
   312 F.3d 782 (6th Cir. 2002) .............................................................................. 41

*Buddenberg v. Weisdack,*
   161 Ohio St.3d 160, 2020-Ohio-3832 ................................................................. 60

*Buddenberg v. Weisdack*,
   939 F.3d 732 (6th Cir. 2019) ..................................................................................... Passim

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006) ........................................................................................................ 56, 57

*Burlington N. & Santa Fe Ry. Co. v. White*,
   364 F.3d 789 (6th Cir. 2003) ....................................................................................... 60

*Christopher v. Stouder Mem'l Hosp.*,
   936 F.2d 870 .................................................................................................................. 58

*City of Canton v. Harris*,
   489 U.S. 378 (1989) ...................................................................................................... 47

*City of St. Louis v. Praprotnik*,
   485 U.S. 112 (1988) ...................................................................................................... 46

*Connick v. Myers*,
   461 U.S. 138 (1983) ...................................................................................................... 38

*Creggett v. Jefferson Cnty. Bd. of Educ.*,
   491 F. App'x 561 (6th Cir. 2012) .............................................................................. 56

*Davis v. Metro Parks and Recreation Dep't*,
   854 F. App'x 707 (6th Cir. 2021) .............................................................................. 58

*DeCrane v. Eckart*,
   12 F.4th 586 (6th Cir. 2021) ...................................................................................... 38, 44

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ...................................................................................................... 38, 40

*Holbrook v. Dumas*,
   658 F. App'x 280 (6th Cir. 2011) .............................................................................. 35

*Jacobson v. Kaforey*,
   149 Ohio St. 3d 398 (2016) ........................................................................................ 60

*Johnson v. Univ. of Cincinnati*,
   215 F.3d 561 (6th Cir. 2000) ...................................................................................... 50, 51

*Jones v. Clark Cnty.*,
   959 F.3d 748 (6th Cir. 2020) ...................................................................................... 46

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
   563 U.S. 1 (2011) .......................................................................................................... 53

*Kinross v. Charter Twp. of Osborne,*
   2007 WL 4284861 (W.D. Mich. Dec. 3, 2007) .......................................................................... 37

*Kubala v. Smith,*
   984 F.3d 1132 (6th Cir. 2021) ............................................................................................. 41, 42

*Lane v. Franks,*
   573 U.S. 228 ............................................................................................................. 35, 37, 38, 40

*Laster v. City of Kalamazoo,*
   746 F.3d 714 (6th Cir. 2014) ............................................................................................. 48, 49, 56

*Lugar v. Edmonson Oil Co., Inc.,*
   457 U.S. 922 (1982) ................................................................................................................. 60

*Luke v. City of Cleveland,*
No. 1:02 CV 1225, 2005 U.S. Dist. LEXIS 49630 (N.D. Ohio Aug. 22, 2005) .................................... 61

*Marohnic v. Walker,*
   800 F.2d 613 (6th Cir. 1986) ....................................................................................................... 37

*McDaniel v. Transcender, LLC,*
   119 F. App'x 774 (6th Cir. 2005) ................................................................................................. 53

*Michael v. Caterpillar Fin. Servs. Corp.,*
   496 F.3d 584 ............................................................................................................................. 56

*Miller v. Calhoun Cnty.,*
   408 F.3d 803 (6th Cir. 2005) ....................................................................................................... 46

*Monell v. Dep't of Social Servs.,*
   436 U.S. 658 (1978) ................................................................................................................... 45

*Moore v. Freeman,*
   355 F.3d 558 (6th Cir. 2004) ....................................................................................................... 53

*Myers v. City of Centerville,*
   41 F.4th 756 (6th Cir. 2022) ....................................................................................................... 37

*Paige v. Coyner,*
   614 F.3d 273 (6th Cir. 2010) ....................................................................................................... 44

*Pembaur v. City of Cincinnati,*
   475 U.S. 469 (1986) ................................................................................................................... 45

*Pickering v. Bd. of Educ.,*
   391 U.S. 563 (1968) ................................................................................................................... 40

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*,
  66 Ohio St.2d 192, 421 N.E.2d 128 (Ohio 1981) ...........................................................52, 56

*Reeser v. Henry Ford Health System*,
  119 F.Supp.3d 710 (FLSA) .......................................................................................... 58

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990) ...................................................................................................... 43

*Smith v. State*,
  41 Ohio App. 64, 179 N.E. 696 (9th Dist. Dec. 9, 1931) ............................................... 61

*Spiteri v. AT&T Holdings, Inc.*,
  40 F.Supp.3d 869 (E.D. Mich. 2014) ........................................................................... 53

*State v. Stepp*,
  117 Ohio App.3d, 690 N.E.2d 1342 (4th Dist. 1997) .................................................... 61

*Thaddeus-X v. Blatter*,
  175 F.3d (6th Cir. 1999) .............................................................................................. 43

*Thomas v. City of Chattanooga*,
  398 F.3d 426 (6th Cir. 2005).....................................................................................45, 47

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011)....................................................................................................57, 58

*Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*,
  495 F. App'x 651 (6th Cir. 2012) ................................................................................. 50

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) .................................................................................................... 58

*Wagner v. Metro. Nashville Airport Auth.*,
  772 F.2d 227 (6th Cir. 1985) ....................................................................................... 59

*Wasek v. Arrow Energy Servs., Inc.*,
  682 F.3d 463 ............................................................................................................... 50

*Washington Cnty. v. Gunther*,
  452 U.S. 161 (1981) .................................................................................................... 55

*Washington v. Ill. Dept. of Revenue*,
  420 F.3d 658 (7th Cir. 2005).........................................................................................57

*Westmoreland v. Sutherland*,
  662 F.3d 714 (6th Cir. 2011) ....................................................................................... 35

*Williams v. Kentucky,*
   24 F.3d 1526 (6th Cir. 1994) ........................................................................................ 40

*Williams v. Northwest Airlines, Inc.,*
   53 F. App'x 350 (6th Cir. 2002) ................................................................................... 55

*Wood v. Eubanks,*
   25 F.4th 414 (6th Cir. 2022) ......................................................................................... 43

*Woodworth v. Time Warner Cable, Inc.*
   Case No. 1:15-CV-1685, 2015 U.S. Dist. LEXIS 148832 (N.D. Ohio Nov. 2, 2015) ..................... 61

*Wuliger v. Christie,*
   310 F.Supp.2d 897 (N.D. Ohio 2004) ........................................................................... 33

**Statutes**

28 U.S.C. § 215(A)(3) ...................................................................................................... 48

29 U.S.C. § 206 (d) ......................................................................................................... 53

42 U.S.C. § 215(a)(3) ...................................................................................................... 53

42 U.S.C. § 1983 ............................................................................................................. 45

42 U.S.C. § 2000e-3(A) ............................................................................................... 48, 49

Ohio Rev. Code §4112(J) .............................................................................................. 2, 61

Ohio Rev. Code § 1111.17(D) ...................................................................................... 53, 54

Ohio Rev. Code § 2307.60(A)(1) ..................................................................................... 60

Ohio Rev. Code § 2901.22(B) .......................................................................................... 60

Ohio Rev. Code § 2921.45 ...................................................................................... 2, 59, 63

Ohio Rev. Code § 2921.45(A) .......................................................................................... 59

Ohio Rev. Code § 3709.01 ............................................................................................... 46

Ohio Rev. Code § 4111.17(D) ............................................................................. 48, 49, 53, 63

Ohio Rev. Code § 4112 .............................................................................................. Passim

Ohio Rev. Code § 4112(J) ............................................................................................. 2, 61

Ohio Rev. Code § 4112.02(A) .......................................................................................... 52

Ohio Rev. Code § 4112.02(I) ................................................................................ 48, 52, 63

Ohio Rev. Code § 4112.02(J) ................................................................................ 61

Ohio Rev. Code §§ 2307.60 ................................................................................... 2

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................... 33

MEMORANDUM IN SUPPORT

## I.    Issues Presented

### A.  First Amendment retaliation.

Such retaliation occurs when (1) a public employee engaged in protected speech; (2) she experienced adverse action(s) that would deter a person of ordinary firmness from continuing; and (3) a causal connection exists between (1) and (2). Rebecca Buddenberg's speech was protected, and Defendants admit to the causal connection between her February 1, 2017 email protesting retaliation against supervisor Dan Mix and resulting adverse actions. Should the Court grant her summary judgment on this claim?

#### 1.  Protected activity.

##### a.  Private-citizen speech.

Public employees have the right to speak as private citizens on matters of public concern, a legal question. Speaking about gender-based pay inequity, unethical and illegal conduct, and policy violations by Commissioner Robert Weisdack wasn't part of Buddenberg's job duties; she spoke to the District's board outside the command chain. Should the Court find as a matter of law she spoke as a private citizen?

##### b.  Matter of public concern.

Public employees are protected for speech as private citizens on matters of public concern, a legal question. Buddenberg's speech to the board was undisputedly about gender-based pay discrimination, unethical self-dealing by the commissioner, and maladministration including policy violations. Defendants generally concede these were matters of public concern, which they are. Should the Court find as a matter of law Buddenberg spoke on matters of public concern?

##### c.  *Pickering* balancing test

In striking the balance between a public employee's and the government's interests, courts must weigh whether an employee's speech meaningfully interfered with the employee's job performance or undermined the employer's mission. But the employer's side of this scale is empty where speech—like Buddenberg's—involves allegations of official misconduct, illegality, and public corruption. Should the Court find the District's empty interests fail to outweigh Buddenberg's free-speech rights?

#### 2.  Adverse actions

First Amendment–retaliation adverse actions would deter a person of ordinary firmness from speech. Buddenberg undisputedly endured, among other things: a working-hours change that hampered her ability to help care for her cancer-stricken grandson; getting the silent treatment from board members who'd promised to protect her; disciplinary-action notice; a hearing where Budzik aggressively interrogated and gaslit her; suspension; demotion; and having her pay slashed almost in half. Should this Court find she faced adverse actions?

### 3.  Causal connection (Feb 1. email).

Defendants admit they gave Buddenberg a disciplinary-action notice, subjected her to a hearing and questioning, demotion, suspension, and having her pay slashed almost in half for protesting in a February 1, 2017 email that supervisor Dan Mix lost his job for protecting her from retaliation. Should the Court find the causal connection between those adverse actions and her email, thus establishing that First Amendment retaliation occurred?

## B.  Title VII, Ohio Rev. Code § 4112, and federal and state Equal Pay Act retaliation.

These statutes protect against retaliation for protected activity, with slightly varying standards. It's undisputed that Buddenberg reported gender-based pay inequity, opposed retaliation against herself and Mix, and filed an EEOC retaliation charge. Defendants knew of this, she experienced certain adverse actions; and many of Defendants' adverse actions and her protected activity are causally connected. Should the Court hold the elements and statutory-retaliation claims are established as a matter of law and enter summary judgment?

## C.  Civil liability for criminal acts including interference with civil and statutory rights (Ohio Rev. Code §§ 2307.60 and 2921.45).

If the previous claims or elements of them are established, then elements of or the claim for civil liability for criminal acts—incorporating the interference-with-civil-and-statutory-rights criminal statute, are established. Should the Court hold the elements and the statutory-retaliation claims are established as a matter of law and enter summary judgment?

## D.  Aiding and abetting

No one—including lawyers—may aid, abet, incite, compel, or coerce retaliation or try even indirectly to retaliate for opposing, or participating in a proceeding about, gender discrimination or retaliation. Nor can anyone assist retaliation by omitting conduct one should do. Defendants admits acts doing these verboten things, which includes omitting responding to Buddenberg and protecting her. Should the Court enter summary judgment under Ohio Rev. Code § 4112(J) entirely, at least regarding satisfied retaliation elements?

## II.  Statement of Undisputed Material Facts[1]

### A.  Rebecca Buddenberg garnered positive evaluations and a merit-pay raise for her performance as the Geauga County Health District's fiscal coordinator.

Plaintiff Rebecca Buddenberg worked at the Geauga County Health District from February

2, 2015, until May 27, 2017. (Dist. Defs.' Answer to Sec. Am. Compl. at 3 ¶ 11, ECF No. 37,

PageID#456.) She served as the fiscal coordinator until March 21, 2017, when she was demoted to a

---

[1] This motion relies almost entirely on Defendants' own material admissions and documents. Only when background facts are needed to fill in gaps does it rely on Plaintiff Buddenberg's testimony—and that too only on topics that Defendants cannot, by their own admission or because they lack foundation, dispute.

clerical position. (*Id.*; Ex. 68, ECF No. 195-19, PageID#5167.)

As fiscal coordinator, Buddenberg helped with financial work, including processing biweekly payroll and weekly accounts payable, preparing monthly fiscal reports, and helping with the annual budgeting process. (Weisdack Dep. Vol. 1 26:13–25, ECF No. 180-1, PageID#1980; Dist. Defs.' Answer to Sec. Am. Compl. at 3 ¶ 12, ECF No. 37, PageID#456.) She was also responsible for maintaining personnel records and acting as liaison for employee-benefits coordination and injury-reporting between the District and the county. (Dist. Defs.' Answer to Sec. Am. Compl. at 3 ¶ 13, ECF No. 37, PageID#456; Weisdack Dep. Vol. 1 29:19–30:16, ECF No. 180-1, PageID#1983–84.)

Buddenberg wasn't a policymaker. (*See, e.g.*, District 30(b)(6) (Litke) Dep. 121:3–6, ECF No. 179-1, PageID#1654 ("Board of Health is the ultimate authority in the Health Department.").) Her ordinary and *ad hoc* job duties didn't include reporting to the District's board on perceived ethical violations, policy violations, or gender-pay-equity issues. (*See, e.g.*, Weisdack Dep. Vol. 1 33:23–34:14, ECF No. 180-1, PageID#1988; Whitright Dep. 42:11–44:3, ECF No. 189-1, PageID#4025–27.)

Weisdack hired Buddenberg. (Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36, PageID#5317; Weisdack Dep. Vol. 1 24:20–24, ECF No. 180-1, PageID#1978.) Although Buddenberg technically reported directly to Weisdack, Administrator Dan Mix was functionally her direct supervisor until April 2016, when the District's organizational chart memorialized on paper that pre-existing role. (*See* Weisdack Dep. Vol. 1 30:17–31:19, ECF No. 180-1, PageID#1984–85.) Mix, who reported directly to Weisdack, remained Buddenberg's supervisor until Mix was effectively forced to resign in February 2017. (*Id.* at 32:11–15, PageID#1986.)

Buddenberg received generally positive performance evaluations. (Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36, PageID#5279 (describing evaluations as "generally favorable" and "show[ing] generally acceptable performance."); Budzik Dep. Vol. 2 326:15–21, ECF No. 184-1, PageID#3062.) Weisdack conducted her first evaluation about four

months into her job. (Ex. 38, ECF No. 194-39, PageID#4835–37.) He offered praise: "I consider Rebecca a professional[-]minded person"; "Rebecca is doing great and learning new (things) skills every day"; "Rebecca's attitude is great and has a lot of motivation"; "Rebecca shows she is [is] very ethical"; and "Rebecca is very genuine in her desire to do more and has great initiative." (*Id.* at PageID#4835–37; Weisdack Dep. Vol. 1 35:20–37:2, ECF No. 180-1, PageID#1989–91.)

The only area Weisdack identified as "need[ing] improvement" was that Buddenberg "not be so aggressive on policy issues" (Ex. 38, ECF No. 194-39, PageID#4836; Weisdack Dep. Vol. 1 37:8–22, ECF No. 180-1, PageID#1991.) Weisdack recommended she "[b]ecome a little more flexible in policy administration and implementation." (Ex. 38, ECF No. 194-39, PageID#4837.)

Weisdack evaluated Buddenberg again in April 2016. (Weisdack Dep. Vol. 1 41:22–42:11, ECF No. 180-1, PageID#1995–96.) And again he lavished her with praise: she "completes timely and accurate reports, grant statements, accounts payable[,] records[,] and payment of bills"; "demonstrates excellent knowledge and skills of her work and adheres to organizational policies and procedures"; "is punctual and organized … and assists others"; "works well with other County departments"; and "has made promising suggestions to improve office moral[e]." He even said she "takes a firm, non-threatening stance when situations arise amongst staff"; and "demonstrates high ethical standards and fiscal responsibility." (Ex. 38, ECF No. 194-39, PageID#4838–39; Weisdack Dep. Vol. 1, 43:2–8, ECF No. 180-1, PageID#1997 (confirming evaluation accurate).)

Although Weisdack repeatedly insisted he exchanged fewer than 600 words with Buddenberg during her entire employment (*see, e.g., id.* at 87:8–14, 89:16–19, 91:14–18, PageID##2041, 2043, 2045), he had no problem signing off on her first evaluation based on what he "had seen of her excellent activities." (*Id.* at 45:2–47:11, PageID#1999–2001.) After her April 2016 review, he also awarded her a raise that was significantly more than the average increase that year. (*Id.* at 43:10–12, 43:15–24, PageID#1997–98; *id.* at 43:15–24 (can't dispute what's reflected in

"the personnel file"; Buddenberg Decl. at 1 ¶ 2; PageID#11745.) Weisdack never directed Mix to discipline Buddenberg; nor did he discuss with her that she supposedly needed to realize "that not everything is black and white" regarding policy violations. (Weisdack Dep. Vol. 1 37:23–38:8, PageID#1991–92; Weisdack Dep. Vol. 2 297:8–17, ECF No. 181-1, PageID#2299; District 30(b)(6) (Litke) Dep. 292:3–5, ECF No. 179-1, PageID#1824–25.)

But things changed when Buddenberg reported what she believed was Weisdack's unlawful and unethical misconduct.

