IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Rebecca Buddenberg,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>Carolyn E. Weisdack, Administrator of the Estate of Robert K. Weisdack, *et al.*,<br><br>　　　　Defendants | Case No. 1:18-cv-00522<br><br>Judge J. Philip Calabrese<br><br>Magistrate Judge Jennifer Dowdell Armstrong |

**PLAINTIFF BUDDENBERG'S OPPOSITION TO DEFENDANTS ESTATE OF ROBERT WEISDACK, GEAUGA COUNTY HEALTH DISTRICT, GOERGEN, GRAGG, WHITRIGHT, LIVERS, AND WENDELL'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rebecca Buddenberg respectfully opposes Defendants Estate of Robert Weisdack, Geauga County Health District, Timothy Goergen, David Gragg, Catherine Whitright, Christine Livers, and Alta Wendell's ("District Defendants'") summary-judgment motion. ECF No. 217, PageID#11906–42.

It is *Buddenberg* who is entitled to partial summary judgment on retaliation-related claims, as her own motion (incorporated by reference and which relies almost exclusively on Defendants' admissions) shows. ECF No. 221, PageID#12022–97. But even if she is not, when all the evidence is considered and all reasonable inferences are drawn in her favor as the non-moving party, genuine issues of material fact preclude summary judgment for District Defendants. To the extent not resolved by Buddenberg's motion, then, this case must at long last be resolved by a jury.

A memorandum in support follows.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ v

MEMORANDUM IN SUPPORT .................................................................................1

I.      Issues Presented .....................................................................................1

II.     Statement of facts ...................................................................................3

        A.  Rebecca Buddenberg wanted to work in an environment that is ethical and
            protects taxpayers and citizens. .............................................................. 3

        B.  Rebecca Buddenberg spoke to the board about both Weisdack's unethical tire-
            contract self-dealing *and* his sexist pay discrimination *before* the board asked if
            there was "anything else" she wanted to raise—and she then told them about
            Weisdack's policy violations and mismanagement. ............................... 5

        C.  Commissioner Weisdack's bad behavior got worse after Buddenberg's report to
            the board—so much so that she and her supervisor Dan Mix feared for her
            safety........................................................................................................ 7

        D.  Whether Defendant James Budzik was really acting as a "lawyer" or just a
            hatchet man is hotly disputed. Even board members don't agree about what he
            was there to do: address Buddenberg's retaliation claims? Serve as a Weisdack
            chaperone? Why would Weisdack need a chaperone? ........................... 8

        E.  District Defendants subjected Buddenberg to a sham "hearing" just three days
            after drowning her in a barrage of charges; she sought to defend herself and have
            Budzik grasp that she was facing retaliation.. ....................................... 9

        F.  Defendant James Budzik prevented Buddenberg from benefiting from any
            supposed internal "appeals"—and the board chair agrees it would have been
            pointless anyway because the board members approved of how she was
            treated......................................................................................................10

        G.  Buddenberg endured her suspension, and her demotion took effect immediately,
            her pay was slashed nearly in half, she was immediately cut off from her
            accounts, her work was reassigned, and she was stopped from performing her
            fiscal-coordinator role.. ..........................................................................10

        H.  Buddenberg's ordinary and *ad hoc* job duties as a fiscal coordinator—as shown by
            Defendants' admissions and expectations and her prior course of conduct—did
            not include speaking three levels up from her line position to the District's board,
            no matter what moral or subjective obligation she felt. .......................11

III.    Law and Argument .................................................................................19

A. Buddenberg engaged in constitutionally protected speech that was not a part of her ordinary or *ad hoc* job duties. ..........................................................................19

   1. The impetus, setting, and audience for the speech: Buddenberg wanted to bring to the board's attention unethical conduct, illegal discrimination, and misconduct by Weisdack that she was not *required* by her fiscal-coordinator role to report. ......................................................................................21

      a. Reporting to the board wasn't part of Buddenberg's ordinary or *ad hoc* job duties.................................................................................................21

      b. Buddenberg nowhere "admits" that reporting to the board was part of her job duties. ...................................................................................................24

   2. The subject matter of the speech: Commissioner Weisdack's unethical contractual self-dealing and illegal, sexist pay discrimination—and other Weisdack policy violations. ..............................................................................29

B. Buddenberg has shown that she was constructively discharged because she has shown that the District, intending to force her to quit, deliberately created intolerable working conditions, and that she in fact quit........................................31

C. District Defendants' actions caused tangible harm to Buddenberg and qualify as "adverse" under applicable legal standards; Defendants defy U.S. Supreme Court authority and argue the wrong legal standards for adverse actions in retaliation cases under Title VII/Ohio Rev. Code § 4112, the Equal Pay Act/Fair Labor Standards Act, and for First Amendment retaliation..............................................34

   1. Under any standard, Buddenberg faced a series of adverse actions. ..............34

   2. Less-stringent standards for adverse actions apply in retaliation cases than in discrimination cases, particularly in the First Amendment context...............37

D. Material fact issues—regarding whether Buddenberg's protected activity was the "but-for" cause of the retaliation she suffered—preclude summary judgment for District Defendants on her Title VII and Equal Pay Act claims..........................43

E. District Defendants deserve no qualified immunity because, as the Sixth Circuit's *Buddenberg* decision demonstrates, the First Amendment law protecting public employees that they violated was clearly established—and had they been reasonable they would have known that. ..............................................................45

F. This case should proceed to trial on Buddenberg's claim, under Ohio Rev. Code § 2307.60, for civil liability for criminal acts..........................................................50

   1. Individual Defendants violated Ohio Rev. Code § 2921.05 because they retaliated against a public servant discharging her duties. ..............................50

2.  Defendants violated Ohio Rev. Code § 2921.45 because they knowingly deprived, conspired, and attempted to deprive Buddenberg of constitutional and statutory rights........................................................52

G.  Buddenberg's Ohio Rev. Code § 4111.17 claim should proceed because Defendants retaliated against her for reporting a prohibited wage disparity in violation of subsection (D)........................................................54

H.  Fact issues preclude summary judgment for District Defendants on Buddenberg's "aiding and abetting" claim under Ohio Rev. Code § 4112.02(J)........................................................55

IV.  Conclusion ........................................................60

**TABLE OF AUTHORITIES**

## Cases

*Abbott v. Crown Motor Co.,*
  348 F.3d 537 (6th Cir. 2003) ................................................................................................ 44

*Alsaada v. City of Columbus,*
  536 F. Supp.3d 216 (S.D. Ohio 2021) .................................................................................. 43

*Aquilina v. Wriggelsworth,*
  759 F. App'x 340 (6th Cir. 2018) ......................................................................................... 20

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) .............................................................................................................. 46

*Bart v. Telford,*
  677 F.2d 622 (7th Cir. 1982) ................................................................................................ 40

*Benison v. Ross,*
  765 F.3d 649 (6th Cir. 2014) .................................................................................... 40, 41, 42

*Bloch v. Ribar,*
  156 F.3d 673 (6th Cir. 1998) ................................................................................................ 40

*Brack v. Budish,*
  2022 WL 1192784 (N.D. Ohio Apr. 21, 2022) .................................................................... 30

*Briggs v. Univ. of Cincinnati,*
  11 F.4th 498 (6th Cir. 2021) ................................................................................................. 34

*Buddenberg v. Weisdack,*
  939 F.3d 732 (6th Cir. 2019) ......................................................................................... Passim

*Burlington Northern & Santa Fe Ry. v. White,*
  548 U.S. 53 (2006) .................................................................................................... 37, 38, 39

*Chappel v. Montgomery Cty. Fire Protection Dist. No.,*
  131 F.3d 564 (6th Cir. 1997) .......................................................................................... 46, 47

*Christopher v. Stouder Mem'l Hosp.,*
  936 F.2d 870 (6th Cir. 1991) ................................................................................................ 44

*Chulsky v. Golden Corral Corp.,*
  583 F. Supp.3d 1059 (S.D. Ohio 2022) ................................................................................ 56

*Cummings v. Greater Cleveland Reg'l. Transit Auth.*,
    88 F. Supp.3d 812 (N.D. Ohio 2015) ................................................................. 56

*Davidson v. Arlington Cmty. Sch. Bd. of Educ.*,
    847 F. App'x 304 (6th Cir. 2021) ....................................................................... 48

*Davis v. Metro Parks and Recreation Dep't*,
    854 F. App'x 707 (6th Cir. 2021) ................................................................. 43, 44

*DeCrane v. Eckart*,
    12 F.4th 586 (6th Cir. 2021) ..................................................................... Passim

*EEOC v. Avery Dennison Corp.*,
    104 F.3d 858 (6th Cir. 1997) ............................................................................. 44

*EEOC v. Ford Motor Co.*,
    782 F.3d 753 (6th Cir. 2015) ............................................................................. 44

*Ehrlich v. Kovack*,
    710 F. App'x 646 (6th Cir. 2017) ...................................................................... 37

*Elek v. Huntington Nat'l Bank*,
    60 Ohio St.3d 135 (1991) .................................................................................. 57

*Farhat v. Jopke*,
    370 F.3d 580 (6th Cir. 2004) ............................................................................. 47

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ........................................................................................... 21

*Gibbs v. Meridian Roofing Corp.*,
    2017 WL 6451181 (S.D. Ohio Dec. 18, 2017) .................................................. 59

*Handy-Clay v. City of Memphis*,
    695 F.3d 531 (6th Cir. 2012) ....................................................................... 28, 46

*Harris v. Detroit Pub. Sch.*,
    245 F. App'x. 437 (6th Cir. 2007) ..................................................................... 37

*Henderson v. City of Flint*,
    751 F. App'x 618 (6th Cir. 2018) ...................................................................... 28

*Herrnreiter v. Chicago Hous. Auth.*,
    315 F.3d 742 (7th Cir. 2002) ............................................................................. 38

*Hill v. Air Tran Airways*,
    416 F. App'x 494 (6th Cir. 2011) ...................................................................... 47

*Howlett v. City of Warren,*
   852 F. App'x. 899 (6th Cir. 2021) ................................................................ 50

*Hughes v. Region VII Area Agency on Aging,*
   542 F.3d 169 (6th Cir. 2008) ..................................................................... 46

*Kisela v. Hughes,*
   138 S. Ct. 1148 (2018) .............................................................................. 46

*Lane v. Franks,*
   573 U.S. 228 (2014) ............................................................................ 19, 30

*Laster v. City of Kalamazoo,*
   746 F.3d 714 (6th Cir. 2014) ............................................................... Passim

*Lee v. Cleveland Clinic,*
   676 F. App'x 488 (6th Cir. 2017) .............................................................. 36

*Lugar v. Edmonson Oil Co., Inc.,*
   457 U.S. 922 (1982) .................................................................................. 53

*Mayhew v. Town of Smyrna, Tenn.,*
   856 F.3d 456 ............................................................................... 27, 46, 48

*McDonald v. Flake,*
   814 F.3d 804 (6th Cir. 2016) ..................................................................... 50

*Mendocino Envtl. Ctr. v. Mendocino Cnty.,*
   192 F.3d 1283 (9th Cir. 1999) ................................................................... 43

*Michael v. Caterpillar Fin. Servs. Corp.,*
   496 F.3d 584 (6th Cir. 2007) ................................................................ 38, 39

*Mullenix v. Luna,*
   577 U.S. 7 (2015) ..................................................................................... 46

*Myers v. City of Centerville, Ohio,*
   41 F.4th 746 (6th Cir. 2022) ...................................................................... 47

*Nagle v. Village of Claumet Park,*
   554 F.3d 1106 (7th Cir. 2009) ................................................................... 36

*Peltier v. United States,*
   388 F.3d 984 (6th Cir. 2004) ..................................................................... 37

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C. R. Comm'n,*
   66 Ohio St. 2d 192, 421 N.E.2d (Ohio 1981) ............................................ 35

*Pucci v. Nineteenth Dist. Ct.*,
   628 F.3d 752 (6th Cir. 2010) ................................................................... 20

*Reeser v. Henry Ford Health System*,
   119 F. Supp.3d 710 (FLSA) ..................................................................... 44

*Regan v. Faurecia Auto. Seating, Inc.*,
   679 F.3d 475 (6th Cir. 2012) ................................................................... 31

*Rodgers v. Banks*,
   344 F.3d 587 (6th Cir. 2003) ................................................................... 47

*Rutan v. Republican Party of*,
   *Ill.*, 497 U.S. 62 ...................................................................................... 40

*Sampson v. Sisters of Mercy of Willard*,
   2015 WL 3953053 (N.D. Ohio June 29, 2015) ....................................... 59

*Savage v. Gee*,
   665 F.3d 732 (6th Cir. 2012) ................................................................... 31

*Schroeder ex rel. Schroeder v. Maumee Bd. of Educ.*,
   296 F. Supp.2d 869 (N.D. Ohio 2003) ................................................... 42

*Sheppard v. Uniboring*,
   72 F. App'x 333 (6th Cir. 2003) .............................................................. 47

*Smith v. Plati*,
   258 F.3d 1167 (10th Cir.2001) ................................................................ 43

*State v. Matthews*,
   2013-Ohio-2183, 2013 WL 2326417 (5th Dist. Fairfield Cty. May 16, 2013) .................................. 51

*State v. Stepp*,
   117 Ohio App.3d, 690 N.E.2d 1342 (4th Dist. 1997) ............................. 55

*Thompson v. N. Am. Stainless, LP*,
   562 U.S. 170 (2011) ................................................................................. 35

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ................................................................................. 43

*Wagner v. Metro. Nashville Airport Auth.*,
   772 F.2d 227 (6th Cir. 1985) ................................................................... 53

*Ware v. L-3 Vertex Aero., LLC*,
   2020 WL 783764 (S.D.N.Y. Feb. 18, 2020) ........................................... 38

*Washington v. Ill. Dep't of Revenue,*
   420 F.3d 658 (7th Cir. August 22, 2005) ............................................................. 38

*Weisbarth v. Geauga Park Dist.,*
   499 F.3d 538 (6th Cir. 2007) ................................................................................. 20

*Westmoreland v. Sutherland,*
   662 F.3d 714 (6th Cir. 2011) ............................................................... 20, 27, 47

*Whittaker v. N. Ill. Univ.,*
   424 F.3d 640 (7th Cir. 2005) ........................................................................ 36, 38

*Wood v. Eubanks,*
   25 F.4th 414 (6th Cir. 2022) ................................................................................ 40

*Woodworth v. Time Warner Cable, Inc.,*
   No. 1:15-CV-1685, 2015 U.S. Dist. LEXIS 148832 (N.D. Ohio Nov. 2, 2015) ...................... 55, 57

*Yasdian v. ConMed Endoscopic Technologies, Inc.,*
   793 F.3d 634 (6th Cir. 2015) ................................................................................ 44

**Statutes**

Ohio Rev. Code 4112 .......................................................................................... 10, 37

Ohio Rev. Code § 2307.60 .............................................................................. 2, 50, 51

Ohio Rev. Code § 2901.22(B) ................................................................................ 53

Ohio Rev. Code § 2921.01(A)–(B) ......................................................................... 53

Ohio Rev. Code § 2921.05 .................................................................................. 2, 50

Ohio Rev. Code § 2921.05(A) ................................................................................ 50

Ohio Rev. Code § 2921.05(C) ................................................................................ 51

Ohio Rev. Code § 2921.45 .............................................................................. 2, 52, 53

Ohio Rev. Code § 2921.45(A) ................................................................................ 52

Ohio Rev. Code § 4111.17 .................................................................................. 2, 54

Ohio Rev. Code §§ 4112 .................................................................................... 2, 53

Ohio Rev. Code § 4112(J) ..................................................................................... 55

Ohio Rev. Code § 4112.01(A)(1) ......................................................................... 58, 59

Ohio Rev. Code § 4112.02.................................................................................................55

Ohio Rev. Code § 4112.02(I) ............................................................................................55

Ohio Rev. Code § 4112.02(J) .......................................................................................Passim

Ohio Rev. Code § 4117(A) ...............................................................................................54

Ohio Rev. Code § 4111.17(D) ......................................................................................2, 55

M<small>EMORANDUM IN</small> S<small>UPPORT</small>

## I.  Issues Presented

**A.  Private-citizen protected speech.** Whether a public employee speaks as a private citizen is a legal question. Buddenberg's passing remarks that she was "just doing [her] job" don't change the legal reality that speaking to the board (over her supervisors' heads) about Weisdack's gender discrimination, unethical self-dealing, and policy violations was never part of her job duties. Should the Court find she spoke as a private citizen?