**B. Buddenberg goes over Weisdack's head to report to the board Weisdack's gender-based pay discrimination against another employee, unethical self-dealing, and failure to comply with District policies; Defendant board members promise to protect her from retaliation.**

Throughout her employment, Buddenberg perceived several Weisdack practices she believed were illegal, unethical, or violated District policy. For instance, Buddenberg learned that female employee Amanda Hill was being paid less than male Frank Varga for the District job of sanitarian-in-training—despite Hill being more experienced and having a higher GPA. Employees' hourly rates were to be set within an established range, "with the lower end reserved for new, inexperienced employees and the higher end used for employees with extensive experience." (Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36, PageID#5279.) When hired, Hill had completed two District internships (experience Varga lacked) and had a much higher GPA. Despite this, Weisdack started Varga at $15.50/hour, while the next year he gave Hill only $13.50/hour. By fall 2016 Varga was earning $2.75/hour more than Hill. (*Id.*, PageID#5279–80; Weisdack Dep. Vol. 1 137:12–21, 141:2–14, 160:5–8, ECF No. 180-1, PageID##2091, 2095, 2114.)

After Hill was hired, Mix and Environmental Health Administrator Michael Tusick complained to Weisdack about the unequal pay. (Weisdack Dep. Vol. 1 175:17–176:8, 179:6–180:3, PageID#2129–30, 2133–34.) Their concerns were reasonable. (*Id.* at 135:23–136:18, PageID#2089–90.) Weisdack told them he'd "look into it" (though he also told Mix that "there are certain job

specifics that are much more suited to a male than a female.") (*Id.* at 179:24–180:3; PageID#2133–24; *see also id.* at 160:21–161:10, PageID#2114–15 ("[I]t would be extremely hard for some of these ladies to lift [septic-tank lids]" but "some ladies are more equipped.") (cleaned up).)

But when *Buddenberg* expressed concern about unequal pay, Weisdack told her she "wasn't a lawyer." (*Id.* at 146:14–21, PageID#2100.) He didn't correct the disparity. (*Id.* at 141:15–18, PageID#2095.)

Buddenberg also believed Weisdack was self-dealing by personally completing unapproved contract work for pay. In 2016, the District obtained an Ohio EPA grant for tire removal and—absent competitive bids—Weisdack himself started the work with no approved contract. (*Id.* at 56:21–24, 58:10–59:25, 61:6, PageID##2010, 2012–13, 2015.) He knew that as commissioner, he wasn't permitted to benefit financially from a contract he oversaw. (*Id.* at 77:5–10, PageID#2031.) Yet he did this work without seeking board approval for any contracts or verification that no conflict of interest existed. (*Id.* at 82:15–24, PageID#2036.) He claimed he and other District employees worked as "volunteers," although he admitted the employees had hoped (if not expected) to be paid. (*Id.* at 93:20–94:3, PageID#2047–48; *see also* Wendell Dep. Vol. 1 90:2–13, ECF No. 190-1, PageID#4342 (after "it all came to a head and Rebecca reported to the Board," Weisdack's assistant Defendant Alta Wendell learned Weisdack was expecting to be paid for his tire work).) Weisdack later personally paid $500 each to the employees who had helped him because he "felt bad" that they had done the work before a contract was approved. (Weisdack Dep. Vol. 1 61:12–23, 61:13–25, 63:13–18, 64:10–12, ECF No. 180-1, PageID##2015, 2017–18.)

Buddenberg reported to the board on October 24, 2016 her concerns about the unequal-pay practices and potential conflict of interest. (Ex. 120 (Dist. Defs.' Answer to Req. for Admis., ECF No. 196-13, PageID#5524; District 30(b)(6) (Litke) Dep. 44:24–45:4, 54:17–25, ECF No. 179-1, PageID#1577–78, 1587; Gragg Dep. 25:5–17, 30:2–6, ECF No. 188-1, PageID##3687, 3692;

Whitright Dep. 16:8–25, 22:15–20, ECF No. 189-1, PageID##3999, 4005.) She also reported that

Weisdack was engaged in other unethical acts, misuse of agency resources, and failure to adhere to

agency policy, including that Weisdack:

- failed to address concerns over staff's resource misuse, including ignoring recommendation to install GPS units in agency vehicles to ensure field staff were actually working. (District 30(b)(6) (Litke) Dep. 63:12–17, ECF No. 179-1, PageID#1596.)

- failed to implement procedures to ensure proper public-fund handling. *See* Gragg Dep. 45:9–16, ECF No. 188-1, PageID#3707 (doesn't dispute Buddenberg raised issue); Whitright Dep. 31:20–32:2, ECF No. 189-1, PageID#4014–15 (same); Buddenberg Decl. at 1 ¶ 4, PageID#11745.)

- failed to implement discipline consistently (e.g., refused to implement a progressive-discipline model and stated he would take staff to coffee to solve any problems). (District 30(b)(6) (Litke) Dep. 63:18–23, 64:19–65:1, ECF No. 179-1, PageID#1596, 1597–98; Whitright Dep. 28:24–29:7, ECF No. 189-1, PageID#4011–12.)

- failed to enforce employee-attendance and paid-break policies. (District 30(b)(6) (Litke) Dep. 65:22–66:20, ECF No. 179-1, PageID#1598–99.)

- failed to honor the reference-check policy for new hires (especially important because District employees would sometimes enter private residences). (*Id.* at 67:1–4, PageID#1600.)

- ignored the employee health-and-safety committee's recommendations (including a request for funds to install speakers in an area where fire alarms couldn't be heard). Gragg Dep. 46:3–12, ECF No. 188-1, PageID#3708 (doesn't dispute Buddenberg raised issue); Whitright Dep. 32:15–33:14, ECF No. 189-1, PageID#4015–16 (same); Buddenberg Decl. at 1 ¶ 4, PageID#11745.

- accepted and allowed the office to accept gifts from contractors to whom the District issued permits. Gragg Dep. 40:22–41:5, ECF No. 188-1, PageID#3702–03 (unable to dispute Buddenberg); Whitright Dep. 26:7–13, ECF No. 189-1, PageID#4009. Buddenberg Decl. at 1 ¶ 4, PageID#11745.

- "yell[ed], threaten[ed], intimidate[d], and ignore[d] the staff," including by hanging a pacifier on his door with the words "For those who disagree." (*See* Ex. 185, District's EEOC Position Statement (Mix), ECF No. 197-29, PageID#6348.)

(*See also* Ex. 25, ECF No. 194-26, PageID#4744–4756 (email from Buddenberg to board members

memorializing details of October 24, 2016 report).)

The ethical, policy compliance, and pay-equity issues Buddenberg reported are matters of

public concern. *See, e.g.*, Weisdack Dep. Vol. 1 163:9–24, ECF No. 180-1, PageID#2117 (gender-based pay discrimination is matter of public concern); District 30(b)(6) (Litke) Dep. 57:18–58:18, ECF No. 179-1, PageID#1590–91 (same); Goergen Dep Vol. 1 31:14–25, ECF No. 186-1, PageID#3286 (same); Gragg Dep. 34:17–22, ECF No. 188-1, PageID#3696 (same); Whitright Dep. 25:24–26:6, ECF No. 189-1, PageID#4008–09 (same); Weisdack Dep. Vol. 1 83:1–84:11, ECF No. 180-1, PageID#2037–38 (potential self-dealing or obligating District to work without legally required contract would be matters of public concern); Goergen Dep. Vol. 1 27:13–22, ECF No. 186-1, PageID#3282 (tire-contract report would be of public concern if "it wasn't handled internally appropriately"); Gragg Dep. 27:23–28:16, ECF No. 188-1, PageID#3689–90 (whether Weisdack was following appropriate protocols on tire contract could be matter of public concern); Whitright Dep. 20:24–21:7, ECF No. 189-1, PageID#4003–04 (work proceeding without authorizing contract could be matter of public concern); District 30(b)(6) (Litke) Dep. 60:5–62:1, ECF No. 179-1, PageID #1593–95 (government employee accepting contractors' gifts would generally be of public concern); Goergen Dep. Vol. 1 32:1–19, ECF No. 186-1, PageID#3287 (same); Gragg Dep. 39:11–21, 40:20–41:5 ECF No. 188-1, PageID##3701, 3702–03 (same); Whitright Dep. 26:14–17, ECF No. 189-1, PageID#4009 (same); Weisdack Dep. Vol. 1 168:12–17, ECF No. 180-1, PageID#2122 (whether field staff are accurately reporting work they did is matter of public concern); District 30(b)(6) (Litke) Dep. 63:24–64:8, ECF No. 179-1, PageID#1596–97 (potential misuse of District resources is matter of public concern); Whitright Dep. 27:7–21, ECF No. 189-1, PageID#4010 (Weisdack's failure to address issues with staff misusing resources is potentially matter of public concern); Weisdack Dep. Vol. 1 198:20–199:1, ECF No. 180-1, PageID#2152–53 (inability to reconcile revenue for functions like birth-certificate issuance is matter of public concern); Whitright Dep. 32:9–14, ECF No. 189-1, PageID#4015 (commissioner failing to implement procedures about handling public funds properly would be matter of public concern); District 30(b)(6) (Litke) Dep.

72:7–17, ECF No. 179-1, PageID#1605 (public "want[s] to have checks and balances for revenues and expenditures" throughout District); *id.* at 65:22–66:10, PageID#1598–99 (Weisdack's refusal to enforce employee-attendance policies would be matter of public concern "given the misuse of public resources"); Whitright Dep. 30:25–31:19, ECF No. 189-1, PageID#4013–14 (Weisdack's refusal to enforce employee-attendance and paid-break policies would be matter of public concern); *id.* at 29:8–14, PageID#4012 (whether commissioner follows written progressive-discipline model could be matter of public concern); *id.* at 33:15–19, PageID#4016 (worker safety could be matter of public concern).)

Most items about which Buddenberg reported didn't directly affect her. (*See, e.g.,* Goergen Dep. Vol. 1 53:17–22, ECF No. 186-1, PageID#3308; Gragg Dep. 30:7–9, 34:7–11 ECF No. 188-1, PageID##3692, 3696 (Buddenberg wasn't alleging gender pay disparity affected her personally); Goergen Dep. Vol. 1 53:17–22, ECF No. 186-1, PageID#3308 (same); District 30(b)(6) (Litke) Dep. 57:18–22 ECF No. 179-1, PageID#1590 (same); *id.* at 64:9–18, PageID#1597 (Buddenberg wasn't alleging progressive-discipline policy was being used against her).)

## C. Buddenberg's reports about gender-based pay inequity, unethical practices, and policy violations aren't in her job duties.

It wasn't within Buddenberg's ordinary or *ad hoc* job duties to report directly to the board on these topics. (Ex. 37, ECF No. 194-38, PageID#4830–34 (fiscal-coordinator job description); Weisdack Dep. Vol. 1 31:20–24; 33:23–34:14, 168:6–11, ECF No. 180-1, PageID##1985, 1987–88, 2122; Whitright Dep. 42:11–44:3, 45:13–20 ECF No. 189-1, PageID##4025–28.) Before October 24, 2016, she had never reported potential commissioner ethical violations. (Goergen Dep. Vol. 1 47:24–48:3, ECF No. 186-1, PageID#3302–03.) In fact, she had never spoken directly to the board. (Gragg Dep. 18:20–19:13, ECF No. 188-1, PageID#3680–81.)

The report came through no routine personnel process. (*Id.* at 19:14–20:4, 32:19–23, PageID#3681–82, 3694 (aware of no other time employee other than commissioner had requested

to speak directly with board; this was unusual).) Before the board meeting, Buddenberg emailed members that she had concerns about leadership she wanted to present. (*Id.* at 17:4–10, PageID#3679; Goergen Dep. Vol. 1 14:12–20, ECF No. 186-1, PageID#3269.) She presented at a special meeting convened to determine whether to extend Weisdack's contract. (Goergen Dep. Vol. 1 13:14–14:7, ECF No. 186-1, PageID#3268–69.)

At the meeting, Buddenberg expressed concern about potential retaliation. (*Id.* at 42:9–25, PageID#3297; Gragg Dep. 48:1–7, ECF No. 188-1, PageID#3710; Whitright Dep. 37:4–9, ECF No. 189-1, PageID#4020.) The board assured her they would "investigate and determine what was going on" and "potentially deal with issues." (Goergen Dep. Vol. 1 74:11–75:17, ECF No. 186-1, PageID#3328–29; Gragg Dep. 20:13–17, ECF No. 188-1, PageID#3682.) They told Buddenberg that they "appreciated her honesty and forthcoming [sic]," and that she "should not feel threatened [for] expressing these concerns[.]" (*Id.* at 48:21–49:1, PageID#3710–11.) They told her not to worry about retaliation. (Gragg Dep. 50:14–18, ECF No. 188-1, PageID#3712.) They assured her they would protect her from retaliation. (Whitright Dep. 37:13–18, ECF No. 189-1, PageID#4020.) But those were empty promises. (*See* Gragg Dep. 51:16–52:1, ECF No. 188-1, PageID#3713–14 (insisting board had "no role to play" in protecting Buddenberg from retaliation; *see also id.* at 98:13–99:16, 106:16–107:8, PageID##3760–61, 3768 (wouldn't care about Buddenberg's positive performance reviews, and wouldn't have wanted to see retaliation reports because he had already concluded it wasn't retaliation and "didn't need to hear this again and again every time it happened."); *id.* at 83:21–84:11, PageID#3745–46 ("[Buddenberg] met with us because she was angry with [Weisdack]. Weisdack, in turn, was angry because [Buddenberg] talked to us…Was there ill feeling going on? I'm sure there was…was there anything I could do about it? No, there wasn't. I didn't get involved…").)

Instead, as described below, they participated in and ratified adverse actions against her.

**D. Right after Buddenberg's board report, Weisdack changes her work schedule and makes it known officewide that he's upset with her for going to the board.**

On October 24, 2016, Weisdack saw Buddenberg walk into the board meeting with Gragg, an unusual event. (Weisdack Dep. Vol. 2 231:19–232:12, ECF No. 181-1, PageID#2233–34.) He knew she had "some issues" with his decisions he had been making—including gender-pay equity issue—and immediately suspected she had to the board reported "something" about him. (*id.* at 234:18–23, 236:22–237:3, PageID##2236, 2238–39.) **Within less than 48 hours of her report**, Weisdack instructed Mix to change her working hours from the 7:00 am–3:30 pm she had negotiated when she was hired to 8:00 am–4:30 pm. (Ex. 46, ECF No. 194-47, PageID#4870; District 30(b)(6) (Litke) Dep. 128:14–18 ECF No. 179-1, PageID#1661; Weisdack Dep. Vol. 2 260:7–13, ECF No. 181-1, PageID#2262.) As Weisdack well knew, Buddenberg relied on the adjusted schedule to accommodate helping her family care for her cancer-stricken grandson. (*Id.* at 269:2–8, ECF No. 181-1, PageID#2271.) The change also affected her ability to complete college course credits. (Whitright Dep. 47:19–25, ECF No. 189-1, PageID#4030 (Whitright knew this).)

Weisdack didn't explain to her why the schedule she'd been working *for over a year and a half* without raising concerns suddenly was no longer acceptable. (Weisdack Dep. Vol. 2 262:17–25, PageID#2264.) Weisdack felt no need to discuss the change with Buddenberg directly because "she was under the supervision of Mix," even though he normally took no such hierarchal view, and routinely chatted with line employees. (*Id.* at 270:6–23, PageID#2272.) As for whether the scheduling change he imposed would harm her, Weisdack pronounced, "It had no relevancy on me." (*Id.* at 314:15–20, ECF No. 181-1, PageID#2316.)

**On Sunday, October 30, 2016**, at 8:34 pm, Weisdack wrote employee Darla Andrews an email from his District–issued iPhone: "Darla, there has been a lot of BS going on in the office and I think you know who is stirring it up. So, I said everyone must start at 8:00 and I can explain when I see you face to face. This needs to remain between you and I [*sic*]. Talk with you when you get back.

Do not mention anything to anyone until you and I talk." (Ex. 6, ECF No. 194-6, PageID#4611.)

(Despite Weisdack's claim that "everyone" would start at 8:00, two other employees, Jay Becker and

Andrews, continued to enjoy flexible schedules.) (Weisdack Dep. Vol. 2 267:16–24, ECF No. 181-1,

PageID#2269; Ex. 76, ECF No. 195-27, PageID#5257.)

The email was delivered to Andrews's email inbox through the District's server, although

Weisdack doesn't recall sending this email or "putting [the email's contents] in print." (*See* Ex. 122,

District's Resp. to Req. for Admis. 4–5 ¶¶ 1, 10, ECF No. 196-15, PageID#5604 (District's server

received email; District not accusing anyone else of sending it); Ex. 98, ECF No. 195-49,

PageID#5445 (District counsel stipulates District's server received email); Weisdack Dep. Vol. 2

275:5–6, ECF No. 181-1, PageID#2277.) The District and Weisdack never produced it in discovery;

Andrews provided it. (Ex. 6, ECF No. 194-6, PageID#4611; District 30(b)(6) (Litke) Dep. 135:25–

136:4, ECF No. 179-1, PageID#1668–69.) If the email had been deleted from Weisdack's account

before the District's servers were backed up the next day around 4:00 p.m., the email would be

permanently deleted from Weisdack's sent-mail folder (but it would still appear in Andrews's inbox).

(District 30(b)(6) (Litke) Dep. 145:4–18, ECF No. 179-1, PageID#1678.)