**B.  Constructive discharge.** A constructive discharge occurs when (1) an employer deliberately created intolerable working conditions such that a reasonable employee would have felt compelled to resign; (2) the employer intended to force the employee to quit; and (3) the employee quit. Defendants, among other things, changed Buddenberg's working hours, froze her out from communication, forced her protective supervisor out, subjected to her to gaslighting charges and a hearing, suspended and demoted her—slashing her pay nearly in half, took away her job responsibilities, eliminated her job, and reassigned her to a menial, clerical position to work for people who disliked her and wouldn't speak to her. Message received, she quit. Should Buddenberg's constructive-discharge claim proceed?

**C.  Adverse actions against Buddenberg under Title VII, Equal Pay Act/FLSA, and First Amendment.**

    **1.  Title VII/Equal Pay Act/FLSA retaliation.** These antiretaliation provisions extend beyond employment-related retaliatory acts and harm and aren't limited to so-called "ultimate employment decisions." The above-described adverse actions and others Buddenberg endured would cause a reasonable person not to report discrimination or engage in any other First Amendment-protected free speech. Can a reasonable jury find Buddenberg suffered adverse actions?

    **2.  Demotion.** An effective demotion occurs when an employer slashes an employee's compensation by nearly half, strips her of previous job responsibilities, and assigns her to menial, clerical work, even if she resigns before serving in the new role but experiences the slashed pay. All these things happened to Buddenberg. Can a reasonable jury find that she was demoted?

    **3.  Exhaustion of appeal rights.** An employee can suffer adverse actions without having "exhausted internal appeal rights" when the claims she pursues contain no such requirement and the attempt would be futile in any event. Buddenberg knew, and was told, that there was no point in appealing, to the board, the board's *own* decision. Can a reasonable jury find Buddenberg suffered adverse actions despite not having exercised

(ineffective) appeal rights?

    **4.**    **Objective standard.** An adverse action, for purposes of First Amendment retaliation, is one that would dissuade a person of reasonable firmness from engaging in further protected activity, even if the complainant herself was not so dissuaded. Can a reasonable jury find that Buddenberg suffered adverse action despite continuing to lodge complaints?

**D.**    **Title VII/Equal Pay Act causation.** Whether, for purposes of a Title VII or Equal Pay Act claim, a particular protected activity or set of activities was the "but-for" cause of an employer's adverse actions is a question of fact. In her motion for partial summary judgment, Buddenberg, through the use of Defendants' own admissions, demonstrated several causal connections between her protected activities and Defendants' adverse actions. To the extent it's not resolved by Buddenberg's motion, should the issue of causation be submitted to a jury?

**E.**    **Qualified Immunity.** Individual government officials are liable for constitutional violations when they violate clearly established law of which a reasonable official would have known. Supreme Court and Sixth Circuit authorities hold that the speech of a public employee who blows the whistle as a private citizen on corruption and illegal conduct is protected. Defendants admit such speech wasn't part of her job duties. Should the Court find Buddenberg's speech was protected and the individual Defendants aren't immune?

**F.**    **Ohio Rev. Code § 2921.05.** This statute's plain language doesn't require that a public servant "be involved in a civil or criminal action" in the discharge of her duties, but only that she was discharging her duties. If the Court finds Buddenberg discharged her duties (including duties unrelated to her speech but for which she endured retaliation), may she proceed through Ohio Rev. Code § 2307.60 with this claim?

**G.**    **Ohio Rev. Code § 2921.45.** This statute criminalizes a government official's violations of both constitutional *and* statutory rights. The record contains substantial evidence that District Defendants committed violations both of the First and Fourteenth Amendments *and* of Title VII, Ohio Rev. Code §§ 4112 and 2921.05, as well as of the federal and state Equal Pay Acts and Fair Labor Standards Acts. Should the Court submit Buddenberg's § 2921.45-through-Ohio Rev. Code § 2307.60 claim to a jury?

**H.**    **Ohio Rev. Code § 4111.17.** This statute prohibits an employer *both* from (subsection (A) engaging in pay discrimination based on certain classifications including gender *and* from (subsection (D)) retaliating against an employee who complains about such pay discrimination, whether against the complainant or another employee. Buddenberg complained about the disparate pay received by a male and a female co-worker. Is she protected from retaliation by § 4111.17(D)?

I.     **Ohio Rev. Code § 4112.02(J).** This statute imposes liability on any "person" who aids or abets a discriminatory practice. Because the term "person" is construed broadly, it applies to entities such as the Health District. And even if the statute is construed, implausibly, to apply only to affirmative acts, the record contains substantial evidence that each of the District Defendants engaged in such acts. Should the Court submit Buddenberg's § 4112.02(J) claim to a jury?

## II.     Statement of facts

Because Geauga County Health District Defendants' motion targets only certain narrow legal issues, Plaintiff Rebecca Buddenberg will present only facts relating to those issues; she will not present a comprehensive set of facts detailing *all* her evidence or revealing *all* material-fact disputes. (She does, however, reserve the right to refer to any such evidence in oral argument or appellate proceedings.) She also incorporates all evidence regarding the undisputed facts presented in her own summary-judgment motion (ECF No. 221) and the content of her concurrently filed opposition to Defendant Budzik's summary-judgment motion.

District Defendants offer no grounds to justify their imposition of discipline against Buddenberg for alleged "Group 3 offenses" or to explain why such discipline was not bogus and pretextual. Buddenberg's expert report and testimony from Rob Wolff, which explain why all the accusations against her were nonsense, now stand unrebutted, as do Defendant Weisdack's deposition admissions walking back many of his baseless accusations.

### A. Rebecca Buddenberg wanted to work in an environment that is ethical and protects taxpayers and citizens.

District Defendants assert that "Buddenberg's dislike for Weisdack ran deeper than functionality—repeatedly describing him as evil and scum." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11913.[1] But Buddenberg also said the following:

---

[1] Even if the distorted picture District Defendants try to paint were true—which it isn't—Defendants fail to show how Buddenberg's subjective *motives* for her protected activity are relevant to whether her whistleblower activity is protected under the First Amendment, Title VII, and the other relevant statutes. As shown below, they are not. Nor do Buddenberg's motives bear on or excuse *Defendants'* behavior—which is what this lawsuit is about. Defendants can't now raise these things for the first time on reply.

- Asked if she didn't want Weisdack to stay on as Health Commissioner, she replied: "I wanted to work in an environment that was ethical and protected the citizens. That's what I wanted. Whether or not it was him as the commissioner or not, it was irrelevant." Buddenberg Dep. Vol. 1, ECF No. 203-1, at 90:21–91:1, PageID#8550–51.

- Buddenberg believed that "steps need to be in place to protect public money, and that was [her] primary concern as a taxpayer, as someone who lives in Geauga County, that our funds were utilized in the way that they should be." *Id.* at 116:19–24, PageID#8576.

- She "wanted a work environment where I could be proud to attach my name to, where I knew that taxpayer dollars were being used appropriately." *Id.* at 239:9–11, PageID#8699.

- She also hoped that expressing her concern to the board would lead to better work conditions. Asked if, by that, she meant getting rid of Weisdack, she responded, "It could have been just being aware and making changes to effect how it's run. That's its role, be able to hold leadership accountable and to be ethical. So my hope and belief was their being aware would—I'm just me. I just asked them in their position of leadership to make it an ethical taxpayer-accountable, transparent location." *Id.* at 138:16–139:9, PageID#8598–99 (cleaned up).

- Asked if she disliked Weisdack, she answered that she disliked how he was *treating* her. Asked if she thought he was evil, she said she thought his *behavior* was evil. Buddenberg Dep. Vol. 3, ECF No. 205-1, at 105:10–106:10, PageID#9118–19. (And the evidence shows her beliefs to be true.) Weisdack was retaliating against her at the time, so the answer is complex but

---

Defendants' arguments seeking to "dirty up" Buddenberg are so irrelevant and substantially outweighed by their prejudicial effect that they be the subject of a motion *in limine* at trial. Retaliation jurisprudence doesn't require retaliation victims to turn the other cheek or meditate and levitate above their feelings about discriminating, unethical, retaliating bosses. Human beings are allowed to feel devastated and angry about inhumane—and illegal—conduct.

rooted in his treatment of her. *Id.* at 147:6–148:15, PageID#9160–61. To be sure, her attitude toward Weisdack grew more negative after he began retaliating against her. *Id.* at 110:24–111:6; PageID#9123–24.

District Defendants assert: "Buddenberg hoped her report to the Board would assure Weisdack's contract was not renewed." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11915. But Buddenberg's motives are irrelevant to the protected nature of her speech. (And besides, what would be *wrong* with not wanting an unethical, self-dealing, gender-discriminating public-sector manager to continue his reign of malfeasance?) Defendants' statement is also misleading. *See* Buddenberg Dep. Vol. 1, ECF No. 203-1, at 162:7–14 and 167:9–168:9, PageID#8622, 8627–28. Buddenberg repeatedly said her hope was that the retaliation would end and that her circumstances would improve after she reported ethical concerns to the board. She added, "If the retaliation would end with Mr. Weisdack's termination, then yes, I would have preferred that." She "wanted a work environment where I could be proud to attach my name to, where I knew that taxpayer dollars were being used appropriately" *Id.* at 239:9–11, PageID#8699.

**B. Rebecca Buddenberg spoke to the board about both Weisdack's unethical tire-contract self-dealing *and* his sexist pay discrimination *before* the board asked if there was "anything else" she wanted to raise—and she then told them about Weisdack's policy violations and mismanagement.**

Defendants claim that "In late October 2016 … Buddenberg had two specific workplace concerns [the tire contract and the pay disparity]." That's true, but she had others as well:

- Buddenberg reported to the board her concerns about the unequal-pay practices and potential conflict of interest. Ex. 120 (Dist. Defs.' Answer to Req. for Admis.), ECF No. 196-13, PageID#5524; District 30(b)(6) (Litke) Dep. 44:24–45:4, 54:17–25, ECF No. 179-1, PageID#1577–78, 1587; Gragg Dep. 25:5–17, 30:2–6, ECF No. 188-1, PageID#3687, 3692; Whitright Dep. 16:8–25, 22:15–20, ECF No. 189-1, PageID#3999, 4005.)

- *See* Pl. Buddenberg's Mot. for Summ. J., ECF No. 221, PageID#12040 for the list of other concerns she reported, all documented and cited throughout that brief via Defendants' own admissions and in her post-meeting memo to the Board.

- Ex. 25, ECF No. 194-26, PageID#4747–49 (showing Buddenberg had other concerns, which she reported to the board).

- The pay-disparity and self-dealing "combined made me concerned that ethical practices were not being followed." She never said those two issues were the full extent of her concerns; those issues "brought it to a head" in Fall 2016, prompting her to reach out to the board. Her public concern was ethical misconduct—of which she came with those two primary examples. Buddenberg Dep. Vol. 1, ECF No. 203-1, at 81:2–82:6, PageID#8541–8542.

District Defendants claim, "At the meeting on October 24, 2016, Buddenberg reported only the tire issue." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11914. Not true. Buddenberg reported not just Weisdack's sleazy self-dealing for the tire contract, but also his gender-discriminatory pay practices. *See, e.g.*, Buddenberg Suppl. Decl. at ¶ 9; ECF No. 257-1, PageID#14653 ("I went to the October 24, 2016 board meeting—an opportunity I had specifically requested earlier that month—prepared to and intending to speak about both those issues. And I definitely did speak about *both* in my opening presentation. When the board asked me about whether there was anything else (which I did not hear as an order or "directive" to speak), I then talked about Weisdack's additional policy violations and mismanagement. That was never part of my job either. In my depositions, the District's lawyer kept interrupting me and never gave me a chance to clearly explain what happened at the board meeting."); Ex. 4 (Buddenberg Resignation Letter), ECF No. 194-4, PageID#4587 ("On October 24, 2016, I chose, as a responsible citizen, to bring serious concerns about Mr. Weisdack's ethical violations relating to a tire contract and his unequal-pay practices to the Health District Board's attention…"); Ex. 5, Mix Decl. at 4 ¶ 20, ECF No. 194-5,

PageID#4593 ("After Rebecca reported ethical violations and pay disparities to the Board on

October 24, 2016…); Buddenberg Decl. at 1 ¶ 4, ECF No. 214-1, PageID#11745 (Buddenberg

reported several other issues to the board); Goergen Dep. Vol. 1, ECF No. 186-1, at 50:9–51:8,

PageID#3305–06.

District Defendants assert: "After reporting her concerns with the tire removal, the Board

asked Buddenberg, 'Is there anything else we should be aware of Is [*sic*] there any other concerns

that you have on Weisdack's behavior or practices.'" They fail to disclose that she said that "the two

items together combined made me concerned that ethical practices were not being followed…."

Buddenberg Dep. Vol. 1, ECF No. 203-1, at 82:1–3, PageID#8542, making an inference that she

(the non-moving party) spoke to *both* issues in her opening remarks. In any case, she clears up any

purported confusion in her Supplemental Declaration quoted in the paragraph above.

### C. Commissioner Weisdack's bad behavior got worse after Buddenberg's report to the board—so much so that she and her supervisor Dan Mix feared for her safety.

District Defendants assert: Buddenberg "concedes Weisdack was degrading and

demoralizing to the staff both before and after her reports to the Board." Again, besides being

irrelevant and hardly a "concession," this is misleading. *See* Ex. 5, Mix Decl. at 4 ¶ 24, ECF No. 194-

5, PageID#4593–94 (after board report, "I observed that certain staff, especially in the

environmental-health department, also became unkind and discourteous to Rebecca, such as Tammi

Mullin and Bob's assistant Alta, as well as plumbing inspector Gayle Duncan."); *id.* at ¶ 26, ECF No.

194-5, PageID#4594 ("Bob became volatile at staff meetings."); *id.* at ¶ 27, ECF No. 194-5,

PageID#4594 (after report, "Bob's behavior was so intimidating that there were times Rebecca and

I communicated about whether it was safe for her to be at the office. On some occasions, I steered

him out of the building when he was angry.")

**D.  Whether Defendant James Budzik was really acting as a "lawyer" or just a hatchet man is hotly disputed. Even board members don't agree about what he was there to do: address Buddenberg's retaliation claims? Serve as a Weisdack chaperone? Why would Weisdack need a chaperone?**

District Defendants assert: Budzik was retained as "outside legal counsel in connection with civil service matters pertaining to the appointment, retention, and discipline of public employees, including Mix and Buddenberg." This is hotly disputed—even by some Defendants. *See*, *e.g.*, Board chair Goergen Dep., Vol. 1, ECF No. 186-1, 129:16–20, PageID#3384 (board chair proclaiming Budzik to be Weisdack's "chaperone" "because of the sensitivity and history relative to Ms. Buddenberg's allegations and Bob's direct supervisory capacity in that role."); *id.* at 127:2–13, PageID#3382 (Budzik hired "at the same time we hired Jeff Embleton. We hired the firm and then Jeff did the initial compliance review and then Jim Budzik was assigned to help provide legal advice on human resource issues"); *id.* at 122:2–14, PageID#3377 (scope of the firm's compliance review included investigating Buddenberg's allegations from October 24, 2016 *and* her retaliation allegations that followed); *id.* at 128:7–9, Page ID#3383 (refusing to answer the question: "So are you saying that as a Board member you had no understanding of what Jim Budzik's role was?"); Board-member Whitright Dep., ECF No. 189-1, at 85:2–87:12, PageID#4068–70 (board member unsure when board hired Budzik, but agrees Mansour Gavin was *hired to investigate Buddenberg's retaliation claims*); Board-member Gragg Deposition, ECF No. 188-1, 118:21–119:6, PageID#3780–81. ("I definitely don't know, to tell you the truth, how Jim Budzik came into the whole operation… Budzik came into it and it wasn't explained to me… So I'm not sure what Mr. Budzik's job duties were or what he was tasked with and by whom, to tell you the truth"); *id.* at 137:5–6, PageID#3799 ("I don't know what Jim Budzik was doing"); *id.* at 143:22–144:1, Page ID#3805–06 ("We hired Mansour Gavin to do the review and were introduced to Jeff Embleton. And then somewhere along the way Jim Budzik showed up and I don't know how, why or where."); *id.* at 144:22–24, 188:12–13,

PageID#3806, 3850 (admitting Budzik took part in drafting the disciplinary notice but "I don't have any knowledge of what Jim Budzik did.").