Weisdack didn't hide that he was upset that Buddenberg had spoken to the board about

him. (*See, e.g.*, Wendell Dep. Vol. 1 26:8–28:1, 41:22–43:4, 61:9–62:7, ECF No. 190-1,

PageID#4278–80, 4293–95, 3413–14 Wendell Dep. Vol. 2 150:20–23, ECF No. 191-1,

PageID#4434.) Wendell saw Weisdack speaking negatively about Buddenberg in the office's

hallways and doorways at least once after Buddenberg's board report. (Wendell Dep Vol. 1 104:18–

106:2, ECF No. 190-1, PageID#4356–58.) Everyone in the office generally understood that

Weisdack was upset with Buddenberg for her board report because he "told everybody everything."

(*Id.* at 94:10–20; 106:3–12, PageID##4346, 4358.) After October 24, 2016, Wendell—Weisdack's

assistant—stopped responding to Buddenberg's inquiries—even though her *job* required

communicating with Buddenberg. (*Id.* at 44:3–6, 44:9–45:6, 53:19–23; 85:3–86:5, PageID##4296–97, 4305, 4337–38 (Wendell in no position to dispute Buddenberg's testimony); Buddenberg Dep. Vol. 1 178:20–181:9, ECF No. 203-1, PageID#8638–41.)

### E. Buddenberg repeatedly reports retaliation to the board, but the board members who promised to protect her freeze her out, stop responding, and do nothing to investigate or correct the problem.

Buddenberg reported retaliation to the board and sought its protection. She wrote numerous emails to board members and outside-board-attorney Jeff Embleton detailing the adverse actions she was experiencing and her belief they were retaliation for her October 24 report. (Whitright Dep. 152:7–17, ECF No. 189-1, PageID#4135 (Buddenberg made multiple retaliation reports).)

**On October 31, 2016**, for example, Buddenberg emailed all four Defendant board members—Livers, Goergen, Whitright, and Gragg—telling them she was experiencing retaliation for reporting concerns to the board. (Ex. 77, ECF No. 195-28, PageID#5258–59; Whitright Dep. 64:5–24, ECF No. 189-1, PageID#4047 (Buddenberg was alleging work-hours change was retaliatory, Weisdack had made it known that he was angry with her for talking to board, and Weisdack had been avoiding her).)

**On November 4, 2016**, Buddenberg again reported retaliation to Livers, expressing concern about Weisdack's announcement to staff the day before that, rather than retiring, he'd would work for at least two more years. (Ex. 78, ECF No. 195-29, PageID#5260.) She said, "[Weisdack's] response to my addressing the board has created a toxic work environment and I do not want his anger towards me to impact the ability for the agency to serve the community." (*Id.*; Goergen Dep. Vol. 1 85:6–18, ECF No. 186-1, PageID#3340 (Buddenberg alleging retaliation in this email); Gragg Dep. 95:21–24, ECF No. 188-1, PageID#3757 (same.); Whitright Dep. 67:12–15, ECF No. 189-1, PageID#4050 (same.)) **The next day**, Buddenberg again reported retaliation to Livers, noting the sudden work-hours change, that Weisdack was ignoring her, and that staff had told her to "watch

[her] back" because he was "out to get [her]." (Ex. 160, ECF No. 197-3, PageID#6050; Buddenberg Dep. Vol. 1 156:22–158:21, ECF No. 203-1, PageID#8616–18; Gragg Dep. 161:10–163:5 (doesn't recall Livers telling him this—and wouldn't have wanted her to); Whitright Dep. 102:7–103:13, ECF No. 189-1, PageID#4085–86 (doesn't recall Livers telling her this).)

 **On November 13, 2016**, Buddenberg again emailed Livers to reiterate the October 24 concerns she had presented. (Ex. 25, ECF No. 194-26, PageID#4744–55.) In her cover email, Buddenberg relayed that, after hearing about upcoming compliance audit, many staff "stated they were not willing to speak because [of] the retaliation that will occur. . . . They see how [ Weisdack] is acting towards me, looking for any reason to cause me difficulty[,] and do not want that for themselves." (*Id.* at PageID#4744.) This was yet another report of retaliation. (Gragg Dep. 104:12–18, ECF No. 188-1, PageID#3766; Whitright Dep. 69:17–19, ECF No. 189-1, PageID#4052.) On **November 18, 2016**, Buddenberg forwarded this email to board attorney (Defendant Budzik's colleague) attorney Jeff Embleton. (Ex. 153, ECF No. 196-46, PageID#5993.)

 **On November 9, 2016**, the board engaged Embleton to perform a "personnel policy compliance audit"—supposedly to help the board determine whether to renew Weisdack's contract. (Dist. Defs.' Answer to Sec. Am. Compl. at 8 ¶ 43, ECF No. 37, PageID#461; Ex. 51, ECF No. 195-1, PageID#4876; Ex. 52, ECF No. 195-2, PageID#4878.)

 **On November 15, 2016**, Buddenberg spoke with Goergen and Whitright after a staff meeting they convened to discuss the upcoming compliance audit. She again said she was facing retaliation. (Ex. 52, ECF No. 195-2, PageID#4878; Goergen Dep. Vol. 1 98:10–99:10, ECF No. 186-1, PageID#3353–54; Goergen Dep. Vol. 2 215:10–16, ECF No. 187-1, PageID#3512; Whitright Dep. 106:12–107:10, ECF No. 189-1, PageID#4089–90.) Mix was present. (Goergen Dep. Vol. 1 99:16–17, ECF No. 186-1, PageID#3354.) Buddenberg wept during this conversation, But Goergen doesn't recall saying anything to her. (*Id.* at 99:18–101:24, PageID#3354–56.)

The next day, **November 16, 2016**, Goergen met with Weisdack and told him about the upcoming audit. (Weisdack Dep. Vol. 2 324:20–325:7, ECF No. 181-1, PageID#2326–27.) After that, Weisdack's and Mix's relationship was never the same. (Mix Dep. Vol. 1 48:1–50:8, ECF No. 206-1, PageID#9562–64; Weisdack Dep. Vol. 2 340:9–341:1, ECF No. 181-1, PageID#2341–2 (agreed with Mix.)) Before Buddenberg's board report three weeks earlier, Weisdack and Mix had been close friends who ate lunch together almost every day. (Goergen Dep. Vol. 1 107:2–11, ECF No. 186-1, PageID#3362; Weisdack Dep. Vol. 2 281:23–282:9, ECF No. 181-1, PageID#2283–84;) Weisdack had thought highly of Mix's prospects and hoped he'd become the next commissioner. (*Id.* at 283:10–16, PageID#2285.) But things changed in November 2016, when Weisdack understood that Mix was trying to "protect" Buddenberg. (*Id.* at 345:16–19, PageID#2347.)

**On November 17, 2016**, Weisdack ordered Mix to change the health-commissioner job description—adding new requirements that would make Mix ineligible for it. (*Id.* at 329:15–330:1, PageID#2331–32; Goergen Dep. Vol. 1 195:7–13, ECF No. 186-1, PageID#3450; Whitright Dep. 113:1–6, ECF No. 189-1, PageID#4096.) That same day, in a "special" meeting, the board approved the revised job description cutting Mix out. (Dist. Defs.' Answer to Sec. Am. Compl. at 8 ¶ 42, ECF No. 37, PageID#461; Ex. 79, ECF No. 195-30, PageID#5263.)

**On November 29, 2016**, the board unanimously voted to extend Weisdack's contract. (Ex. 80, ECF No. 195-31, PageID#5270; Weisdack Dep. Vol. 2 345:24–347:3, ECF No. 181-1, PageID#2347–49.) **The next day**, Buddenberg reported to Embleton that she believed this would enable Weisdack to further retaliate against her: "the board has placed back in authority the individual who has betrayed residents['] trust, who has mismanaged this department and has verbally attacked my character, making my workplace very uncomfortable. He has verbalized a desire to terminate my employment so I imagine I will not be here much longer . . . It is obvious by the lack of communication and protection of employees that the board is as negligent as [Weisdack]." (Ex.

81, ECF No. 195-31, PageID#5271; Gragg Dep. 115:20–116:7, ECF No. 188-1, PageID#3777–78)
(Buddenberg reporting not only retaliation, but concern about future retaliation).)

On December 14, 2016, Buddenberg emailed Livers about what she believed was ongoing
retaliation: "I do find it ironic that the ideas and concerns I had identified and were substantiated
resulted in my work environment becoming even more hostile. Perhaps I should have followed
[Weisdack's] directive to keep my mouth shut." (Ex. 82, ECF No. 195-33, PageID#5272; Gragg
Dep. 120:12–121:5, ECF No. 188-1, PageID#3782–83 (Buddenberg expressing concern about
consequences she's facing for her October 24, 2016 board report).)

On December 15, 2016, Buddenberg emailed Embleton reporting retaliation. (Ex. 83, ECF
No. 195-34, PageID#5273–74; Whitright Dep. 79:21–24, ECF No. 189-1, PageID#4062
(Buddenberg reporting a hostile work environment because of her board report).) She told
Embleton that Weisdack had created a hostile work environment by telling her coworkers that
"[she] was part of setting him up," "accus[ing] [her] of providing false information to the board
regarding the tire job," and falsely telling Hill (the female sanitarian-in-training who was paid less
than a male in the same job) that he'd been unaware of the pay difference (when "multiple parties
including [herself had] vigorously attempt[ed] to convince him equal pay was necessary.") (Ex. 83,
ECF No 195-34, PageID#5273.) She also opposed the board's lack of response to her reports:
"[The board] has allowed [Weisdack] to remain…in a position of authority [despite my many reports
that his conduct has] been detrimental to my wellbeing. He has been permitted to continue his
attacks on my character and intentions. His directives that included adverse action and retaliation
have been upheld. [Weisdack's actions] and [the board's] lack of action and communication…have
negatively impacted my employment." (Id. at PageID#5274.) The following day, Embleton replied
to Buddenberg's email stating, "I have forwarded this to [Goergen] and the assistant prosecutor as
this is beyond the scope of my engagement." (Ex. 165, ECF No. 197-8, PageID#6060.)

These were serious retaliation allegations of retaliation that Buddenberg believed to be true. (Gragg Dep. 124:15–125:5 ECF No. 188-1, PageID#3786–87.) It was reasonable for her to bring these concerns to the board. (Whitright Dep. 84:22–85:1, ECF No. 189-1, PageID#4067–68.) The board was responsible for handling retaliation claims. (*Id.* at 13:2–24, 86:11–16, PageID##3996, 4069; Goergen Dep. Vol. 1 116:23–117:2, ECF No. 186-1, PageID#3371–72; Gragg Dep. 125:6–11, ECF No. 188-1, PageID#3787.) But except for Embleton's single email disclaiming responsibility, the District has produced no responses to her emails.

(Meanwhile, **on December 19, 2016**, per Embleton's compliance-audit recommendations, the Board adjusted Hill's pay rate from $14.00 to $17.25/hour—the same rate as Varga—and backdated it to be effective June 18, 2016. (Ex. 43, ECF No. 194-44, PageID#4863–65; Goergen Dep. Vol. 1 125:5–11, ECF No. 186-1, PageID#3380; Weisdack Dep. Vol. 1 119:23–120:9, ECF No. 180-1, PageID#2073–74; Ex. 198, ECF No. 197-42, PageID#6784 (report recommended District "[c]orrect individual pay disparity issues which exist."))

**On January 12, 2017**, Embleton sent Buddenberg a letter saying that many of her October 24 concerns were being addressed. (Ex. 154, ECF No. 196-47, PageID#5995.) But he didn't mention her retaliation reports. (*Id.*; Whitright Dep. 81:17–22, ECF No. 189-1, PageID#4064.)

And the adverse actions continued. The lack of communication, for one, affected Buddenberg's ability to perform her essential job functions. (Buddenberg Dep. Vol. 1 174:6–176:8, ECF No. 203-1, PageID#8634–36.) Co-workers stopped providing her information. For example:

a.  Wendell refused to provide Buddenberg information about the purpose of purchase-order requests, making it difficult for Buddenberg to determine the expenditure categories and thus whether there were sufficient funds. (Wendell Dep. Vol. 1, 44:9–45:6, ECF No. 190-1. PageID#4296–97 (doesn't dispute she ignored Buddenberg's requests for information); Buddenberg Decl. at 2 ¶ 6, ECF No. 241-1, PageID#11746.)

b. Environmental Health Services department employees refused to respond to Buddenberg's requests for information on expected permit revenue, making it impossible for Buddenberg to accurately determine purchase-order carryover amounts (estimates for expenditures needed for the end of the year). (Weisdack Dep. Vol. 2 359:12–361:9, ECF No. 181-1, PageID#2361–63 (not aware of this, would make it difficult for Buddenberg to do her job); (Buddenberg Decl. at 2 ¶ 6, ECF No. 241-1, PageID#11746.)

c. Wendell refused to respond to Buddenberg's requests for information on items necessary to complete the year-end asset inventory, information about the District's value that would go to the auditor. (Wendell Dep. Vol. 1, ECF No. 190-1, PageID#4337–38 (doesn't dispute Buddenberg); Buddenberg Decl. at 2 ¶ 6, ECF No. 241-1, PageID#11746.)

**On January 24, 2017**, Buddenberg again sought the board's help by reporting retaliation to Livers and Embleton. (Ex. 84, ECF No. 195-35, PageID#5275–76; Whitright Dep. 89:2–6, ECF No. 189-1, PageID#4072 (this was another report of retaliation.)) She wrote about the lack of communication affecting her ability to perform her job and about being "punished" for "sp[eaking] up for those who had been treated poorly by Mr. Weisdack." (Ex. 84, ECF No. 195-35, PageID#5275–76.) She wrote: "I have been the victim of a personal attack by Mr. Weisdack. I have had my credibility undermined, impacting my ability to perform essential job functions." (*Id.* at PageID#5275.) She continued, "The Board has made no visible effort to counteract Mr. Weisdack's negative actions towards me." (*Id.*) "Please protect myself and others from the retaliation Mr. Weisdack is eager to dole out." (*Id.* at PageID#5276.)

But Livers never brought these retaliation allegations to Weisdack's attention; nor did she ask him to correct or be careful about his behavior. (Weisdack Dep. Vol. 2 367:13–368:15, ECF No. 181-1, PageID#2369–70.) Weisdack claimed no board member broached the topic of retaliation with him between Buddenberg's October 24, 2016 board report and the end of her employment. (*Id.*

at 327:7–329:3, PageID#2329–31; *but see* Whitright Dep. 72:10–76:2, ECF No. 189-1, PageID##4055–59 (board "accepted Bob Weidack's assurances about retaliation without really questioning whether they were true").) Nor did the board ask to hear from Buddenberg directly. (Whitright Dep. 153:25–154:2, ECF No 189-1, PageID#4136–37.) Gragg insisted the board—Weisdack's supervisors—had no role to play in protecting Buddenberg from retaliation, and it was not an issue they addressed. (*Compare* Gragg Dep. 51:16–52:1, ECF No. 188-1, PageID#3713–14 (board had no role to play) *with id.* at 125:6–11, PageID#3787 (board was responsible for handling retaliation claims); Goergen Dep. Vol. 1 116:23–117:2, ECF No. 186-1, PageID#3371–72 (same); Whitright Dep. 13:2–24, 86:11–16, ECF No. 189-1, PageID##3996, 4069 (same).)

**On January 31, 2017**, Buddenberg's supervisor, Mix, resigned after receiving a notice of disciplinary action "recommending and proposing" his termination. (*See* Ex. 15, ECF No. 194-16, PageID#4664 (resignation); Ex. 36-C, ECF No. 194-37, PageID#4819–22; Weisdack Dep. Vol. 2 384:5–7, ECF No. 181-1, PageID#2386 (notice referenced termination/removal at least three times); Budzik Dep. Vol. 1 204:5–8, ECF No. 183-1, PageID#2887 (notice referenced termination/removal at least twice); Whitright Dep. 94:24–95:3, ECF No. 189-1, PageID#4077–78 (notice made multiple references to potential termination).) The notice also contained several direct references to Buddenberg. (Ex. 36–C, ECF No. 194-37, PageID# 4819–22; Weisdack Dep. Vol. 2 382:11–17, ECF No. 181-1, PageID#2384.) Budzik drafted this notice with Weisdack's help. (Weisdack Dep. Vol. 2 370:5–12, ECF No. 181-1, 378:21–379:1, PageID##2372, 2380–81; Budzik Dep. Vol. 1 84:7–10, ECF No. 183-1, PageID#2767.) Budzik also signed as a witness of acceptance of Mix's resignation. (Ex. 15, ECF No. 194-16, PageID#4664.)

After Mix was gone, Buddenberg was under Weisdack's direct supervision. (District 30(b)(6) (Litke) Dep. 172:12–17, ECF No. 179-1, PageID#1705.) In a **February 1, 2017** email to Livers and Embleton, Buddenberg expressed frustration at the board's non-responsiveness, and reported she

believed Mix's disciplinary action was an act of retaliation against him, and part of Weisdack's
pattern or scheme of retaliation against her: "Is there any concern that up until my reporting to the
board on October 24th the potential EEOC violation and the [e]thics violation, Weisdack had no
issue with my performance[?] Up until Dan defended me to Goergen, stating concern for Bob's
behavior, Bob treated Dan as his best friend. I cannot help but believe Dan's dismissal was directly a
result of my reporting and his defending me for reporting." (Ex. 28, ECF No. 194-29,
PageID#4759; Whitright Dep. 95:19–23, ECF No. 189-1, PageID#4078 (email was report of
ongoing Weisdack retaliation).) In the email's next sentence, Buddenberg referred to Mix's
resignation. (Ex. 28, ECF No. 194-29, PageID#4759; Budzik Dep. Vol. 1 177:2–19, PageID#2860.)