Budzik—a seasoned, senior lawyer at his firm—claimed not to know whether there was a separate engagement agreement related to his representation beginning in January 2017. Budzik Dep. Vol. 1, ECF No. 183-1, 99:9–14, PageID#2782. Neither the District nor Budzik produced such an agreement in discovery. The District, through counsel, confirms that none exists. *See* Email from Spyker to Chandra dated September 17, 2022, ECF No. 252-2, PageID#14549. So no engagement agreement exists defining the scope of representation or even whether this *really* was a "legal" representation.

Or just a hatchet job under the veneer of legal representation. As detailed in the Statement of Facts in Buddenberg's opposition to Defendant Budzik's summary-judgment motion—including the discussions of the expert conclusions of longtime public-sector defense counsel Robert Wolff and legal ethicist William B. Leahy—given Budzik's behavior, including professional-norm-and-responsibility violations, all signs point to the latter. Someone who happened to be a lawyer was just joining in on the retaliation in extralegal fashion. On this record and as the non-moving party, Buddenberg is entitled to that factual inference.

### E. District Defendants subjected Buddenberg to a sham "hearing" just three days after drowning her in a barrage of charges; she sought to defend herself and have Budzik grasp that she was facing retaliation.

District Defendants assert: "During the [March 3, 2017 pre-disciplinary] hearing, Buddenberg was afforded the opportunity to be heard and present evidence. She consistently refused to do that, though. Overall, she only denied one of the charges. She just asserted the charges were retaliatory and offered excuses." This is both fabricated and hotly disputed. *See and hear generally* Exs. 61-A & 13-A (Transcript and Audiorecording of Mar. 3, 2017 "hearing"), ECF Nos. 195-12, 220, PageID#4944–95, PageID#12021; Buddenberg Decl. at 2 ¶ 10, ECF No. 214-1,

PageID#11746–47 (Buddenberg did, in fact, offer several defenses and present exculpatory documentary evidence during the hearing); Budzik Dep. Vol. 1, ECF No. 183-1, 115:20–23, PageID#2798 ("Ms. Buddenberg had provided several documents for the consideration of the defense against the administrative charges."); Buddenberg Dep. Vol. 1, ECF No. 203-1, at 212:20–24, PageID#8672 (Buddenberg provided a statement from intern Kelly (*id.* at 212:10–13, PageID#8672) debunking the shredding allegation, and referenced co-worker documents, including an email from the auditor's office, illustrating certain allegations' falsity). Buddenberg incorporates the facts presented about the hearing in her own summary-judgment motion (ECF No. 221, PageID#12054–60) and her concurrently filed, more-detailed opposition to Budzik's motion.

**F. Defendant James Budzik prevented Buddenberg from benefiting from any supposed internal "appeals"—and the board chair agrees it would have been pointless anyway because the board members approved of how she was treated.**

District Defendants assert: "Under the Personnel Policy, Buddenberg had … the ability to address the [disciplinary] findings with the Board. Yet she chose not to do so. Accordingly, the Board accepted the recommended discipline." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11918. This, too, is legally irrelevant because the First Amendment, Title VII, Ohio Rev. Code 4112, and Equal Pay Act do not require exhaustion of administrative remedies. Even if exhaustion were required, Defendants themselves prevented Buddenberg from exercising her rights. *See*, *e.g.*, Ex. 13, Buddenberg Aff. at 2 ¶ 6, ECF No. 194-13, PageID#4659 (in his post-hearing meeting, Budzik denied Buddenberg's request to speak to the board). And going to the board about its own decision would have been futile. Goergen Dep. Vol. 2, ECF No. 187-1, at 230:10–231:19, PageID#3527–28 (District's board chair agrees there's no point in appealing after the board approves the decision).

**G. Buddenberg endured her suspension, her demotion took effect immediately, her pay was slashed nearly in half, she was immediately cut off from her accounts, her work was reassigned, and she was stopped from performing her fiscal-coordinator role.**

District Defendants assert: "Before working a single day in her new role, Buddenberg requested a leave of absence." They also claim: "Her planned demotion never took effect because she did not work a single day in the position." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11918. Both statements are highly misleading and improperly demand incorrect inferences in the movants' favor. Defendants fail to disclose to this Court that they cut Buddenberg off from her accounts (including access to essential key shared computer drives) right after the March 3, 2017 hearing, before she was told of the board's *fait accompli* punishment decision. That and the lack of communication impeded her ability to execute *any* duties before or later. Buddenberg Dep. Vol. 2, ECF No. 204-1, 311:1–313:9, Page ID#8865–67. Buddenberg was immediately stripped of her duties, effectively demoted, and placed in shame-and-humiliation corner. And the District and Weisdack immediately reassigned her duties to others. *Id.* at 304:19–306:16 and 310:22–313:24, PageID#8858–60, 8864–67. The District even eliminated her job from its organizational chart. Ex. 9 (March 13, 2017 Board of Health meeting minutes), ECF No. 194-9, PageID#4640–41.

District Defendants fail to disclose that they also slashed Budddenberg's pay nearly in half effective March 21 or 24, 2017, an act that reinforces the conclusion that she *did* suffer the demotion before she quit. *See* Ex. 68 (suspension and demotion order dated Mar. 16, 2017), ECF. No. 195-19, PageID#5167, 5170 (pay rate slashed effective Mar. 21, 2017); Ex. 72 (payroll records), ECF No. 195-23, PageID#5235–37 (showing that as of June 20, 2016, she'd had been earning $19.75/hr, but that effective Mar. 24, 2017, Defendants had slashed her pay nearly in half to $10.25/hr).

### H. Buddenberg's ordinary and *ad hoc* job duties as a fiscal coordinator—as shown by Defendants' admissions and expectations and her prior course of conduct—did not include speaking three levels up from her line position to the District's board, no matter what moral or subjective obligation she felt.

District Defendants assert: "According to Buddenberg, when she went before the Board, she was 'just doing her job.'" District Defs.' Mot. Summ. J., ECF No. 217, PageID#11919. This is misleading, and the moving Defendants improperly demand inferences in their favor. Buddenberg

specifically said about this quote that it was not her job to *speak or report* to the board. Buddenberg Dep. Vol. 3, ECF No. 205-1, 114:24–116:7, PageID#9127–29. And, by Defendants' own admissions, there is no evidence to the contrary. Neither her ordinary nor any *ad hoc* job duties included reporting to the board on perceived ethical violations, policy violations, or gender-pay-equity issues. *See*, *e.g.*, Weisdack Dep. Vol. 1, 33:23–34:14, ECF No. 180-1, PageID#1987–88; Whitright Dep. 42:11–44:3, ECF No. 189-1, PageID#4025–27. Her formal job description didn't include reporting ethical issues to the board. Ex. 37 (fiscal-coordinator job description), ECF No. 194-38, PageID#4830–34; Weisdack Dep. Vol. 1, ECF No. 180-1, at 31:20–24; 33:23–34:14, 168:6–11, PageID#1985, 1987–88, 2122; Whitright Dep., ECF No. 189-1, at 42:11–44:3, 45:13–20, PageID#4025–28; District 30(b)(6) (Litke) Dep., ECF No. 179-1, at 90:17–100:5, PageID#1623–33. Weisdack told her staff shouldn't even go to board meetings. Buddenberg Suppl. Decl. at ¶ 3, ECF No. 257-1, PageID#14651; Ex. 154 (includes Email exchange from Sept. 15, 2015 and Buddenberg notes of Weisdack directive), ECF No. 196-47, PageID#5996. And her supervisor Dan Mix warned her not to go to the board. Mix Dep. Vol. 3 at 133:10–16, ECF No. 208-1, PageID#10372.

All government employees have a moral/ethical responsibility to report misconduct. Goergen Dep. Vol. 1, ECF No. 186-1, at 45:4–22 and 47:13–20, PageID#3300, 3302; District 30(b)(6) (Litke) Dep., ECF No. 197-48, at 225:25–226:4, PageID#7649–7650; Wendell Dep. Vol. 1, ECF No. 190-1, at 81:1–84:22, PageID#4333–36 (all employees are "supposed to report things that they see that are wrong," *id.* at 81:20–25, PageID#4333, but doesn't know whether reporting ethical violations was part of Buddenberg's ordinary job duties, *id.* at 83:22–84:22, PageID#4335–36). Weisdack himself told Buddenberg that staff shouldn't go to board meetings because it isn't normal and board members will be concerned if they attend. Buddenberg Suppl. Decl. at ¶ 3, ECF No. 257-1, PageID#14651; Ex. 154 (includes Buddenberg and Weisdack email exchange of Sept. 15, 2015 and Buddenberg notes), ECF No. 196-47, PageID#5996. Based on these facts, District Defendants'

insistence that Buddenberg reported her concern about the tire contract to the board "pursuant to her role as fiscal coordinator" is incorrect.

District Defendants assert: After Buddenberg reported her concern about the tire contract on Oct. 24, the Board "directed that Buddenberg tell them what other concerns she had regarding Weisdack and the Health District. At the Board's request, Buddenberg communicated remaining concerns regarding Weisdack." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11923. Defendants fail to tell this Court that, in a contemporaneous email, Buddenberg memorialized to the board that she reported the tire-contract issue *and* unequal-pay practices *first*, and *then*, after being asked if there were additional concerns, presented other "miscellaneous concerns" about Weisdack's conduct. Ex. 25 (Buddenberg email dated Nov. 13, 2016 memorializing her board speech), ECF No. 194-26, PageID#4747. *See also* Buddenberg Dep. Vol. 1, ECF No. 203-1, 81:2–82:6, PageID#8541–8542 (Buddenberg starting to explain her board speech, saying that she needed her detailed notes but being interrupted by defense counsel, and also saying that the two issues—tire contract and pay equity—brought the issue to a head and that she told the board there could be retaliation); Buddenberg Suppl. Decl. at ¶ 9, ECF No. 257-1, PageID#14653 (she went to board meeting "prepared to and intending to speak about" both tire contract and pay discrimination and "definitely did" in her "opening presentation"; when the board asked her "whether there was anything else (which I did not hear as an order or "directive" to speak)," she then talked about "Weisdack's additional policy violations and mismanagement.").

District Defendants assert: "None of these complaints had any immediacy." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11923. Beyond being irrelevant, this statement is untrue. When, months earlier, Buddenberg first expressed concern about the unequal pay Amanda Hill was suffering, Weisdack—by his own admission—didn't correct the disparity. Weisdack Dep. Vol. 1 at 141:15–18, ECF No. 180-1, PageID#2095. *See also* Buddenberg Dep. Vol. 1, ECF No. 203-1, 62:1–

9, PageID#8522 ("Mr. Weisdack was presented with this and chose not to act on correcting it."); *id.* at 68:10–12, PageID#8528 (Hill and Tusick expressed "concern" over the "substantial difference" in pay); *id.* at 76:7–11, PageID#8536 (Hill was "disturbed that her pay was significantly less"). Also, when Buddenberg reported Weisdack's misconduct, the board was considering renewing his contract, *see, e.g.,* Gragg Dep., ECF No. 188-1, 236:18–237:2, PageID#3898–99, so the complaints she made about Weisdack had some immediacy (for whatever dubious relevance that might have).

District Defendants assert: Buddenberg was responding to a direct board request for information about her employment. District Defs.' Mot. Summ. J., ECF No. 217, PageID#11923. But they fail to disclose that, *before* the board meeting, Buddenberg emailed members that she had concerns about leadership *she* wanted to present. Gragg Dep., ECF No. 188-1, 17:4–10, PageID#3679; Goergen Dep. Vol. 1, ECF No. 186-1, 14:12–20, PageID#3269; Buddenberg Dep. Vol. 1, ECF No. 203-1, 82:24–83:7, PageID#8542–43; Buddenberg Suppl. Decl. at ¶ 9, ECF No. 257-1, PageID#14653. That is, *she* initiated the speech; it didn't happen at the board's request.

District Defendants assert: "Buddenberg's [resignation letter] lists a change in work hours, rudeness by Mr. Weisdack, and the demotion as the reasons she considered the environment hostile. But there was no talk of resigning until she was demoted." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11926 (citing ECF No. 204-23, PageID#9009). Here again, relevance of her few examples aside, Defendants misrepresent the record. Buddenberg had expressed concern about her future with the District two months earlier: "The negative result of my commitment, endless personal attacks, a hostile environment, sleepless nights and grave concern for my *future ability to remain employed* in a position I have done successfully, am qualified to do and have passion for." Ex. 84 (Email from R. Buddenberg to C. Livers and J. Embleton dated Jan. 24, 2017), ECF No. 195-35, PageID#5275 (emphasis added). But Defendants fail to disclose this email.

District Defendants assert: "Buddenberg effectively conceded she was going to accept the demotion, until her supervisor was changed to Ms. Wendell in that demotion." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11926. Not so. Buddenberg discussed her decision not to return in her deposition. Buddenberg Dep. Vol. 2, ECF No. 204-1, 342:21–345:6, PageID#8896–99. Asked why she didn't "try it out," Buddenberg responded that she "could not return knowing what I knew of being under Alta, being in the environmental health department. Those were the people who treated me horribly." *Id.* at 343:6–9, PageID#8897. The problem was with multiple people in the environmental-health division—not just Wendell—who refused to communicate with her. *See id.* at 344:9–18, PageID#8898. *See also* Vol. 1, 177:20–24, ECF No. 203-1, 180:9–181:25, and 231:18–22, PageID#8640–41, 8691 (describing failures and delays in those employees' providing needed information). She also knew Wendell was simply an extension of Weisdack and doing his bidding. Buddenberg Dep. Vol. 2, ECF No. 204-1, 343:14–16, PageID#8897 (Wendell wouldn't talk to her and "had to comply with whatever Bob directed her to do.") Defendants leave out that they had also already slashed her pay nearly in half.

District Defendants assert: "So there is no dispute, but-for the demotion to being supervised (for the first time) by Ms. Wendell in Environmental Health, she would not have resigned." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11926. Defendants' effort (however irrelevant) to isolate Buddenberg's decision, and to wish away everything else she had endured, is belied by the evidence. Everett Buddenberg Dep., ECF No. 244-1, 13:15, 14:2–6, 15:17–19, PageID#14081–83 ("I remember her coming home pretty upset"; "So all this distraughted [*sic*] her and she was basically very emotional about it and confused… it was very confusing for her"; "…she was confused. She felt rejected. She felt humiliated, fearful, frustrated"). *See also* R. Buddenberg Dep. Vol. 2, ECF No. 204-1, 337:16–25, PageID#8891 (although Buddenberg was struggling, she didn't want to resign from her dream job; *id.* at 335:19–22 and 336:25–337:3, PageID#8889, 8890–91) (expressing

concerns about health insurance and a wish to "stay and work" and get better). Explaining her final decision to resign rather than return to the office, she stressed that it "was just not a good environment" for her to work in. *Id.* at 342:21–345:6, PageID#8896–99. With the board backing Weisdack no matter what he did, and with her pay lopped nearly in half, she had (reasonably) given up hope that her situation would improve when she was placed in the environmental-health department under retaliatory Wendell. But her decision didn't rest entirely on that. It was instead the "cumulative effect" of everything she had endured, most recently the suspension, demotion, and pay cut. Buddenberg Suppl. Decl. at ¶ 11, ECF No. 257-1, PageID#14653.