      In a **February 1, 2017** meeting, board members approved Mix's "resignation" (and then, by
their own admission, disciplined Buddenberg for sending this retaliation-report email). (Ex. 10, ECF
No. 194-10, PageID#4643; Ex. 68, ECF No. 195-19, PageID#5163; Ex. 85, District's EEOC
Position Statement (Buddenberg), ECF No. 195-36, PageID#5282 ("Ms. Buddenberg's statement
that [Mix] was terminated was false and an appropriate basis for discipline."))

    **F.**  **Days after learning Buddenberg filed an EEOC retaliation charge, Weisdack and
        Budzik ratchet-up adverse actions with policy-infraction allegations— including
        a supposed violation *explicitly* based on her having reported retaliation about her
        supervisor Dan Mix.**

    **On February 15, 2017**, Buddenberg reported the retaliation to the EEOC. (Ex. 155, ECF
No. 196-49, PageID#5999–6005.) **On February 23, 2017**, the District received EEOC notice of her
charge. (Ex. 170, ECF No. 197-14, PageID#6116–18 (box "Retaliation" checked); Dist. Defs.'
Answer to Sec. Am. Compl. at 9 ¶ 53, ECF No. 37, PageID#462.) Budzik also received notice of
her EEOC retaliation charge on **February 23, 2017** (Budzik Dep. Vol. 2 (Errata) 379:8–11, ECF
No. 184-1, PageID#3115; Ex. 174, ECF No. 197-19, PageID#6125–28; *cf.* Budzik's Answer to Sec.
Am. Compl. at 9 ¶ 68, ECF No. 42, PageID#506; Budzik Dep. Vol. 2 270:5–8, ECF No., 184-1,
PageID#3006; *id.* at 272:13–17, PageID#3008; *id.* at 294:16–21, PageID#3030; *id.* at 297:2–5,

PageID#3033; *id.* at 299:18–19, PageID#3035; *id.* at 353:2–18, PageID#3089; *id.* at 353:25–354:4, PageID#3089–3090; *id.* at 354:19–24, PageID#3090; *id.* at 355:4–7, PageID#3091 (finally admitting truth after first denying it in his answer, and at least eight times under oath in his deposition—after the Sixth Circuit opinion showed how key the issue is. *Buddenberg*, 939 F.3d at 740).)

Weisdack didn't try to mask his anger at Buddenberg for having complained to the EEOC. (Wendell Dep. Vol. 1 99:18–100:10, ECF No. 190-1, PageID#4351–52; Weisdack Dep. Vol. 2 414:9–23, ECF No. 181-1, PageID#2416 (Weisdack told people words to the effect that "[Buddenberg] is out to get me").) **On or around February 17, 2017**, Weisdack—now responsible for approving Buddenberg's leave requests—sat on her request for longer than he normally would. (Weisdack Dep. Vol. 2 415:21–416:12, ECF No. 181-1, PageID#2417–18 (doesn't dispute Buddenberg); Buddenberg Decl. at 2 ¶ 7, ECF No. 214-1, PageID# 11746.)

On **February 28, 2017**—four days after receiving notice of Buddenberg's EEOC charge— and a few weeks after her board email protesting Weisdack's retaliation against Mix, Weisdack issued Buddenberg a "Notice of Disciplinary Action." (Ex. 68, ECF No. 195-19, PageID#5163–66; Dist. Defs.' Answer to Sec. Am. Compl. at 9 ¶ 56, ECF No. 37, PageID#462.) This notice to an employee who had never been disciplined—and indeed had been showered with praise in her two performance evaluations—claimed that "[with]in the last forty-five (45) days, [she had] engaged in a repeated pattern of violating Agency policies." It hurled eight accusations against which she would have to defend herself just three days later at a March 3, 2017 hearing, namely that she:

- was "rude, unprofessional, and disrespectful" and "[waived] papers in front of [Weisdack]" during an interaction regarding water-well permit refunds;

- emailed a board member on February 1, 2017 that "stated [she] believed [Mix], who had resigned his employment with the Board, was dismissed as a result of a prior report [she] made and for [Mix] purportedly defending [her]." This supposedly constituted "willfully

demeaning and verbally abusing" Weisdack. The notice alleged her email "was made to continue the disrespect [against Weisdack]" and her statements ("which were not investigated") were made "in defiance of [Weisdack's] authority and/or [constituted] making a false claim in order to obtain a benefit."

- two weeks earlier had "attempted to mandate [her] attendance" at a Weisdack and county-auditor meeting to "demand revisions to the 2017 budget appropriation," and this supposedly was a "continuing attempt to impair the efficient operation of the Agency";

- defied a directive not to transfer "contaminated" furniture from the county maintenance department to the District for the lunchroom-renovation project, which supposedly "constituted insubordination, misuse of County resources and neglect of duty";

- failed to complete payroll by a purported February 10, 2017 deadline which, despite her having "previously successfully processed such payroll approximately [(48)] times," was "egregious neglect of duty and willful violations of a core function of the job description";

- had personnel files (her own and Mix's) in her office without authorization and had failed to place documents into other personnel files, which supposedly constituted "neglect of duty, unauthorized possession and willful misuse of documents and Agency property, and failure of good behavior," and "impaired the compliance audit";

- "sent an email to [Weisdack] and supervisor, Darla Andrews, notifying them that while [she] would help to gather numbers, [she] was completely unfamiliar with the annual Ohio Department of Health financial report/subsidy" and couldn't find copies of prior reports when Weisdack asked her for them, which supposedly constituted "neglect of duty"; and

- on February 23, 2017 shredded documents "for a significant portion of the day" without authorization or approval, which supposedly constituted "egregious and willful neglect of

duty, destruction of . . . records without authority, and violations of state and local retention

regulations and requirements."

(Ex. 68, ECF No. 195-19, PageID#5163–66.)

Defendant Budzik drafted the notice with Weisdack. (Weisdack Dep. Vol. 1 214:21–215:5,

ECF No. 180-1, PageID#2168–69; Dist. Defs.' Answer to Sec. Am. Compl. at 10 ¶ 57, ECF No. 37,

PageID#463; Budzik Dep. Vol. 2 322:7–323:6, ECF No. 184-1, PageID#3058–59.) Weisdack also

consulted one or more board members about the proposed disciplinary action, and shared the notice

with them. (Dist. Defs.' Answer to Sec. Am. Compl. at 10 ¶ 59, ECF No. 37, PageID#463.)

Budzik's notice failed to advise Buddenberg of her right, under the District's policy, to counsel—yet

another adverse action. (Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No 195-

36, at PageID#5303 ("You have the right to be represented at this pre-deprivation hearing."); *cf.* Ex.

63, ECF No. 195-14, PageID#5123 ("Employees will be informed of their right to *legal counsel* at [a]

pre-disciplinary conference.") (emphasis added).)

One of these allegations explicitly admitted to unlawful retaliation: Buddenberg had said in

her February 1, 2017 email to Livers that she believed Mix had been dismissed "as a result of my

reporting ['potential EEOC and [e]thics violations' to the board on October 24, 2016] and his

defending me for reporting." (Ex. 28, ECF No. 194-29, PageID#4759; Ex. 68, ECF No. 195-19,

PageID#5163; Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36,

PageID#5282, 5311.) The next sentence referenced Mix's forced resignation. (Ex. 28, ECF No. 194-

29, PageID#4759.) That is, Buddenberg was threatened with discipline for reporting her belief

Weisdack retaliated against Mix because of her October 24, 2016 report. (District 30(b)(6) (Litke)

Dep. 218:1–18, ECF No. 179-1, PageID#1751 (email reflects Buddenberg's belief Mix was

dismissed based on her board report); Whitright Dep. 95:19–23, ECF No. 189-1, PageID#4078

(email was report of Weisdack's ongoing retaliation).) These statements supposedly constituted

"willfully demeaning and verbally abusing" Weisdack. (Ex. 68, ECF No. 195-19, PageID#5163.)

Buddenberg had previously received only positive performance reviews—in fact, Weisdack's sole "criticism" of her in her 2015 evaluation had been that she adhered to policy too closely. (Ex. 38, ECF No. 194-39, PageID#4835–37; Budzik Dep. Vol. 2 326:15–21, ECF No. 184-1, PageID#3062.) Up until this point, Buddenberg had never been disciplined. (District 30(b)(6) (Litke) Dep. 292:3–5, ECF No. 179-1, PageID#1825.)

### G. Budzik aggressively interrogates Buddenberg in a March 3, 2017 pre-disciplinary hearing, fails to address her protests that the charges against her are baseless and retaliatory, and meets with her privately to cajole her to accept a demotion, pay cut, suspension, and reassignment.

As Weisdack's express designee under the District's policies (Ex. 63, ECF No. 195-14, PageID#5123), Budzik played the "leading role" in questioning Buddenberg during her pre-disciplinary hearing, with Weisdack saying very little. (Weisdack Dep. Vol. 3 529:8–15, ECF No. 182-1, PageID#2581; Budzik Dep. Vol. 1 152:10–7, ECF No. 183-1, PageID#2835; Budzik Dep. Vol. 2 306:6–307:9, ECF No. 184-1, PageID#3042–43.) She refuted the charges, stating about 20 times that the charges were retaliatory. (*See* Exs. 61-A & 13-A ECF Nos. 195-12, 194-14 PageID##4944–95, 4661.) And she gave Budzik several documents. (Budzik Dep. Vol. 1 115:20–23, ECF No. 183-1, PageID#2798; Buddenberg Decl. at 2–3 ¶ 10, ECF No. 214-1, PageID#11746–47.) It's unclear whether Budzik ever produced them, or even bothered to look at them.

A pre-disciplinary hearing's goal is simply "to review the administrative charges, and to give the employee a right to respond." (Budzik Dep. Vol. 1 119:24–120:4, ECF No. 183-1, PageID#2802–03.) But Budzik helped drive the charges by (selectively) challenging her defenses.

For example, rebutting the charge that her email reporting to the board her belief that Mix had been retaliated against was a "false claim [made] in order to obtain a benefit," Buddenberg asked exactly what kind of benefit she could derive. Budzik gave an unintelligible, circular answer about how it could be inferred she was trying to improve her working conditions:

Buddenberg: Can you provide clarification on the benefit that I would receive from making this statement?

Budzik: Clearly, uh—the benefit that you would potentially receive—there are several. It would be—one, if you look through the health manual, it does note that, under conduct, you cannot do anything that would be in order to make some benefit for you as an employee. Here, [Mix]—at this point, I believe was your supervisor– clearly, obviously, could be easily be inferred that you were attempting to make employment benefits by having—doing things for your former boss, in order for you to enjoy select working conditions, or better or more favorable working type of conditions. That would be the benefit that one could be inferred that you were trying to obtain.

(Exs. 61-A & 13-A, ECF Nos. 195-12, 194-14, PageID##4950, 4661.) Budzik presented

Buddenberg this word salad even though he knew that Mix had no control over her working

conditions when she wrote her February 1, 2017 email because *Mix no longer worked for the District.*

(Budzik Dep. Vol. 1 187:3–188:6, ECF No. 183-1, PageID#2870–71.)

Buddenberg likewise rebutted the charge that her report of Mix's dismissal was "false" by

explaining in part why she believed that Mix's "resignation" was involuntary: about a day before the

email, Buddenberg had heard that Budzik or his associate had left a document open on a computer

visible and accessible to District personnel. (*Id.* at PageID##4951–52, 4661.) Budzik shot back

("Well, are you speaking for [Mix] now? You know exactly why Mix resigned?"), cut her off when

she tried to answer ("Do you know why Mix resigned?"), and then, after she asked him to let her

finish and explained her reasoning, interrogated her (e.g., "A termination threat. I see. Did you

visually *see* this termination threat?"). (*Id.*)

But Budzik can't dispute Buddenberg reasonably believed Mix resigned under threat of

termination (Budzik Dep. Vol. 1 194:8–17, ECF No. 183-1, PageID#2877) because he authored the

threats to Mix. (*Id.* at 84:7–10, PageID#2767 (Budzik drafted the notice); *id.* at 204:5–8,

PageID#2887) (notice referenced termination or removal at least twice).)

Even though Budzik now asserts that retaliation "was mainly [Buddenberg's] defense to all

of the administrative charges" (*id.* at 110:22–111:1, PageID#2793–94), he sought no information in

about Buddenberg's repeated protests of retaliation. This included when she said Weisdack had a "history of retaliation towards employees who question him or make any statements regarding his performance," or when, in her closing, she reported *again* her belief that the notice's allegations were in retaliation for her October 24, 2016 board report—and that before that she'd had only positive performance reviews. (Exs. 61-A & 13-A, ECF Nos. 195-12, 194-14, PageID#4948–49, 4995, 4661.)

He neither asked for specifics nor otherwise followed up on those facts. (*Id.*; *see also* Budzik Dep. Vol. 1 105:1–12, ECF No. 183-1, PageID#2788; *id.* at 244:22–245:5, PageID#2927–28 ("I don't recall if I used the word retaliation in asking her any questions."); *id.* at 216:7–16, PageID#2899 (he asked no follow-up questions about Buddenberg's allegation that claim she attempted to mandate her attendance at meeting was "unfounded and retaliatory in nature" (*Id.* at 235:3–236:4, 242:13–20, PageID#2918–19, 2925 (he asked no follow-up questions about retaliation specifically when Buddenberg said charge she failed to properly process payroll was "false and retaliatory"); *id.* at 249:21–250:22, PageID#2932–2933 (he didn't ask her about her allegation that charge about moving personnel files was retaliatory); Budzik Dep. Vol. 2 267:21–268:13, ECF No. 184-1, PageID#3003–04 (he asked no follow-up questions to Buddenberg's claim that she believed ODH-report allegation was "totally retaliatory"); *id.* at 285:9–20, PageID#3021 (he asked no further questions about her allegation that shredding claim was retaliatory).)

For all the questions Budzik had about why Buddenberg had said, "I cannot help but believe Mr. Mix was terminated…" in her February 1, 2017 email to Livers (described above), he evinced no curiosity about the rest of that sentence ("as a result of my reporting and his defending me for reporting")—even though he supposedly "wasn't sure what [she] meant" by that statement. (Budzik Dep. Vol. 1 178:13–23, ECF No. 183-1, PageID#2861.) Nor did he ask about the sentence before it ("Is there any concern that up until my reporting to the board on October 24th the potential EEOC violation and [e]thics violation, Mr. Weisdack had no issue with my performance[?]") (Ex. 28, ECF

No. 194-29, PageID#4759.) He supposedly didn't ask what she was alleging Mix had defended her for reporting because he was only there to present the charges and "listen to any response and defenses to [them.]" (Budzik Dep. Vol. 1 178:24–179:5, ECF No. 183-1, PageID#2861–62.)

As an experienced employment lawyer, Budzik understood that alleging someone else is experiencing retaliation could be protected activity. (*Id.* at 175:23–176:5, PageID#2858–59.) And he grasped that at some point, learning too much may require him to act:

> Q:     In general would you agree that if in the course and scope of your representation for a public sector client with respect to a particular employee or employees, if you became aware of allegations of retaliation, then it would be your responsibility to try to engage with your client on those particular allegations, correct?
>
> ***
>
> A:     It could, yes.
>
> ***
>
> Q:     And if you became aware of evidence suggesting retaliation, it would be your responsibility to engage with your client and talk to them about the need to address those issues, correct?
>
> ***
>
> A:     I'm taking your question as a general question and I would say yes.

(*Id.* at 34:10–35:8, PageID#2717–18.)

Right after the March 3, 2017 hearing, Budzik called Buddenberg back to a conference room. (Budzik Dep. Vol. 2 294:3–8, ECF No. 184-1, PageID#3030.) In another adverse action, he refused her request to have a witness present for this conversation because, supposedly, "that would not be appropriate" and there was "no need" for a witness. (*Id.* at 294:9–13, PageID#3030; *id.* at 307:17–22, PageID#3043.) (District policy didn't prohibit her from having witness present for meeting.) (*Id.* at 307:23–308:10, PageID#3043–44.) There, Budzik asked Buddenberg to "consider settling the disciplinary matter" by taking a voluntary demotion and salary reduction—even though the notice was already proposing a demotion and reduction in pay. (*Id.* at 300:2–301:14, PageID#3036–37.) Budzik told Buddenberg that if she took a voluntary demotion there would be no record of any type of disciplinary action in her personnel file. (*Id.* at 301:15–302:3, PageID#3037–38.) But the notice of disciplinary action against Buddenberg already existed as a

Page 27 of 64

public record. (*Id.* at 302:4–6, PageID#3038.) He gave her four days, until March 7, 2017, to decide. (*Id.* at 303:2–12, PageID#3039.) Buddenberg asked to present a statement about the hearing to the board directly. (*Id.* at 303:13–16.) She didn't accept Budzik's proposed "settlement."

She recounted these events in a **March 10, 2017** email to Livers, in which she again alleged retaliation (including Budzik's role in it): "I have been humiliated and threatened with disciplinary action, which I demonstrated to be unfounded, excessive and retaliatory during a grueling, nearly 2 hour, hearing." She also reported that she "felt intimidated by Mr. Budzik to settle" to terms that would "include [her] waiving all claims of retaliation and any adverse employment action taken by [Weisdack.]" (Ex. 161, ECF No. 197-4, PageID#6051–52; Goergen Dep. Vol. 1 162:22–163:4, ECF No. 186-1, PageID#3417–18 (email constitutes retaliation allegations and Budzik's role in it.))

### H. Buddenberg is found supposedly "guilty" of all but one of the allegations. The board members approve, suspend her, demote her to a clerical position, and slash her pay almost in half.