District Defendants assert: "Buddenberg had never worked under Ms. Wendell before." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11927. Relevance aside, Defendants neglect to mention that Buddenberg had worked *with* her. Wendell had aided and abetted Weisdack's retaliation by ostracizing Buddenberg and failing to respond to work-related needs. Buddenberg Dep. Vol. 1, ECF No. 203-1, 180:9–181:25, PageID#8640–41; Wendell Dep. Vol 1, ECF No. 190-1, 44:3–6, 44:9–45:6, 53:19–23, 85:3–86:5, PageID#4296–97, 4305, 4337–38 (Wendell doesn't dispute Buddenberg's testimony about Wendell's own behavior).

District Defendants assert: "Buddenberg was given notice she was demoted. On April 3, 2017, instead of returning, she requested two leaves of absence." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11928. Defendants' timeline is off. Buddenberg received notice of her suspension and demotion on March 16, 2017. The official demotion date was March 21, 2017. She worked *stripped of her duties and access to software and documents with her duties already reassigned* until the suspension. Buddenberg Decl. at ¶ 11, 12, ECF No. 214-1, PageID#11747–48. She endured suspension without pay on March 21, 22, and 23, 2017. She took vacation and sick leave time. She then requested leave on April 3, 2017. Ex. 68, ECF No. 195-19, PageID#5167.

District Defendants assert: Buddenberg's change in working hours was not an intolerable act

because she worked those hours for about six months before she resigned. District Defs.' Mot. Summ. J., ECF No. 217, PageID#11930. But the change in hours did affect her ability to complete college-course credits. Whitright Dep., ECF No. 189-1, 47:19–25, PageID#4030. *See* R. Buddenberg Dep. Vol. 1, ECF No. 203-1, 123:2–10; 132:11–13, PageID#8583, 8592 (needed work-hour flexibility for college and caretaking for grandchildren; attending online college at the time). And the change in hours affected her ability to help care for her grandson (i.e., impeded her "care taking ability"). *Id.*; Everett Buddenberg Dep., ECF No. 244-1, 45:1–46:3, PageID#14113–14. Buddenberg Suppl. Decl. at ¶ 12, ECF No. 257-1, PageID#14653–54. While changing her working hours *alone* may not necessarily have been an intolerable act, combined with the relentless barrage of retaliation that followed it had a cumulative effect. Defendants forget that they also ignored her when she needed information to do her job, deprived her of her protective supervisor, leveled bogus charges against her, put her through a grueling and gaslighting hearing, suspended her without pay, demoted her, slashed her pay nearly in half, delayed her leave requests, and transferred her to a division where everyone knew others didn't like her. *Id.* at ¶ 11, PageID#14653.

District Defendants assert: Buddenberg alleges Weisdack made "comments to her and to others (i.e., gossip)." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11934. Again, Defendants improperly seek inferences in their favor because it was far worse than that: Ex. 5, Mix Decl. at 4 ¶ 23, ECF No. 194-5, PageID#4593 (Weisdack was disparaging Buddenberg—"After Rebecca reported to the Board, Bob also attacked Rebecca's character to me and to other employees, calling her untrustworthy and telling us not to talk to her.") She was being mistreated. Mix Dep. Vol. 3, ECF No. 208-1, 8:1–8, PageID#10247); Mix Dep., Vol. 1, ECF No. 206-1, 50:1–5, PageID#9564 ("Bob has had some bad interactions with Rebecca and has told some employees not to trust her. So he is kind of pitting some employees against her and making it a very difficult situation for her..."); *Id.* at 135:3-4, Page ID#9649) (Defendant Wendell told Mix that Weisdack said

not to trust Buddenberg); Wendell Dep. Vol. 2, ECF No. 191-1, 157:3–13, PageID#4441 (Wendell

doesn't dispute this); Mix Dep., Vol. 1, ECF No. 206-1, 143:4–15, PageID#9657 (Mix overheard

Weisdack tell Herb Shubick: "…he doesn't trust her, that he shouldn't trust her either, that Herb

shouldn't trust her either, to watch your back because she's going after me, and she's going to come

after you").

District Defendants assert: Buddenberg has "not provided a single piece of evidence –

during discovery—supporting [her allegation that she was forced to drop college classes]." District

Defs.' Mot. Summ. J., ECF No. 217, PageID#11934. Yes, she has. *See* R. Buddenberg Dep. Vol. 1,

ECF No. 203-1, 123:2–10; 132:11–13, PageID#8583, 8592 (needed work-hour flexibility for college

and caretaking for grandchildren; attending online college at the time); Whitright Dep., ECF No.

189-1, 47:19–25, PageID#4030; Buddenberg Suppl. Decl. at ¶ 12, ECF No. 257-1, PageID#14653–

54. And factual inferences should be in her favor as the non-moving party.

There is no question, moreover, that in taking all these actions Defendants intended to force

or at least encourage Buddenberg to quit. Weisdack, for one, made no secret of his own wishes. In

the disciplinary-action notice he signed and gave to Buddenberg, he suggested just this solution:

"Finally, you have the right to resign your employment prior to the pre-deprivation hearing as part

of the administrative process." Ex. 68 (Notice of Proposed Disciplinary Action), ECF No. 195-19,

PageID#5166. There would've been no reason to say that unless Defendants wanted her to quit.

District Defendants assert: "Buddenberg complains of actually being afforded her due

process rights by way of a pre-deprivation hearing." District Defs.' Mot. Summ. J., ECF No. 217,

PageID#11934. Buddenberg's point is that the "hearing" was a sham. Budzik was dismissive and

unfair—"vindictive" was her word. Buddenberg Dep. Vol. 2, ECF No. 204-1, 374:14–375:21,

PageID#8928–29. Andrews Dep., ECF No. 212-1, 28:3–4, PageID#11475 (Budzik was "incredibly

brutal, rude, and pompous." (cleaned up). As Buddenberg explains:

Attorney James Budzik, of Mansour Gavin, was closely involved in the retaliatory disciplinary process against me. Mr. Budzik, for example, conducted the so-called predisciplinary hearing. Mr. Weisdack was present but asked no questions, nor took any notes. Mr. Budzik did all the questioning, and took notes. After the hearing, Mr. Budzik also called me to the conference room to talk to me about the potential for "settlement" before he presented the disciplinary action to the Board. He suggested that under the terms of an agreement, moving forward, all past violations would be considered void (i.e., never placed in my file) if I accepted a demotion to a clerical position at $14/hour and gave up all my rights to an appeal or other claims. I did not accept the offer, as I was innocent of the charges and I believed the proposed action was retaliatory. I asked if I could make a statement to the Board and Mr. Budzik said I could only if I accepted the settlement. Attached as Ex. B to this affidavit is an email I wrote to Board member Chris Livers about this meeting with Mr. Budzik. From the way he seemed to be in charge of the whole process, I believed Mr. Budzik had also been involved in creating the allegations in the notice of disciplinary action and participating in the findings of guilt.

Ex. 13 (Buddenberg Aff. at 2 ¶ 6), ECF No. 194-13, PageID#4659.

Budzik, in Weisdack's presence, gaslit Buddenberg by, among other things, pretending her supervisor Dan Mix resigned voluntarily when he knew otherwise. Budzik had drafted the charges, which included multiple references to Buddenberg—including termination threats—and so knew that Mix had left under threat of termination. Pl. Buddenberg's Mot. Summ J., ECF No. 221, PageID#12052 (citations within).

## III.    Law and Argument

### A.  Buddenberg engaged in constitutionally protected speech that was not a part of her ordinary or *ad hoc* job duties.

To prevail on a First Amendment–retaliation claim, Buddenberg, as a public employee, must show her speech was as a private citizen on a matter of public concern. *See, e.g., Buddenberg,* 939 F.3d at 739–40. Defendants have not argued, and thus concede, that her speech to the board was on matters of public concern. So she focuses here only on the private-citizen nature of the speech.

The First Amendment insulates public employees from retaliation for speaking as private citizens (that is, not pursuant to their ordinary job duties). *Lane v. Franks*, 573 U.S. 228, 237 (2014). Whether speech was made pursuant to an employee's ordinary job duties is a question of law.

*DeCrane v. Eckart,* 12 F.4th 586, 596 (6th Cir. 2021) (legal question "to be decided without reference to the factfinder."). *Cf. Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011) ("When there is no factual dispute regarding what was said, the court treats the question of whether an employee's speech is constitutionally protected as a question of law").

As discussed below, District Defendants introduce factual disputes about what Buddenberg said. These disputes must be resolved in the light most favorable to the employee. *DeCrane v. Eckart*, 12 F.4th 586, 596 (2021) (citing *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 768 (6th Cir. 2010)). But once those issues are resolved, it is *the Court*, and not the parties, that determines the character (i.e., private-citizen or public-employee) of Buddenberg's speech; her subjective beliefs about that character are irrelevant.

In making that determination, the Court asks whether Buddenberg's speech is ordinarily within the scope of her professional duties, and not (as Defendants wrongly assume) whether it merely *concerns* those duties. *See Lane*, 573 U.S. at 239–40. This requires the Court to consider the duties Buddenberg actually performed day-to-day. *DeCrane*, 12 F.4th at 595–96.

The Sixth Circuit has identified several "factors to consider" when determining whether speech was within the employee's duties, including:

(1) the impetus for the speech;

(2) the setting of the speech;

(3) the speech's audience; and

(4) the general subject matter.

*See*, *e.g.*, *id.* at 596; *Aquilina v. Wriggelsworth*, 759 F. App'x 340, 344 (6th Cir. 2018) (citing *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 540–41 (6th Cir. 2007)). Applying these factors shows that Buddenberg spoke as a private citizen.

1. **The impetus, setting, and audience for the speech: Buddenberg wanted to bring to the board's attention unethical conduct, illegal discrimination, and misconduct by Weisdack that she was not *required* by her fiscal-coordinator role to report.**

    a. **Reporting to the board wasn't part of Buddenberg's ordinary or *ad hoc* job duties.**

District Defendants' argument disregards and sows confusion about the U.S. Supreme Court's most pertinent teaching: "[The question is] whether the speech at issue *itself* is ordinarily within the scope of an employee's duties, not whether it merely *concerns* those duties… the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 239–40 (emphasis added). Here, and as Buddenberg's own summary-judgment motion shows, the undisputed evidence is that reporting Weisdack's pay discrimination, unethical contractual self-dealing, and policy violations to the board wasn't part of her ordinary (or *ad hoc*) job duties.

A public employee's job description is not conclusive: "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25. After all, overemphasizing a job description risks allowing employers to "restrict employees' rights by creating excessively broad job descriptions." *Id.* at 424.

In any event, speech of the type in which Buddenberg engaged and made directly to the board—three levels above her line-employee station—wasn't in her written job description. *See* Ex. 27 (fiscal-coordinator job description), ECF No. 194-38, PageID#4830–34; District 30(b)(6) (Litke) Dep., ECF No. 179-1, 90:17–100:5, PageID#1623–33. District Defendants don't allege it was. Her ordinary duties simply didn't include reporting to the board on ethical and legal violations. *See, e.g.,*

Weisdack Dep. Vol. 1, ECF No. 180-1, 31:20–24; 33:23–34:14, 168:6–11, PageID#1985, 1987, 2122;

Whitright Dep., ECF No. 189-1, 42:11–44:3, 45:13–20, PageID#4025–27, 4028. Indeed, before

October 24, 2016, Buddenberg had *never* spoken directly to the board about these or any other

topics. *See* Gragg Dep., ECF No. 188-1, 18:20–19:13, PageID#3680–81. And her reports followed

no District policy or process: no employee (other than the commissioner) had ever requested to

speak with the board in this way. *Id.* at 19:14–20:4, 32:19–23, PageID#3681–82, 3694.

     Nor, contrary to District Defendants' incantations, had Buddenberg been "directed" to

speak to the board; she *asked* the board to be heard. *See, e.g.*, Buddenberg Dep. Vol. 1, ECF No. 203-

1, 82:18–25, PageID#8542 ("I sent an email requesting that in October."); Buddenberg Suppl. Decl.

at ¶ 3, 11, ECF No. 257-1, PageID#14651, 14653. She spoke at a special board meeting convened to

decide whether to extend Weisdack's employment contract (Buddenberg Dep. Vol. 1, ECF No. 203-

1, 82:18–25, PageID#8542), a topic plainly not in her job wheelhouse.

     The fact that Buddenberg's misconduct reports to the board went outside the chain of

command reinforces the conclusion that her speech wasn't part of her job duties. *See Buddenberg,* 939

F.3d at 740 (reporting to the board as Buddenberg did supports finding of private-citizen speech).

Buddenberg's reporting chain on October 24, 2016 was Mix, Weisdack, and then the board. District

30(b)(6) (Litke) Dep., ECF No. 179-1, 75:13–18, PageID#1608. Buddenberg went around her

supervisors both by going to the board on October 24, 2016 and in her later retaliation reports. It

was unusual for an employee to come directly to the board the way Buddenberg did. Gragg Dep.

32:19–33:2, ECF No. 188-1, PageID#3694–95.

     *On these same facts* at the motion-to-dismiss stage, the Sixth Circuit found that Buddenberg

was speaking as a private citizen and not pursuant to her ordinary job duties. *See Buddenberg*, 939 F.3d

at 739–40 (distinguishing this case from those where a plaintiff's job duties included overseeing

department operations and reporting situations and accidents immediately to management) (citations

omitted). Buddenberg oversaw nothing and was responsible for reporting nothing. The Court

should thus hold as a matter of law that Buddenberg spoke as a private citizen.

In *DeCrane v. Eckart,* 12 F.4th 586 (6th Cir. 2021), former Cleveland Fire Division Battalion

Chief Sean DeCrane sued Assistant Safety Director Edward Eckart for First Amendment retaliation.

Evidence showed Eckart retaliated against DeCrane after incorrectly perceiving that DeCrane had

blown the whistle to the media about the fire chief's failure to undergo required training. Eckart

protested that DeCrane had previously given a few media interviews on the city's behalf, and that his

speech must therefore have been government rather than private-citizen speech.

The Sixth Circuit made short work of Eckart's argument, holding that DeCrane's perceived

speech was that of a private citizen and observing that "leaking information to the media cannot

even be described as one of DeCrane's 'ad hoc' duties." *Id.* at 598–99. Buddenberg is in an even

stronger position than DeCrane because she had never previously spoken to the board about *anything*

she had learned in her job. She was never expected to.

Similarly, in *Romero v. City of Middletown*, the Southern District of Ohio held that a water-

treatment lab analyst's internal reports about workplace safety and water quality weren't within his

ordinary duties because he wasn't tasked with investigating either the plant's conditions or the city's

regulatory compliance. 479 F. Supp.3d at 679–80 ("The comments on which [plaintiff] relies here

were not prompted by his supervisor's request to inspect plant operations or give his opinion on

whether [the City] was complying with the required regulations. And he was under no specific

obligation to report anything he saw to his supervisors.") Even the fact that most of the plaintiff's

speech was made to supervisors didn't resolve whether it was within his ordinary duties. That's

because "he was not making typical employee complaints (i.e., about his job responsibilities) up the

chain of command, but rather claims that he was trying to raise the alarm about water quality with

public officials who he believed were in a position to address those concerns." *Id.* at 680.

Buddenberg was likewise not tasked with investigating Weisdack's conduct or the District's regulatory compliance with Ohio ethics or discrimination laws. Nor was she making typical employee complaints (e.g., about her job responsibilities or about working conditions) up the chain of command; instead she was raising the alarm about legal and ethical violations with public officials who she believed could address those concerns.

### b. Buddenberg nowhere "admits" that reporting to the board was part of her job duties.

Failing to disclose their own admissions about Buddenberg's job duties cited above, and disregarding the rest of the record, District Defendants incorrectly characterize three of Buddenberg's statements as dispositive "admissions" on the private-citizen speech issue. They divorce these statements from their context, contort their meaning, and improperly demand inferences in their own favor. They also ignore what she said when she was forced to resign, namely that she spoke to the board "as a responsible citizen." Ex. 4 (Buddenberg Resignation Letter), ECF No. 194-4, PageID#4587. Buddenberg will address each of these statements in turn.