On Monday, **March 6, 2017**, three days after Buddenberg's pre-disciplinary hearing but before any official determination about her alleged conduct, Weisdack already had a co-worker performing some of her fiscal-coordinator job responsibilities. (Buddenberg Decl. at 3 ¶ 11, ECF No. 214-1, PageID#11747; District 30(b)(6) (Litke) 179:20–180:4, ECF No. 179-1, PageID#1712–13 (doesn't recall whether this happened.)) Buddenberg reported this to Livers in a **March 10, 2017** email. (Ex. 161, ECF No. 197-4, PageID#6051.)

On **March 7 and 13, 2017**, the board held meetings to consider the issues involving Buddenberg's discipline. (Ex. 9, ECF No. 194-9, PageID#4640; Ex. 163, ECF No. 197-6, PageID#6057.) Budzik participated in at least the March 7 meeting. (Budzik Dep. Vol. 2 318:9–18, ECF No. 184-1, PageID#3054.)

During board members' deliberations, they expressed no concern about whether this discipline against Buddenberg was retaliatory. (Whitright Dep. 190:2–13, ECF No. 189-1,

PageID#4173.) Nor did they ask Buddenberg for her side of the story. (*Id.* at 166:10–17, PageID#4149; Goergen Dep. Vol. 2, 312:10–25, ECF No. 187-1, PageID#3609.)

At the **March 13, 2017** board meeting, which Weisdack attended, Livers—to whom Buddenberg had repeatedly entrusted her retaliation reports after reporting board-wide on October 31—moved to suspend Buddenberg without pay and consign her to a clerical position at slashed pay. (Ex. 9, ECF No. 194-4, PageID#4640; Dist. Defs.' Answer to Sec. Am. Compl. at 12 ¶ 71, ECF No. 37, PageID#465.) All board members present—Livers, Whitright, and Goergen—voted for these actions. (Dist. Defs.' Answer to Sec. Am. Compl. at 12 ¶ 71, ECF No. 37, PageID#465.)

**On March 16, 2017**, the District imposed a disciplinary order on her sustaining all but one of the charges in the notice. (*Id.* at 11 ¶ 67, PageID#464; Ex. 68, ECF No. 195-19, PageID#5167–70; Budzik Dep. Vol. 2 321:11–16, ECF No. 184-1, PageID#3057.) Goergen, Livers, and Whitright signed it. (Ex. 120, Dist. Defs.' Answer to Req. for Admis., ECF No. 196-13, PageID#5541, Ex. 68, ECF No. 195-19, PageID#5167; Goergen Dep. Vol. 1 176:6–8, ECF No. 186-1, PageID#3431.) (Gragg was out of town when the action was taken, but later signed off on it.) (Gragg Dep. 57:1–4, ECF No. 188-1, PageID# 3719; Ex. 68, ECF No. 195-19, PageID#5170).

Traditionally, Weisdack or the board carried out disciplinary actions like drafting a notice, holding a hearing, and drafting the offenses and order. (Ex. 63, ECF No. 195-14, PageID#5120 ("An employee's immediate supervisor and/or the Health Commissioner shall be responsible for administering discipline"); *id.* at PageID#5123 ("Pre-disciplinary conferences will be conducted by the Health Commissioner or designee"); *id.* ("The Health Commissioner and Board will decide what discipline, if any, is appropriate.")) But before bulldozing Buddenberg, the board had never signed off on disciplinary action against an employee beyond the commissioner. (*See* Goergen Dep Vol. 1 183:12–25, ECF No. 186-1, PageID#3438; Gragg Dep. 11:5–21, ECF No. 188-1, PageID#3673.)

Budzik personally drafted the Order's contents and verbiage. (Budzik Dep. Vol. 2 322:7–

323:6, ECF No. 184-1, PageID#3059.) He, the District, and the board claimed Buddenberg was guilty of seven separate "group 3" disciplinary offenses. (Ex. 68, ECF No. 195-19, PageID#5169–70.) District policy defines group three offenses as "those infractions which are of a very serious or possibly a criminal nature, and/or which cause a critical disruption to the organization in terms of decreased productivity, efficiency, and/or morale" and that, "if left undisciplined by a proper authority, may have a long lasting and serious adverse impact on the organization." (Ex. 63, ECF No. 195-14, PageID#5124; District 30(b)(6) (Litke) Dep. 210:13–211:5, ECF No. 179-1, PageID#1743–44.) Among the group three offenses in this order was the allegation that Buddenberg had reported her belief that Mix had been retaliated against in an email to a board member. According to the order, "Buddenberg made a false statement and otherwise failed to investigate such claims prior to issuing the email" and that "[t]he email was a false and/or fraudulent statement" which constituted a group three offense and "created an adverse working environment for other Agency employees." (Ex. 68, ECF No. 195-19, PageID#5169.)

Buddenberg was suspended without pay for three days, demoted to a clerical job, and had her pay slashed by nearly half (from $19.75 to $10.25/hour). (*Id.* at PageID#5170; Dist. Defs.' Answer to Sec. Am. Compl. at 11 ¶ 69, ECF No. 37, PageID#464.) The paycut meant her accrued sick leave and vacation time would be worth less. (Dist. Defs.' Answer to Sec. Am. Compl. at 14 ¶ 86, ECF No. 37, PageID#467; Ex. 63, ECF No. 195-14, PageID#5074.)

**I. Weisdack continues adverse actions even after the disciplinary order, making things so intolerable that Buddenberg has no choice but to resign.**

**On March 17, 2017**, four days before her demotion to clerical service's effective date, Buddenberg discovered she had been denied access to the District's accounting software, any of the ledgers, and her email (making it impossible to carry out her remaining fiscal-coordinator responsibilities). Buddenberg Decl. at 3 ¶ 11, ECF No. 214-1, PageID#11747; Gragg Dep. 227:8–228:4, ECF No. 188-1, PageID#3889–90 (unaware this happened).)

Buddenberg served the unpaid suspension from March 21 to 23, 2017. (Dist. Defs.' Answer to Sec. Am. Compl. at 12 ¶ 74, ECF No. 37, PageID#465.) During that time, Weisdack directed Buddenberg to be placed—not in the Personal Health Services division the Order stated, but in the Environmental Health division. (Goergen Dep. Vol. 2 322:13–19, ECF No. 187-1, PageID#3619 (this was Weisdack's decision); Ex. 68, ECF No. 195-19, PageID#5170 (demoting Buddenberg to clerical position in Personal Health Services division); Dist. Defs.' Answer to Sec. Am. Compl. at 13 ¶ 79, ECF No. 37, PageID#466; Ex. 12, ECF No. 194-12, PageID#4648 (March 24, 2017 board-meeting minutes reflecting the change)). This meant Buddenberg would be working directly under Defendant Wendell (Weisdack's administrative assistant.) (Ex. 12, ECF No. 194-12, PageID#4650; Wendell Dep. Vol. 1 11:11–15, ECF No. 190-1, PageID#4263; Goergen Dep. Vol. 2 322:20–22, ECF No. 187-1, PageID#3619.) Buddenberg expressed in an April 3, 2017 email to Livers and Weisdack concern that this change was retaliatory. (Ex. 157, ECF No. 196-51, PageID#6041.)

On **March 21, 2017**, Buddenberg appealed the Order to the State Personnel Board of Review. (Dist. Defs.' Answer to Sec. Am. Compl. at 12 ¶ 75, ECF No. 37, PageID#455.) **That day**, Buddenberg also submitted a supplemental complaint to the EEOC regarding this additional retaliation. (Ex. 155, ECF No. 196-49, PageID#6006–09.)

A **March 24, 2017** re-worked organization chart omitted Buddenberg's fiscal-coordinator job—previously present on February 2017 organizational charts. (Ex. 12, ECF No.194-12, PageID#4650; Dist. Defs.' Answer to Sec. Am. Compl. at 2 ¶ 5, ECF No. 37, PageID#455.) The board adopted the change when it renewed Weisdack's contract. (Ex. 12, ECF No. 194-12, PageID#4649.) On March 29, 2017, Weisdack presented the new organizational chart at a special staff meeting and announced that Buddenberg's fiscal-coordinator duties were to be split between Wendell, another clerk, and an independent contractor (Litke). (Ex. 2, ECF No. 194-2, PageID#4585.) This job abolishment made it impossible for Buddenberg to return to her position

were she to win her SPBR appeal (because there would be no job to be reinstated to).

On **May 27, 2017**, Buddenberg sent board members a resignation letter, conveying her belief that she had been constructively discharged. (Ex. 4, ECF No. 194-4, PageID#4587–89.)  She stated, "I had no intention of leaving the organization and this is against my wishes … [b]ut conditions at [the District] have become so intolerable for me that I feel I have no choice to resign… Since the October 24th reporting, I have lived in fear of [Weisdack's] retaliation and unprofessional actions, which have continued despite my efforts to correct them by reporting to the Board… The unchecked retaliatory conduct has had a negative impact on my health and has created stress for both my family and me." (*Id.* at PageID#4587–88.) Ms. Buddenberg specified adverse actions she'd experienced at Weisdack's hands, saying he had changed her previously negotiated work schedule (which then forced her to drop her college-degree program); disparaged her to her coworkers and stopped communicating with her; eliminated her fiscal-coordinator position; transferred her to a clerical position after bringing "a number of baseless job-related accusations" against her; penalized her with a three-day suspension, demotion, and reduction in pay, despite a "clean employment record"; and placed her under Wendell's supervision, despite her disciplinary order directing her to be placed in a different division. (*Id.*)

Buddenberg also expounded on the board's failure to address her retaliation reports: "Since it permitted [Weisdack to continue in leadership despite knowing of his repeated unethical practices, and his retaliatory conduct, the Board has shown it will allow the retaliatory, intolerable working conditions to continue."; "My attempts to expose his misconduct have resulted in nothing but emotional pain and financial loss." (*Id.* at PageID#4589.) Buddenberg concluded this letter by saying, "As far as I am concerned, I have been fired." (*Id.*)

Buddenberg exhausted administrative obligations through the EEOC for the Title VII claim against the District. (Declaration of Regional EEOC Enforcement Manager (Cleveland Field Office)

Dilip Gokhale dated Feb. 14, 2022 at ¶ 1, ECF No. 213-1, PageID#11742.) The government issued

Buddenberg right-to-sue letters on January 17, 2018, and October 26, 2018. (*Id.* at ¶ 2.; *see also* right-

to-sue letter, ECF No. 213-2, PageID# 11743.) (She received these letters on January 25, 2018, and

November 2, 2018.) (Gokhale Decl. at ¶ 2, ECF No. 213-1, PageID#11742.) Buddenberg timely

filed the Complaint in this matter on March 6, 2018. (ECF No. 1, PageID#1–52.)

### III.  Law & Argument[2]

For the Court and parties' convenience, Buddenberg provides a table (attached as Appendix

1) summarizing the relevant claims and elements upon which Buddenberg seeks partial summary

judgment, by Defendant. It may be useful to view that separately while following the argument.

**A.  The Court should grant partial summary judgment on those elements of claims
regarding which, as here, there is no genuine dispute as to any material fact and
the moving party is entitled to judgment as a matter of law.**

Under Fed. R. Civ. P. 56(a), the Court must grant summary judgment when "there is no

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The

central issue is "whether the evidence presents such a disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The "normal summary judgment" standard applies for

partial-summary judgment. *Wuliger v. Christie*, 310 F.Supp.2d 897, 900–01 (N.D. Ohio 2004).

**B.  Affirmative summary judgment for plaintiffs in retaliation cases is appropriate
when, as here, there is no genuine dispute on key elements like whether the
plaintiff engaged in legally protected activity and suffered adverse actions.**

---

[2] *Buddenberg v. Weisdack*, 939 F.3d 732 (6th Cir. 2019) is law of the case on the core retaliation issues. It gives
Defendants—especially Defendant Budzik, who pursued the appeal—no wiggle room for escape from
liability because what was alleged in the operative Second Amended Complaint has been more than proved.
For conciseness, internal quotations are omitted, but *Buddenberg* relies on cases predating Defendants' adverse
actions. *Buddenberg* and the cases it relies ensure that qualified immunity doesn't apply because the
constitutional violations alleged were clearly established before May 27, 2017.

As the most interesting man in the world[3] might say, "Plaintiffs may not always move for summary judgment, but when they do, they're entitled to summary judgment when their evidence is 'so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

C. **Based on their admissions, Defendants District, Weisdack, Budzik, Goergen, Gragg, Livers, and Whitright are liable on the protected-activity and adverse-actions elements of First Amendment Retaliation, and on the causation/retaliatory motive element are liable for the adverse actions against Buddenberg they admit are causally connected to her February 1, 2017 email protesting retaliation against Mix.**

The First Amendment, applied to state political subdivisions through the 14th Amendment, guarantees public employees the right to freedom of speech in their capacity as private citizens. *Connick v. Myers*, 461 U.S. 138, 142 (1983). Defendants District, Weisdack, Budzik, Goergen, Gragg, Livers, and Whitright are liable for First Amendment–retaliation if: (1) Buddenberg engaged in constitutionally-protected speech (i.e., speech made as a private citizen that touched upon matters of public concern); (2) they took an adverse action against Buddenberg that would deter a person of ordinary firmness from continuing to engage in that speech; and (3) there is a causal connection between her protected speech and the adverse action. *Buddenberg*, 939 F.3d at 739 (6th Cir. 2019).

Buddenberg, based on the undisputed material facts, is entitled to summary judgment on elements (1) and (2), namely that she engaged in protected speech and suffered adverse actions. As to one action—discipline for having reported retaliation against her former supervisor Dan Mix, Buddenberg is entitled to summary judgment because Defendants have *admitted* the causal

---

[3] Humabon Kurogbangkaw, *The Story Behind the Most Interesting Man in the World Meme*, Humor + Tech, Jul. 7, 2015, https://humortechblog.com/2015/07/the-story-behind-the-most-interesting-man-in-the-world-meme.html.

connection. No reasonable jury could find otherwise based on Defendants' own plain wording.

**1. Buddenberg engaged in First Amendment–protected activity by reporting Weisdack's unlawful and unethical conduct to the board.**

As a public employee, Buddenberg must show her speech was as a private citizen on a matter of public concern. *See id.* at 739–40. A three-step inquiry determines whether public employees' speech is protected: First, the court must determine whether the speech addressed a matter of public concern. *Id.* at 739. Second, the court must determine whether the employee spoke as a private citizen or as an employee pursuant to her official duties. *Id.* at 739–40; *Lane v. Franks*, 547 U.S. at 239–41. Third, the court must balance the parties' interests and determine whether the employee's speech interest outweighs the government employer's interest in promoting the efficiency of the public services it performs through its employees. *Buddenberg*, 939 F.3d at 739.

Based on Defendants' admissions—undisputed material facts—Buddenberg is entitled to summary judgment for engaging in protected speech. *See, e.g.*, *Holbrook v. Dumas,* 658 F. App'x 280, 284 n.3 (6th Cir. 2011) ("Here, treatment of the issue [of whether a public employee speech is constitutionally protected] as a matter of law is entirely appropriate . . . because the facts material to the nature and status of [plaintiff's] speech are undisputed."); *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011) ("When there is no factual dispute regarding what was said, the court treats the question of whether an employee's speech is constitutionally protected as a question of law.").

**a. Buddenberg's speech about Weisdack's unlawful and unethical conduct— including retaliation—touched upon matters of public concern.**

Speech involves a matter of public concern when it relates to "any matter of political, social, or other concern to the community" or is the "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Buddenberg*, 393 F.3d at 739 (quoting *Lane*, 573 U.S. at 240. Allegations of public corruption, in particular, "are exactly the types of statements that demand strong First Amendment protections." *Buddenberg,* 939 F.3d at 739.

The Court must decide whether the issues about which Buddenberg spoke were a matter of public concern. Defendants do not dispute that they were. *See* above at Part II(B) (detailing Defendants' belief that the issues Buddenberg raised were matters of public concern).

On October 24, Buddenberg met with the board to report unethical and unlawful practices within the District, including unequal pay based on gender, ethical violations related to a Ohio Department of Health–issued grant, misuse of agency resources, and failure to adhere to policies. *See id.* Buddenberg alleged retaliation for this report: to the board on October 31, 2016, November 4, 2016, November 5, 2016, November 13, 2016, November 15, 2016, December 14, 2016, December 15, 2016, January 24, 2016, February 1, 2017, and March 10, 2017; to Budzik and Weisdack on March 3, 2017; and to the EEOC on February 15, 2017. *See* above at Part II(E).

Buddenberg's speech touched upon matters of public concern under the law of this case. *Buddenberg*, 939 F.3d at 739. ("Buddenberg's complaint alleges that she reported a conflict of interest by her supervisor, sex-based pay disparities within the District, and several other instances of maladministration to authorities both within and outside of her chain of command … accepting Buddenberg's allegations as true, her speech is constitutionally protected.") (citations omitted).

On October 24 and November 13, 2016, Buddenberg undisputedly reported to the board Weisdack's conflict of interest, gender-pay-disparity issues, and other maladministration. *See* above at Part II(B); Ex. 185, District's EEOC Position Statement (Mix), ECF No 197-29, PageID#6348 ("On October 24, 2016 another employee, the Agency Fiscal Officer, filed an internal complaint with the [board]. She complained about a tire contract…and excessive spending on [it]; that a female employee…was hired at a lower rate than male employee for an alleged same job although the female did not challenge the [board] or [Weisdack]; that discipline of employees was not considered standard; that [Weisdack] knew that employees were not working as they should; that performance evaluations were outdated; that breaks were not enforced properly; that [Weisdack] yelled or ignored

staff; and that no written procedures were allegedly in place for the handling of funds.").