Defendants first inaccurately claim that Buddenberg, referring to her speech to the board, said, "I was just doing my job" in a text to Darla Andrews. What she in fact said was "not vindictive… just doing my job," a reference to her professional demeanor and to the *moral* obligation she felt when working as an honest citizen in public service to report misconduct. Buddenberg Suppl. Decl. at ¶¶ 4–6, ECF No. 257-1, at PageID#14651–52. She was *not* commenting on the scope of her ordinary or *ad hoc* job duties. And she certainly wasn't confessing that, as a low-level fiscal coordinator, it was her role to speak to the board on this or any other topic *Id.* Defendants take Budddenberg's casual comment out of context and imbue it with a legal significance it lacks.

Second, District Defendants claim that Buddenberg filed an ethics complaint in which she remarked that, "[i]n exchange for fulfilling the obligations of my position and reporting wrong doing, I have been retaliated against and placed in a hostile work environment."[2] In context, Buddenberg's reference to "fulfilling the obligations of [her] position" was *not* an acknowledgement that "reporting wrong doing" was one of those obligations. She complained that she had been retaliated against "for fulfilling the obligations of my position *and* [for] reporting wrong doing." (Emphasis added.) She didn't say that she fulfilled the obligations of her position *by* reporting wrongdoing. *See* Buddenberg Suppl. Decl. at ¶ 8, ECF No. 257-1, PageID#14652–53. There were, in short, two separate activities for which Defendants retaliated against her—fulfilling the obligations of her position *and* reporting wrongdoing. Only by improperly conflating these two—and misconstruing the syntax of Buddenberg's statement—can Defendants suggest that Buddenberg has "admitted" that reporting wrongdoing was among her job duties as a fiscal coordinator. It was not. (As discussed extensively in the Facts section above and shown in Buddenberg's own summary-judgment motion, even District Defendants acknowledge this.)

For similar reasons, District Defendants' third example is no more persuasive. Defendants claim that "Buddenberg said complaining to the Board was '**performance of my job responsibilities.**'" PageID#11921 (emphasis by Defendants). But as usual, they deny this Court vital context. The statement was embedded in a December 15, 2016 email to Defendant Budzik's firm colleague Jeff Embleton, in which she reported retaliation, which Embleton proceeded to blow off. Here is the statement in context:

> I clearly stated that my intention of communicating to the board my concerns with the tire and the pay discrimination was to; first ensure to my best ability we were legally compliant with employment law and the Ohio Code of Ethics. Second, to possibly avoid a legal action against the GCHD by the harmed party of the unfair wage discrimination and to correct

---

[2] Defendants are wrong in claiming that she didn't produce the draft in discovery: it was stored in the devices she handed over as part of her production, under Rule 34, of the fruits of her ESI search. Although she produced other material related to the Ethics Commission, she just forgot about this document.

what many believed was wrong.

> Mr. Weisdack has turned the performance of my job responsibilities into an attack on my credibility and character. I have fully complied with the investigation; I have made every effort to carry out my job responsibilities in spite of the adverse conditions.

Ex. 83 (December 15, 2016 Buddenberg email to Embleton), ECF No. 195-34, PageID#5274.

Here again, Buddenberg was not saying that the "performance of [her] job responsibilities" included or consisted in her communicating with the board. The last quoted sentence makes this clear. When she stated that she "made every effort to carry out my job responsibilities in spite of the adverse conditions," she was *not* saying that she "made every effort *to report to the board* in spite of the adverse conditions." She was addressing the retaliatory adverse conditions she faced while she was performing ordinary duties after her board report. These included Weisdack "badmouthing me to other employees and having them stop communicating with me so that I couldn't obtain financial documents I needed to do my job, and him preventing me from accessing and maintaining personnel files," etc. *See* Buddenberg Suppl. Decl. at ¶ 5, ECF No. 257-1, PageID#14651–52. It didn't stop there. Weisdack continued to turn the performance of her job responsibilities into attacks on her credibility and character. *Id.* ("This included me doing things like overseeing routine shredding, trying to help with financial reporting, offering to help at a budget meeting with the auditor's office, my having tried to help create a nice breakroom for my co-workers, help get payroll in while I was out sick, etc. Weisdack kept coming up with new opportunities to attack me.")

Even if Buddenberg did regard reporting to the board as her "job responsibility," it was not one of her formal, assigned, or *ad hoc* duties. All the evidence belies any suggestion that it was. She instead saw it as her personal, moral responsibility to call out the discrimination and corruption she was witnessing. It was not her *job* to "ensure … we were legally compliant with employment law and the Ohio Code of Ethics," to "avoid a legal action against the GCHD" by victims of wage discrimination, or "to correct what many believed was wrong." Nowhere was it written or implied,

and no one ever told her, that her job required her to take these actions. And there is zero contrary evidence in the record. (Again, she had never done anything like it before.) Yet she nonetheless felt obligated to do the right thing—for the benefit of the District and its constituents and employees.

But far and away the biggest problem with Defendants' argument is its assumption that Buddenberg's off-hand characterizations of her own job responsibilities (misinterpreted or not) are somehow legally significant, i.e., that her "admitting" something makes it so. It does not.

Again, whether speech was made pursuant to an employee's ordinary job duties is a question of law. *DeCrane v. Eckart,* 12 F.4th 586, 596 (6th Cir. 2021) (legal question "to be decided without reference to the factfinder."); *see also Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011) ("When there is no factual dispute regarding what was said, the court treats the question of whether an employee's speech is constitutionally protected as a question of law"). And in deciding the question, a court should ask not how the employee *subjectively* viewed her own speech but how a reasonable person would understand her intention, since such an *objective* approach "might better comport with our cases given that they treat *Garcetti* as raising a legal issue." *DeCrane*, 12 F.4th at 597 (citing *Mayhew*, 856 F.3d at 462–64).

Here, any factual disputes about *what* Buddenberg said must be resolved in her favor as the non-moving party. The Court must thereafter decide as a matter of law whether her statements to the board were made pursuant to her job duties or, instead, as a private citizen. Buddenberg's so-called "admissions" play no role in that legal determination, which should instead be made by reference to the (objective) evidence bearing on the scope and nature of her job responsibilities. It would not matter, for that determination, if Buddenberg had stood on the conference-room table, pounded her fist, and shouted "I'm here as a public employee (not, mind you, as a concerned private citizen) to report, as it is my duty as a fiscal coordinator to do, and completely within my chain of command, that Bob Weisdack is violating policy!" Such an "admission," that is, could not make it

*true* that Buddenberg was speaking pursuant to her job duties if it weren't *in fact* true that she was. And on this record it would *not* be true.

The "admission" would thus run counter to all the evidence, including Defendants' own admissions, showing that it was not part of Buddenberg's ordinary or *ad hoc* duties to report to the board. Such evidence includes the fact that Buddenberg had never before spoken to the board; the fact that Buddenberg had not been asked to investigate or report on the matters she brought to the board's attention; and the fact that Buddenberg's job description did not include any such "duty." *These*—and not Buddenberg's so-called "admissions" (which are anything but)—are the (objective) facts the Court should consider in making its legal determination.

District Defendants rely on *Henderson v. City of Flint*, 751 F. App'x 618 (6th Cir. 2018) to try to deny Buddenberg the right to speak. But they fail to disclose the facts of that case, which are quite different from those presented here. The *Henderson* plaintiff was not a line fiscal-coordinator like Buddenberg but the top *city administrator* for Flint, Michigan, whose senior-level, municipal-job duties *required* that she report the mayor's suspected lawbreaking to legal counsel. *Id.* at 623–24. Buddenberg's situation was completely different. *See Buddenberg*, 939 F.3d at 740 (distinguishing factual allegations here—which are now proved—from those where plaintiff's job duties included overseeing department operations and reporting situations and accidents immediately to management) (citations omitted); *Handy-Clay v. City of Memphis*, 695 F.3d 531, 542–43 (6th Cir. 2012) (holding city public-records coordinator's ordinary duties didn't include reporting concerns about city improperly using funds and employees improperly reporting absences; coordinator wasn't asked to investigate misconduct or provide her opinion on violations, and she communicated her concerns to individuals outside of her department rather than just to her supervisor).

To sum up, nothing in this record suggests that the *impetus* for Buddenberg's speech was her being ordered, or her being required by her job responsibilities, to speak. The *setting* of her speech,

moreover, was a formal board meeting with people functioning as a body. Buddenberg Suppl. Decl. at ¶ 3, ECF No. 257-1, PageID#14651. The speech's *audience*, finally, was that board, a collection of individuals three levels up from her line responsibilities. These factors combine to show that Buddenberg spoke as a private citizen.

> ### 2. The subject matter of the speech: Commissioner Weisdack's unethical contractual self-dealing and illegal, sexist pay discrimination—and other Weisdack policy violations.

Here, District Defendants cherrypick from their deficient deposition questioning to try and draw a peculiar distinction between Weisdack's sexist pay discrimination and his unethical angling to steer the (non-existent) tire contract to himself. They exaggerate testimonial gaps that they themselves created by failing to ask the right clarificatory questions. They claim that "[Buddenberg] initially related one concern to the Board—the perceived issue with the tire contract." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11922. They claim that, after she reported her concerns with the tire contract, the board asked her if there was "anything else" it should be aware of and that it then "*directed* that Buddenberg tell them" about other concerns. They claim that Buddenberg, at the board's request, then communicated her remaining concerns about Weisdack, including pay disparities, misuse of public resources, and personnel-policy failures. District Defs.' Mot. Summ. J., ECF No. 217, PageID#11923 (emphasis added).

But this is all factual conjuring. The fact is that District Defendants took a deficient deposition and are now filling gaps with their own fabrications. Had defense counsel not interrupted and sidetracked Buddenberg (*see, e.g.*, Buddenberg Dep. Vol. 1, ECF No. 203-1, at 81:2–82:6, PageID#8541–42), what she would have explained in completing her answer is that she came to the board meeting (which was convened at *her* request) prepared and intending to speak—and that she *did* speak in her opening presentation—about *both* Weisdack's unethical tire-contract self-dealing *and* the gender-pay-discrimination issues. "The two items together combined made me concerned that

ethical practices were not being followed…" *Id.* at 81:25–82:3, PageID#8541, 8542; Ex. 4

(Buddenberg Resignation Letter), ECF No. 194-4, PageID#4587 ("On October 24, 2016, I chose,

as a responsible citizen, to bring serious concerns about Mr. Weisdack's ethical violations relating to

a tire contract and his unequal-pay practices to the Health District Board's attention…"). *Then*, when

the board asked her (did not "direct" her) whether there was "anything else," she raised Weisdack's

other policy infractions. Buddenberg Suppl. Decl. at ¶ 9, ECF No. 257-1, PageID#14653.

      In any event, the Court need not analyze every item on which Buddenberg reported, because

"attending [a] meeting as an employee or in one's official capacity does not necessarily, as a matter

of fact or law, bring every statement made at the meeting within the scope of one's official duties."

*Brack v. Budish*, No. 1:19-CV-01436, 2022 WL 1192784, at *12 (N.D. Ohio Apr. 21, 2022)

(Calabrese, J.) (finding good-faith basis for First Amendment–retaliation claims where nurse first

went to a county-council meeting as part of his duties but then shifted course, in response to lies by

an official and questioning by council members, and proceeded to blow the whistle as a private

citizen on a matter of public concern, namely jail conditions).

      Nor does the board's question whether Buddenberg wanted to report "anything else"

transform Buddenberg's (previous or subsequent) speech into government speech. If it did, then any

public employee who, outside her job duties, blows the whistle to high-level government officials

about misconduct would lose all First Amendment protection as soon as the query is posed. And if

that were so, any government entity or official could defeat an employee's otherwise meritorious

First Amendment–retaliation claim in advance by employing a simple expedient: ask her if there's

"anything else" and, as if by magic, all her subsequent speech loses its protected, private-citizen

character. That simply isn't the law.

      And by perseverating on the tire-contract segment of Buddenberg's report and its relation to

her job, District Defendants flout the Supreme Court's *Lane v. Franks* teaching that public employees

may base First Amendment retaliation claims on information they learn from performing their job duties—provided only that the speech is not made *pursuant to* or *as part of* those duties. And flout they do. As the Sixth Circuit said of a contention just like Defendants': "This argument flouts precedent…. The Supreme Court has made clear that employees do not speak "on the job" simply because they speak *about* the job." *DeCrane v. Eckart*, 12 F.4th at 598 (citing *Lane*, 573 U.S. at 239–40). "Indeed, 'speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment.'" *Id.* (quoting *Lane*, 573 U.S. at 240).

As mentioned, Buddenberg had never before spoken to the board about anything. And everything she knew about Weisdack's corrupt and illegal behavior she learned on the job (even though it was not her job to find out). Some of the things she learned may even have been somewhat relevant to her job. But that doesn't mean that she was *required* or *expected* to talk to anyone about the misconduct or that it was part of her job to do so.

This Court should thus find that Buddenberg spoke as a private citizen.

**B. Buddenberg has shown that she was constructively discharged because she has shown that the District, intending to force her to quit, deliberately created intolerable working conditions, and that she in fact quit.**

To prove constructive discharge, an employee must show that: (1) the employer deliberately created intolerable working conditions "as perceived by a reasonable person," which means that "a reasonable person would have [felt] compelled to resign"; (2) the employer intended to force the employee to quit; and (3) the employee actually quit. *Buddenberg,* 939 F.3d at 739 (citing *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481–82 (6th Cir. 2012)) (quoting *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012); *see also Laster v. City of Kalamazoo*, 746 F.3d 714, 727–28 (6th Cir. 2014).

Although whether a reasonable person would have felt compelled to resign (the first prong) depends on the facts of each case, a court will consider whether the employee experienced some of the following employment actions:

    (1)  demotion;

    (2)  reduction in salary;

    (3)  reduction in job responsibilities;

    (4)  reassignment to menial or degrading work;

    (5)  reassignment to work under a younger supervisor;

    (6)  badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or

    (7)  offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 728.

Here, the District and Weisdack deliberately created intolerable working conditions for Buddenberg. Her working hours were first changed to something that made it harder for her to attend college or help care for her cancer-stricken grandchild. The boss who was trying to protect her from retaliation was forced out for doing so. She was placed on an unpaid suspensions, her job responsibilities were taken away, she was demoted to a menial, clerical position, and her salary was hacked nearly in half. She was assigned to work for and with people who didn't like her—and who wouldn't even talk to her anymore. Over time, she faced badgering, harassment, and humiliation by the employer, all calculated to encourage her resignation. This included Budzik's aggressive interrogation as Weisdack's designee, where Budzik gaslit her by pretending Dan Mix resigned voluntarily even though Budzik knew—from having written the charges himself—that it was under threat of termination. And in a backroom following her disciplinary "hearing," Budzik, for the

District Defendants, sought to intimidate Buddenberg into dismissing her EEOC retaliation charge by "offering" her continued employment on terms far less favorable than her former status.

There is little question, moreover, that in taking these actions Defendants intended to force or at least encourage Buddenberg to quit. Weisdack indeed made no secret of his own wishes. In the disciplinary-action notice he signed and gave to Buddenberg, he suggested just this solution: "Finally, you have the right to resign your employment prior to the pre-deprivation hearing as part of the administrative process." Ex. 68 (Notice of Proposed Disciplinary Action), ECF No. 195-19, PageID#5166. There would have been no reason to mention that unless he wanted her to quit.

The evidence also shows that Weisdack was enraged about Buddenberg's board report, thought she was "stirring up B.S.," and let everyone know just how angry he was with her. *See, e.g.*, Andrews Decl. at ¶15, ECF No. 194-6, PageID#4608; *Id.* at PageID#4611; Wendell Dep. Vol. 1, ECF No. 190-1, 42:9-25, PageID#4294. So he had a motive to get rid of her. Demoting an employee and cutting her pay nearly in half—especially someone who had had good performance evaluations, moreover, is rather extreme. So is reassigning the employee to a group of people you know dislike and will mistreat the employee. These are not actions an employer takes who would like to see an employee stick around. Board-member Gragg didn't even *care* about Buddenberg's retaliation complaints—and wouldn't have cared if he'd learned more about them. Gragg Dep., ECF No. 188-1, at 218:23–219:11 and 230:18–25, PageID#3880–81, 3892. Defendants have not produced a single document (or piece of testimony) to show that any Defendant was surprised or disappointed to see the back of Buddenberg when she quit. A reasonable jury has more than enough information to conclude that the employer—Weisdack, the District, and its board members— intended for her to quit.