Buddenberg's October 31; November 4, 5, 13, 15, and 30; December 14 and 15, 2016; and January 24, February 1, and March 10, 2017 reports of retaliation by Weisdack, Budzik, and Wendell—and the board members for participating in and failing to respond to her reports—also touched upon a matter of public concern. *See* above at Part II(E) (discussing each report). Defendants don't dispute that these were retaliation reports. *See id.* In each, Buddenberg opposed unlawful retaliation and petitioned the board for redress. Each communication reported on the adverse acts and Weisdack's alleged retaliatory motive. Each on the effect of Weisdack's conduct on the District's operation—which sometimes included chilling others' speech. Each communication was its own "whistleblower report," protected activity, and speech on a matter of public concern. *See, e.g.*, *Myers v. City of Centerville*, 41 F.4th 756, 761 (6th Cir. 2022) (letter alleging that coworker was unfairly fired touched upon matter of public concern); *Bonnell v. Lorenzo*, 241 F.3d 800, 817 (letter about retaliation for classroom speech "inherently" touched upon matter of public concern); *Kinross v. Charter Twp. of Osborne*,  No. 2:06-cv-245, 2007 WL 4284861, at *32 (W.D. Mich. Dec. 3, 2007) (complaining about management's First Amendment retaliation is matter of public concern because "[p]ublic interest is near its zenith when ensuring that organizations are being operated in accordance with the law.") (quoting *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986)).

The Sixth Circuit has held that the issues about which Buddenberg spoke to the board were matters of public concern. And it's undisputed that her reports are as described in the operative complaint. Nor is there any dispute that Buddenberg repeatedly reported retaliation for her October 24 board report. Buddenberg's speech thus touched upon matters of public concern.

### b.  Buddenberg's ordinary job duties didn't include reporting to the board Weisdack's unlawful and unethical conduct.

The First Amendment insulates public employees from discipline for speaking as private citizens (i.e., not pursuant to their ordinary job duties). *Lane*, 573 U.S. at 237. Whether speech was

made pursuant to an employee's ordinary job duties is a question of law. *DeCrane v. Eckart,* 12 F.4th 586, 596 (6th Cir. 2021) (it is a legal question "to be decided without reference to the factfinder."). Under these facts Buddenberg spoke as a private citizen. *See Buddenberg*, 939 F.3d at 740.

The critical question is whether the speech at issue is ordinarily within the scope of the employee's professional duties. *Id.* at 239–40. This requires the Court to consider the duties the employee actually performs on a day-to-day basis. *DeCrane*, 12 F.4th at 595–96. Formal job descriptions are relevant, but not dispositive. "[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of…professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424.

The Court need not analyze every item on which Buddenberg reported, because "attending [a] meeting as an employee or in one's official capacity does not necessarily, as a matter of fact or law, bring every statement made at the meeting within the scope of one's official duties." *Brack v. Budish*, No. 1:19-CV-01436 2022 WL 1192784, at *12 (N.D. Ohio Apr. 21, 2022) (Calabrese, J.) (finding good-faith basis for First Amendment–retaliation claims). Nor should the Court consider whether the topics on which she reported concerned her job duties. *Lane*, 573 U.S. at 239–40. ("[The question is] whether the speech at issue itself is ordinarily within the scope of an employee's duties, not whether it merely concerns those duties… the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech.").

On October 24, 2016, Buddenberg reported to the board concerns about Weisdack's unethical and unlawful practices. She also expressed fear of retaliation—and the board promised her protection. *See* above at Part II(B)–(C). This was the first time she had ever interfaced with the board directly. (Gragg Dep. 18:20–19:13, ECF No. 188-1, PageID#3680–91.) After that, she repeatedly reported concerns that she was facing retaliation for her report. *See* above at Part II(E).

Buddenberg's formal job description didn't include reporting ethical issues to the board. (Ex. 27, ECF No. 194-38, PageID#4830–34 (fiscal-coordinator job description); District 30(b)(6) (Litke) Dep. 90:17–100:5, ECF No. 179-1 PageID#1623–33.) Before October 24, 2016, she had *never* spoken directly to the board. (Gragg Dep. 18:20–19:13, ECF No. 188-1, PageID#3680–91.) Her reports followed no District policy or process: no employee (other than the commissioner) had ever requested to speak with the board in this way. (*Id.* at 19:14–20:4, 32:19–23, PageID#3681–82.)

And reinforcing that her speech wasn't part of her ordinary responsibilities, Buddenberg's complaints to the board went outside the chain of command. *Buddenberg,* 939 F.3d at 740. The chain on October 24, 2016 above Buddenberg was Mix, Weisdack, and then the board. (District 30(b)(6) (Litke) Dep. 75:13–18, ECF No. 179-1, PageID#1608.) Buddenberg undisputedly went around her supervisors by going to the board on October 24, 2016 and in her later retaliation reports. It was unusual for an employee to come directly to the board the way Buddenberg did; Gragg would have expected her to first raise concerns with Weisdack. (Gragg Dep. 32:19–33:2, ECF No. 188-1, PageID#3659.) The District, defending its discipline of Buddenberg for her February 1, 2017 email to Livers, insisted—incorrectly—an employee should "go through the chain of command" to report retaliation. (District 30(b)(6) (Litke) Dep. 254:11–16, ECF No. 179-1, PageID#1787.)

On these same facts, Sixth Circuit found Buddenberg was speaking as a private citizen and not pursuant to her ordinary job duties. *See Buddenberg*, 939 F.3d at 739–40 (distinguishing this case from those where plaintiff's job duties included overseeing department operations and reporting situations and accidents immediately to management) (citations omitted). Buddenberg's ordinary duties didn't include reporting to the board on these issues. (*See, e.g.*, Weisdack Dep. Vol. 1 31:20–24; 33:23–34:14, 168:6–11, ECF No. 180-1, PageID##1985, 1987, 2122; Whitright Dep. 42:11–44:3, 45:13–20, ECF No. 189-1, PageID##4025–27, 4028.) The Court should thus hold as a matter of law that Buddenberg's speech was made as a private citizen.

      c. **Because the employer's side of the scale is empty when it comes to illegal conduct and public corruption, the District had no legitimate interest that outweighed Buddenberg's constitutional right to speak about that misconduct and corruption.**

The third and final question the Court must ask before finding that Buddenberg's speech was constitutionally protected is whether the District had "an adequate justification" for treating Buddenberg differently from non-employee citizens based on "its needs as an employer." *Buddenberg*, 939 F.3d at 740 (quoting *Garcetti*, 547 U.S. at 418); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

Normally, in striking the balance between the employee's and the public employer's interests, the court would consider, among other things, whether the speech meaningfully interfered with the employee's job performance or undermined the employer's mission. *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994). But "the employer's side of the *Pickering* scale is entirely empty" in cases where, as here, the speech involves allegations of official misconduct, illegality, and public corruption. *Buddenberg*, 939 F.3d at 740 (citing *Lane*, 573 U.S. at 242); *see also* above at Part II(B) (Buddenberg alleged, among other things, that Weisdack was involved in pay discrimination, mishandling public funds, and self-dealing—and that she was then enduring retaliation).

Defendants thus lacked any legitimate interest in taking, supporting, facilitating, or ratifying actions like Buddenberg's retaliatory suspension, demotion, and paycut for her reports. In fact, her interest in revealing Weisdack's wrongdoing and wanting a properly functioning organization aligned with what should have been a functional board's interest. *Mahronic*, 800 F.2d at 616 ("[W]hen an employee exposes unscrupulous behavior in the workplace, his interests are co-extensive with those of his employer; both want the organization to function in a proper manner.").

The Sixth Circuit has already held that Defendants cannot prevail on this element based on the now-undisputed contents of her reports. *Buddenberg*, 939 F.3d at 740; s*ee also* above at Part II(B). Buddenberg's speech, made as a private citizen on matters of public concern, is thus protected.

**2. The District, Weisdack, Budzik, Goergen, Gragg, Livers, and Whitright subjected Buddenberg to a barrage of adverse actions (e.g., freezing her out, threatening and carrying out disciplinary charges against her, interrogating her, gaslighting her, demoting her, suspending her without pay, and slashing her pay nearly in half) that would deter a person of ordinary firmness from engaging in free speech.**

Adverse actions "beyond those that create only de minimis negative consequences offend the Constitution." *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021) (citations omitted). For First Amendment–retaliation purposes, adverse actions are those that might cause a person of ordinary firmness to refrain from engaging in free speech. *Buddenberg*, 939 F.3d at 740. For example, demotions and disciplinary actions (including even "the potential threat" of disciplinary sanctions) are sufficiently adverse actions to support a First Amendment–retaliation claim. *See, e.g.*, *Buddenberg*, 939 F.3d at 740; *Brown v. Crowley,* 312 F.3d 782, 789 (6th Cir. 2002).

The Sixth Circuit held that Buddenberg sufficiently had alleged First-Amendment–retaliation adverse actions by pleading, in proven relevant part here, that after she filed her EEOC charge, Budzik and Weisdack drafted the notice of disciplinary action against her; Budzik "aggressively interrogated" Buddenberg during the pre-disciplinary hearing; Budzik tried to "intimidate" Buddenberg into accepting a "settlement" in which she would "abandon her retaliation charges, be demoted, and receive significantly less pay"; Budzik refused Buddenberg's request to have a witness at the post-hearing meeting; Weisdack and Budzik presented "bogus" disciplinary charges to the board, which approved them; and Buddenberg was suspended for three days, demoted to a clerical position, and her pay was cut nearly in half. *Buddenberg*, 939 F.3d at 740.

Budzik and Weisdack drafted the disciplinary-action notice accusing Buddenberg of eight policy violations and proposing a demotion to a clerical position and an unpaid suspension. (*See, e.g.*, Dist. Defs.' Answer to Sec. Am. Compl. at 10 ¶ 57, ECF No. 37, PageID#463; Ex. 68, ECF No. 195-19, PageID#5167) Budzik, in drafting the notice, also failed to inform Buddenberg of her right under District policy to have legal representation at the pre-disciplinary hearing. (Ex. 68, ECF No.

195-19, PageID#5166 ("You have the right to be represented at this pre-deprivation hearing."); *cf.* Ex. 63, ECF No. 195-14, PageID#5123 ("Employees will be informed of their right to *legal counsel* at [a] pre-disciplinary conference.") (emphasis added).)

Budzik undisputedly took the lead role in interrogating Buddenberg during her March 3, 2017 pre-disciplinary hearing. (Budzik Dep. Vol. 1 152:10–7, ECF No. 183-1, PageID#2835; Budzik Dep. Vol. 2 306:6–307:9, ECF No. 184-1, PageID#3043.) Even Budzik's "aggressive" questioning during the pre-disciplinary hearing is an adverse action. *Buddenberg,* 939 F.3d at 737, 737, 740. So was his gaslighting (*id.* at 737) when he demanded, "Well, are you speaking for [Mix] now? You know exactly why Mix resigned?," "Do you know why Mix resigned?," and "A termination threat. I see. Did you visually *see* this termination threat?"—when he himself had authored multiple termination threats into Mix's Notice of Disciplinary Action. (*See* Exs. 61-A & 13-A, ECF Nos. 195-12, 194-14, PageID##4952, 4661; Budzik Dep. Vol. 1 84:7–10, ECF No. 183-1, PageID#2767; *id.* at 204:5–8, PageID#2887) (notice referenced termination or removal at least twice).)

Buddenberg undisputedly was demoted to clerical service, suspended without pay, had her pay slashed nearly in half, and lost already-accrued benefits. *See* above at Part II(H). Defendants Weisdack, Goergen, Whitright, Gragg, and Livers each participated in and signed off on these decisions. (Ex. 9, ECF No. 194-9, PageID#4640; Ex. 68, ECF No. 195-19, PageID#5167; *see also, e.g.*, Goergen Dep. Vol. 1 176:16–18, ECF No. 186-1, PageID#343; Gragg Dep. 57:5–19, ECF No. 188-1, PageID#3791.) Budzik engineered the whole thing. *See* above at Part II(B)–(H).

The threat and doling out of disciplinary sanctions against Buddenberg are adverse actions. But the First Amendment protects public employees from more than just formal disciplinary sanctions. Buddenberg need not demonstrate "Olympian fortitude," or that the action actually chilled or silenced speech to support an adverse-action finding. *Kubala*, 984 F.3d at 1139–40 (citations omitted). "[T]his threshold is…not a means whereby solely egregious retaliatory acts are

allowed to proceed past summary judgment." *Thaddeus-X v. Blatter*, 175 F.3d at 398 (6th Cir. 1999).

Even an act "as trivial as failing to hold a birthday party for a public employee" is an adverse action

"when intended to punish her for exercising her free speech rights." *Wood v. Eubanks*, 25 F.4th 414,

429 (6th Cir. 2022) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 n.8 (1990)).

Defendants' actions are adverse under these modest standards. Undisputedly:

- On October 26, 2016 (two days after her board report), Weisdack suddenly directed Mix to change Buddenberg's hours without explanation or justification. Even though he knew she relied on her schedule to help care for her cancer-stricken grandson. (*See above at Part II(D).)*

- Weisdack made negative comments to Buddenberg's coworkers about her, making it known he was upset about her board report. (*See id.*)

- After October 24, 2016, Wendell ignored Buddenberg's requests for information, even though Wendell's job required her to do so. (*See above at Parts II(D), (E).)*

- Board members froze Buddenberg out, failing to respond to her retaliation reports. (*See above at Part II(E)–(I).)*

- In February 2017, Weisdack didn't immediately respond to Buddenberg's request for leave (contrary to his normal practice). (*See above at Part II(F).)*

- In November 2016, Weisdack and the Board changed the Health Commissioner job description (making Mix ineligible for the position), and in January 2017 effectively forced Mix's resignation by threatening termination against him. (*See above at Part II(E).)*

- After the March 3, 2017, pre-disciplinary hearing, Budzik tried to convince Buddenberg to "settle" the disciplinary charges (and denied her request to have a witness present for that discussion). (*See above at Part II(G).)*

- Weisdack stripped Buddenberg of some of her fiscal-coordinator responsibilities before the official disciplinary decision was made. (*See above at Part II(H).)*

- After Buddenberg was demoted, the board approved a new organization chart that eliminated her fiscal-coordinator position (making it impossible for her to return to it were she to win her SPBR appeal). (*See above at Part II(I).)*

- Weisdack reassigned Buddenberg to Environmental Health, even though the disciplinary order directed she be placed in Personal Health. Buddenberg would thus be forced to work directly under Wendell, and with others Weisdack believed had "concerns" about Buddenberg. (*See id.*)

Each of these undisputed actions would cause a person of ordinary firmness to refrain from engaging in free speech. *See, e.g.*, Wendell Dep. Vol. 2 143:4–144:10 ("I didn't think [demoting Buddenberg] was the right thing to do…because I wouldn't want to see that happen to anyone… [and] I know how I would feel if that happened to me.") (cleaned up).) The adverse actions Buddenberg alleged and, as to those listed above, it is undisputed she endured, are adverse actions for First Amendment–retaliation purposes. *Buddenberg*, 939 F.3d at 740.

> ### 3. Defendants admit a causal connection between disciplining Buddenberg for sending her February 1, 2017 email reporting retaliation—that is, they punished her for her speech.

A causal connection exists between the protected conduct and the adverse action if Defendants' adverse action(s) were caused at least in part by the employee's exercise protected speech. *Buddenberg*, 939 F.3d at 741 (citations omitted). Buddenberg thus must show that her speech was "a substantial or motivating factor" in the District's decision to take the adverse action(s) against her. *Id.* The issue of causal connection between the protected activity and the adverse actions (retaliatory motive), is typically a fact question for juries. *DeCrane*, 12 F.4th at 602; *see also Buddenberg*, 939 F.3d at 741 ("[A] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury.") (quoting *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010)).

But for purposes of this affirmative partial summary-judgment motion, Defendants' own words establish the causal connection between one protected activity by Buddenberg—her February 1, 2017 stated opposition to Dan Mix's forced resignation as a proxy for retaliation against her—and Defendants' adverse actions of going after her on this as a punishable policy violation. These events, connections, and motives are effectively undisputed and thus established *as a matter of law.*

Defendants admit Buddenberg in this email was alleging retaliation. (*See* Goergen Dep. Vol. 1 153:16–21, ECF No. 186-1, PageID#3408; Whitright Dep. 95:19–23, ECF No. 189-1, PageID#4078–79.) Defendants even admit Buddenberg charged and disciplined *for the content of her*

*speech* in this email. (*See, e.g.*, Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36, PageID#5282 ("On February 1, 2017, [Buddenberg] sent an email to [Livers] stating that she believed [Mix] had been terminated due to [Buddenberg's] prior report of alleged pay discrimination . . . Buddenberg's statement that he was terminated was false and an appropriate basis for discipline.")) Buddenberg was charged with and found guilty of a "group three" terminable offense for sending it (Ex. 68, ECF No. 195-19, PageID##5163, 5169), even though the next sentence in her email referred to Mix's resignation.

There is thus no genuine dispute about whether Buddenberg's protected retaliation report was a "substantial or motivating factor" in the District's decision to issue a disciplinary sanction for sending that email. By Defendants' own admissions, it was the *sole* basis for that charge. Threatening (and subsequently meting out) discipline expressly for engaging in constitutionally protected speech and statutorily protected activity is blatant, unlawful First Amendment–retaliation.