And thanks to the cumulative effect of District Defendants' relentless, inhumane barrage, Buddenberg did just that. Buddenberg Suppl. Decl. at ¶¶ 11–12, ECF No. 257-1, PageID#14653–54. Just as Defendants intended.

But Defendants insist that "[t]here was no talk of resigning until she was demoted" and that Buddenberg wouldn't have resigned but for having her position changed to EH after the demotion. *See* ECF No. 204-17, PageID#9002; ECF No. 204-23, PageID#9009. Here, Defendants just happen to pick the final act in a series of intolerable employment actions whose *cumulative effect* was to force Buddenberg's resignation. In any wrongful-discharge action, a defendant will be able to point to some penultimate act or event, i.e., one that immediately preceded the termination, and claim that *that* was the act or event without which the employee would not have resigned. But that's not always fair. Here, the fact that Buddenberg resigned shortly after being demoted does not mean that the demotion was the but-for cause of her resignation. The above-listed actions all played a role in causing Buddenberg to believe she couldn't remain employed at the District. A reasonable jury could conclude that that's the case.

By any reasonable measure, Buddenberg suffered a constructive discharge. On this record, Defendants' denials ring hollow. At a minimum, issues of material fact preclude summary judgment for Defendants on the issue.

### C. District Defendants' actions caused tangible harm to Buddenberg and qualify as "adverse" under applicable legal standards; Defendants defy U.S. Supreme Court authority and argue the wrong legal standards for adverse actions in retaliation cases under Title VII/Ohio Rev. Code § 4112, the Equal Pay Act/Fair Labor Standards Act, and for First Amendment retaliation.

#### 1. Under any standard, Buddenberg faced a series of adverse actions.

Under Title VII, Ohio Rev. Code § 4112, and the Equal Pay Act, "materially adverse actions" are those that would dissuade a reasonable worker from making or supporting a discrimination charge. *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014); *Briggs v. Univ. of*

*Cincinnati*, 11 F.4th 498, 514 (6th Cir. 2021) (Equal Pay Act); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C. R. Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d, 131 (Ohio 1981) (Ohio Rev. Code § 4112). What constitutes a materially adverse action is "not reducible to a comprehensive set of clear rules" but is based an objective view of its harm. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011).

Defendants argue that what they call Buddenberg's "planned demotion" is not an adverse employment action. ECF No. 217, PageID#11931. "Buddenberg never spent a single day in the demoted position," Defendants observe, and so "the harm never manifested itself." *Id.* What Defendants fail to appreciate is that the "planned demotion" was the culmination of a series of employment actions that, both individually and together, qualify as "adverse" under even the "manifest harm" standard Defendants articulate.

Forget about any "planned" demotion; an *effective* demotion had occurred before the District took any "formal" disciplinary action against Buddenberg. As shown in the Facts section above, District Defendants had stripped Buddenberg of her accounts and taken away her job responsibilities before Defendants conveyed the formal disciplinary decision. Their refusals to communicate with her in the leadup to the formal demotion, moreover, impaired her ability to discharge her regular duties. *See* Buddenberg Dep. Vol. 1, ECF No. 203-1, 174:25–176:8, PageID#8634–36; Buddenberg Decl. at ¶ 6, 12, ECF No. 214-1, PageID#11746, 11748. Most significantly, the telltale sign of any demotion—a substantial pay cut—had been formally imposed before she stepped into the "planned" demotion "position": just after the hearing, Buddenberg's pay was slashed nearly in half. *See, e.g.*, Ex. 72, ECF No. 195-23, PageID#5235–37 (payroll records showing that as of June 20, 2016, she had been earning $19.75/hour, but that as of March 24, 2017 her pay had been slashed to $10.25/hour; disciplinary order discussed in Facts section above reflect a March 21 date). And when the District reimbursed Buddenberg's vacation pay (again before she

returned from leave into the formal demotion position), it did so at the reduced rate. *See* Buddenberg Dep. Vol. 2, ECF No. 204-1, at 351:17–352:8, PageID#8905–06.

If it walks like a demotion and quacks like a demotion, it *is* a demotion. Buddenberg thus *did* serve in a demoted capacity—and suffered "manifest" harm—in the most relevant sense. (If it's the word "demotion" that puts Defendants off, the Court can consider the District's actions an "elimination of job responsibilities and a corresponding gutting of pay." That would drive home that Buddenberg indeed suffered multiple adverse actions even before her formal demotion.) That she didn't obligingly accept and perform her new, demeaning work assignment is beside the point; the severe adverse actions had already been taken.

This is why Defendants' cases—dealing with unserved suspensions and other inchoate, unrealized harms—are inapt. *See Lee v. Cleveland Clinic Fdn.*, 676 F. App'x 488, 497 (6th Cir. 2017) ("Plaintiff's suspension without pay was not an adverse employment action because she resigned before she could serve the suspension"); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (because [plaintiff] never served the suspension, she never realized any economic effect from the slated employment action"); *Nagle v. Village of Claumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009) ("the April 2005 suspension which Nagle never served does not constitute an adverse action") (emphasis added).

When the District, board members, and Weisdack—with Budzik's help—slashed her wages by nearly half, Buddenberg experienced tangible economic harm—leading to her constructive discharge. She didn't have to serve (i.e., perform work) in a demoted capacity to suffer this loss; District Defendants made sure of that.

Defendants' other cases are likewise distinguishable. The court in *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014), held that the "Plaintiff's two-day suspension does not meet the standard of an 'adverse employment action' *since it was ultimately revoked.*" *Id.* at 727 (emphasis added).

But unlike Buddenberg, the *Laster* plaintiff did not claim to have suffered a series of *antecedent* harms—all building toward a main harmful action. And unlike Laster's employer, the District never *revoked* the discipline it imposed. It may well be that no adverse action occurs when an employer itself revokes a previously imposed sanction, assuming the employee hasn't suffered in the interim. But here, far from revoking a prior disciplinary action, the District piled on.

Nor does *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017), excuse the District's treatment of Buddenberg. The *Ehrlich* court, true enough, held that "being placed on paid administrative leave while an investigation is conducted into suspected wrongdoing is not an adverse action." *Id.* at 650 (citing *Harris v. Detroit Pub. Sch.*, 245 F. App'x. 437, 443 (6th Cir. 2007); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004)).[3] But here there was no "waiting for the results of an investigation" to see if discipline was warranted; the District took multiple adverse actions immediately after the hearing. And one of those actions, which the *Ehrlich* plaintiff did not suffer, was an almost 50% reduction in pay. Harm to Buddenberg was "manifest" and "realized" in a way that the harm in *Ehrlich* was not.

### 2. Less-stringent standards for adverse actions apply in retaliation cases than in discrimination cases, particularly in the First Amendment context.

Two additional distinctions diminish the persuasiveness of Defendants' adverse-action arguments. Defendants' cases arise for the most part under *Title VII* and deal with *discrimination*, not retaliation. But in addition to Title VII, the Equal Pay Act, and Ohio Rev. Code 4112, Buddenberg's

---

[3] *But cf. Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006), another of the District's cases, in which the Supreme Court held in the Title VII context and contrary to the District's "manifest harm" thesis, that a suspension without pay could constitute an adverse action "even if the suspended employee eventually receives backpay."

claims arise under *the First Amendment*. Her claims, moreover, are for *retaliation*, not discrimination.

When it comes to the standards for adverse action, these distinctions make a big difference.

Contrary to what District Defendants claim or imply, the U.S. Supreme Court has held that

the antiretaliation provisions of Title VII and the Equal Pay Act are not limited to adverse actions

affecting employment terms and conditions:

> Title VII's substantive provision and its antiretaliation provision are not coterminous. *The scope of the antiretaliation provision extends beyond* workplace-related or employment-related retaliatory acts and harm. We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so called 'ultimate employment decisions.'

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64–69 (2006) (emphasis added). District

Defendants failed to disclose this controlling U.S. Supreme Court authority.

As Defendants' own cases recognize, "[t]he 'adverse employment action' concept is broader

in the context of retaliation than it is in the context of discrimination." *Ware v. L-3 Vertex Aero.,*

LLC, No. 16 Civ. 8067, 2020 WL 783764, at *8 (S.D.N.Y. Feb. 18, 2020). The court in *Whittaker v.*

*N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005), noted that "[s]ection 2000e–3(a) [of Title VII] is

'broader' than § 2000e–2(a) in the sense that retaliation may take so many forms, while § 2000e–

2(a) is limited to discrimination 'with respect to [the worker's] compensation, terms, conditions, or

privileges of employment.'" *Id.* (quoting *Washington v. Ill. Dep't of Revenue,* 420 F.3d 658 (7th Cir.

August 22, 2005); and citing *Herrnreiter v. Chicago Hous. Auth.,* 315 F.3d 742, 745–46 (7th Cir. 2002)

(recognizing that, to be actionable under Title VII, retaliation need not even involve "an

actual *employment* action") (emphasis in original)).

In *Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014), another of Defendants'

cases, the court recognized that "[t]he 'materially adverse action' element of a Title VII retaliation

claim is substantially different from the 'adverse employment action' element of a Title VII race

discrimination claim." *Id.* (citing *Burlington N.*, 548 U.S. at 59 (2006); *Michael v. Caterpillar Fin. Servs.*

*Corp.,* 496 F.3d 584, 595 (6th Cir. 2007)). "Under the former," the *Laster* court continued, "Plaintiff need only show 'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N., 548 U.S. at 57). That the *Laster* plaintiff couldn't show that he was constructively discharged, moreover, was "not dispositive of Plaintiff's Title VII retaliation claim where Plaintiff has provided evidence of other adverse actions which raise a genuine issue of fact as to whether or not they satisfy this standard." *Id.*

Materially adverse actions thus are not limited to demotions. *See, e.g., Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (placing employee on brief paid administrative leave and 90-day performance plan meet "relatively low bar" of materially adverse action for retaliation-claim purposes); *Laster*, 746 F.3d at 732 ("Facing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and being forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing might well have dissuaded a reasonable worker from making or supporting a charge of discrimination").

Whether required to show economic harm or only some other "materially adverse" action, Buddenberg easily meets the standard. A nearly 50% reduction in pay, particularly when coupled with the removal of job responsibilities, account access, and near-total ostracism, is "materially adverse," as it "it well might have dissuaded a reasonable worker from" engaging in the protected conduct.

Defendants' reliance on Title VII cases is unpersuasive for another reason: the activity in which Buddenberg engaged—i.e., reporting the self-dealing and misuse of public funds in which Weisdack was engaged—warrants the even greater degree of protection that the First Amendment

affords. As the *Laster* court observed, "the type of activity protected by the First Amendment is different than the type of activity protected by Title VII." 746 F.3d at 727.

What constitutes Title VII adverse action is different from what constitutes an First Amendment–retaliation adverse action. In the latter case, any act qualifies that would deter a "a person of ordinary firmness" from exercising or continuing to engage in protected speech. *Buddenberg*, 939 F.3d 732, 739 (6th Cir. 2019). "This standard is 'distinct' from the adverse-action standard used in traditional employment discrimination claims, and thus we must 'tailor our analysis under the adverse action prong to the circumstances of this specific retaliation claim.'" *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014).

The threshold for adverse action in the First Amendment context is quite low and need not even involve pecuniary loss. *See, e.g., Bloch v. Ribar*, 156 F.3d 673, 679 (6th Cir. 1998) (adverse action may include conduct that causes embarrassment or "intimidation, marital problems, weight loss, loss of sleep, shock, or humiliation"). Even an act "as trivial as failing to hold a birthday party for a public employee" is an adverse action "when intended to punish her for exercising her free speech rights." *Wood v. Eubanks*, 25 F.4th 414, 429 (6th Cir. 2022) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75, n. 8 (1990)). The court in *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), explained that, while an employee's complaints may seem trivial, "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Id.* at 625.

What Defendants try to diminish as non-actionable "rude behavior" and "petty slights," (ECF No. 217, PageID#11933–34), moreover, can be exactly the sort of adverse action of which the First Amendment takes notice. Particularly when coupled with the (unquestionably materially adverse) salary cut the District imposed, and seen as a small piece in an ongoing campaign of retaliation, Defendants' behavior triggers First Amendment protection.

Even if District Defendants were right about the quantum of harm required for adverse actions in retaliation cases—which they are not—their specific points lack logic. They observe that Buddenberg didn't actually work the clerical position (to which she was relegated in humiliating fashion) and infer that she therefore didn't suffer an adverse action. But all the cases they cite for this conclusion were decided in the context of Title VII, the ADA, or some other *statute* outlawing discrimination or retaliation. ECF No. 217, PageID#11931–34. None examined the substantially diminished burden faced by litigants claiming *First Amendment* retaliation. Defendants thus fail to support their defense that a litigant must actually *serve* in a demoted capacity to experience actionable harm. And again, they fail to acknowledge or appreciate that Buddenberg experienced a variety of undeniably adverse actions, including being stripped of her duties and a near 50% pay cut, and that she was therefore *effectively* demoted, in the lead-up to her formal demotion.

District Defendants also argue that the Court should deny Buddenberg any relief because she didn't "exhaust" her "appeal" rights. ECF No. 217, PageID#11932. But in suggesting that Buddenberg ought to have taken advantage of "available" "internal procedures," they fail to mention that the board members themselves had embraced her demotion, suspension, and pay cut. Ex. 72, ECF No. 195-23, PageID#5235–37. They also neglect to mention that Defendant Budzik denied her access to the board. *See, e.g.,* Ex. 13, Buddenberg Aff. at 2 ¶ 6, ECF No. 194-13, PageID#4659; Buddenberg Suppl. Decl. at ¶ 13, ECF No. 257-1, PageID#14654, and that the board chair himself said any appeal would be pointless**,** *see* Goergen Dep. Vol. 2, ECF No. 187-1, 230:10–231:19, PageID#3527–28.

Even the single case District Defendants cite for their "exhaustion of administrative remedies" requirement—*Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014)—actually requires no such thing. Instead, the case is limited to the unique circumstances of "decisions in an academic setting[, which] involve a combination of factors which tend to set them apart from employment decisions

generally." *Id.* (internal quotations omitted). Because the *Benison* faculty member didn't wait for a final university decision in an elaborate process, certain actions in the case were found not to be adverse. But here, the District stands by its decision. District 30(b)(6) (Litke) Dep., ECF No. 179-1, 206:16-18, PageID#1739. And again, even the board chair said it would make no sense to appeal, to the board, a decision that the board itself had made. Goergen Dep. Vol. 2, ECF No. 187-1, 230:10–231:19, PageID#3527–28.

District Defendants cite no case that would have required Buddenberg to bring or maintain an action before the State Personnel Board of Review. And any such attempt would likely have been futile once Defendants had abolished her fiscal-coordinator position from the organization chart.[4]

Defendants also hope to trap Buddenberg in a classic "Catch 22." They reason that, because an adverse action is one that would deter a reasonable employee from filing a discrimination charge (note that this is the standard for a Title VII case, *not* a First Amendment case), and because Buddenberg "had no problem filing charges of discrimination" (ECF No. 217, PageID#11933), she must not have suffered an adverse action. But if that were the applicable test, then no retaliation cases could ever be proven, because anyone who seeks redress for retaliation has by definition not been deterred from seeking redress for retaliation.

In any event, District Defendants are barking up the wrong tree. The question is not whether Buddenberg *herself* was deterred from engaging in protected conduct but whether a *person of ordinary firmness*, facing the kind of retaliation to which Budddenberg was subjected, would be so deterred. "[T]he focus, of course, is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled." *Schroeder ex rel. Schroeder v. Maumee Bd. of Educ.*,

---

[4] The Court should disregard District Defendants' invocation of a Buddenberg remark that "They dropped the SPBR case because it would limit the federal case" as misguided hearsay, irrelevant, and a statement whose probative value is substantially outweighed by its prejudicial effect. It's also an inscrutable legal proposition. Buddenberg does not waive attorney-client privilege and her attorneys do not waive work-product protection.