> **4. Defendant District is liable under 42 U.S.C. § 1983 and *Monell* because the First Amendment retaliation against Buddenberg resulted from a policy and practice, driven by officials with final decision-making authority; a policy of inadequate training and supervision; and a custom of tolerance of or acquiescence to federal rights violations.**

To prevail in a § 1983 suit against a locality, a plaintiff must show the constitutional violations are the result of a practice, policy, or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). An illegal policy or custom, existence may be shown by (1) legislative enactments or official agency policies; (2) actions officials with final decision-making authority took; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of or acquiescence to federal rights violations. *Thomas*, 398 F.3d at 429 (citing, among others, *Monell*, 436 U.S. at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

> **a. The District's actions against Buddenberg were taken by, among others, officials with final decision-making authority—board members, Commissioner Weisdack, and Budzik because Weisdack made him a designee, implementing agency policies.**

Even a local official's single decision with final policymaking authority may trigger § 1983 liability. *Jones v. Clark Cnty.*, 959 F.3d 748, 762 (6th Cir. 2020); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). State and local law govern who qualifies as a policymaker. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005); *see also Baar v. Jefferson Cnty. Bd. of Educ.*, 476 F. App'x 621, 638 (6th Cir. 2012). The District is a governmental health district. Ohio Rev. Code § 3709.01. (Dist. Defs.' Answer to Sec. Am. Compl. at 2 ¶ 7, ECF No. 37, PageID#454.) As board members, the individual Defendants made ultimate employment-action determinations like hiring, firing, and discipline such as suspension, demotion, and reduction in pay. (*Id.* at 2 ¶ 5 ("These Defendants… admit that the Board of Health serves as the appointing authority for the Geauga County Health District."); District 30(b)(6) (Litke) Dep. 121:3–6, ECF No. 179-1, PageID#1654 ("The Board of Health is the ultimate authority in the Health Department"); Goergen Dep. Vol. 1 11:11–18, ECF No. 186-1, PageID#3266 (board has authority to overturn health-commissioner decision on an employment action); Whitright Dep. 12:21–13:1, ECF No. 189-1, PageID#3995–96.) As commissioner, Weisdack, was "responsible for the day-to-day management and oversight of the Health District." (Ex. 85, ECF No. 195-36, PageID#5279.) As shown above, Defendants admit that adverse actions alleged and proved in this matter including the disciplinary-action notice, hearing, demotion, suspension, paycut, and reassignment to clerical work were actions the board and Weisdack took, except for those entrusted or delegated to Budzik, who was Weisdack's designee for conducting the hearing. Defendants cannot reasonably dispute that the actions these officials had final decision-making authority. These officials purported to implement agency policies, namely the discipline policy to punish supposed violations. The District is liable.

### b. The District failed to train, supervise, and discipline Weisdack for his serial retaliation.

A local government may be held liable for failure to train, supervise, and discipline, that is, liable for an underlying constitutional violation when the entity's policy is objectively indifferent to

the likelihood a particular constitutional violation will occur. *See City of Canton v. Harris*, 489 U.S. 378, 387–88 (1989). As detailed above, over the course of many months, Weisdack was an adverse-action wrecking ball and the District's board failed to either train him to not be retaliatory or supervise him and hold him accountable—despite their promises to Buddenberg and her many retaliation reports. (*See, e.g.*, Whitright Dep. 37:4–38:20 (board promised to protect Buddenberg from retaliation)*;* Gragg Dep. 51:16–52:1, ECF No. 188-1, PageID#3713–14 (board had "no role to play" in protecting her from retaliation, and didn't address it); 30(b)(6) (Litke) Dep. 27:23–28:21, ECF NO. 179-1, PageID#1560–61 (doesn't know what District or its board did to protect her from retaliation). Weisdack Dep. Vol. 2 328:22–329:3, ECF No. 181-1, PageID#2330–31 (board members never discussed retaliation with Weisdack or asked him to correct his behavior); *id.* at 367:13–368:15, PageID#2370 (Around January 2017, Livers asked Weisdack "how things were going in the office" but didn't mention retaliation); Goergen Dep. Vol. 2 303:7–22, ECF No. 187-1, PageID#3600 (doesn't know that anyone—other than Weisdack—investigated retaliation allegations).)

### c. The District had a custom of tolerance or acquiescence to serial civil-rights violations over seven months against Buddenberg.

A local government may also be held liable for federal rights violations when it had an unwritten, but entrenched policy of tolerating federal rights violations. A plaintiff must show (1) the existence of a clear and persistent pattern of illegal activity; (2) notice (or constructive notice) by defendant; (3) that the defendant's "tactic approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction"; and (4) that defendant's custom was the "moving force" or direct causal link in the rights violation. *Thomas*, 398 F.3d at 429. Here, the serial adverse actions recounted above over seven months, along with the District's many ignored reports by Buddenberg of retaliation show the District's custom was the "moving force" or direct causal link in the rights violations against her.

**D. The District is liable on three Title VII–, Ohio Rev. Code § 4112–, Equal Pay Act– and Ohio Rev. Code § 4111.17(D))–retaliation elements (protected activity, Defendant's knowledge of that activity, and adverse employment actions)—and, on the fourth (causation), is liable for retaliatory motive for the adverse actions against Buddenberg Defendants admit are causally connected to her February 1, 2017 email protesting retaliation against Mix. Weisdack, Goergen, Gragg, Livers, and Whitright are likewise liable on the same Equal Pay Act– and Ohio Rev. Code § 4112–retaliation elements, as is Budzik on the same Equal Pay Act–retaliation elements.**

Defendant District is liable for retaliation under 42 U.S.C. § 2000e-3(A) (Title VII) and Weisdack, Goergen, Gragg, Livers and Whitright are individually liable under Ohio Rev. Code § 4112.02(I)) if (1) Buddenberg engaged in Title VII–protected (or § 4112–protected) activity; (2) Defendants knew she had engaged in the protected activity; (3) Defendants took a materially adverse employment action against her; and (4) there's a causal connection between the protected speech and the adverse employment action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014); *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541–42 (6th Cir. 2003). (Section 4112 claims are analyzed under the same standards as Title VII claims).

Defendants District, Weisdack, Budzik, Goergen, Gragg, Livers, and Whitright are liable for unlawful retaliation under the 28 U.S.C. § 215(A)(3) (Equal Pay Act ((Fair Labor Standards Act)) (and therefore Ohio Rev. Code § 4111.17(D)) if: (1) Buddenberg engaged in FLSA–protected activity; (2) Defendants knew she'd engaged in the protected activity; (3) Defendants took a materially adverse employment action against her; and (4) there is a causal connection between the protected speech and the adverse employment action. *Adair*, 452 F.3d at 489; *Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 161 n.6 (6th Cir. 2004) (§ 4111.17(D) claims are analyzed under the same standards as Equal Pay Act–retaliation claims).

Based on the undisputed facts, Buddenberg is entitled to summary-judgment on elements (1), (2), and (3), namely that she engaged in protected activity, of which Defendants were aware, and suffered materially adverse actions. As detailed above in the First Amendment–retaliation section,

Buddenberg is also entitled to summary judgment on element (4), causal connection, as to one particular set of adverse employment actions—those resulting from her complaint of retaliation against Mix—because Defendants have admitted the causal connection. No reasonable jury could find otherwise based on Defendants' own admissions and plain wording.

1. **Buddenberg engaged in Title VII–, Ohio Rev. Code § 4112–, and Equal Pay Act–protected activity by reporting gender-discrimination, equal-pay concerns to Weisdack, the board, and its agents, filing her February 2017 EEOC retaliation charge, and repeatedly complaining about retaliation against herself and the supervisor protecting her, Dan Mix.**

Buddenberg is entitled to summary judgment against Defendant District for having engaged in protected activity under Title VII; against the District, Weisdack, Goergen, Whitright, Livers and Gragg under Ohio Rev. Code § 4112; and against the District, Weisdack, Budzik, Goergen, Gragg, Livers, and Whitright under the Equal Pay Act and Ohio Rev. Code § 4111.17(D). Her protected activity included reporting gender-based pay inequity to the board on October 24 and November 13, 2016; reporting retaliation for opposing the pay inequity to the board on October 31, 2016, November 4, 2016, November 5, 2016, November 13, 2016, November 15, 2016, December 14, 2016, December 15, 2016, February 1, 2017, and March 10, 2017; and filing an EEEC retaliation charge.

a. **Buddenberg engaged in Title VII–protected opposition activity by reporting to the board her concern that a man and a woman were being paid differently for the same work, retaliation for having reported about the gender-pay-equity issue, and filing an EEOC retaliation charge.**

Employers cannot retaliate against an employee for opposing an unlawful discriminatory practice or making a charge or participating in a Title VII proceeding ("opposition" and "participation"). 42 U.S.C. § 2000e-3(a); *Laster v. City of Kalamazoo*, 746 F.3d 714, 729–30 (6th Cir. 2014). Complaints to management about potential violations of Title VII–protected "opposition" activity. *Laster,* 746 F.3d at 730.

As discussed above, Buddenberg on October 24, 2016 reported to the board potential gender-based pay discrimination (and then repeatedly opposed retaliation she experienced for reporting). *See* above at Part II(C)–(I). On October 24, 2016, Varga (a man) and Hill (a woman) were both "sanitarians-in-training," but Hill was making $2.75/hour less than Varga. (*See, e.g.*, Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36, PageID#5279–80.)

Paying a man more than a woman for equal work, and retaliating against an employee for reporting such discrimination, are unlawful employment practices under Title VII, so each of Buddenberg's reports to the board were opposition activities. *See, e.g., Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (reporting allegedly unlawful conduct is "classic opposition activity"); *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity[.]") (citations omitted).

An employee's reasonable opposition may be protected under Title VII regardless of whether the challenged practice was actually unlawful. *Wasek*, 682 F.3d 463 at 469. Buddenberg's opposition is protected as long as (1) her manner of opposition was reasonable; and (2) they were based on a reasonable and good-faith belief that the opposed practices were unlawful. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).

Defendants admit Buddenberg's reporting to the board concerns of pay discrimination was a reasonable manner of opposition. (Ex. 85 (District's EEOC Position Statement (Buddenberg)), ECF No. 195-36, PageID#5279.) And Defendants assert that an employee "should" bring concerns about retaliation to the board (effectively admitting that it was reasonable for Buddenberg to do so). (Whitright Dep. 129:16–24, ECF No. 189-1, PageID#4112; District 30(b)(6) (Litke) Dep. 220:10–221:8, ECF No. 179-1, PageID 1753–54; *id.* at 225:25–225:4, PageID#1758–59.)

And Buddenberg reasonably believed that Hill's and Varga's pay differential was unlawful sex discrimination. (*See, e.g.*, Gragg Dep. 132:13–133, ECF No. 188-1, PageID#3794–95 (doesn't dispute Buddenberg had reasonable belief about her October 24, 2016 allegations); Goergen Dep. Vol. 1 125:5–11, ECF No. 186-1, PageID#3390 ("Q: Can we agree that the concerns she raised about gender pay equity had a reasonable basis for concern? … A: Yes. An investigation showed that there was a pay disparity and we addressed [it.]")

Buddenberg had reasonable bases for believing that Defendants were retaliating against for reporting pay discrimination (which she repeatedly expressed to the board). (*See* above at Part II(C)–(I).) (describing Buddenberg's retaliation reports). For example, in her October 31, 2016, email to Livers, Buddenberg stated her belief that Weisdack changed her work hours in retaliation for her October 24, 2016 board report because, among other things, the change took place less than 48 hours after her report, and she had heard from coworkers that Weisdack was "ma[king] it known he is angry at [her] for talking to the board." (Ex. 77, ECF No. 195-28, PageID#5258.) Defendants cannot argue that Buddenberg's retaliation reports were unfounded or unreasonable. (*See, e.g.*, Goergen Dep. Vol 1 (when Goergen saw Buddenberg's October 31, 2016 retaliation report, he "was concerned because of the abrupt change); Gragg Dep. 97:16–20, ECF No, 188-1, PageID#3759 ("[Buddenberg] complained to the Board. [Weisdack] Bob found out [it]. There was a lot of friction between the two of them." ).) These reports were Title VII–protected activities as a matter of law.

On February 15, 2017, Buddenberg filed an EEOC charge alleging Title VII retaliation, which is a "participation" activity that absolutely protects her from retaliation, regardless of reasonable belief.[4] *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 581–82 (6th Cir. 2000) (holding that

---

[4] In deposition, District Defendants' counsel misled Budzik on this blackletter issue into wrongly claiming that participation in an EEOC proceeding requires a good faith belief. (Budzik Dep. Vol. 2 362:17–24, ECF No. 184-1, PageID#3097.) Both attorneys are wrong and Budzik, a seasoned employment lawyer, would have known this.

the district court reached erroneous conclusion by applying good-faith standard); *Booker v. Brown &*
*Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989) ("The exceptionally broad protection
of the participation clause extends to persons who have participated in any manner in Title VII
proceedings … Protection is not lost if the employee is wrong on the merits of the charge, … nor is
[it] lost if the contents of the charge are malicious and defamatory as well as wrong. Thus, once the
activity in question is found to be within the scope of the participation clause, the employee is
generally protected from retaliation.") (citations omitted) (internal quotations omitted). As a matter
of law, Buddenberg's filing an EEOC charge was a Title VII–protected activity.

> **b. Buddenberg engaged in Ohio Rev. Code § 4112–protected opposition by reporting to the board her concern that a man and a woman were being paid differently for the same work, and retaliation she was facing for telling the board about it.**

Under Ohio Rev. Code § 4112.02(I) it is an unlawful employment practice for "any person"
to discriminate in any manner because that person has opposed any unlawful discriminatory practice.
"Any person" is defined as including individuals, legal representatives, agents, political subdivisions
of the state, authorities, agencies, and boards. Ohio Rev. Code § 4112.02(A).

As detailed above, Buddenberg engaged in Title VII–protected activity by reporting to the
board sex-based pay discrimination, and retaliation for reporting. *See* above at Part III(D)(1)(a).
Section 4112's language "mirrors that of Title VII," and federal caselaw interpreting Title VII thus
generally applies to § 4112–violation cases. *See, e.g., Braun v. Ultimate Jetcharters*, LLC, 828 F.3d 501,
510–11 (6th Cir. 2016) (citing *Baker v. Buschman Co.*, 127 Ohio App.3d 561, 713 N.E.2d 487, 491
(Ohio Ct. App. 1998); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 66 Ohio
St.2d 192, 421 N.E.2d 128, 131 (Ohio 1981). Because, as shown above, Buddenberg's
discrimination-and-retaliation reports were Title VII–protected "opposition" of a discriminatory
employment practice, they are also protected under Ohio law. *Braun*, 828 F.3d at 510–11.

      **c.** **Buddenberg engaged in Equal Pay Act– and Ohio Rev. Code § 1111.17(D)–protected activity by reporting to the board about the gender-based pay disparity between Hill and Varga, retaliation she was facing for reporting this inequity, and filing an EEOC retaliation charge.**

No person may retaliate against an employee for reporting a potential Equal Pay Act violation or filing a complaint related to that chapter (including the prohibition on sex discrimination in pay rates under 29 U.S.C. § 206 (d)). 42 U.S.C. § 215(a)(3); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). Likewise, under Ohio law, it's unlawful to discriminate against an employee for making a complaint addressing pay discrimination. Ohio Rev. Code § 4111.17(D).

Filing an EEOC charge about unlawful pay discrimination and retaliation for reporting is a protected activity under the statute's plain language (i.e., "fil[ing] a complaint.") 42 U.S.C. § 215(a)(3); *see also McDaniel v. Transcender, LLC*, 119 F. App'x 774, 779 (6th Cir. 2005) (declining to adopt FLSA antiretaliation provision to limit protected activity to EEOC "formal proceedings"); *Spiteri v. AT&T Holdings, Inc.*, 40 F.Supp.3d 869, 875–76 (E.D. Mich. 2014) (finding plaintiff's filing Title VII EEOC charge is sufficient evidence of protected activity for prima facie case of FLSA retaliation). Buddenberg's February 15, 2017 EEOC charge alleging Title VII retaliation is thus protected activity under the Equal Pay Act.

Informal complaints to management about unequal pay are also protected activity for Equal Pay Act–retaliation purposes, as long as the complaint is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011); *Moore v. Freeman*, 355 F.3d 558, 562–63 (6th Cir. 2004).

Defendants indisputably knew that Buddenberg on October 24 and November 13, 2016 was alleging unlawful gender-pay discrimination. *See* above at Part II(B); (Ex. 194-26, ECF No. 194-26, PageID#4747 (Buddenberg's November 13, 2016 email to board members) ("A female employee was hired to perform the same job as a male employee, hired 12 months prior. The female had a

better GPA and more experience than the male at time of hire. Female was given a starting pay of $2.00 less per hour and has not been given an increase to correct the inequality…According to the Equal [P]ay [A]ct of 1963…discrimination based on sex is prohibited.")) Nor is there any dispute that Buddenberg's February 1, 2017 email (for which she was disciplined) clearly stated she was alleging Mix's forced termination was retaliation against her for reporting gender-based pay discrimination. (*See, e.g.*, Ex. 185, ECF No 195-36, PageID#5311; Whitright Dep. 95:19–23, ECF No. 189-1, PageID#4078 (this email was a report of ongoing retaliation by Weisdack.))

These activities thus are protected under the Equal Pay Act (and so also under Ohio Rev. Code § 1111.17(D)). *Birch*, 392 F.3d 151, 161 n.6 (6th Cir. 2004).

### 2. Defendants knew Buddenberg had engaged in protected activity by reporting to the board about the gender-based pay disparity between Hill and Varga, retaliation for having reported about the inequity, and filing an EEOC retaliation charge.