296 F. Supp.2d 869, 878 (N.D. Ohio 2003) (citing *Smith v. Plati,* 258 F.3d 1167, 1177 (10th Cir.2001)). And "'[o]rdinary firmness' is an objective standard that will not 'allow a defendant to escape liability for First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.'" *Alsaada v. City of Columbus*, 536 F. Supp.3d 216, 269 (S.D. Ohio 2021) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)). Regardless of how Buddenberg responded to Defendants' retaliation, the harmful actions she alleges would certainly deter a person of ordinary firmness from engaging in future protected activity.

### D. Material fact issues—regarding whether Buddenberg's protected activity was the "but-for" cause of the retaliation she suffered—preclude summary judgment for District Defendants on her Title VII and Equal Pay Act claims.

As District Defendants point out, a plaintiff asserting a Title VII or Equal Pay Act retaliation claim must prove a causal connection between her protected activity and the adverse action(s) she suffered. Such a causal connection exists when the protected activity was the "but-for" cause of the employer's alleged adverse action. *Davis v. Metro Parks and Recreation Dep't*, 854 F. App'x 707, 713 (6th Cir. 2021) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

Defendants say that Buddenberg cannot meet this "but-for" causation requirement due to "the sheer number of retaliatory actions" she alleges. "The problem is that Buddenberg also claims to have engaged in a boatload of protected activity such that it is impossible for her to prove the but-for causal connection for each of these claimed retaliatory acts." ECF 217, PageID#11935.

Defendants' concerns are overblown. They forget that, as the case is postured (i.e., on summary judgment), it is *they*, not Buddenberg, who must eliminate issues of material fact, e.g., about which protected acts stand in what causal relation(s) to which retaliatory acts. The question at this juncture is not whether Buddenberg can *prove* a causal connection between any particular set of acts but whether Defendants can rule it out.

In *Yasdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634 (6th Cir. 2015), the court acknowledged that the causation element of a Title VII claim "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 649; *EEOC v. Ford Motor Co.,* 782 F.3d 753, 767 (6th Cir. 2015) (*en banc*)). "Nevertheless," it continued, "at the summary-judgment stage, the 'burden to establish a prima facie case of retaliation ... is a burden easily met.'" *Id.* (quoting *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997)).

Indeed, a plaintiff may bypass the entire *McDonnell Douglas* burden-shifting framework where, as here, she presents direct evidence of discrimination or retaliation. *See, e.g., Davis v. Metro Parks and Recreation Dep't,* 854 F. App'x 707, 713 (6th Cir. 2021); *Christopher v. Stouder Mem'l Hosp.,* 936 F.2d 870, 879 (6th Cir. 1991) ("It is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* [burden-shifting framework.]"); *Reeser v. Henry Ford Health System,* 119 F. Supp.3d 710, 718 (FLSA). Direct evidence "if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action." *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir. 2003) (emphasis in original). Buddenberg has produced ample evidence of a causal connection between her protected activities and several of Defendants' retaliatory acts. Meanwhile, Defendants have fallen woefully short of meeting their burden of demonstrating that no such connections could reasonably be found to exist.

In fact, Buddenberg shows in her own summary-judgment motion, ECF No. 221, PageID#12077, 12081–82, 12091, that Defendants have admitted the existence of just such causal connections, and that (because she plainly satisfies all other elements) it is *she* who is therefore entitled to summary judgment on her Title VII and Equal Pay Act claims. Buddenberg commends a full read (or re-read) of her motion (whose arguments and evidence, again, she incorporates by reference) in this regard. There the Court will read how, e.g., "Defendants' own words show that the

causal connection between Buddenberg's February 1, 2017 email opposing Mix's forced resignation as a proxy for retaliation against her and the adverse action of her suspension and demotion are effectively undisputed and thus established *as a matter of law. See* above at Part III(C)(3)." (ECF No. 221, PageID#12077.) And it will learn, among many other things, that,

> [f]or one particular set of adverse actions—being charged, enduring a hearing, being interrogated and gaslit, being demoted and suspended, and having her pay slashed for having reported retaliation against her former supervisor Dan Mix—Buddenberg is entitled to summary judgment on causation because the District, Weisdack, Goergen, Gragg, and Livers—with Budzik's help—have effectively admitted causation. (Ex. 68, ECF No. 195-19, PageID#5163; *id.* at PageID#5169; Ex. 85, District's EEOC Position Statement (Buddenberg), ECF No. 195-36, PageID#5282.) No reasonable jury could find otherwise based on Defendants' own plain wording.

*Id.* at PageID#12092.

By enlisting Defendant's own admissions, then, Buddenberg's motion traces the "but-for" causal connections that, in their own motion, Defendants claim cannot be shown. In any case, Defendants cannot rule out these connections *as a matter of law* or demonstrate the unreasonableness of any jury that finds them to have been established. Because that is the only argument they deploy against Buddenberg's Title VII or Equal Pay Act claims,[5] Defendants are not entitled to summary judgment on these claims.

### E. District Defendants deserve no qualified immunity because, as the Sixth Circuit's *Buddenberg* decision demonstrates, the First Amendment law protecting public employees that they violated was clearly established—and had they been reasonable they would have known that.

District Defendants repeatedly urge upon this Court a heightened, indeed impossible (and thus non-existent) legal standard. The individual Defendants are entitled to qualified immunity, they say, because "[s]imply, there is no case on 'all fours….'" *See, e.g.,* PageID#11938. But defeating

---

[5] For unknown reasons, District Defendants also argue that Title VII doesn't provide for individual liability (*see* PageID#11934), even though Buddenberg's Second Amended Complaint nowhere asserts any such claim. (*See* ECF No. 31, Page ID#398–402.) Defendants' argument can be safely ignored or denied as moot.

qualified immunity doesn't require a case "on all fours." *See Kisela v. Hughes,* 138 S. Ct. 1148, 1153 (2018) ("qualified immunity does not require a case directly on point"); *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"; "qualified immunity… does not require a case directly on point…"). Defendants not only fail to disclose these controlling cases but they cite no case for their baseless, "all-fours" standard *because there isn't one.* They simply make it up. And if this were in fact the standard, no constitutional claim could ever overcome qualified immunity because some factual distinctions, however minor or irrelevant, could always be identified.

All that is needed to overcome qualified immunity is for it to be "sufficiently clear that every reasonable official would understand that what [the government official] is doing is unlawful." *Mullenix v. Luna,* 577 U.S. 7, 12 (2015). One need look no further than the Sixth Circuit's qualified-immunity decision in *Buddenberg,* 939 F.3d 732 (6th Cir. 2019)—and the rich citations within it—to understand that this case meets that standard. The federal constitutional law the District violated was clearly established—and a reasonable public official would have grasped that. *Id.* at 739–42.

Even though, as noted above, District Defendants don't argue and therefore waive the matter-of-public-concern element of free speech, in their qualified-immunity section they suddenly characterize Buddenberg's speech as conveying a "quintessential employee beef." District Defs.' Mot. Summ. J., ECF No. 217, PageID#11937. This is what the *Buddenberg* court said about how her speech, as then alleged and now proved, addressed matters of public concern:

> We have found that speech addresses a matter of public concern when it alleges the misuse of public funds, *Chappel v. Montgomery Cty. Fire Protection Dist. No. 1,* 131 F.3d 564, 576–77 (6th Cir. 1997), or discrimination, *Hughes v. Region VII Area Agency on Aging,* 542 F.3d 169, 182 (6th Cir. 2008). Allegations of public corruption 'are exactly the type of statements that demand strong First Amendment protections." *Mayhew,* 856 F.3d at 468 (quoting *Handy-Clay v. City of Memphis,* 695 F.3d 531, 543 (6th Cir. 2012) (collecting cases)). Accordingly, accepting Buddenberg's allegations as true, her speech is constitutionally protected.

*Buddenberg*, 939 F.3d at 739. *See also Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.* 495, F. App'x 651, 655 (6th Cir. 2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation"); *Hill v. Air Tran Airways*, 416 F. App'x 494, 498 (6th Cir. 2011); *Sheppard v. Uniboring*, 72 F. App'x 333, 336 (6th Cir. 2003). Despite their efforts to recast the topics as "employee beefs," Buddenberg has proven, and Defendants don't dispute, that she spoke on these topics of public concern.

District Defendants' argument rests on three hotly disputed contentions. First, they claim Buddenberg was motivated by hate. But they fail to show *either* that that is true *or* that it has any legal relevance to the issue of speaking as a private citizen on a matter of public concern. (This is the only feint they make at the public-concern prong of First Amendment–protected activity.) And they fail to disclose abundant controlling Sixth Circuit authority on this point: *Myers v. City of Centerville, Ohio* 41 F.4th 746, 760–61 (6th Cir. 2022) ("'While motive for the speech is a relevant factor, ... "the pertinent question is not why the employee spoke, but what he said."'"); *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (quoting *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004)). … We first determine the "point" of the letter—based mainly on its content, not Myers's motives for writing it. *Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003). We then ask whether that point addressed a matter of public concern. *Id.*" "Although Plaintiff's underlying motive in writing the memo might have been to complain about incompetent management, our duty is not to discern her underlying motive, but rather to evaluate her point as it is presented in the speech. *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 575–76 (6th Cir. 1997)." *Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003).

District Defendants insist that "a jury could believe Buddenberg was simply trying to get rid of a boss she hated." (PageID#11937.) "But," Defendants continue, "by believing her – that she

was innocently trying to correct a situation, within the confines of her employment position – the individual Defendants have immunity." *Id.* Not so. As just discussed, Buddenberg spoke on matters that, for the Sixth Circuit, are of public concern; and her motives for doing so are irrelevant. Because these conclusions are clearly established, Defendants' surmises don't afford them immunity.

Second, District Defendants' argument claims, "Buddenberg clearly thought she was performing her job 'responsibilities.' ECF No. 215-1, PageID#11811–12. So how can it be that the Board would know she was not?" (PageID#11938.) But as shown above, and as Defendants admitted in testimony cited in Buddenberg's own summary-judgment motion, this isn't true. As discussed above, Buddenberg nowhere purported to characterize the nature of her *job* responsibilities, though she did on occasion express what she believed her moral convictions required her to do. But even if it were true, *DeCrane* teaches that her subjective beliefs are irrelevant. In deciding what an employee intended by her speech, instead, a court should ask how a reasonable person would understand her intention, since such an "objective" approach "might better comport with our cases given that they treat *Garcetti* as raising a legal issue." *DeCrane*, 12 F.4th at 597 (citing *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d, 456, 462–64).

"[T]o the extent many of the complaints came directly in response to a Board directive to tell them her grievances," District Defendants also argue, "there is clear law that an instruction to air concerns about a workplace, before a Board, renders the speech unprotected." (PageID#11938, citing *Davidson v. Arlington Cmty. Sch. Bd. of Educ.*, 847 F. App'x 304, 309 (6th Cir. 2021). But as shown above, the board gave no employment "directive"; a member just asked, "anything else?" Such question cannot, on a dime, convert otherwise protected speech into government speech.

Nor does *Davidson* stand, as Defendants claim it does, for the simple proposition that an "[e]mployee invited by employer to speak to Board was not entitled to protection." (PageID#11938.) The case is far more nuanced. Defendants don't discuss *Davidson*'s facts because

they are so readily distinguishable from those presented here. In *Davidson*, a school board *invited* a principal to comment on a school-policy issue. Her "opinion was specifically solicited [because] the Board might value her input as principal of Donelson." *Id.* at 309. Here, Buddenberg wasn't invited to address the board but sought out the opportunity herself.

The facts, moreover, showed that, in complying with the board's request, the principal acted in her capacity as a high-ranking school official. "The record demonstrates that Davidson's speech was within her ordinary job responsibilities." So did the "context" of her speech. "She presented her views at a work session before Mason and the ACS Board, who were formulating a five-year strategic plan for the district, and her audience then decided to approve Davidson's recommendation …" *Id.*

Also undercutting Davidson's contention that she spoke as a private citizen was the fact that "[she] admitted she would not have communicated with the Board without the permission of Mason, her immediate superior. She also specifically avoided saying anything 'critical of Ms. Mason' because Mason was her 'boss' and she did not want to be 'insubordinate.'" *Id.*

None of these circumstances is present here. Buddenberg wasn't invited to speak with the board but requested to do so. The board wasn't seeking her "valuable input" on a controversial policy issue. She sought no "permission" from Weisdack and never indicated that she needed it before she could approach the board. Indeed, her supervisor Mix warned her not to. Mix Dep. Vol. 3 at 133:10–16, ECF No. 208-1, PageID#10372.

And far from wishing not to say anything "critical" of her supervisor, she approached the board *precisely* to voice her concerns about Weisdack's improper and unethical conduct.

What Buddenberg alleged in this connection, and the Sixth Circuit affirmed, has all been proven in this record, as recited in the Facts above and, citing Defendants' own admissions, in Buddenberg's own dispositive motion.

District Defendants don't address whether it was clearly established that actions such as those taken against Buddenberg are adverse actions or—what amounts to the same thing—whether a reasonable public official would know this. Buddenberg therefore need say no more on the subject than what she has already said, above, on the topic of adverse actions.

One last point on qualified immunity. Because, as shown throughout this brief, District Defendants' qualified-immunity argument (PageID#11936–68) rests so heavily on misleading and disputed facts—and improper factual inferences they demand in their own favor—the Court should deny them qualified immunity. *See*, *e.g.*, *McDonald v. Flake*, 814 F.3d 804, 817 (6th Cir. 2016) (sanctions discussion where defendant's interlocutory, qualified-immunity appeal did not accept plaintiff's facts as true); *Howlett v. City of Warren* 852 F. App'x. 899, 901–02 (6th Cir. 2021) (finding frivolous supervisor's fact-based appeal from district court's qualified-immunity denial and municipality's appeal from summary-judgment denial on *Monell* claim without making any serious argument that appellate jurisdiction was proper; allowing for sanctions).

## F.  This case should proceed to trial on Buddenberg's claim, under Ohio Rev. Code § 2307.60, for civil liability for criminal acts.

Ohio Rev. Code § 2307.60 creates a civil right of action in favor of victims of criminal acts. District Defendants here have violated Ohio Rev. Code §§ 2921.05 and 2921.45 and are therefore liable to Buddenberg for any damages she suffered as a result.

### 1.  Individual Defendants violated Ohio Rev. Code § 2921.05 because they retaliated against a public servant discharging her duties.

Ohio Rev. Code § 2921.05(A) provides that

> [n]o person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness.

Under § 2921.05(C), persons who violate subdivision (A) are "guilty of retaliation, a felony of the third degree." And, by virtue of § 2307.60, they potentially become civilly liable to their victims.

As described in the Facts section above, District Defendants engaged in numerous acts of retaliation against Buddenberg. Many of these acts constitute the "unlawful threats of harm" the section criminalizes. (The section nowhere says that the threatened "harm" must be physical or bodily.) And Buddenberg is indisputably a "public servant" protected by the section. If the Court determines that her speech was as a public servant rather than private citizen—which as shown above, it shouldn't, then Defendants accordingly are guilty of the crime of retaliation. In any case, the evidence shows that District Defendants retaliated against her for discharging other duties as a public servant. *See*, *e.g.*, Buddenberg Suppl. Decl. at ¶ 5, ECF No. 257-1, PageID#14651–52. Buddenberg was also a witness involved civil proceedings, namely her EEOC proceeding required for her to file civil suit and Dan Mix's EEOC proceeding. So District Defendants are equally liable under this prong as well. And, because Buddenberg was harmed by their acts, they are liable to her under Ohio Rev. Code § 2307.60.

In their only argument against civil liability under § 2921.05, Defendants suggest that Buddenberg doesn't satisfy the terms of the statute because she "has not alleged or established that she was involved in a civil or criminal action or proceeding because she discharged her duties." PageID#11938–39. But Defendants misread the statute: public servants like Buddenberg are not required to have been "involved in a civil or criminal action or proceeding" to be victimized by retaliation; that phrase applies only to attorneys and witnesses.