Defendants knew Buddenberg alleged on October 24 and November 13, 2016 that a man was being paid less than a woman for the same job. (*See, e.g.*, Ex. 120, Dist. Defs.' Answer to Req. for Admis., ECF No. 196-13, PageID#5524; Ex. 153, ECF No.196-46, PageID#5993; Weisdack Dep. Vol. 2, 246:4–12, ECF No. 181-1, PageID#2248 (Weisdack knew by November 2016 that Buddenberg's complaint to the board was, in part, about gender-based unequal pay); *id.* at 245:7–12, PageID#256 (Weisdack told Wendell that part of the substance of Buddenberg's board complaint included an allegation of unequal pay based on gender); Budzik Dep. Vol. 3 449:22–450:4, ECF No. 185-1, PageID#3215–16 (before Buddenberg's March 3, 2017 hearing, Budzik was aware of underlying facts alleged in District's position statement he drafted in response to Mix's EEOC charge—which included recitations of Buddenberg's protected activity!); Ex. 185 (District's EEOC Position Statement (Mix), ECF No 197-29, PageID#6348 ("On October 24, 2016…the Agency Fiscal Officer[] filed an internal complaint with the [board]. She complained…that a female employee who was hired at a lower rate than a male employee for an alleged same job[.]"))

Buddenberg undisputedly alleged she was being retaliated against for her October 24, 2016 board report. *See* above at Part II(D)–(I) (discussing Buddenberg's October 31, 2016, November 4, 2016, November 5, 2016, November 13, 2016, November 15, 2016, November 30, 2016, December 14, 2016, December 15, 2016, February 1, 2017, and March 10, 2017 retaliation reports); Part II(G) (discussing Buddenberg's March 3, 2017 pre-disciplinary hearing during which repeatedly told Weisdack and Budzik the disciplinary charges against her were retaliatory).

By February 23, 2017, all defendants were aware that Buddenberg had filed a retaliation charge with the EEOC. (Ex. 170, ECF No. 197-14, PageID#6116–18; Dist. Defs.' Answer to Sec. Am. Compl. at 9 ¶ 53, ECF No. 37, PageID#462; Budzik Dep. Vol. 2 (Errata) 379:8–11, ECF No. 184-1, PageID#3115; Ex. 174, ECF No. 197-19, PageID#6125–28; Goergen Dep. Vol. 1 168:22– 169:2, ECF No. 186-1, PageID#3423–24.) Budzik even understood she had engaged in protected activity by going to the EEOC. (Budzik Dep. Vol. 3 398:10–16, 403:2–10, ECF No. 185-1, PageID##3164, 3169; Budzik Dep. Vol. 2 358:17–25, ECF No. 184-1, PageID#3094.)

Because Defendants were aware that Buddenberg had reported to the District and the EEOC gender-pay discrimination—and retaliation for reporting that discrimination—Title VII, Ohio Rev. Code § 4112, and the Equal Pay Act establish that her activities are legally protected.

> **3.  After Buddenberg engaged in protected activity, Defendants subjected her to materially adverse actions (e.g., charging her, gaslighting her in a hearing, threatening and carrying out a litany of disciplinary charges against her, demoting her, suspending her without pay, and slashing her pay nearly in half) that would dissuade a reasonable worker from making or supporting a discrimination or retaliation charge.[5]**

Under Title VII, Ohio Rev. Code § 4112, and the Equal Pay Act, "materially adverse actions" are those that would dissuade a reasonable worker from making or supporting a

---

[5] Buddenberg exhausted her administrative remedies and timely filed the complaint as required. *See* above at Part II(I); *Williams v. Northwest Airlines, Inc.*, 53 F. App'x 350, 351–52 (6th Cir. 2002) (detailing requirements). (There is no administrative exhaustion requirement under the Equal Pay Act.) *Washington Cnty. v. Gunther*, 452 U.S. 161, 175 n.14 (1981).

discrimination charge. *Laster*, 746 F.3d at 731 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *Briggs v. Univ. of Cincinnati*, 11 F.th 498, 514 (6th Cir. 2021) (Equal Pay Act); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C. R. Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d, 131 (Ohio 1981) (§ 4112). *cf.* above at Part III(C)(2) (adverse actions in the First Amendment–retaliation context are those which would deter a person of ordinary firmness from exercising free-speech rights.) Title VII and the Equal Pay Act's antiretaliation provisions aren't limited to adverse actions affecting the terms and conditions of employment. *Burlington N.*, 548 U.S. at 64–69; *see also e.g.*, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (placing employee on brief paid administrative leave and 90-day performance plan meet "relatively low bar" of materially adverse action for retaliation-claim purposes).

Under this standard, Buddenberg's suspension, demotion, pay cut, and reassignment are all materially adverse actions. *See*, *e.g.*, *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 565 (6th Cir. 2012) (materially adverse actions may include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461–62 (6th Cir. 200) (demotion is materially adverse action); *Burlington N.*, 364 F.3d at 802 (suspension without pay for one week was materially adverse action, even though employee's lost wages later reimbursed).

The same is true of the District's decision to confront Buddenberg with disciplinary charges and subject her to the March 3, 2017 pre-disciplinary hearing. "Facing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and being forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014).

What is a materially adverse action isn't "reducible to a comprehensive set of clear rules" but is based an objective view of its harm. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011). The change in Buddenberg's hours thus was materially adverse, because—as Weisdack knew—she relied on those hours to help care for her cancer-stricken grandchild. *Burlington N.,* 548 U.S. at 69 ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances …. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.") (citing *Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (flex-time schedule critical to employee with disabled child)).

Buddenberg repeatedly expressed to the board the harm adverse actions against her (that she undisputedly endured) caused, but they failed to respond or act. *See* above at Part II(D)–(I). (Given their promise to protect her, this too was an adverse action.) Weisdack created a "hostile" environment by disparaging her to coworkers; Wendell and others were ignoring her requests for information, making it difficult to do her job; Weisdack sat on her request for leave for abnormally long; Budzik failed to inform her of her right to legal representation, gaslit her during her pre-disciplinary hearing, tried to convince her to "settle" the disciplinary actions against her, and refused her request to have a witness present in that meeting; the District eliminated her job (making it impossible to return if she won her appeal); Weisdack reassigned her to an unfavorable department; board members approved. *Id.* Each action was objectively, materially adverse.

Even those actions Defendants took against Mix (e.g., Weisdack's abrupt change in demeanor with Mix, changing the Health Commissioner job description, and his forced resignation) constitute retaliation against her. *Thompson*, 562 U.S. at 173–74 (third-party reprisals included Title VII's antiretaliation provision); *id.* (declining to identify a fixed class of relationships because the determination is based on the circumstances). Weisdack then understood that Mix was defending

Buddenberg for her board report, and Defendants admit (in defending disciplining her for reporting this adverse action) that having Mix as her supervisor was a "benefit." *See* above at Parts II(E)–(F). Using Mix (Buddenberg's trusted supervisor) as a proxy for retaliation would dissuade a reasonable worker from engaging in protected activity. *See Thompson*, 562 U.S. 174.

There is no dispute that Buddenberg endured each of these materially adverse actions. *See* above at Part II(B)–(I). Each of these actions would dissuade a reasonable worker from making or supporting a charge of discrimination. (*See, e.g.*, Wendell Dep. Vol. 2 143:4–144:10 ("I wouldn't want to see that happen to anyone… [and] I know how I would feel if that happened to me.") (cleaned up).) They are thus sufficiently adverse actions for Title VII–, Ohio Rev. Code § 4112–, and Equal Pay Act–retaliation purposes. *See Buddenberg*, 939 F.3d at 740.

### 4. Defendants' admissions establish as a matter of law the causal connection between Defendants' adverse actions that followed Buddenberg's February 1, 2017 email and the protected-activity email itself.

A causal connection between an employer's actions exists when the protected activity was the "but-for" cause of the employer's alleged adverse action. *Davis v. Metro Parks and Recreation Dep't*, 854 F. App'x 707, 713 (6th Cir. 2021) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). A plaintiff may prove unlawful retaliation by presenting direct evidence of it. *See, e.g., Davis v. Metro Parks and Recreation Dep't*, 854 F. App'x 707, 713 (6th Cir. 2021) (citations omitted); *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 ("It is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* [burden-shifting framework.]"); *Reeser v. Henry Ford Health System*, 119 F.Supp.3d 710, 718 (FLSA). Direct evidence "if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (emphasis in original).

As discussed above, Defendants' own words show that the causal connection between Buddenberg's February 1, 2017 email opposing Mix's forced resignation as a proxy for retaliation

against her and the adverse action of her suspension and demotion are effectively undisputed and thus established *as a matter of law*. *See* above at Part III(C)(3).

Before Buddenberg faced and as she was facing adverse actions, every Defendant (and so the District) knew that Buddenberg had reported unequal-pay gender discrimination. *See* above at Part II(C). There is no dispute this email was a retaliation report for her "reporting to the board on October 24th *the potential EEOC violation* and the [e]thics violation[s]." (*See, e.g.,* Ex. 185, District's EEOC Position Statement (Buddenberg), ECF No 195-36, PageID#5311 (emphasis added); Whitright Dep. 95:19–23, ECF No. 189-1, PageID#4078 (Buddenberg was reporting retaliation).)

For one particular set of adverse actions—being charged, enduring a hearing, being interrogated and gaslit, being demoted and suspended, and having her pay slashed for having reported retaliation against her former supervisor Dan Mix—Buddenberg is entitled to summary judgment on causation because the District, Weisdack, Goergen, Gragg, and Livers—with Budzik's help—have effectively admitted causation. (Ex. 68, ECF No. 195-19, PageID#5163; *id.* at PageID#5169; Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36, PageID#5282.) No reasonable jury could find otherwise based on Defendants' own plain wording.

### E. The retaliation elements established above are also elements of the Ohio Rev. Code § 2921.45 (interfering with civil and statutory rights) and § 2307.60 (civil liability for criminal acts) claim, so Defendants Weisdack, Goergen, Gragg, Livers, and Whitright are just as liable for that claim.

"No public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." Ohio Rev. Code § 2921.45(A). ("Public servant" includes any officer, employee, or agent of a political subdivision of the state, whether in a temporary or permanent capacity, and any person "performing ad hoc a governmental function.") § 2921.01(A)–(B). A plaintiff must prove that the defendant: (1) knowingly deprived or conspired or attempted to deprive plaintiff of a constitutional or statutory right; (2) under color of state law; (3) caused damages to plaintiff. § 2921.45(A); *Wagner v. Metro.*

*Nashville Airport Auth.,* 772 F.2d 227, 229 (6th Cir. 1985); *Lugar v. Edmonson Oil Co., Inc.,* 457 U.S. 922, 924 (1982).

Under Ohio Rev. Code § 2307.60(A)(1), "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action … and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code." The statute, "by its plain and unambiguous terms, creates a statutory cause of action for damages resulting from any criminal act." *Jacobson v. Kaforey*, 149 Ohio St. 3d 398, 400 (2016). *See also Buddenberg v. Weisdack*, 161 Ohio St.3d 160, 2020-Ohio-3832, ¶ 11 ("We agree with Buddenberg that the plain language of the statute does not require proof of an underlying criminal conviction.").

There is no dispute that Defendants Weisdack, Goergen, Gragg, Livers, and Whitright were acting under color of state law. (Dist. Defs.' Answer to Sec. Am. Compl. at 2 ¶¶ 5, 7, ECF No. 37, PageID#455.) Defendants acted knowingly when they pursued and meted out disciplinary actions against Buddenberg. *See* above at Part II(F)–(H). There is no dispute that Buddenberg's pay was slashed in nearly in half when she was demoted, and that she lost entitlement to benefits as a result, demonstrating (in part) the damages she suffered. *Id.*

The question, then, is whether they knowingly deprived or attempted to deprive Buddenberg of a constitutional or statutory right. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." Ohio Rev. Code § 2901.22(B). Here, the undisputed evidence (as discussed above) shows that Defendants Weisdack, Goergen, Gragg, Livers, and Whitright took actions against Buddenberg they were aware would probably cause a certain result or be of a certain nature—that would interfere with Buddenberg's constitutional and statutory rights. These actions included—to name only a few—bringing disciplinary charges against her, forcing her just three days

later to defend herself against them in disciplinary hearing, suspending her, demoting her, and slashing her pay in half as retaliation for exercising her right to oppose unlawful employment actions and government misconduct. The protected-activity and adverse-action elements of First Amendment and statutory acts of retaliation are established as a matter of law. So is the causal connection Defendants admit between the adverse actions that followed Buddenberg's February 1, 2017 email and the email itself, which was protected activity. *See* above at Parts II(F)–(H), III(C)(3).

Defendants Weisdack, Goergen, Gragg, Livers, and Whitright, are thus civilly liable as a matter of law for criminally interfering with Buddenberg's constitutional and statutory rights.

> **F. Defendants District, Weisdack, Budzik, Gragg, Livers, Whitright, Goergen, and Wendell's admissions should cause the Court to also enter summary judgment on Ohio Rev. Code § 4112.02(J) aiding-and-abetting elements and claims.**

It is unlawful for "any person" to "aid, abet, incite, compel, or coerce the doing of" or "attempt directly or indirectly to commit" any act declared to be an unlawful discriminatory practice under Ohio Rev. Code § 4112.02. Ohio Rev. Code §4112.02(J). This includes the unlawful employment practice of discriminating in any matter (i.e., retaliate) against any person because she opposed an unlawful discriminatory practice. § 4112.02(I). "Person" includes individuals, legal representatives, and all political subdivisions, authorities, agencies, boards, and commissions of the state. §4112.02(J).

Aiding and abetting retaliation under Ohio Rev. Code §4112(J) is established if a defendant knowingly does something he ought not to do, or omit to do something he ought to do, that "assists or tends in some way to affect the doing of the thing which the law forbids." *State v. Stepp*, 117 Ohio App.3d, 569, 690 N.E.2d 1342 (4th Dist. 1997) (quoting *Smith v. State*, 41 Ohio App. 64, 67–68, 179 N.E. 696 (9th Dist. Dec. 9, 1931)), cited in *Luke v. City of Cleveland*, No. 1:02CV1225, 2005 U.S. Dist. LEXIS 49630 (N.D. Ohio Aug. 22, 2005); *see also Woodworth v. Time Warner Cable, Inc.*, No. 1:15-CV-1685, 2015 U.S. Dist. LEXIS 148832 (N.D. Ohio Nov. 2, 2015) (citations omitted).

Here, among other things shown above,

- **Weisdack** made disparaging comments about Buddenberg to her coworkers, making it known that he was upset with her over her October 24, 2016 board report; directed Mix to change her hours without explanation or justification; signed off on the disciplinary actions against her; stripped her of her fiscal-coordinator duties before the official disciplinary decision was made; and reassigned her to the Environmental Health Division (to name a few). *See* above at Part II(D)–(I).

- **Budzik** drafted the disciplinary charges against Buddenberg knowing she'd just filed an EEOC retaliation charge; failed to notify her of her right to legal representation at the pre-disciplinary hearing; took the lead in interrogating and gaslighting her knowing the answers to his sarcastic questions about Mix at the March 3, 2017 pre-disciplinary hearing; and pressured her to "settle" the disciplinary charges in a private meeting at which he denied her request to have a witness present. *See* Part II(F)–(G).

- **Goergen, Gragg, Whitright, and Livers** each participated in and signed off on, the decision to demote Buddenberg to clerical service, suspend her without pay, and slash her pay nearly in half. (Ex. 9, ECF No. 194-9, PageID#4640; Ex. 68, ECF No. 195-19, PageID#5167; *see also, e.g.*, Goergen Dep. Vol. 1 176:16–18, ECF No. 186-1, PageID#3431; Gragg Dep. 57:5–19, ECF No. 188-1, PageID#3791.) All gave her the silent treatment in nonresponse to her multiple retaliation reports (including her November 13, 2016 report to all board members) and pleas for help. And they affirmed her job being cut from the organization chart. *See* Part II(B)–(G).

- **Defendant Wendell** ignored Buddenberg's requests for information after Buddenberg's October 24, 2016 board report. *See* above at Part (D)–(I).

All these actions aided, abetted, incited, compelled, and coerce, and represented attempts directly and indirectly to commit, violations of Ohio Rev. Code § 4112. There's no factual dispute that they did these acts knowingly and omitted things they ought to have done—respond to and protect Buddenberg—that assisted doing things the law forbids (retaliation).

IV.     **Conclusion**

Rebecca Buddenberg undisputedly engaged in legally protected activity. She experienced adverse actions at Defendants' hands. And Defendants premised at least some of these adverse actions—the notice of discipline, hearing interrogation and gaslighting when Budzik *knew* the answers, demotion, pay cut, unpaid suspension, and job reassignments—on protected activity, namely her February 1, 2017 email protesting Dan Mix's job termination for having protected her.

She is thus entitled to partial summary judgment on the protected activity, adverse actions, and some of the causal connection elements of **Claim 1** (Title VII–retaliation), **Claim 2** (Ohio Rev. Code § 4112.02(I)–retaliation), **Claim 3** (Equal Pay Act–retaliation), **Claim 4** (Ohio Rev. Code § 4111.17(D)–retaliation), **Claim 5** (First Amendment–retaliation), and **Claim 8** (Interfering with civil rights under Ohio Rev. Code §§ 2921.45, 2307.60). (This will result as judgment as a matter of law on First Amendment, Title VII, Ohio Rev. Code § 4112, and Equal Pay Act retaliation.) If the Court doesn't find the causation element established as a matter of law—which it should, then the Court should at least find the first two elements, protected activity and adverse actions, established, and find that Ms. Buddenberg is entitled to partial summary judgment on the relevant claims in relation to those elements.

And each Defendant admits to knowingly acting in ways that constitute aiding and abetting. The Court should enter judgment there as well, or at least on elements of it.

Dated: January 24, 2023

Respectfully submitted,

/s/ Melissa S. Obodzinski
Subodh Chandra (0069233)
Donald P. Screen (0044070)
Melissa S. Obodzinski (0102556)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Melissa.Obodzinski@ChandraLaw.com

*Attorneys for Plaintiff Rebecca Buddenberg*