In *State v. Matthews*, 2013-Ohio-2183, 2013 WL 2326417 (5th Dist. Fairfield Cty. May 16, 2013), the court carefully examined § 2921.05's structure and concluded that the legislature "intended … to prohibit retaliation against three categories of individuals: (1) the public servant, (2) the party official, or (3) the attorney or witness who was involved in a civil or criminal action or

proceeding." *Id.* at * 2. The modifier "involved in a civil or criminal action or proceeding," the court concluded, applies only to the third category:

> The placement of the comma before "or an attorney or witness" in the context of this sentence clearly establishes the third category of potential victims of retaliation encompasses attorneys or witnesses who were involved in civil or criminal actions or proceedings. The use of "or" before the word "attorney" would be superfluous if the phrase "who was involved in a civil or criminal action or proceeding" was meant to modify each category.

*Id.* The statute thus does not require, for criminal liability to attach, that either public-servant or party-official victims have been involved in a civil or criminal action or proceeding.

The *Matthews* court underscored that Ohio's pattern jury instructions support its plain-language statutory reading. For § 2921.05, the instructions enumerate the same three categories of potential retaliation victims the court identified and, with the use of parentheses, separate public servants and party officials from "…attorneys… and witnesses… who [were] involved in a [civil] [criminal] action or proceeding." *Id.* (quoting 2 OJI–CR 521.05(1)). So again, it is only attorneys and witnesses—not party officials or public servants—who must, to state a claim under § 2921.05, allege their involvement in a civil or criminal proceeding.

Buddenberg has amply supported the District Defendants' liability for retaliation under § 2921.05. And because she has shown that, when properly construed, the statute prohibits exactly the type of conduct in which Defendants engaged—against exactly the categories of victims into which she fits—the Court should deny their summary-judgment motion on this claim.

## 2. Defendants violated Ohio Rev. Code § 2921.45 because they knowingly deprived, conspired, and attempted to deprive Buddenberg of constitutional and statutory rights.

Ohio Rev. Code § 2921.45(A) provides that "No public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a *constitutional* or *statutory* right." (emphasis added). "Public servant" includes any officer, employee,

or agent of a political subdivision of the state, whether in a temporary or permanent capacity, and any person "performing ad hoc a governmental function." Ohio Rev. Code § 2921.01(A)–(B). A plaintiff must prove that the defendant: (1) knowingly deprived or conspired or attempted to deprive plaintiff of a constitutional or statutory right; (2) under color of state law; and (3) caused damages to plaintiff. Ohio Rev. Code § 2921.45, 2921.45(A); *Wagner v. Metro. Nashville Airport Auth.,* 772 F.2d 227, 229 (6th Cir. 1985); *Lugar v. Edmonson Oil Co., Inc.,* 457 U.S. 922, 924 (1982).

"A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." Ohio Rev. Code § 2901.22(B).

District Defendants' only argument against liability under this statute is the conclusory pronouncement that they "did not deprive Buddenberg of any constitutional or statutory right." (PageID#11939.) Unfortunately for Defendants, Buddenberg has already shown that they deprived her of *both* types of rights.

Defendants' constitutional argument rises or falls with the success or failure of the First Amendment arguments Buddenberg refuted above. Thus, for all the reasons Buddenberg there explains, Defendants lose the argument. They can't take refuge in qualified immunity, moreover, because that doctrine does not shield them from state-law claims. Even if District Defendants are entitled to qualified immunity against § 1983 liability, then, no comparable immunity offers them refuge from liability under Ohio Rev. Code §§ 2307.60 and 2921.45.

But Defendants also lose summary judgment because § 2921.45 encompasses statutory, not just constitutional, rights. As Buddenberg showed above District Defendants violated Title VII and the Equal Pay Act. As she will show below, they violated Ohio Rev. Code §§ 4112 and 4111.17(D), too. In the process, they incurred liability under § 2921.45 as well. Defendants' only argument

against liability for these violations consists in their embrace of a "but-for" causation standard, which Buddenberg has demonstrated she readily meets. And Defendants are procedurally barred from introducing new arguments via a reply brief.

### G. Buddenberg's Ohio Rev. Code § 4111.17 claim should proceed because Defendants retaliated against her for reporting a prohibited wage disparity in violation of subsection (D).

Ohio Rev. Code § 4117(A) imposes liability on an employer that "discriminate[s] in the payment of wages on the basis of race, color, religion, sex, national origin, or ancestry…" Subsection (D) of the statute also imposes liability on an employer that "discriminate[s] against any employee *because such employee makes a complaint* or institutes, or testifies in, any proceeding under this section." (Emphasis added.)

In their motion, District Defendants argue that Buddenberg's § 4111.17 claim should be dismissed because "[s]he has made no allegations that she was personally discriminated against in the payment of wages based on her race, color, religion, sex, age, national origin, or ancestry." PageID#11939. They thus mistakenly assume that, to state a claim under this statute, an employee must complain about a wage disparity that directly affects *her*; they disregard subsection (D)'s prohibition of *retaliation* against an employee who *makes a complaint* about, or who initiates or testifies in any proceeding alleging, such discrimination.

There is no statutory warrant for Defendants' interpretation. Subsection (D) does not restrict the class of employees about whose wages a plaintiff can complain—or in whose proceeding she can testify. Its reference to "any" proceeding, on the contrary, implies that she can complain on behalf of, or otherwise support, *anyone* victimized by a prohibited wage disparity. Any contrary interpretation would also undermine the statute's fair-wage/anti-discrimination purpose.

It is undisputed that among the complaints Buddenberg made to the board was that Amanda Hill was receiving a substantially lower wage than a male colleague performing essentially the same

work and that Weisdack failed to correct the situation. *See* Weisdack Dep. Vol. 1 at 141:15–18,

PageID#2095. *See also* Buddenberg Dep. Vol. 1, ECF No. 203-1, 62:1–9, PageID#8522 ("Mr.

Weisdack was presented with this and chose not to act on correcting it."); *id.* at 68:10–12,

PageID#8528 (Hill and Tusick expressed "concern" over the "substantial difference" in pay); *id.* at

76:7–11, PageID#8536 (Hill was "disturbed that her pay was significantly less"). Thus when, as

Buddenberg has established, Defendants retaliated against her for so complaining, they violated

§ 4111.17(D). Defendants fail even to address this argument and so are not entitled to summary

judgment on the claim.

### H. Fact issues preclude summary judgment for District Defendants on Buddenberg's "aiding and abetting" claim under Ohio Rev. Code § 4112.02(J).

Under Ohio Rev. Code § 4112(J), it is unlawful for "any person" to "aid, abet, incite,

compel, or coerce the doing of" or "attempt directly or indirectly to commit" any act declared to be

an unlawful discriminatory practice under Ohio Rev. Code § 4112.02. This includes the unlawful

employment practice of discriminating in any matter (i.e., retaliating) against any person because she

opposed an unlawful discriminatory practice. Ohio Rev. Code § 4112.02(I). "Person" includes

individuals, legal representatives, and all political subdivisions, authorities, agencies, boards, and

commissions of the state. Ohio Rev. Code § 4112.02(J).

Aiding and abetting retaliation under Ohio Rev. Code § 4112(J) is established if a defendant

knowingly does something he ought not to do, or omits to do something he ought to do, that

"assists or tends in some way to affect the doing of the thing which the law forbids." *State v. Stepp*,

117 Ohio App.3d, 569, 690 N.E.2d 1342 (4th Dist. 1997); *see also Woodworth v. Time Warner Cable, Inc.*,

No. 1:15-CV-1685, 2015 U.S. Dist. LEXIS 148832 (N.D. Ohio Nov. 2, 2015).

District Defendants deny that they are liable under Ohio Rev. Code § 4112.02(J). They claim

that the statute applies only to employees who were "involved in or actually made the company's

decision to discriminate or retaliate against the plaintiff," citing *Chulsky v. Golden Corral Corp.*, 583 F. Supp.3d 1059, 1088 (S.D. Ohio 2022), and not to "the individual Board Members' failure to discipline Weisdack or otherwise prevent his allegedly retaliatory behavior." PageID#11940. Weisdack himself incurs no liability, they add, because "as discussed above, none of [his] acts rose to the level of an adverse action …" *Id.* By cryptically adverting to "reasons discussed above," finally, Defendants deny that board members' "voting to suspend Buddenberg" triggers liability. But for the reasons Buddenberg *does* explain below, Defendants' arguments are non-starters.

Contrary to Defendants' contention, first of all, there is no "rule" requiring that a person, to be liable under the statute, have been "involved in or actually made" the discriminatory decision.[6] And even if there were such a rule, Buddenberg has, as discussed below, produced evidence in spades of each Defendant's active contribution to the decisions that harmed her.

Ohio Rev. Code 4112.02(J) provides as follows:

> It shall be an unlawful discriminatory practice . . . [f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

Nothing in this statute purports to require active involvement in a discriminatory decision. For all the statute says, a person can "aid" or "abet" a discriminatory practice by, e.g., indulging or acquiescing in another's discriminatory practice, or by failing to take corrective action, etc. Recognizing that liability can attach in such circumstances, moreover, would be more in line with the

---

[6] *Chulsky* took its cue from *Cummings v. Greater Cleveland Reg'l. Transit Auth.*, 88 F. Supp.3d 812 (N.D. Ohio 2015). But *Cummings* never formulated a rule requiring that, to be liable under the statute, a person have been "involved in or made" a discriminatory decision. Instead, it merely noted that a plaintiff who had pleaded such involvement "[met] the standard," without specifying what that standard is or where it comes from. *Id.* at 820. In any event, because no such restriction can be found in the statute, and because the statute must be construed liberally to achieve its anti-discrimination and anti-retaliation purposes, this Court should reject Defendants' reliance on *Chulsky* (if it even matters, which it doesn't).

statute's remedial purpose. *See, e.g., Woodworth v. Time Warner Cable*, Case No. 1:15CV1685, 2015 WL 6742085, * 2 (N.D. Ohio Nov. 2, 2015), ("as a remedial statute, Chapter 4112 is to be liberally construed to promote its purpose of eliminating discrimination"; thus § 4112.02(J) applies to all "persons" and not just to supervisors and managers) (citing *Elek v. Huntington Nat'l Bank*, 60 Ohio St.3d 135, 137 (1991).

In any event, Buddenberg's claims can't be reduced, as Defendants imply, to the contention that "the individual Board Members fail[ed] to discipline Weisdack or otherwise prevent his allegedly retaliatory behavior." This straw man in fact forms no part of Buddenberg's case, which instead alleges (what has since been proven) numerous *affirmative* acts of retaliation by *all* Defendants.

Board members, for instance, (1) unanimously voted on March 13, 2017 to suspend Buddenberg without pay[7]; (2) imposed, on March 17, a disciplinary order sustaining all but one of the trumped-up charges against Buddenberg; (3) consigned Buddenberg to a menial, clerical position, (4) slashed Buddenberg's compensation nearly in half; and (5) adopted a revised organization chart that eliminated Buddenberg's fiscal-coordinator position.

Defendant Alta Wendell also actively aided and abetted the retaliation against Buddenberg by, among other things, willfully refusing to provide Buddenberg with information she needed to do her job (and indeed refusing to interact with Buddenberg at all), even though her own job required it. This made it impossible for Buddenberg to, for example, identify appropriate expenditure categories and assess the adequacy of the District's budget, or to prepare the year-end asset inventory for the County auditor's review.

And for his part, Weisdack, among his many other retaliatory acts, (1) modified Buddenberg's work schedule to make it harder for her to take college courses or help care for her

---

[7] Defendants fail to explain why the affirmative act of voting doesn't qualify as "making a decision" or being "involved in" a decision under even *Chulsky's* interpretation of the statute.

sick grandchild; (2) helped Budzik draft the bogus February 28, 2017 disciplinary-action notice; (3) helped Budzik draft another disciplinary-action notice of January 31, 2017 to pursue the termination of Dan Mix's, who had supported Buddenberg; and (4) participated with Budzik in the March 3, 2017 sham pre-disciplinary hearing.

By means of a not-so-subtle sleight of hand, Defendants suggest that, for Weisdack's acts to constitute *Chulsky*-style decision-making, they would have to qualify as "adverse actions" under the retaliation law they already discussed. PageID#11940. But there is no textual (or case-based) reason to *further* restrict § 4112.02(J)'s meaning in this way, hardly liberal construction. And even if there were, Defendants' argument would fail for all the reasons explained above in sections C.1 and C.2. Because Defendants' actions would deter someone from engaging in protected activity, that is, they readily qualify as "adverse" under applicable law.

Although they needn't do so, all the above actions meet the *Chulsky* standard for "aiding and abetting" liability.

But District Defendants have one final argument: § 4112.02(J) permits liability to be imposed only on individuals, they say, and does not apply to "entities such as the Health District." PageID#11940. The argument is misguided as shown below.

Section 4112.02(J) imposes liability on "any person." Ohio Rev. Code § 4112.01(A)(1) provides that "As used in this chapter . . . '[p]erson' includes . . . the state and all political subdivisions, authorities, agencies, boards, and commissions of the state." And, as the Northern District of Ohio noted in *Woodworth*,

> According to the Ohio Supreme Court, when interpreting a section of the Revised Code, a court must give effect to every word and clause in the statute and avoid a construction that would render any term meaningless. When the meaning of a statute is clear and unambiguous, a court should apply it as written.

*Woodworth* at *2.

The *Woodworth* court rejected the argument that § 4112.02(J) applies only to supervisors., noting that "the section states that it is unlawful for 'any person' to aid and abet discriminatory conduct" and that "Ohio Rev. Code § 4112.01(A)(1) defines 'person' broadly." *Id.* "If the section were interpreted to apply to only supervisors and managers, [then] such a construction would render the term 'employee' meaningless in § 4112.01(A)(1)'s definition of 'person.'" *Id.*

Similarly, if § 4112.02(J) were interpreted to apply only to individuals, then such a construction would render meaningless the unambiguous language "state and all political subdivisions, authorities, agencies, boards, and commissions of the state" in § 4112.01(A)(1)'s definition of "person." *See also Gibbs v. Meridian Roofing Corp.*, Case No. 1:17-cv-245, 2017 WL 6451181, *6 (S.D. Ohio Dec. 18, 2017) ("§ 4112.02(J) applies to 'persons' and not just 'employers'"); *Sampson v. Sisters of Mercy of Willard*, No. 3:12-cv-00824, 2015 WL 3953053, at *6 (N.D. Ohio June 29, 2015) ("[§ 4112.02(J)] is not limited to employers but assigns liability to any 'person.'").

Defendants' citation to *Glass v. Tradesmen Int'l, LLC.* 5050 F. Supp.3d 747, 762 (N.D. Ohio 2020), doesn't change the analysis. The fact "a corporate entity may aid and abet itself in discriminating against a plaintiff," as the *Glass* court reasoned, *id.* at 762, doesn't mean that it can't aid and abet *its constituents* (or vice versa). Particularly where, as here, an entity acts through a board, whose individual members actively engage with officials like Weisdack, and with counsel like Budzik, to retaliate against employees like Buddenberg, there is no reason why liability for aiding and abetting can't attach. Buddenberg nowhere argues that the District aided and abetted *itself.* But its reciprocal collaboration with Weisdack, Budzik, board members, Wendell, and uncharged others created enough aiding and abetting liability to go around.

The Court should thus deny Defendants' summary-judgment motion on Buddenberg's Ohio Rev. Code § 4112.02(J) claim.

**IV.    Conclusion**

While certain of Rebecca Buddenberg's claims can be resolved in her favor as a matter of law, the same can't be said for District Defendants. Their summary-judgment motion is founded on incomplete and misleading factual assertions and improperly draws inferences in their own favor. It also frequently misconstrues—when it even discloses—relevant or controlling law. The Court should deny their motion in its entirety.

Dated:  May 8, 2023                                  Respectfully submitted,

                                                    */s/ Subodh Chandra*
                                                    Subodh Chandra (0069233)
                                                    Donald P. Screen (0044070)
                                                    THE CHANDRA LAW FIRM LLC
                                                    The Chandra Law Building
                                                    1265 W. 6th St., Suite 400
                                                    Cleveland, OH 44113-1326
                                                    216.578.1700 Phone
                                                    216.578.1800 Fax
                                                    Subodh.Chandra@ChandraLaw.com
                                                    Donald.Screen@ChandraLaw.com

                                                    *Attorneys for Plaintiff Rebecca Buddenberg*