# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA BUDDENBERG, | ) | Case No. 1:18-cv-00522 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jennifer Dowdell Armstrong |
| ESTATE OF ROBERT K. | ) | |
| WEISDACK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>OPINION AND ORDER</u>

This case involves a fairly routine employment dispute between Plaintiff Rebecca Buddenberg and her former employer, Defendant Geauga County Health District, and its former Commissioner, the late Robert Weisdack.  Describing as routine any public-sector wrongful termination claim implicating the First Amendment and allegations of retaliation for whistleblowing might not be fair.  To the extent it is, this action started out as such a case.  Its litigation has been anything but.  After two interlocutory appeals, the parties engaged in contentious scorched-earth discovery that required intensive supervision and involvement by the Court, culminating in competing allegations of spoliation and misconduct and a motion for sanctions.  Even that high-level summary does not do justice to the level of resources the parties dedicated to litigation of what should have been a fairly straightforward case.

Ruling on the parties' competing motions for summary judgment presents the primary task before the Court. Additional evidentiary issues complicate what the Supreme Court characterizes under the best of circumstances as the difficult job of balancing a public employee's free speech rights and a public employer's interest in efficient operations, *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Connick v. Myers*, 461 U.S. 138, 150 (1983), which will never be easy "unless one side of the scale is relatively insubstantial," *United States v. National Treasury Emps. Union*, 513 U.S. 454, 482 (1995) (O'Connor, J., concurring). This is not an easy case. Neither side of the scale is insubstantial. On the one hand, Ms. Buddenberg brought matters of public concern about her boss, a public official, to the District's governing body. On the other hand, she strategically pursued these issues, and the District has an interest in efficiently managing its operations and providing governmental services to the public.

To resolve the difficult issues bound up with these questions, the parties compiled a massive record, particularly relative to the size of the case. And that record applies not just to the primary claims of retaliation that have driven this litigation but to the numerous claims and defenses under federal and State law that the parties litigate. Beyond the inherently difficult questions on the merits, this case presents additional challenges. There are several threshold questions regarding certain evidentiary matters and other objections to the record on summary judgment. These issues implicate, among other things, the testimony of three prominent lawyers tendered as expert witnesses in this case. Then, the parties make competing requests

2

to reopen discovery on the basis of the crime-fraud exception to the attorney-client privilege and for sanctions based on alleged spoliation of evidence.  In this omnibus ruling, the Court addresses all these pending matters.

## STATEMENT OF FACTS

Plaintiff and Defendants filed cross-motions for summary judgment.  In this procedural posture, the Court construes the facts in Defendants' favor in ruling on Plaintiff's motion for summary judgment, and in Plaintiff's favor in ruling on Defendants' motions for summary judgment.  Where the record presents material disputes or competing versions of the facts, the Court so notes.  With that, the record on summary judgment consists of over 425 pages of briefs and more than 10,500 pages of evidentiary materials.  It establishes the following facts.

### A.    The Geauga County Health District

Ohio law divides the State into health districts made up of the political subdivisions with certain geographical areas.  *See* Ohio Rev. Code §§ 3709.01 & 3709.051.  The Geauga County Health District is a public health district organized under Ohio law located in Geauga County, Ohio, approximately 30 miles east of Cleveland.  (*See* ECF No. 31, ¶ 7, PageID #365.)  It serves over 95,000 residents and has as many as thirty employees.  (ECF No. 206-1, PageID #9558.)  The District is responsible for "protecting and promoting the health of the residents of Geauga County through programs and activities designed to address safety, health, and general well-being."  (ECF No. 195-36, PageID # 5278; ECF No. 195-14, PageID #5007.)  Additionally, it maintains "wells, plumbing, sewage, and septic tanks."  (ECF No. 195-36, PageID # 5278.)

3

A board of health consisting of five members governs a health district. Ohio Rev. Code § 3709.02(A). The board of health appoints a commissioner who operates as the "executive officer of the board" and "enforce[s] all sanitary laws and regulations in the district." *Id.*, § 3709.11.

On February 2, 2015, Plaintiff Rebecca Buddenberg began work as the Fiscal Coordinator for Defendant Geauga County Health District. (ECF No. 203-1, PageID #8477.) Defendant Robert Weisdack, the District's Health Commissioner at the time, hired Ms. Buddenberg. (ECF No. 180-1, PageID #1978.) For most of the time she worked for the District, Dan Mix was Ms. Buddenberg's direct supervisor. (ECF No. 203-1, PageID #8482–83; ECF No. 180-1, PageID #1981, #1985–86.) Mix served as the fiscal officer for the District, worked closely with Mr. Weisdack and, along with Mr. Weisdack, reported to the volunteer Board of Health. (ECF No. 180-1, PageID #1987.)

### A.1.   Ms. Buddenberg's Work at the District

Ms. Buddenberg's official job description included duties like managing the District's accounts payable, handling payroll, preparing fiscal reports for the Board, and maintaining personnel records. (ECF No. 194-38; ECF No. 180-1, PageID# 1980.) But her daily duties differed from her job description. (ECF No. 204-1, PageID #8847–54.) For example, she never met with the Health District Advisory Council or registered birth and death records. (ECF No. 204-1, PageID #8846 & #8848.) Mr. Weisdack testified that Ms. Buddenberg's "ordinary or *ad hoc*" job duties did not include reporting to the Board possible ethics violations, perceived violations of contracts or policies, or gender equity issues. (ECF No. 180-1 Page ID #1988.) Indeed,

4

her formal job description does *not* include reporting ethical issues to the Board. (ECF No. 194-38, PageID #4830–34.)    Moreover, Plaintiff maintains that Ms. Buddenberg was not a policymaker for the District (ECF No. 221, PageID #12036)—a fact Defendants do not dispute (ECF No. 258, PageID #14684).

Ms. Buddenberg received generally favorable performance reviews.  (*See generally* ECF No. 194-39; ECF No. 195-36, PageID #5279.)  Four months after she started with the District, Mr. Weisdack conducted her first performance evaluation and made positive comments.  (ECF No. 194-39, PageID #4835–37.)  An area needing improvement was that Ms. Buddenberg should "not be so aggressive on policy issues." (*Id.*, PageID #4836; ECF No. 180-1, PageID #1991.)  In April 2016, Mr. Weisdack gave Ms. Buddenberg another positive performance review.  (ECF No. 180-1, PageID #1995–96.)  After this review, Ms. Buddenberg received a raise in excess of the average for other employees that year.  (*Id.*, PageID #1997–98.)

### A.2.  Mr. Weisdack's Alleged Mismanagement

At the center of Plaintiff's claims lie three areas of alleged mismanagement on the part of Mr. Weisdack:  (1) a failure to correct a gender-pay gap; (2) an unapproved personal labor contract; and (3) his general unprofessional and domineering management style.  At his deposition, Mr. Weisdack agreed that these issues present matters of public concern.  (ECF No. 180-1, PageID #2038.)  These issues arose against the backdrop of the end of Mr. Weisdack's contract with the District in November 2016, at which time he was expected to retire.  (ECF No. 203-1, PageID #8547–48.)

5

### A.2.a. Gender Pay Disparity

By June 2016, Ms. Buddenberg learned that a female District employee was paid less than a male employee in the same position although the woman had better credentials and experience.  (ECF No. 203-1, PageID #8526–28.)  After the employee was hired, sometime between 2015 and October 24, 2016, Mix and the female employee's supervisor, Mike Tusick, complained to Mr. Weisdack about the unequal pay between the two employees.  (ECF No. 180-1, PageID #2089–90.)  Mr. Weisdack agreed that their concerns were reasonable (*id.*, PageID #2090) and that he did not handle the situation as well or as quickly as he should have (*id.*, PageID #2133–34).

Sometime in June 2016, the female employee and Tusick came to Ms. Buddenberg with their concerns about the pay disparity.  (ECF No. 203-1, PageID #8527–29.)  Ms. Buddenberg raised this issue with Mr. Weisdack, Mix, and Tusick.  (ECF No. 203-1, PageID #8535.)  When confronted with the issue, Mr. Weisdack said, "We are going to look at it" and that he "wasn't a lawyer."  (ECF No. 180-1, PageID #2095 & #2100.)  Also, he told Ms. Buddenberg that she was not a lawyer either.  (*Id.*)  Mr. Weisdack did not address the pay disparity with the Board until a compliance review several months later, in December 2016.  (ECF No. 180-1, PageID# 2095.)  Eventually, the District corrected the disparity but only after Ms. Buddenberg raised the issue with the Board.  (ECF No. 180-1, PageID #2073–74; ECF No. 197-42, PageID #6784.)

### A.2.b. Unapproved Tire Contract

In the fall of 2016, Mr. Weisdack performed tire removal services for the District without an approved contract. (ECF No. 180-1, PageID #2010–15.)  By way

of background, the District received a grant of approximately $23,000 from the Ohio Environmental Protection Agency for tire removal.  (*Id.*, PageID #2010–11.)  Without a competitive bidding process, Mr. Weisdack and two other employees of the District performed the work themselves, removing some 2,000 tires, without a contract from the State.  (*Id.*, PageID #2013–15.)  Mr. Weisdack personally paid the two employees $500 each and compensated himself as well.  (*Id.*, PageID #2014–15 & #2017.)  Because the three men performed the work before approval of a contract, Mr. Weisdack claimed that they served as volunteers.  (*Id.*, PageID #2013.)  Nonetheless, all three men expected to be paid for their work.  (*Id.*, PageID #2047–48.)  Even so, Mr. Weisdack knew that he was not permitted to benefit personally from a contract that he oversaw.  (*Id.*, PageID #2031.)

Mr. Weisdack's conduct concerned Ms. Buddenberg, because as the fiscal coordinator, she had to seek outside approval to process certain payments when Mr. Weisdack was paid for his services.  (ECF No. 203-1, PageID #8504–05.)  Without an approved contract and other required paperwork, it would have been difficult for her to deliver payment to Mr. Weisdack.  (ECF No. 203-1, PageID #8566–67.)

### A.2.c. Management Style and Commissioner Contract

Ms. Buddenberg testified that Mr. Weisdack treated staff in degrading and demoralizing ways throughout her tenure with the District.  (ECF No. 203-1, PageID #8595–96.)  She said that he yelled, threatened, intimidated, and ignored staff.  (*Id.*; *id.*, PageID #8501–02; ECF No. 194-26, PageID #4749.)  At one point, Mr. Weisdack hung a pacifier on his office door with a sign that read "for those who disagree."  (ECF No. 180-1, PageID #2154.)  Defendant Alta Wendell, Mr. Weisdack's assistant,

7

described Mr. Weisdack as having a "volatile temper." (ECF No. 190-1, PageID #4298.)

At the end of 2016, Mr. Weisdack's contract was due to expire, and he contemplated retiring. (ECF No. 203-1, PageID #8547–48.) Alternatively, he might have retired and been immediately rehired into the same role—a generally lawful, if unseemly, practice under Ohio law. (ECF No. 180-1, PageID #1975–76.) Ms. Buddenberg was interested in Mr. Weisdack's removal or retirement—she described him as the "main barrier" to the District's functionality. (ECF 208-2, PageID #10432.) Also, Ms. Buddenberg expressed her personal antipathy for Mr. Weisdack to Mix for months. For example, she described Mr. Weisdack in private texts to Mix as "scum," "evil," and a "truly horrible human." (ECF No. 208-2, Page ID #10444, #10445, #10448, #10451, #10475, #10502 & #10505.) She testified that she meant that she disliked the way Mr. Weisdack was treating her and his behavior. (ECF No. 205-1, PageID #9118.)

At the same time, she "wanted to work in an environment that was ethical and protected the citizens. . . . Whether or not it was him as the commissioner or not, it was irrelevant." (ECF No. 203-1, PageID #8550–51.) She "wanted a work environment where [she] could be proud to attach [her] name to, where [she] knew that taxpayer dollars were being used appropriately." (*Id.*, PageID #8699.) To another employee, Ms. Buddenberg discussed how "lovely" it would be if Mr. Weisdack left his position at the District. (ECF No. 205-5, PageID #9371.)

Mr. Weisdack knew that Ms. Buddenberg and Mix wanted him gone.  (ECF No. 215-1, PageID #11804.)

### B.     Board Meeting (October 24, 2016)

Another central component of Plaintiff's allegations in this case involves Ms. Buddenberg's report to the Geauga County Board of Health in an executive session of a special meeting held on October 24, 2016 at which she presented her grievances about Mr. Weisdack.    (*See* ECF No. 186-1, PageID #3268–70.) Mr. Weisdack was scheduled to meet with the Board at that meeting to discuss his employment contract.  (ECF No. 203-1, PageID #8547–48.)

Ms. Buddenberg requested the opportunity to speak to the Board to raise concerns about the District's leadership.  (ECF No. 186-1, PageID #3268–70; ECF No. 188-1, PageID #3679; ECF No. 203-1, PageID #8542–43.)    According to Ms. Buddenberg, Board member David Gragg, a Defendant in this case, asked her to attend the meeting.  (ECF No. 203-1, Page ID #8543–45.)  Whether requested to speak or affirmatively approaching the Board on her own initiative, Ms. Buddenberg had not previously spoken directly to the Board.  (ECF No. 188-1, PageID #3680–81.)

### B.1.    Ms. Buddenberg's Report to the Board

At the Board meeting, Ms. Buddenberg expressed concern about the tire contract, specifically that Mr. Weisdack was benefitting from a public contract, which might present a conflict of interest.  (ECF No. 203-1, PageID #8483, #8508, #8521–22 & #8541.)    After discussing the tire contract, the Board asked Ms. Buddenberg whether she had any other concerns to raise.    (*Id.*, PageID #8541.)    Then, Ms. Buddenberg presented the issue regarding the gender pay that she had learned

about and raised with Mr. Weisdack several months earlier.  (*Id.*, PageID #8538.) She "wanted to address the Board regarding [her] concerns and the liability that the Health District might have in regards to an unequal pay." (*Id.*, PageID #8537–38.) Although she first learned about the pay disparity five months earlier, she did not immediately go to the Board because she felt like her supervisors should have addressed it.  (*Id.*, PageID #8535.)  Once prompted at the meeting, she thought it was an appropriate time to discuss the issue.  (*Id.*, PageID #8541–42.)

Additionally, Ms. Buddenberg presented several other complaints about Mr. Weisdack that she broadly categorized as "operational concerns."  (ECF No. 31, PageID #370–71; ECF No. 194-26, PageID #4747–50.)  These concerns included, among other things, that:  (1) Mr. Weisdack ignored her request to install GPS units in agency vehicles to ensure that field staff were doing their jobs (ECF No. 179-1, PageID #1596); (2) Mr. Weisdack refused to use the District's progressive discipline policy with employees (ECF No. 189-1, PageID #4011–12) or to enforce the District's policies for attendance, paid breaks, and background checks (ECF No. 179-1, PageID 1598–1600); and (3) Mr. Weisdack accepted gifts from contractors with whom the District did business (ECF No. 189-1, PageID #4009).

This meeting marked the first time Ms. Buddenberg reported perceived ethical violations to the Board.  (ECF No. 188-1, PageID #3680–91.)  In deciding whether to bring Mr. Weisdack's alleged mismanagement to the Board, Ms. Buddenberg stated she had "nothing to lose . . . someone must be held accountable."  (ECF No. 208-2, PageID #10433.)

On November 10, 2016, one Board member asked Ms. Buddenberg to summarize the issues she raised in a letter.  (ECF No. 194-26, PageID #4744.)  In response, the letter Ms. Buddenberg drafted spans five pages and provides additional detail regarding the issues involving District policies and procedures on which she presented.  (*Id.*, PageID #4745–50.)  It also identified issues of workplace morale and staff wellbeing.  (*Id.*, PageID #4748.)

### B.2.  Motivation and Immediate Reaction

After the meeting, Ms. Buddenberg told Mix that she hoped Mr. Weisdack would leave his job.  (ECF No. 208-3, PageID #10533.)  Ms. Buddenberg also suggested that she and Mix "build a proposal to present to [the] [B]oard" and "show them some ideas on how we can function without [Mr. Weisdack]."  (ECF No. 208-4, PageID #10537.)  Ms. Buddenberg said that the District "will be fine without [Mr. Weisdack] but the [B]oard does not know it until we show them."  (ECF No. 208-4, PageID #10537.)  Referring to Mr. Weisdack's contract nearing an end, Ms. Buddenberg told another District employee:  "Timing on these tires was perfect!"  (ECF No. 205-5, PageID #9366.)  Still, Ms. Buddenberg told that employee that if the Board decided to rehire Mr. Weisdack, he would accept and continue on in the position.  (*Id.*, PageID #9368.)  Such a possibility gave her doubts about such a storybook ending.  (*Id.*)

Ms. Buddenberg repeatedly described her decision to go to the Board as "just doing [her] job."  (ECF No. 205-5, PageID #9366.)  For example, she texted a co-worker that her actions were "[n]ot vindictive . . . just doing my job."  (*Id.*)  In a draft ethics complaint, she wrote, "I was mandated to report his actions by law . . . [b]y neglecting

11

to do so I would have placed myself subject to disciplinary proceedings." (ECF No. 215-1, Page ID #11806.) In her letter responding to the Board's request to put the issues she raised in the executive session in writing, Ms. Buddenberg wrote that she "felt it necessary to address the board" after "[w]eeks of attempting to do my job and ensure we remained in compliance" with the policies governing the tire contract. (*Id.*, PageID #11814.) Later, she wrote to another Board member, "I came forward and addressed the board because I was required to." (ECF No. 195-35, PageID #5275.)

In contrast, during her deposition, Ms. Buddenberg emphasized that she felt a moral and ethical obligation to report Mr. Weisdack's conduct to the Board. (*See, e.g.*, ECF No. 203-1, Page ID #8538–42.)

### C.    Retaliation

When Ms. Buddenberg appeared at the special Board meeting on October 24, 2016, Mr. Weisdack saw her walk into the meeting with one of the Board members— an usual event. (ECF No. 181-1, PageID #2233–34.) At that point, Mr. Weisdack knew that Ms. Buddenberg expressed concern about the gender pay gap issue, and he believed that she brought some concern about him to the Board. (*Id.*, PageID #2236 & #2238–39.)

In speaking to the Board, Ms. Buddenberg expressed concern about potential retaliation. (ECF No. 186-1, PageID #3297.) In response, the Board said that it "would investigate the allegations and determine what was going on in the department." (*Id.*, PageID #3329.) Also, it told Ms. Buddenberg that the Board members "appreciated her honesty" and her willingness "to come to us in a private

meeting to discuss workplace issues and her interactions with the Health Commissioner and that she should not feel threatened." (ECF No. 188-1, PageID #3710.) Although the Board told Ms. Buddenberg not to worry about retaliation, one Board member testified that it made no promises to her in that regard. (*Id.*, PageID #3712.) Another testified that the Board gave assurances that members would protect her. (ECF No. 189-1, PageID #4021.)

After Ms. Buddenberg's appearance before the Board, she experienced what she perceived to be retaliation from Mr. Weisdack and other employees. Within the lengthy record, Plaintiff principally points to the following instances of retaliation.

### C.1.  Change in Work Hours

Two days after the Board meeting, on October 26, 2016, Mr. Weisdack directed Mix to change Ms. Buddenberg's working hours. (ECF No. 194-47, PageID #4870.) Previously, she worked from 7:00 am to 3:30 pm to accommodate care for a grandson who had cancer. (*Id.*; ECF No. 179-1, PageID #1661; ECF No. 181-1, PageID #2271.) Mr. Weisdack changed her hours to 8:00 am to 4:30 pm. (ECF No. 194-47, PageID #4870.) He knew that this change affected care for Ms. Buddenberg's grandchild. (ECF No. 181-1, PageID #2271.) Also, it affected her ability to complete college course credits. (ECF No. 189-1, PageID #4030.) Mr. Weisdack did not explain to Ms. Buddenberg why her schedule changed. (*Id.*, PageID #2264.) But she knew— before her reports to the Board—that her schedule could change at any time. (ECF No. 181-1, PageID #2271.)

As additional evidence of retaliation based on the change in her work hours, Plaintiff points to an email (ECF No. 194-6, PageID #4611), which is the subject of

13

some controversy between the parties.  The email was sent on Sunday, October 30, 2016, and it appears that Mr. Weisdack sent it to another employee of the District, Darla Andrews.  (*Id.*)  In the email, Mr. Weisdack says:  "there has been a lot of BS going on in the office and I think you know who is stirring it up.  So, I said everyone must start at 8:00 and I can explain when I see you face to face. This needs to remain between you and [me]. . . . Do not mention anything to anyone until you and I talk." (*Id.*)

At his deposition, Mr. Weisdack disputed the authenticity of this email, testifying, "I'm certain I didn't write it." (ECF No. 181-1, PageID #2278.)  Defendants did not produce this email in discovery.  (ECF No. 221, PageID #12045.)  Instead, Andrews provided it.  (ECF No. 194-6, ¶ 15, PageID #4608.)  Defendants maintain that they "could stipulate that the email came off [the District's] server" but they do not concede that Mr. Weisdack wrote it. (ECF No. 195-49, PageID #5445.)  For purposes of summary judgment only, the Court assumes that a trier of fact would determine that Mr. Weisdack wrote and sent the message, then deleted it from his sent items folder to prevent it from saving to the server.

In any event, Mr. Weisdack testified that he changed Ms. Buddenberg's work hours to simplify the procurement process for supplies because Ms. Buddenberg was not able to get purchase orders done.  (ECF No. 181-1, PageID #2265–69.) Notwithstanding the change to Ms. Buddenberg's schedule, two other District employees continued to have flexible working hours.  (ECF No. 181-1, PageID #2269.) This change to her schedule motivated Ms. Buddenberg to push harder for

14

Mr. Weisdack's retirement, as she texted a colleague:  "He is dumber than I thought. I was neutral before . . .  now I am pissed.  He messed with the wrong girl!"  (ECF No. 205-5, PageID #9366 (ellipsis in original).)

### C.2.  Work Environment

Within a day or two of her report to the Board, Mr. Weisdack was particularly upset with Ms. Buddenberg and told his assistant as much (ECF No.  190-1, PageID #4278–79, #4293–94 & #4313–14; ECF No. 191-1, PageID #4434), but Mr. Weisdack denied that he did so (ECF No. 181-1, PageID #2240–42).  His assistant testified that Mr. Weisdack spoke negatively about Ms. Buddenberg to others and that the entire staff within the Department knew how he felt.  (ECF No. 190-1, PageID #4356–58.) Ms. Buddenberg testified that she experienced retaliation:  her work environment was "very hostile" and "impact[ed] every minute of [her] life," and she was "very uncomfortable" in her job.  (ECF No. 203-1, PageID #8599–8600.)

Mix provided a declaration attesting that, after Ms. Buddenberg's report to the Board, Mr. Weisdack's "behavior was so intimidating that there were times Rebecca and I communicated about whether it was safe for her to be at the office.  On some occasions, I steered him out of the building when he was angry."  (ECF No. 194-5, ¶ 27, PageID #4594.)  At the same time, Ms. Buddenberg texted a colleague, "You missed good days!  lol Bob is angry and won't look at or talk to me. . . . Retaliation!" (ECF No. 205-5, PageID #9365.)

Further, she identified an "immediate change in the interactions" at work, and Mr. Weisdack and others limited communication and "refus[ed] to converse" with her to the point that she did not receive information needed to perform "elements of her

job." (*Id.*, PageID #8634–35 & #8636–40.)  At her deposition, Ms. Buddenberg identified delayed responses from Mr. Weisdack's assistant and two other employees as examples of the retaliation she experienced.  (ECF No. 203-1, PageID #8640–42.)

Plaintiff argues that Mr. Weisdack's assistant stopped responding to inquiries from Ms. Buddenberg.  (ECF No. 221, PageID #12045.)  But the record does not go that far.  (*See* ECF No. 190-1, PageID #4296.)  More accurately, Mr. Weisdack's assistant did what she could to stay in his "good graces."  (*Id.*, PageID #4296–97; ECF No. 204-1, PageID #8926.)  In light of Mr. Weisdack's "volatile temper," a finder of fact would be justified in finding that his assistant tried to appease him by not talking to Ms. Buddenberg.  (ECF No. 190-1, PageID #4298.)

### D.    Ms. Buddenberg's Follow-Up Reports to the Board

In response to the conduct at work, Ms. Buddenberg reported Mr. Weisdack's retaliation against her to the Board.  For example, on October 31, 2016, she emailed all four Board members to report retaliation.  (ECF No. 195-28, PageID #5258.)  In this email, Ms. Buddenberg reported the change in her working hours, which she described as "a minor event."  (*Id.*)  Also, she noted that Mr. Weisdack "is angry at" her, "has avoided all contact with" her, and made his anger known to her co-workers. (*Id.*)  At this time, she texted Mix:  "I hope he goes, I love this place."  (ECF No. 208-3, PageID 10533.)

On November 4, 2016, Ms. Buddenberg emailed Board member Christina Livers, a Defendant in this case, concerning Mr. Weisdack's continued employment as Commissioner.  (ECF No. 195-29, PageID #5260.)  This email came a day after a staff meeting at the District during which Mr. Weisdack announced his intention not

16

to leave his position and instead to work another two years.  (*Id.*)  Ms. Buddenberg sought to confirm the accuracy of this development because, if true, "I will need to begin seeking other employment."  (*Id.*)  Ms. Buddenberg reported that Mr. Weisdack's response to her report to the Board "has created a toxic work environment."  (*Id.*)

On the morning of Saturday, November 5, 2016, Ms. Buddenberg emailed Mix, suggesting a more active approach to bring about a change in the District's leadership.  (ECF No. 208-4, PageID #10537.)  Specifically, she proposed building a case to present to the Board to "show them some ideas on how we can function without [Mr. Weisdack so] they may feel more confident."  (*Id.*)  "We know we will be fine without [Mr. Weisdack] but the board doesn't know it until we show them."  (*Id.*)

Later that afternoon, Ms. Buddenberg spoke with Ms. Livers over the phone.  (ECF No. 197-3, PageID #6050; ECF No. 203-1, PageID #8617.)  Ms. Buddenberg told Ms. Livers about the retaliation she was experiencing, specifically the change to her schedule, Mr. Weisdack's failure to communicate with her, and his anger toward her that Mr. Weisdack made known to staff within the Department.  (ECF No. 203-1, PageID #8617–18.)

Ms. Buddenberg emailed Ms. Livers again on Sunday, November 13, 2016.  (ECF No. 194-26, PageID #4744.)  After complaining that Mr. Weisdack changed the procedure for requesting leave to require his personal approval, she raised concern about her work environment and retaliation.  (*Id.*)  Specifically, she wrote:

> Staff approached me Thursday after learning from their supervisors there will be interviews in the near future by a third party.  Many stated

17

> they are not willing to speak because the retaliation that will occur.
> Everyone is convinced [Mr. Weisdack] is staying two more years. There
> is great confusion and frustration expressed by staff.  They see how he
> is acting towards me, looking for any reason to cause me difficulty and
> do not want that for themselves.

(*Id.*)  Ms. Buddenberg attached a summary of her report to the Board on October 24.

(*Id.*, PageID #4745–49 & #4750–55.)  She concluded that report by saying, "Steps need to be in place to protect public money."  (*Id.*, PageID #4749.)  At her deposition, Ms. Buddenberg testified that this sentence reflects her "primary concern as a taxpayer, as someone who lives in Geauga County, that our funds were utilized in the way that they should be."  (ECF No. 203-1, PageID #8576.)  She thought that, by making the Board aware of the issues she raised, it would "hold leadership accountable and . . . be ethical."  (*Id.*, PageID #8598–99.)

### E.    Outside Investigation

At a special meeting held on November 9, 2016, the Board engaged attorney Jeffrey Embleton of the law firm Mansour Gavin to conduct a compliance audit and review of the District.  (ECF No. 195-1, PageID #4876.)

### E.1    Staff Meeting

At a subsequent special staff meeting, the President of the Board explained that, although Mr. Weisdack was retiring at the end of the month, the Board was considering extending his contract for two years and had engaged Embleton to investigate the District under Mr. Weisdack's leadership.  (ECF No. 195-2, PageID #4878.)  Through its President, the Board asked each staff member at the District to respect the process, speak openly and honestly with Embleton, and cooperate with the investigation.  (*Id.*)

18

Ms. Buddenberg met with Timothy Goergen, the President of the Board, and Catherine Whitright, another Board member—both Defendants in this case—that same day after the staff meeting.  (ECF No. 186-1, PageID #3353–54.)  Mix also attended this meeting.  (*Id.*, PageID #3354.)  Ms. Buddenberg was visibly upset, cried, and expressed concern that Mr. Weisdack remained on the job.  (*Id.; see also* ECF No. 189-1, PageID #4090; ECF No. 206-1, PageID #9562–63.)  During that meeting, at least some complaints of Mr. Weisdack's mistreatment of Ms. Buddenberg were aired.  (ECF No. 206-1, PageID #9563.)

### E.2.  Subsequent Board Actions

The next day, on November 16, 2016, Mr. Goergen met with Mr. Weisdack to tell him about the compliance audit.  (ECF No. 181-1, PageID #2326–27.)  After that, the relationship between Mr. Weisdack and Mix was never the same.  (ECF No. 181-1, PageID #2342–43; *see also* ECF No. 206-1, PageID #9564.)  Previously, the two men were close friends, and Mr. Weisdack wanted Mix to succeed him at the District.  (ECF No. 181-1, PageID #2283–85.)  But Mr. Weisdack thought Mix was trying to protect Ms. Buddenberg.  (ECF No. 181-1, PageID #2347.)  Also, he knew that Mix was "trying to force [him] out."  (ECF No. 215-1, PageID #11804.)  Mr. Weisdack summarized the situation in an email:

> He and our financial office have said I have been bad to the staff.  I have to retire by the end of November due to [changes in Ohio retirement plans] and the Board want to rehire me back but Dan and this woman see this as a opportunity to stop the Board from rehiring me.  This is a mess and Dan thinks he is entitled to be the [Health Commissioner].  I think the Board sees through this little game but that remains to be seen.

(*Id.*)

On November 17, 2016, Mr. Weisdack directed Mix to edit the job description for the Health Commissioner to add qualifications that made Mix ineligible for the position.  (ECF No. 181-1, PageID #2331; ECF No. 186-1, PageID #3450; ECF No. 189-1, PageID #4096.)  In a special meeting that day, the Board approved the revised job description.  (ECF No. 195-30, PageID #5263.)  When Ms. Buddenberg heard the news, she texted a colleague:  "I despise that man.  I am disgusted and devastated."  (ECF No. 205-5, PageID #9375.)

On November 18, 2016, Ms. Buddenberg drafted an ethics complaint.  (ECF No. 215-1, PageID #11805–08.)  In that draft, Ms. Buddenberg wrote:  "I was mandated to report [Mr. Weisdack's] actions by law, Ohio Ethics Policy and our Geauga County Board of Health Personnel Policy."  (*Id.*, PageID #11806.)  Failure to report would have subjected her "to disciplinary proceedings up to termination."  (*Id.*)  She described her "sole purpose" in going to the Board as seeking "to reduce and hopefully, avoid a greater risk to the agency based on what should be perceived as his neglect of duties."  (*Id.*)  Doing what she saw as "fulfilling the obligations of [her] position and reporting wrong doing" resulted in retaliation and a hostile work environment.  (*Id.*)  Ms. Buddenberg complained that the Board knew all of this, disregarded it, and allowed Mr. Weisdack's actions and retaliation to continue.  (*Id.*)

At the end of the month, on November 29, in a special meeting, the Board unanimously voted to extend Mr. Weisdack's contract for four months, with an option to extend it for another two years.  (ECF No. 195-31, PageID #5270.)

### E.3. Additional Reports from Ms. Buddenberg

The next day, on November 30, 2016, Ms. Buddenberg emailed Embleton to request estimates for budgeting purposes. (ECF No. 195-32, PageID #5271.) At the end of her email, Ms. Buddenberg commented on the Board's action extending Mr. Weisdack's contract:

> I just learned the board has placed back in authority the individual who has betrayed residents [*sic*] trust, who has mismanaged this department and has verbally attacked my character, making my workplace very uncomfortable. He has verbalized a desire to terminate my employment so I imagine I will not be here much longer. I appreciate your efforts. It is obvious by the lack of communication and protection of employees that the board is as negligent as Mr. Weisdack.

(*Id.*)

On December 14, 2016, Ms. Buddenberg responded to Ms. Livers in an email discussion about ethics policies. (ECF No. 193-33, PageID #5272.) She took the opportunity again to raise concern about retaliation: "I do find it ironic that the ideas and concerns I had identified and were substantiated resulted in my work environment becoming even more hostile. Perhaps I should have followed Mr. Weisdack's directive to keep my mouth shut." (*Id.*)

On December 15, 2016, Ms. Buddenberg emailed Embleton again, raising complaints about Mr. Weisdack's continuing behavior creating a hostile work environment. (ECF No. 195-34, PageID #5273–74.) Ms. Buddenberg reported that Mr. Weisdack told other employees that she was "part of setting him up" to sabotage him and that she was "the cause of the problems currently taking place at [the District]." (*Id.*, PageID #5273.) Regarding the tire contract and the gender pay disparity, Ms. Buddenberg advised that Mr. Weisdack told colleagues and affected

individuals false information.  (*Id.*)  Because of Mr. Weisdack's position and authority, Ms. Buddenberg found his words "very impactful and damaging" (*id.*) and wrote that Mr. Weisdack "has turned the performance of my job responsibilities into an attack on my credibility and my character" (*id.*, PageID #5274.)  Also, she advised that she viewed the Board as supporting Mr. Weisdack and complicit in his "attacks on my character and intentions" that negatively affected her employment.  (*Id.*)

She explained that her purpose in speaking to the Board was to (1) ensure that the District complied with the law and the Ohio Code of Ethics, and (2) avoid legal action against the District based on unfair wage discrimination.  (*Id.*, Page ID #5274.) She requested that Embleton instruct Mr. Weisdack "to stop all slanderous communication."  (*Id.*, PageID #5273.)  She threatened to make a public request for all of Mr. Weisdack's communications regarding her and the relevant circumstances since her report to the Board on October 24, 2016.  (*Id.*)

Embleton responded that any claims of retaliation or hostile work environment fell outside the scope of his engagement.  (ECF No. 197-8, PageID #6060.) Accordingly, he forwarded Ms. Buddenberg's email to the Board President and the assistant county prosecutor in her capacity as counsel for the Board.  (*Id.*)  At least one Board member recognized that Ms. Buddenberg believed these allegations and that, if true, they were serious.  (ECF No. 188-1, PageID #3786–87.)  Another agreed that Ms. Buddenberg acted reasonably in bringing her concerns and claims to the Board.  (ECF No. 189-1, PageID #4067–68.)

### E.4.    The Conclusion of the Outside Investigation

By mid-January 2017, Embleton corresponded with Ms. Buddenberg on behalf of the Board, advising her that he had presented the findings from his investigation to the Board.  (ECF No. 196-47, PageID #5995.)  Further, he stated that the Board was taking action to address many of the issues she had raised at the Board meeting on October 24, 2016.  (*Id.*)  Although Embleton's letter did not mention retaliation expressly, and by addressing the concerns Ms. Buddenberg presented to the Board on October 24, 2016 appears not to extend to her claims of retaliation, one Board member specifically testified that the Board took steps to ensure that Mr. Weisdack changed his behavior and did not retaliate.  (ECF No. 189-1, PageID #4064.)

Around the same time, Ms. Buddenberg reached out to former employees to learn additional information and seek help.  (ECF No. 205-8, PageID #9504.)  In connection with this effort, Ms. Buddenberg told a former employee that she was waiting on the final report from the Board and recommendations from the investigation.  (*Id.*, PageID #9505.)  But she said, "If he stays I will take legal action. If he goes I will see if it improves."  (*Id.*)

On January 24, 2017, Ms. Buddenberg emailed Ms. Livers "in complete frustration" by being left "in limbo for months, waiting patiently for something to improve."  (ECF No. 195-35, PageID #5275.)  She said that she made her report to the Board in the first place "because I was required to" and had exhausted "every effort to resolve my concerns with the Health Commissioner to no avail."  (*Id.*)  As a result, "I have been punished for my sincere effort to fulfill my job responsibilities.  I have been the victim of a personal attack by Mr. Weisdack.  I have had my credibility

undermined, impacting my ability to perform essential job functions" and causing "sleepless nights." (*Id.*) She criticized the Board for making "no visible effort to counteract Mr. Weisdack's negative actions towards me." (*Id.*) It appears that a recent Board action triggered the email. Specifically, minutes of a Board meeting held on January 10, 2017 referenced a deadline for a financial report about which Ms. Buddenberg did not know. (*Id.*) Her email included a plea: "Please protect myself and others from the retaliation Mr. Weisdack is eager to dole out." (*Id.*, PageID #5276.) In doing so, she expressed "grave concern for my future ability to remain employed" with the District. (*Id.*, PageID #5275.)

Mr. Weisdack testified that no Board member raised any issue or concern about retaliation with him. (ECF No. 181-1, PageID #2330 & #2369–70.) One Board member corroborated this testimony (*see* ECF No. 188-1, PageID #3713), even as he conceded that the Board had an obligation to stop any retaliation (*id.*, PageID #3787). But at least one Board member disputes Mr. Weisdack's testimony on this point, recalling that the Board sought and received assurances from Mr. Weisdack that he was not retaliating against Ms. Buddenberg. (ECF No. 189-1, PageID #4053–57.) But the Board accepted Mr. Weisdack's representations about retaliation without further investigation. (*Id.*, PageID #4058–59.) And this particular Board member did not ask to hear directly from Ms. Buddenberg about her experience of retaliation. (*Id.*, PageID #4136–37.)

**F.    The End of Ms. Buddenberg's Employment at the District**

In January 2017, the Board retained attorney James Budzik as outside counsel in connection with civil service matters relating to the appointment, retention, and

discipline of public employees. (ECF No. 183-1, PageID #2701.) Like Embleton, Mr. Budzik practices at the Mansour Gavin firm, and he represents public sector employers in contract negotiations, grievances, arbitration, and civil service matters. (*Id.*, PageID #2697 & #2699.)

The record contains some disagreement about the scope of Mr. Budzik's representation. One Board member, its President, testified that Mr. Budzik's role included investigating whether Ms. Buddenberg experienced retaliation. (ECF No. 186-1, PageID #3393.) He described Mr. Budzik's role as acting as a "chaperone" given "the sensitivity and history" of Ms. Buddenberg's allegations. (*Id.*, PageID #3384.)

But Mr. Budzik testified that investigating the allegations of retaliation that Ms. Buddenberg made fell outside the scope of his representation and that of his firm. (*Id.*, PageID #2702–03.) Because the District did not produce an agreement specifically relating to Mr. Budzik's engagement, Plaintiff contests whether Mr. Budzik provided legal services at all. (ECF No. 252-2, PageID #14549; ECF No. 259, PageID #14710.) Whatever the case, his responsibilities included civil service issues involving Mix and Ms. Buddenberg. (ECF No. 183-1, PageID #2729–30.)

### F.1. Mix's Separation from Employment

Effective February 1, 2017, Mix resigned. (ECF No. 194-16, PageID #4664.) Mix resigned after receiving a notice of disciplinary action "recommending and proposing" his termination for numerous stated reasons. (ECF No. 194-37, PageID #4819–22.) Mr. Weisdack and the Board's President provided Mr. Budzik with the

information contained in the notice, and Mr. Budzik wrote it. (ECF No. 180-1, PageID #2168; ECF No. 181-1, PageID # 2374–75.) Among the reasons listed for the District's action, the first involved Mix's conduct during an investigation unrelated to the events at issue in this lawsuit. (ECF No. 206-8, PageID #9786–89.) Specifically, the notice explained that Mix disclosed confidential information about an ongoing criminal investigation of certain employees. (*Id.*)

Some grounds for Mix's separation directly or indirectly relate to Ms. Buddenberg. For example, the compliance review uncovered that Mix had a key without authorization to an office containing personnel files. (ECF No. 194-37, PageID #4821.) His personnel file and that of Ms. Buddenberg were missing and located in her office, even though she was not their custodian and did not have authorization to have these files. (*Id.*) Additionally, the notice references Mix's failure to discipline Ms. Buddenberg (though not mentioned by name) over obtaining cloth chairs for use in the lunchroom that might harbor contamination contrary to District policy. (*Id.*, PageID #4820–21; ECF No. 181-1, PageID #2386; ECF No. 206-1, PageID #9681–82.)

### F.2. Ms. Buddenberg's Reaction to Mix's Termination

After learning of Mix's resignation, Ms. Buddenberg emailed Ms. Livers on February 1, 2017, with a copy to Embleton, stating, "Dan's dismissal was directly a result of my reporting and his defending me for reporting." (ECF No. 194-29, PageID #4759.) She based this belief on rumors about a termination letter addressed to Mix reportedly left open on a District laptop that she never saw. (ECF No. 203-1, PageID #8660–62.) Also, Ms. Buddenberg wanted to ensure the Board knew that she was

"doing [her] job" when she initially reported Mr. Weisdack's conduct.  (ECF No. 194-29, PageID #4759.)  She reiterated that her report to the Board led to "great hostility."  (*Id.*)  With Mr. Weisdack still serving as commissioner, Ms. Buddenberg advised that he "will be permitted to continue his harassment" and the "primary factor of dysfunction continues."  (*Id.*)

Following Mix's resignation, Ms. Buddenberg reported directly to Mr. Weisdack.  (ECF No. 179-1, PageID #1705.)

### F.3.  EEOC Charge

On February 15, 2017, Ms. Buddenberg filled out an EEOC intake questionnaire to start the process of filing a charge of discrimination.  (ECF No. 203-10, PageID #8789–94.)  In it, she stated that retaliation occurred days after her October 24, 2016 report to the Board.  (ECF No. 203-10, PageID #8791.)  She reported that Mix offered no reason for the change to her scheduled working hours but told her "to be cautious as Mr. Weisdack was out to hurt [her] for reporting."  (*Id.*)  She added that Mix was "forced to resign [and] threatened with termination."  (ECF No. 203-10, PageID #8792.)

On February 22, 2017, the EEOC provided notice to the District of Ms. Buddenberg's charge, but the notice did not include the questionnaire or provide any substantive information about Ms. Buddenberg's charge.  (ECF No. 197-14, PageID #6116–18.)  Instead, the notice indicated that Ms. Buddenberg had filed a claim under Title VII of the Civil Rights Act and that "no action is required [by the District] at this time."  (ECF No. 197-14, PageID #6116.)  Also, it advised that the

27

claim alleged retaliation occurring on October 26, 2016. (*Id.*) The following day, the District provided a copy of the notice to Mr. Budzik. (ECF No. 184-1, PageID #3115.)

When Mr. Weisdack received the notice, "he was dismayed" and "upset" that Ms. Buddenberg filed the charge and "was not thrilled about it." (ECF No. 190-1, PageID #4351–52.) He thought that Ms. Buddenberg was out to get him and said as much to others. (ECF No. 181-1, PageID #2416.)

### F.4. Notice of Disciplinary Action against Ms. Buddenberg

On February 28, 2017, Mr. Weisdack provided Ms. Buddenberg with a notice of proposed disciplinary action. (ECF No. 195-19.) Citing a "repeated pattern" of violating the District's policies since mid-January 2017, Mr. Weisdack and the Board proposed demotion to a clerical-secretarial position, with a concomitant reduction in pay, and a three-day unpaid suspension. (*Id.*, PageID #5163 & #5166.) As an example, the notice cited rude, unprofessional, and disrespectful communications with Mr. Weisdack, including in front of other employees. (*Id.*) It identified Ms. Buddenberg's email to Ms. Livers dated February 1, 2017 stating that Mix was dismissed as a result of his defense of Ms. Buddenberg as false, intended to obtain a benefit for herself and create an adverse work environment for all District employees. (*Id.*) Mr. Weisdack testified that Mr. Budzik included that email as a ground for discipline. (ECF No. 181-1, PageID #2406.) Also, it listed the following additional grounds for discipline:

1. Attempting to mandate her attendance at a meeting to obtain revisions to the 2017 budget appropriations.

2. Insubordination in connection with an unauthorized transfer of chairs within District offices as part of the lunchroom renovation project.

28

3.      Failure to complete payroll by the deadline.

4.      Improper storage of Mix's personnel file in her office.

5.      Failure properly to maintain other employees' personnel files.

6.      Failure to familiarize herself with the Ohio District of Health financial report/subsidy and to maintain prior reports.

7.      Improper shredding of District records.

(ECF No. 195-19, PageID #5163–65.)  This notice advised Ms. Buddenberg of a hearing three days later.  (*Id.*, PageID #5166.)  It advised her that "You have the right to be represented at this pre-deprivation hearing."  (*Id.*)  And it did not include the possibility of termination as discipline.  (*Id.*)

Mr. Weisdack and the President of the Board provided the information included in the notice to Mr. Budzik.  (ECF No. 180-1, PageID #2168–69, #2377–78 & #2393.)  Then, Mr. Budzik drafted the notice.  (*Id.*, PageID #2169.)  Mr. Weisdack also shared the notice with the Board.  (ECF No. 31, ¶ 79, PageID #385; ECF No. 37, ¶ 59, PageID #463.)

### F.5.    Pre-Disciplinary Hearing (March 3, 2017)

On March 3, 2017, Ms. Buddenberg had a pre-disciplinary hearing.  (ECF No. 210-4, PageID #11325.)  Usually, Mr. Weisdack conducted such hearings; but, due to recent facial surgery affecting his ability to speak, Mr. Budzik conducted the hearing instead.  (ECF No. 181-1, PageID #2376; ECF No. 182-1, PageID #2567; ECF No. 183-1, PageID #2835; ECF No. 186-1, PageID #3395.)  Additionally, Mr. Weisdack testified that Mr. Budzik conducted the hearing because he was "told not to be directly involved with any staff members while this report was going to be made."  (ECF

29

No. 180-1, PageID #2161 & #2168–70.)  For these reasons, Mr. Budzik conducted the hearing as Mr. Weisdack's designee (ECF No. 182-1, PageID #2581), and Mr. Weisdack said little at the hearing (ECF No. 184-1, PageID #3042–43.)  Up to this point in time, Ms. Buddenberg had no interaction with Mr. Budzik.  (ECF No. 203-1, #8650, #8654–55 & #8658.)  Mr. Budzik had no other control or influence on Ms. Buddenberg's day-to-day work activities, including the change in her work hours.  (ECF No. 203-1, PageID #8654–55 & #8658.)

Mr. Budzik, Mr. Weisdack, Darla Andrews (a District employee), and Ms. Buddenberg attended the hearing.  (ECF No. 203-1, PageID #8671.)  According to District policy, Ms. Buddenberg was entitled to counsel at the hearing, and her disciplinary notice stated that she had a "right to be represented."  (ECF No. 195-14, PageID #5123, ECF No. 207-4, PageID #10092.)  But Ms. Buddenberg did not request or retain counsel or any other representation for the hearing.  (ECF No. 203-1, PageID #8671.)  However, during the hearing, Ms. Buddenberg disclosed that she had counsel by then.  (ECF No. 210-4, PageID #11333.)  The hearing was recorded and lasted approximately 96 minutes.  (ECF No. 210-4, PageID #11325 & #11376.)

### F.5.a. Charges

Mr. Budzik read the charges against Ms. Buddenberg nearly verbatim from the notice of disciplinary action.  (*Id.*, PageID #11327–65.)  After separately reading each charge, Ms. Buddenberg had the opportunity to respond to each.  (*Id.*)  In response to some, Ms. Buddenberg provided a specific response or rebuttal.  (*See, e.g.*, *id.*, PageID #11328–29 & #11338–41.)  In response to others, she declined to provide specific supporting documentation or evidence.  (*Id.*, PageID #11329 & #11334–35.)

30

But she did provide documents to address certain charges.  (*See e.g.*, *id.*, PageID #11375; ECF No. 183-1, PageID #2798.)

A transcript of the hearing establishes the following facts for the disciplinary charges:

- Rude and Unprofessional Behavior:  Ms. Buddenberg admitted raising her voice at Mr. Weisdack. (ECF No. 210-4, PageID #11329.)

- Mix's Resignation:  Ms. Buddenberg admitted that she was aware that Mix resigned, under threat of termination, despite claiming in her email to Ms. Livers that he had been dismissed, which was her opinion based on what she knew.  (*Id.*, PageID #11331–33.)

- Unauthorized Transfer of Chairs (Contaminated Furniture): Ms. Buddenberg stated that she requested furniture from the District's maintenance department without prior approval from the Commissioner.  (*Id.*, PageID #11338.)  In this litigation, Ms. Buddenberg did not remember whether Mix or Mr. Weisdack told her not to get these chairs.  (ECF No. 204-1, PageID #8910.) But Mr. Weisdack testified that Ms. Buddenberg had no authority to obtain this furniture.  (ECF 182-1, PageID #2571.)  Apparently, Mr. Weisdack's assistant told Ms. Buddenberg that she could not bring the furniture to the District's offices.  (ECF No. 182-1, PageID #2572.)

- Payroll: Ms. Buddenberg admitted that she failed to attach the documentation necessary for timely processing of payroll as required. (ECF No. 210-4, PageID #11343.)

- Personnel Files:  Ms. Buddenberg admitted that she stored her personnel file and that of Mix in her office.  (*Id.*, PageID #11349–51 & #11356.)  She presented no proof that Mr. Weisdack authorized her to move the files into her office.  (*Id.*, PageID #11349–50.)  In this case, Mr. Weisdack testified that any work Ms. Buddenberg did with the personnel records was to be done in his office.  (ECF No. 180-1, PageID #1981–82.)

- Ohio Department of Health Report:  Ms. Buddenberg admitted being unfamiliar with this report.  (ECF No. 210-4, PageID #11361.)  Previously, Mix had responsibility for it.  (*Id.*, PageID #11361.)

- Shredding:  Ms. Buddenberg admitted that an intern shredded District documents at Ms. Buddenberg's direction (*id.*, PageID #11369) and provided a statement from the intern on the issue (ECF No. 203-1, PageID #8672).

Typically, the Board makes a decision about three to five days after the pre-disciplinary hearing.  (*Id.*, PageID #11326.)

### F.5.b. Ms. Buddenberg's Responses

One point of the pre-disciplinary hearing is to provide an employee with the opportunity to respond to the charges.  (ECF No. 183-1, PageID #2802–03.)  In response to each charge, Ms. Buddenberg offered explanations or justifications.  (*See generally* ECF No. 210-4.)  At times, Mr. Budzik questioned or challenged the response from Ms. Buddenberg.  (*See, e.g.*, ECF No. 210-4, PageID #11331–32.)  Generally, she also asserted that the charges were retaliatory and false.  (*See, e.g.*, *id.*, PageID #11329, #11332, #11336, #11337, #11340, #11344 & #11372.)  But Mr. Budzik did not follow up on her position or request facts to support it.  (ECF

No. 183-1, PageID #2788, #2899 & #2933; ECF No. 184-1, PageID #3003–04 & #3021.) At deposition, Mr. Budzik conceded that, as an experienced employment lawyer, if he learned about retaliation against an employee in the course of his representation, he might have to act on that information. (ECF No. 183-1, PageID #2717–18.)

Ms. Buddenberg maintains that Mr. Budzik knew the charges against her were "baseless"—because "any reasonable intelligent person" would understand that fact. (ECF No. 203-1, PageID #8673.) She described Mr. Budzik as "vindictive" and conspiring against her during the hearing. (ECF No. 204-1, PageID #8928.) When asked whether she wished to provide any statements from other employees to verify or support her side of the story, Ms. Buddenberg responded that she would not offer co-worker statements or names because "Mr. Weisdack has a history of retaliation towards employees who question him." (ECF No. 210-4, PageID #11329.)

### F.5.c. Audio Recording of the Hearing

Plaintiff submitted an audio recording of the pre-disciplinary hearing. (ECF No. 194-14.) On the audio recording of the hearing, Mr. Budzik's demeanor is best described as calm, almost soporific. Nor did Mr. Weisdack raise his voice or express emotion on the few occasions he spoke. Instead, he spoke slowly and evenly to supplement and clarify the record. For her part, Ms. Buddenberg offered even-toned, matter-of-fact rebuttals to the charges Ms. Budzik read.

Mr. Budzik repeatedly encouraged Ms. Buddenberg to present all the evidence she had to rebut the charges. (*See, e.g.*, ECF No. 210-4, PageID #11334.) Ms. Buddenberg and Mr. Budzik interrupted each other at times—but that was a

33

bipartisan occurrence, with neither side doing so more than the other. And Ms. Buddenberg even shared a laugh with Mr. Budzik when she burped during the hearing. (*Id.*, PageID #11360.) Overall, the hearing proceeded professionally and as cordially as could reasonably be expected under the circumstances.

### F.5.d. Off-the-Record Settlement Discussions

At the hearing, Ms. Buddenberg and Mr. Budzik had two conversations off the record. In the first, Ms. Buddenberg asserted that Mr. Budzik "implied" that if he and Mr. Weisdack presented their findings and her responses to the Board, she would likely be terminated. (ECF No. 203-1, PageID #8675–76.) To avoid such an outcome, Mr. Budzik broached the possibility of a settlement as an alternative. (*Id.*) Ms. Buddenberg asked to have a witness present for the conversation, but he denied the request. (*Id.*, PageID #8676; ECF No. 184-1, PageID #3030 & #3043.) Although the notice of discipline did not reference termination, Ms. Buddenberg understood based on her account of this discussion with Mr. Budzik that, once the Board received the record, it was free to take whatever action it felt was appropriate. (ECF No. 203-1, PageID #8676; ECF No. 204-1, PageID #8938–39.)

In the second conversation, immediately following the hearing, Mr. Budzik offered a settlement agreement at the direction of and with the authorization of Mr. Weisdack, who was also present. (ECF No. 203-1, PageID #8677; ECF No. 204-1, PageID #8938–39; ECF No. 184-1, PageID #3033 & #3047.) He proposed that Ms. Buddenberg agree to the discipline recommended: a voluntary demotion, reduction in pay, and three-day unpaid suspension with no record of discipline in her personnel file. (ECF No. 184-1, PageID #3037–38.) But the disciplinary notice

already existed as a public record.  (*Id.*, PageID #3038.)  Ms. Buddenberg had a few days to consider the offer.  (*Id.*, PageID #3039.)

Additionally, Ms. Buddenberg claims that this offer was contingent on dismissing her pending EEOC charge.  (ECF No. 203-1, PageID #8677.)  Mr. Budzik denies making a settlement proposal contingent on dismissing charges with the EEOC.  (ECF No. 184-1, PageID #3030–33.)  Because the record shows that Mr. Budzik received notice of the EEOC charge (*id.*, PageID #3115), in the current procedural posture, the Court construes the record in favor of Plaintiff and treats this settlement proposal as directed at *all* of Ms. Buddenberg's claims and actions, including the EEOC charge.

In her deposition, Ms. Buddenberg accused Mr. Budzik of not presenting her side of the story to the Board.  (ECF No. 204-1, PageID #8929–30.)  But she admits that she does not know what he presented to the Board.  (ECF No. 204-1, PageID #8930.)  Mr. Budzik disputes that he denied her ability to speak to the Board and stated that "[s]he could always ask the Board to discuss things with it."  (ECF No. 184-1, PageID #3039–40.)  And the record shows that Ms. Buddenberg communicated with Board members on several occasions.  (*See, e.g.*, ECF No. 194-29, PageID #4759.)  In any event, Ms. Buddenberg did not accept any settlement.  (ECF No. 195-17, PageID #5156.)

### F.6.    EEOC Charge of Retaliation

On March 7, 2017, Ms. Buddenberg filed an EEOC charge alleging retaliation based on the notice of disciplinary action dated February 28, 2017.  (ECF #204-9, PageID #8984.)  That same day, Mr. Budzik discussed Ms. Buddenberg's disciplinary

hearing with the Board in executive session, but the Board did not make any final determination at that meeting.  (ECF No. 197-6, PageID #6056–57; ECF No. 184-1, PageID #3054.)  During their deliberations, no Board member expressed concern that imposing discipline might be retaliatory.  (ECF No. 189-1, PageID #4173.)  Nor did the Board hear Ms. Buddenberg's side of the story directly.  (*Id.*, PageID #4149; ECF No. 187-1, PageID #3609.)

On March 10, 2017, Ms. Buddenberg sent an email to Ms. Livers again alleging retaliation.  (ECF No. 197-4, PageID #6051.)  In this email, Ms. Buddenberg identified Mr. Budzik's actions at the hearing and in attempting to intimidate her into settling afterward as retaliatory.  (*Id.*)  She specifically called out being prevented from having a witness present for that discussion.  (*Id.*)  She told Ms. Livers that she asked to make a statement directly to the Board, but Mr. Budzik refused that request.  (*Id.*)

Further, Ms. Buddenberg advised Ms. Livers that, a few days earlier, on March 7, Mr. Weisdack reassigned some of her duties as fiscal coordinator to other employees.  (*Id.*; ECF No. 204-1, PageID #8872–73.)  Ms. Buddenberg testified that an unknown person deleted her voicemails without her knowledge or consent and that she also lost access to certain shared computer drives needed to do fiscal work.  (ECF No. 204-1, PageID #8864–66.)

### F.7.  Discipline (March 13, 2017)

On March 13, 2017, the Board reconvened to discuss Ms. Buddenberg's discipline.  (ECF No. 195-17, PageID #5154–55.)  Mr. Budzik was not present or consulted at this special meeting.  (*Id.*, PageID #5155; ECF No. 184-1, PageID #3059.)  All Board members except Mr. Gragg attended this meeting. (ECF No. 195-17,

PageID #5155; ECF No. 204-1, PageID #8875.)  After discussing the matter in executive session for about an hour, the Board returned to open session and, on the motion of Ms. Livers, voted 3-0 to discipline Ms. Buddenberg, suspending her without pay for three days.  (ECF No. 195-17, PageID #5155–56.)  The order of discipline also shows a reduction in pay and demotion to a clerical position and adoption of all but one of the findings proposed in the notice of disciplinary action (ECF No. 204-13, PageID #8990–92)—the one relating to Ms. Buddenberg's attendance at a meeting to seek budget revisions (ECF No. 195-19, PageID #5164), which she rebutted at the hearing (ECF No. 210-4, PageID #11336–37).  These disciplinary actions had the effect of reducing the value of her accrued sick leave and vacation time.  (ECF No. 31, ¶ 124, PageID #396; ECF No. 37, ¶ 86, PageID 467; ECF No. 195-14, PageID #5074.)

Mr. Weisdack and the Board members present for the special meeting on March 13, 2017 signed the disciplinary order (*id.*, PageID #8990), and Mr. Weisdack and the Board chair signed the findings, though he had missed the meeting (*id.*, PageID #8992).  Mr. Budzik drafted the disciplinary order.  (ECF No. 184-1, PageID #3059.)  The findings identified seven offenses, classified under the Board's policies as Group III offenses.  (ECF No. 195-19, PageID #5169–70.)  Group III offenses are "infractions which are of a very serious or possibly a criminal nature, and/or which cause a critical disruption to the organization in terms of decreased productivity, efficiency, and/or morale" and that, "if left undisciplined by a proper authority, may have a long lasting and serious adverse impact on the organization."  (ECF No. 194-14, PageID #5124; *see also* ECF No. 179-1, PageID #1743–44.)  On no prior

37

occasion had the Board signed off on disciplinary action against an employee other than the commissioner. (ECF No. 186-1, PageID #3438; ECF No. 188-1, PageID #3673.) Instead, Mr. Weisdack handled discipline. (ECF No. 195-14, PageID #5123.)

Three days later, on March 16, 2017, the order of discipline was hand-delivered to Ms. Buddenberg. (ECF No. 204-13, PageID #8990.) After receiving the order imposing discipline, Ms. Buddenberg had no further direct contact with Mr. Budzik. (ECF No. 203-1, PageID #8682.) Ms. Buddenberg had the right to appeal her demotion and suspension to the State Personnel Board of Review. (ECF No. 195-14, PageID #5134.) She filed an appeal (ECF No. 194-43, PageID #5966–67), but dropped that appeal in favor of proceeding with this lawsuit (ECF No. 208-2, PageID #10502).

### F.8. Reassignment

Although the disciplinary order directed that Ms. Buddenberg's new position would be in the personal health service division of the District (ECF No. 204-13, PageID #8990), Mr. Weisdack placed her in the environmental health division (ECF No. 194-12, PageID #4648; ECF No. 187-1, PageID #3619; ECF No. 31, ¶ 114, PageID #395; ECF No. 37, ¶ 79, PageID #466.) As a result, Ms. Buddenberg would work directly under Mr. Weisdack's administrative assistant. (ECF No. 187-1, PageID #3619; ECF No. 31, ¶ 114, PageID #395; ECF No. 37, ¶ 79, PageID #466.) At a later Board meeting, this reassignment was reported as occurring "[d]ue to budgetary constraints." (ECF No. 194-12, PageID #4648.)

On March 21, 2017, Ms. Buddenberg submitted a supplemental complaint to the EEOC reporting this reassignment as additional retaliation. (ECF No. 196-49, PageID #6006–09.) She appealed to the State Personnel Board of Review the same

day.  (ECF No. 31, ¶ 109, PageID #394; ECF No. 37, ¶ 75, PageID #465.)  On that same day, her demotion took effect, cutting Ms. Buddenberg's pay nearly in half. (ECF No. 195-23, PageID #5235–37.)

At a special Board meeting held on March 24, 2017, a new organization chart omitted the position of fiscal coordinator.  (ECF No. 194-12, PageID #4650.)  The Board adopted the reorganization reflected in that chart and approved a two-year contract for Mr. Weisdack at that same meeting.  (*Id.*, PageID #4649.)  When Mr. Weisdack presented the reorganization at a staff meeting, he indicated that his assistant, another clerk, and an independent contractor would perform the duties of the fiscal coordinator position.  (ECF No. 194-2, PageID #4584–85.)

On April 3, 2017, Ms. Buddenberg was notified of her new role following the reorganization.  (ECF No. 204-1, PageID #8885.)  In an email to Ms. Livers that same day, Ms. Buddenberg expressed concern that this reassignment was retaliatory. (ECF No. 196-51, PageID #6041.)  After learning this information, Ms. Buddenberg did not return to work.  Instead, she took unpaid leave from April 3, 2017 to May 26, 2017.  (ECF No. 204-17, PageID #9002; ECF No. 204-18, PageID #9003; ECF No. 204-1, PageID #8896–97.)

### F.9.   Resignation (May 27, 2017)

On May 27, 2017, Ms. Buddenberg resigned from her position at the District without working a day in her new role.  (ECF No. 194-4, PageID #4587–89, ECF No. 204-1, PageID #8896–97.)  She did work at the District for five days after receiving notice of her demotion on March 16, 2017 before it took effect on March 21. ECF No. 204-13, PageID #8990; ECF No. 195-19, PageID #5167.)  Ms. Buddenberg

testified that she could not return to work knowing she would be working under Mr. Weisdack's assistant.  (ECF No. 204-1, PageID #8897.)  She added that the personnel in the environmental health department treated her horribly.  (*Id.*)

In a resignation letter sent to the Board, Ms. Buddenberg noted that, as far as she was concerned, she had been fired.  (ECF No. 194-4, PageID #4589.)  She wrote that she "had no intention of leaving the organization and this is against my wishes." (*Id.*, PageID #4587.)  Because "conditions at [the District] have become so intolerable for me," Ms. Buddenberg said, "I feel I have no choice but to resign."  (*Id.*)  Since "bring[ing] serious concerns about Mr. Weisdack's ethical violations" to the Board "as a responsible citizen" on October 24, 2016, Ms. Buddenberg "lived in fear of Mr. Weisdack's retaliation and unprofessional actions," which "continued despite my efforts to correct them by reporting to the Board."  (*Id.*, PageID #4587–88.)  According to Ms. Buddenberg, the "unchecked retaliatory conduct has had a negative impact on my health and has created stress for both my family and me."  (*Id.*, PageID #4588.)  Ms. Buddenberg's ex-husband corroborated these effects the events at issue had on her.  (ECF No. 244-1, PageID #14081–83.)

Finally, the letter identifies the actions Ms. Buddenberg says are retaliatory, up to and including the reassignment to work under Mr. Weisdack's assistant.  (*Id.*, PageID #4588–89.)  Ms. Buddenberg concluded the letter by calling out the Board for allowing "Mr. Weisdack to continue in leadership despite knowing of his repeated intentional dishonest and unethical practices, and his retaliatory conduct."  (*Id.*, PageID #4589.)

In February 2018, Ms. Buddenberg began working at a new job. (ECF No. 203-1, PageID #8684–85.) Her starting salary exceeded her highest salary at the District. (*Compare id. with* ECF No. 195-23.)

## STATEMENT OF THE CASE

### A.     The EEOC and Commencement of This Litigation

On October 20, 2017, the District submitted its EEOC position statement. (*See* ECF No. 195-36.) In its position statement, the District asserted that most of the events leading to Ms. Buddenberg's discipline occurred between January 2017 and February 2017—five months after her initial report to the Board. (ECF No. 210-4, PageID #5284.) The District emphasized that the "impetus" of Ms. Buddenberg's discipline was her failure to complete the Ohio Department of Health Annual Financial Report and "resulted in all then existing disciplinary issues being addressed." (ECF No. 195-36, PageID #5284.) The District summarized the basis for each of Ms. Buddenberg's disciplinary charges. (ECF No. 195-36, PageID #5280–85.) Notably, the District said, "Ms. Buddenberg's statement that [Mix] was terminated was false and an appropriate basis for discipline." (ECF No. 195-36, PageID #5282.)

On January 25, 2018, Ms. Buddenberg received a right-to-sue letter from the EEOC. (ECF No. 213-2.) On March 6, 2018, Plaintiff filed suit in federal court, and the case was randomly assigned to Judge Polster (ECF No. 1.) Based on the events set forth above, Plaintiff brings various claims under federal and State law. Plaintiff's second amended complaint asserts nine causes of action against eight Defendants as follows:

| Count | Claim | Defendant(s) |
|---|---|---|
| 1 | Title VII Retaliation, 42 U.S.C. § 2000e-3(a) | District |
| 2 | Retaliation, Ohio Rev. Code § 4112.02 | District; Weisdack; Goergen, Whitright, Livers, and Gragg |
| 3 | Fair Labor Standards Act Retaliation, 29 U.S.C. § 215(A)(3) | District; Weisdack; Budzik; Goergen; Gragg; Livers; Whitright |
| 4 | Retaliation, Ohio Rev. Code § 4111.17(D) | District, Weisdack; Budzik; Goergen; Gragg; Livers; Whitright |
| 5 | First Amendment Retaliation, 42 U.S.C. § 1983 | District; Weisdack; Budzik; Goergen; Gragg; Livers; Whitright |
| 6 | Retaliation, Ohio Rev. Code §§ 2921.05 & 2307.60 | District; Weisdack; Budzik; Goergen; Gragg; Livers; Whitright |
| 7 | Intimidation Using False Writing, Ohio Rev. Code §§ 2921.03 & 2307.60 | Weisdack; Budzik |
| 8 | Interfering with Civil Rights, Ohio Rev. Code §§ 2921.45 & 2307.60 | Weisdack; Goergen; Gragg; Livers; Whitright |
| 9 | Aiding and Abetting Discrimination, Ohio Rev. Code §§ 4112.02(J) & 4112.99 | District; Weisdack; Budzik; Gragg; Livers; Whitright; Goergen; Wendell |

(ECF No. 31.)

### B.    Interlocutory Appeal to the Sixth Circuit

After Plaintiff filed suit, Mr. Budzik moved to dismiss the six claims brought against him.  (ECF No. 14.)  Also, the District Defendants moved for partial judgment on the pleadings on the claims in Counts 6 through 8 asserted against them.  (ECF No. 20.)  The Court denied the motions.  (ECF No. 38.)  In doing so, the Court determined that Mr. Budzik was not entitled to qualified immunity, at least at the

pleading stage before development of a sufficient factual record. (*Id.*, PageID #482–83.) Mr. Budzik appealed this ruling. (ECF No. 43.) On appeal, the Sixth Circuit affirmed. *Buddenberg v. Weisdack*, 939 F.3d 732, 742 (6th Cir. 2019).

### C.    Certification to the Ohio Supreme Court

In August 2018, the Court granted in part Defendants' motion to certify certain questions of State law to the Ohio Supreme Court. (ECF No. 49.) Specifically, the Court certified unsettled questions of State law regarding Plaintiff's claims in Counts 6, 7, and 8 asserting civil liability for criminal acts. The Court certified the following questions:

1.    Does O.R.C. § 2307.60's creation of a civil cause of action for injuries based on a "criminal act" require an underlying criminal conviction?

2.    Is a criminal conviction a condition precedent to a civil claim pursuant to O.R.C. § 2921.03?

(ECF No. 49, PageID #566.)

In July 2020, the Ohio Supreme Court ruled that a claim under Section 2307.60 does not require an underlying criminal conviction. *Buddenberg v. Weisdack*, 161 Ohio St. 3d 160, 2020-Ohio-3832, 161 N.E.3d 603, ¶¶ 13 & 14. Further, the Court held that the plain language of Section 2921.03 also does not require a criminal conviction as a prerequisite for civil liability. *Id.* at ¶ 18.

### D.    Discovery and Procedural History

In the early stages of the case, Judge Polster engaged the parties in settlement negotiations. (Minutes, July 2, 2018.) Following remand from the Sixth Circuit, he conducted a settlement conference and stayed discovery, except that the Court

ordered Mr. Budzik to make initial disclosures, directed the parties to serve third-party subpoenas, and ordered Defendants "to exchange assurances with Plaintiff regarding document preservation." (Minutes, Aug. 28, 2018.)

After the initial appeals, the case returned to active litigation, and the Court initially set a fact discovery cut-off of April 15, 2021. (Minutes, Aug. 19, 2020.) In doing so, Judge Polster strongly encouraged counsel and their clients to pursue settlement of the dispute. (*Id.*)

On December 15, 2020, the case was reassigned to the undersigned pursuant to General Order 2020-27, even though the case was not eligible for transfer because it had been filed more than two years earlier. At a preliminary status conference following reassignment, the Court vacated the operative schedule then actively managed the contentious and protracted discovery. (Minutes, Jan. 26, 2021.) As discovery proceeded, the parties agreed to extensions and changes to the discovery cut-off. (*See, e.g.*, Minutes, May 5, 2021; ECF No. 87 & ECF No. 94.) Following an unsuccessful private mediation, the Court set January 31, 2022 as the cut-off for fact discovery, other than issues relating to damages. (ECF No. 108; Minutes, Oct. 18, 2021).

On January 31, 2022, the date of the fact discovery cut-off, the parties raised various discovery disputes and issues with the Court. (ECF No. 130.) Notwithstanding the deadline for fact discovery, the parties requested that the Court remain available to resolve disputes as they completed discovery. (*Id.*, PageID #885–86.) Accordingly, the Court held a series of status conferences from March 2022

44

to December 2022 to address various issues. Without recounting all of these numerous issues and developments, two merit a mention and bear on the issues presently before the Court.

### D.1. Mr. Budzik, Privilege, and the Crime-Fraud Exception

One of the issues that Plaintiff raised on January 31, 2022 involved challenges to certain claims of privilege involving Mr. Budzik. (*Id*., PageID #885.) At a status conference on another issue a month later, the parties again raised issues regarding privilege involving Mr. Budzik in advance of his deposition, scheduled for March 2022. (Minutes, Feb. 24, 2022.) After Mr. Budzik's deposition, Plaintiff raised concerns about certain issues and claimed inconsistencies in Mr. Budzik's testimony. (Minutes, Mar. 22, 2022.) In response, the Court directed the parties to submit relevant excerpts of his testimony and errata for the Court's review. (*Id.*)

After reviewing relevant excerpts from Mr. Budzik's deposition and the errata, which disclosed for the first time, despite repeated previous denials, that he had received notice of Ms. Buddenberg's first EEOC charge, the Court ordered that Mr. Budzik was subject to further deposition and determined that it would go forward in the presence of the Court. (Minutes, Apr. 4, 2022.) In so ordering, the Court ruled on certain objections made at his deposition, sustaining many but overruling others. (ECF No. 133.) Further, at this deposition, the Court ruled that "Plaintiff is entitled to inquire into Mr. Budzik's errata and the basis for it." (Minutes, Apr. 4, 2022.) To facilitate completion of the deposition, including ruling on any and all objections, including questions of privilege, the Court ordered Mr. Budzik and his counsel to have

45

present at the deposition all "privilege logs, billing records, and other relevant documents." (*Id.*; *see also* ECF No. 133, PageID #899.)

That deposition proceeded on April 29, 2022. (*See generally* ECF No. 185-1.) Plaintiff's counsel questioned Mr. Budzik briefly about specific entries on the privilege logs, but otherwise focused on issues related to the merits of Plaintiff's claims and inconsistencies in his previous testimony. (*Id.*, PageID #3192–93 & #3201–02.)

In a joint status report filed a month after the deposition, Plaintiff raised several discovery issues. (ECF No. 140, PageID #932.)  She sought leave to issue subpoenas to Mr. Budzik's law firm, Mansour Gavin LPA, and his partner Jeffrey Embleton. (*Id.*, PageID #931.)  Also, Plaintiff requested that the Court conduct an *in camera* review of items listed on Mr. Budzik's privilege logs (which appear in the record at ECF No. 197-9 and ECF No. 197-10), based on the crime-fraud exception to the attorney-client privilege. (ECF No. 140, PageID #931.)  Defendants opposed both requests. (*Id.*, PageID #931–32.)

On June 7, 2022, the Court held a status conference and ordered Mr. Budzik to submit certain documents and transcripts identified in the joint status report for *in camera* review. (Minutes, June 8, 2022.)  On June 15, 2022, the Court resolved several of Ms. Buddenberg's discovery issues.  First, the Court found that the attorney-client privilege protected the documents submitted for *in camera* review and that the crime-fraud exception did not apply.  (ECF No. 142, PageID #937–38.) Second, the Court preemptively denied any future request for review of additional

46

items—whether privileged or not—because "discovery closed earlier [in 2022]," and Plaintiff had the opportunity to inquire into such issues during Mr. Budzik's deposition, over which the undersigned presided, on April 29, 2022.  (*Id*.)  Accordingly, "the record on this issue has been made."  (*Id*.)  Third, the Court denied Plaintiff's subpoena requests because she previously had "ample opportunity to pursue resolution of [her] issues using the formal tools of discovery."  (*Id*.)

Plaintiff continued to raise the issue, doing so next at a status conference on July 14, 2022.  (ECF No. 144, PageID #942.)  Plaintiff felt the issue "need[ed] to be dealt with by briefing."  (ECF No. 150, PageID #1089–90.)  And since Plaintiff finally had "the record as a whole," she could adequately address the issues.  (*Id.*, PageID #1090.)  Plaintiff's counsel verified that he had not attempted to meet and confer with Defendants' counsel to exhaust efforts to resolve the issue.  (*Id.*, PageID #1086.)  Accordingly, the Court directed Plaintiff's counsel to confer with defense counsel as Rule 37, Local Rule 37.1, and the Court's Civil Standing Order require.  (ECF No. 144, PageID #943–43.)

### D.2.  Spoliation Questions

After the close of fact discovery, but before the deadline for dispositive motions (ECF No. 141), Defendants raised questions regarding Ms. Buddenberg's spoliation of evidence.  At the status conference on March 23, 2022, Defendants "raised an issue regarding a late and incomplete production of documents after Plaintiff's deposition." (Minutes, Mar. 22, 2022.)  Those issues relate to certain electronically stored information, including text messages between Ms. Buddenberg and Mix, not previously produced.  Defendants represented that they were working through the

issues with Plaintiff.  In their joint status report in May 2022, the parties reported that they were working through these issues with their vendors.  (ECF No. 140, PageID #930–31.)  As a preliminary matter, the parties staked out competing views and interpretations of the evidence, which was still being analyzed.  (*Id.*)

On July 14, 2022, the Court held a status conference to discuss the potential spoliation issue.  (ECF No. 144, PageID #942.)  At this status conference, the Court discussed the record the parties needed yet to develop on the issue, ordered them to supplement their expert reports as needed to address it, and directed Plaintiff to serve third-party subpoenas to certain technology companies relevant to the investigation of the loss or destruction of electronically stored information.  (*Id.*)

### D.3.   Closing the Record on These Issues

On August 5, 2022, the Court held a status conference during which Plaintiff's counsel again raised the privilege issue and indicated that he was working through deposition transcripts.  (ECF No. 289, PageID #15548.)  When Defendants' counsel began to discuss additional development of the record relating to the potential spoliation issue, Plaintiff's counsel asserted that "my view is that discovery is closed." (*Id.*, PageID #15550.)  Further, Plaintiff's counsel argued that, if the Court allowed Defendants to issue new third-party subpoenas to support their spoliation allegations, he "would like to reopen discovery as to things we're interested in as well."  (*Id.*, PageID #15551–52.)

From this point on, in the interest of judicial economy, the Court proceeded on two tracks at the same time, directing the parties to brief dispositive motions and conducting evidentiary proceedings to conclude the spoliation issue.  (*See, e.g.*, ECF

No. 155; ECF No. 173.)  At a status conference on November 30, 2022, the Court discussed summary judgment briefing and a spoliation hearing.  (ECF No. 174, PageID #1523; ECF No. 293-1, PageID #15596.)  Plaintiff's counsel again raised questions about the question of privilege relating to certain materials belonging to Mr. Budzik.  (*Id.*)  The Court directed the parties to proceed with summary judgment, spoliation, and this privilege issue on "parallel tracks."  (ECF No. 174, PageID #1523; ECF No. 293-1, PageID #15596.)  The Court set January 24, 2023 as the deadline for dispositive motions.  (ECF No. 202, PageID #8457.)  All parties filed their motions for summary judgment on January 24, 2023.  (ECF No. 216 (Mr. Budzik); ECF No. 217 (District Defendants); ECF No. 221 (Plaintiff's Corrected Partial Motion for Summary Judgment).)

As the parties briefed summary judgment, the Court held an evidentiary hearing on spoliation over two days, March 8 and March 9, 2023.  (ECF No. 237; ECF No. 238.)  During the hearing, the parties discussed briefing schedules for summary judgment and spoliation.  (*Id.*, PageID #13346–51.)  Plaintiff's counsel did not seek to raise or file any remaining privilege issues.  (*See id.*)

Because of the evidentiary hearing and related briefing to close the spoliation issue, the parties requested—and the Court granted—extensions of various deadlines.  Summary judgment briefing finally closed on June 29, 2023.  (ECF No. 269.)  Even then, the parties sparred over Defendants' motion to strike (ECF No. 270) and notices of supplemental authority (ECF No. 271; ECF No. 272; ECF No. 277; ECF No. 278).  Defendants moved for sanctions against Ms. Buddenberg on

May 1, 2023.  (ECF No. 256), and the record closed on this issue at the end of July 2023.  (ECF No. 282.)

At that point, after briefing closed on both summary judgment and Defendants' motion for sanction based on alleged spoliation, Plaintiff moved on August 1, 2023 for discovery of materials and information within the crime-fraud exception to the attorney-client privilege.  (ECF No. 283.)  She requests that the Court compel production of "purportedly privileged materials and oral communications" or to "conduct an *in camera* review of such materials to assess the exception's applicability."  (*Id.*, PageID #15472.)  She seeks discovery of privileged communications between Embleton, Mr. Budzik, and all representatives of the District relating to herself or Mix.  (*Id.*, PageID #15453.)  Defendants jointly move to strike and oppose discovery of any privileged material.  (ECF No. 292.)

### E. Pending Motions

In short, the following motions are pending before the Court:

1. Mr. Budzik's motion for summary judgment (ECF No. 216);

2. The District Defendants' motion for summary judgment (ECF No. 217);

3. Plaintiff's motion for partial summary judgment as to specific elements of Counts 1, 2, 3, 4, 5, 8, and 9 (ECF No. 218; ECF No. 221; ECF No. 221-1);

4. Defendants' joint motion for sanctions (ECF No. 256);

5. The District Defendants' motion to strike improper summary judgment evidence (ECF No. 270);

50

6.   Plaintiff's motion for discovery of materials and information within the crime-fraud exception to attorney-client privilege (ECF No. 283); and

7.   Defendants' joint motion to strike or in the alternative opposition to Plaintiff's motion to compel discovery materials pursuant to the crime-fraud exception to the attorney-client privilege (ECF No. 292).

## THE RECORD ON SUMMARY JUDGMENT

Before turning to the merits of the parties' motions for summary judgment, the Court considers three issues regarding the record.  First, Ms. Buddenberg submitted substantive declarations in connection with summary judgment.  Second, Plaintiff filed two notices of supplemental authority after the close of summary judgment briefing.  Third, the District Defendants move to strike Plaintiff's experts as to them, leading to a dispute about the admissibility of their testimony.

### A.    Ms. Buddenberg's Declarations

In support of her partial motion for summary judgment, Plaintiff filed a supplemental declaration.  (ECF No. 214-1.)  By this point in time, Ms. Buddenberg had been deposed for some ten hours over two days.  (ECF No. 203-1; ECF No. 204-1.)  Plaintiff filed a second declaration after the District Defendants moved for sanctions and opposed Plaintiff's motion for partial summary judgment.  (ECF No. 257-1.)  In reply, Defendants urge the Court to disregard these declarations in considering the summary judgment record.  (ECF No. 267, PageID #14975–78.)

Self-serving affidavits alone will not create an issue of fact sufficient to survive summary judgment.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  The Court can strike or disregard an affidavit that "constitute[s] an attempt

51

to create a sham fact issue," *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908–09 (6th Cir. 2006), as well as any unsupported legal conclusions contained in an affidavit, *Sigmon v. Appalachian Coal Props.*, 400 F. App'x 43, 49 (6th Cir. 2010); Alan A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (4th ed. 2023).

### A.1.   Ms. Buddenberg's Declarations

Plaintiff relies extensively on her declaration executed on January 23, 2023 to establish that she raised specific issues to the Board during the October 2016 meeting.  (*See e.g.*, ECF No. 221, PageID #12040.)  For example, she states that she reported particular instances of Mr. Weisdack's mismanagement, such as "fail[ing] to implement procedures to ensure proper public-fund handling" and "ignor[ing] the employee health-and-safety committee's recommendations."  (*Id.*)  But the evidence on which Plaintiff relies to support these assertions, beyond Ms. Buddenberg's declaration, is deposition testimony in which a Board member was either unaware of the issue or did not dispute that she might have raised it.  (*Id.*)

Similarly, Plaintiff uses Ms. Buddenberg's declaration to explain how the environmental health division "refused to respond" to her requests for information.  (*Id.*, PageID #12051 (citing Ms. Buddenberg's declaration to support the fact that these retaliatory actions occurred and Mr. Weisdack's testimony that he was unaware of it).)  Again, the same pattern holds for Mr. Weisdack sitting "on her [leave] request for longer than he normally would."  (*Id.*, PageID #12054 (citing Ms. Buddenberg's declaration to explain Mr. Weisdack's behavior and Mr. Weisdack's deposition that he had no reason to dispute this fact).)

In her most recent declaration (ECF No. 257-1), Ms. Buddenberg clarified earlier testimony that she was "just doing my job" (and other similar statements)—key testimony on which Defendants rely in their summary judgment briefing.  In her declaration, Ms. Buddenberg says that such formulations were not about her actual job duties, but the "moral obligation she felt when working as an honest citizen in public service to report misconduct."  (*Id.*, PageID #14651.)  But this declaration contradicts other evidence in the record.  For example, in her draft ethics complaint, Ms. Buddenberg wrote that, by going to the Board, she was "following policy and performing the duties the residents and Board are paying me to provide."  (ECF No. 215-1, PageID #11806.)  She made similar statements in correspondence with the Board (ECF No. 215-1, PageID #11813–17), an email to Embleton (*id.*, PageID #11808), and in her deposition testimony (ECF No. 203-1, PageID #8505 & #8544).

After her first deposition, but before her second, Ms. Buddenberg also executed a declaration.  (ECF No. 210-3.)  In it, Ms. Buddenberg swears that she did not have time to retain counsel before the pre-disciplinary hearing on March 16, 2016, though she had attempted to do so.  (*Id.*, ¶ 3, PageID #11324.)  But this account conflicts with the transcript of that hearing.  During the hearing, Ms. Buddenberg disclosed that she had counsel by then.  (ECF No. 210-4, PageID #11333.)  Indeed, she responded to a question from Mr. Budzik by stating that she learned certain facts because supporting her retaliation claim because District employees provided them to her attorney.  (*Id.*)

In short, the record shows, and the Court finds, that Plaintiff's declarations contain multiple statements of fact that conflict with other evidence in the record on summary judgment.

### A.2. Application of the Sham Affidavit Rule

The Court rejects Plaintiff's use of declarations to attempt to create disputes of material fact that might affect the merits of a ruling on summary judgment. To the extent that other summary judgment evidence exists, including Plaintiff's deposition testimony, that evidence speaks for itself. Consequently, Plaintiff's previous statements will form the basis for the Court's ruling. *Holbrook v. Dumas*, 658 F. App'x 280, 288–89 (6th Cir. 2016) (cleaned up) (rejecting a fire chief's *post hoc* characterization of an email sent to employees as a "concerned citizen or friend" based on the factual record demonstrating that he spoke as a public official).

To illustrate application of this rule here, the Court uses two examples. First, Plaintiff relies on her declarations to establish the fact that she had come prepared to talk to the Board as a "private citizen" about the tire contract *and* the gender pay disparity issue. (See ECF No. 269, PageID #15048–49.) She argues that any contention that she spoke to the Board about the gender pay disparity at the Board's direction is "belied by [her] complete testimony." *Id.* (citing Ms. Buddenberg's declaration (ECF No. 257-1, PageID #14653).) Second, Plaintiff uses Ms. Buddenberg's most recent declaration to describe Mr. Budzik's "intimidating demeanor and condescending approach" as retaliatory. (ECF No. 257-1, PageID #14654; *see also* ECF No. 263, PageID #14885).

But the Court need not, and does not, rely on Ms. Buddenberg's declarations to consider the record on summary judgment, construed in favor of the non-moving party on the other's motion.   In the former example, the record shows that Ms. Buddenberg spoke to the Board to raise her concerns about the tire contract and then, when asked or prompted, raised the issue of the gender pay disparity.  (ECF No. 203-1, PageID #8537–42.)  As for the latter, the transcript of the pre-disciplinary hearing transcribes what was said, and the audio captures the tone, cadence, and vocal demeanor of the speakers.

Accordingly, Plaintiff cannot rely on these declarations to create a sham issue of fact to bolster her position on summary judgment.  *See Holbrook*, 658 F. App'x at 288–89.  The timing of the declarations, particularly the most recent one (ECF No. 257-1), betrays their true motivation.  In any event, the key issues before the Court present questions of law, not fact.  *See DeCrane v. Eckart*, 12 F.4th 586, 595–96 (6th Cir. 2021) (describing the determination whether a plaintiff speaks as a citizen or as an employee as a legal conclusion).  Those questions of law turn on a record construed in Plaintiff's favor on Defendants' motions for summary judgment.  With that procedural advantage, it is difficult to conceive of circumstances in which self-serving affidavits would not defeat summary judgment.  *See Aerel, S.R.L.*, 448 F.3d at 908 (quotation omitted). For this reason, the Court disregards Ms. Buddenberg's declarations, and the statement of facts set forth above contains no reference to them.

### B.    Supplemental Authority

After the close of summary judgment briefing, Plaintiff filed two notices of supplemental authority to support her opposition to Mr. Budzik's motion for

summary judgment.  (ECF No. 271; ECF No. 272.)  Mr. Budzik filed a response to each.  (ECF No. 277; ECF No. 278.)  The Court's Civil Standing Order allows parties to file a notice of supplemental authority "[i]f pertinent and significant authorities come to a party's attention after the party's brief has been filed."  Section 9.J.  But the Order should not be treated as an invitation to subvert page limitations and submit additional briefing.  *See In re Steinle*, 835 F. Supp. 2d 437, 433 (N.D. Ohio 2011) (noting that neither the Federal Rules of Civil Procedure nor the Northern District of Ohio's Local rules provide for a surreply as a matter of course).  A notice of supplemental authority "should be used sparingly and for new, controlling case law—not for recently discovered case law, nor for arguments which the parties did not think to make [earlier]."  *General Elec. Co. v. Latin Am. Imports, S.A.*, 187 F. Supp. 2d 748, 752 (W.D. Ky. 2001).

Plaintiff's first notice provides legal argument and discussion of a First Amendment case under Section 1983, *King v. Zamiara*, 680 F.3d 686 (6th Cir. 2012).  This case, decided eleven years before summary judgment briefing, is not newly discovered authority.  Nor was it recently discovered.  Indeed, Plaintiff relies on *King* in her reply brief.  (*See* ECF No. 269, PageID #15065 ("Defendants are liable if their actions are the proximate cause of the adverse actions.") (citing *King*, 680 F.3d at 695).)  Moreover, Mr. Budzik's motion for summary judgment and Plaintiff's reply and opposition each discuss *Poppy v. City of Willoughby Hills*, 96 F. App'x 292 (6th Cir. 2004).  (*See* ECF No. 216, PageID #11855–56; ECF No. 263, PageID #14907; ECF No. 269, PageID #15065.)  On remand following the Sixth Circuit's ruling in *King*,

56

the district court also discusses *Poppy*. *See King v. Zamiara*, No. 4:02-cv-141, 2009 WL 1067317, at *4 (W.D. Mich. 2009) (discussing *Poppy*, 96 F. App'x at 295). Even a cursory review of the cases that cite or discuss *Poppy* would reveal *King*.

Plaintiff's second notice of supplemental authority raises similar issues. Essentially, it copies and pastes portions of her reply. (ECF No. 269, PageID #15067.) This second notice provided a string citation to five unreported Sixth Circuit and district court opinions—each decided years before summary judgment briefing in this case even began. One case in the notice, *Ward v. Athens*, 187 F.3d 639 (6th Cir. 1999), does not appear in Plaintiff's reply. And it is the oldest case of them all. Even if Plaintiff did not previously know of *Ward* or discover it in her research, which strains credulity, three of the cases she string cites in her reply discuss *Ward*. *See Nailon v. University of Cincinnati*, 715 F. App'x 509, 516 (6th Cir. 2017); *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 530 (6th Cir. 2015); *McMillion v. Metropolitan Gov't of Nashville & Davidson Cnty.*, No. 3:10-cv-0229, 2011 WL 1100007, at *4 (M.D. Tenn. Mar. 22, 2011).

Plaintiff does not show good cause for further consideration of the additional legal arguments—that she largely already made—relying on cases she or Mr. Budzik previously cited. At best, Plaintiff's notices of supplemental authority stem from a desire to have the last word. At worst, they amount to efforts to evade the already generous (and extended) pages limits for summary judgment briefing. For these reasons, Plaintiff's notices of supplemental authority are not well taken. The Court

takes no notice of them or Mr. Buzdik's responses and does not consider them or the arguments made in them.

### C.    Experts

On July 14, 2022, Plaintiff timely disclosed her experts.  (ECF No. 148, PageID #949; *see also* ECF No. 140.)  In support of her summary judgment motion, Plaintiff proffers the testimony of two experts examining Mr. Budzik's role in Ms. Buddenberg's discipline:  William Leahy and Robert Wolff.  (ECF No. 209-2; ECF No. 210-2.)  She has a third expert, Michael Abouserhal, who opines on whether the District could have funded the fiscal coordinator position in its 2017 budget instead of eliminating it as part of a reorganization.  (ECF No. 148-3.)  In response, Mr. Budzik relies on an expert of his own (ECF No. 154-1), which Plaintiff rebuts through one of her previously disclosed experts (ECF No. 156-1).

The District Defendants, but not Carolyn Weisdack as the administrator of the estate of Robert Weisdack, move to strike Plaintiff's experts as to them.  (ECF No. 270.)  Plaintiff opposes the motion.  (ECF No. 273.)

### C.1.    Expert Opinions

No party has moved under Rule 104(a) for an order *in limine* precluding the testimony of any expert in whole or in part.  Under Rule 702 as now in effect, the Court need not "make a finding of reliability in the absence of objection."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  Therefore, the Court declines to do so *sua sponte*.  However, this does not mean that all opinions that the parties intend to present are admissible.  To tackle that question, the Court begins by summarizing the opinions of the experts that the parties proffer.

### C.1.a. William B. Leahy

William Leahy is an attorney, legal ethics consultant, and adjunct law professor. (ECF No. 209-2, PageID #10711.) He has been a litigator for over 30 years and has served as the ethics chair of two law firms—Thompson Hine and Buckingham, Doolittle & Burroughs—for a total of 15 years. (*Id.*, PageID #10711.) Since 2006, Mr. Leahy has advised law firms on conflicts and other ethical issues and testified as an expert legal ethical witness in several cases. (*Id.*, PageID #10712.) Also, he has served on the Ohio State Bar Association Grievance Committee. (*Id.*) Plaintiff retained Mr. Leahy to opine on the conduct of Mansour Gavin, and principally Mr. Budzik, under the Ohio Rules of Professional Conduct in its representation of the District in 2016 and 2017. (*Id.*)

Mr. Leahy opines that Mr. Budzik's law firm, Mansour Gavin, violated Rule 1.7(a)(2) of the Ohio Rules of Professional Conduct, which governs conflicts of interest. (*Id.*, PageID #10722.) Mr. Leahy views the District as "seeking outside counsel's objective, unbiased personnel policy audit" as "in effect, a different client" than the District "seeking legal assistance to summarily punish Ms. Buddenberg." (*Id.*)

Namely, Mr. Leahy distinguishes between Embleton's role in performing the audit and Mr. Budzik's role in Ms. Buddenberg's discipline. (*Id.*, PageID #10722–23.) He characterizes Mr. Budzik's role as "in effect, the prosecutor of a protected whistleblower." (*Id.*, PageID #10723.) Further, he sees Mr. Budzik's role as "conflicted diametrically with Embleton's role as an objective factfinder." (*Id.*, PageID #10723.) Mr. Leahy opines that "[e]thically" Embleton could not share information

he learned during his personnel audit with Mr. Budzik; and, conversely, Mr. Budzik could not adequately represent the District because he did not have the information that Embleton did.  (*Id.* PageID #10723.)  In this way, the firm at which the two lawyers work had an "irreconcilable and incurable" conflict."  (*Id.*)

Despite their ethical obligation to screen one another, Mr. Leahy sees evidence that a "cross-fertilization" of information between the two occurred, resulting in prejudice to Ms. Buddenberg.  (*Id.*)  Mr. Leahy bases his conclusion on communications listed on Mr. Budzik's privilege log bearing the names of both attorneys, several of which Embleton authored.  (*Id.*)  Obviously, Mr. Leahy does not know the specific content of those messages.  (*Id.*)  Further, Mr. Leahy stated that Ms. Buddenberg can testify that Mr. Budzik shared information during their off-the-record meeting that she originally shared in confidence with Embleton.  (*Id.*)

Because the conflict of one lawyer is attributed to others at the same firm, in Mr. Leahy's opinion, Embleton could not have punished Ms. Buddenberg given his role in the audit.  Therefore, Mr. Budzik could not either.  (*Id.*, PageID #10724.)  Further, Mr. Leahy sees Mr. Budzik acting not as a "chaperone" to Mr. Weisdack but as the Commissioner himself.  (*Id.*, PageID #10722 & #10724.)  "Budzik took control of the entire [disciplinary] process, becoming the principal rather than the advisor."  (*Id.*, PageID #10722.)  Because Mr. Budzik drafted the notice of discipline, conducted the hearing, and engaged in off-the-record conversations with Ms. Buddenberg, Mr. Leahy says that for all intents and purposes he "WAS the Geauga County Health Commissioner."  (*Id.*, PageID #10724.)

60

In addition to Rule 1.7(a)(2), Mr. Leahy opines that Mr. Budzik violated Rule 4.2 (governing communications with represented persons) and the District's policy manual by failing to inform Ms. Buddenberg that she was entitled to *legal* counsel at her hearing—advising only that she had a right to be *represented*.  (ECF *Id.*, PageID #10719 & #10725.)  Given the information Mr. Budzik received at the hearing, he should "have adjourned . . . and ceased any further communication with Ms. Buddenberg until she had retained counsel."  (*Id.*, PageID #10726.)

Finally, Mr. Leahy sees a violation of Rule 4.3, which imposes a duty on an attorney to correct an unrepresented person's misunderstanding about the lawyer's role in the matter because he failed explicitly to describe his role in the hearing as an adversary representing the interests of the District.  (*Id.*, PageID #10726.)  In violation of Rule 4.4(a), which prohibits using measures that have no substantial purpose but to harass or burden another, Mr. Leahy describes Mr. Budzik's conduct during the hearing as "unnecessarily aggressive, dismissive, and disrespectful."  (*Id.*, PageID #10726.)  But he does not include the audio of the pre-disciplinary hearing among the materials he reviewed.  (*Id.*, PageID #10713.)

### C.1.b. Robert M. Wolff

Robert Wolff is a retired lawyer who practiced labor and employment law for almost forty years, including as the managing partner at Duvin, Cahn & Hutton and Littler Mendelson.  (ECF No. 210-2, PageID #11285–86.)  He also served as the chief labor and employment counsel at the City of Cleveland.  (*Id.*)  Over the course of his career, he represented many public and private employers, including local governments.  (*Id.*, PageID #11286.)  Mr. Wolff opines that Mr. Budzik became an

active participant in retaliation either intentionally or through willful blindness.  (*Id.*, PageID #11316.)  He spends considerable time in his report evaluating the merits of Ms. Buddenberg's retaliation claims.  (*Id.*, PageID #11307–16.)  When discussing the role of Mr. Budzik, Mr. Wolff concludes that, although the District retained Mr. Budzik as legal counsel, his role was more "business than legal."  (*Id.*, PageID #11307.)

Mr. Wolff opines that Mr. Budzik ignored Ms. Buddenberg's reports of retaliation and participated in retaliatory conduct against Ms. Buddenberg.  (*Id.*, PageID #11309.)  Even a cursory investigation into Ms. Buddenberg's claims would have shown Mr. Budzik that "Ms. Buddenberg already had a prima facie case of discrimination."  (*Id.*, PageID #11309.)  Instead, "Mr. Budzik acted like an offensive lineman doing whatever necessary to protect his quarterback's scheme to retaliate." (*Id.*)

Further, Mr. Wolff opines that Ms. Buddenberg's disciplinary charges "present a hornbook example of pretext."  (*Id.*, PageID #11310.)  "Mr. Budzik's conduct was simply not within the bounds of appropriate lawyering."  (*Id.*, PageID #11314.)  In addition to drafting the "grossly pretextual" disciplinary charges, he "removed his lawyer hat" and became a partner in punishing Ms. Buddenberg for reporting concerns to the Board by running the pre-disciplinary hearing, ignoring exculpatory evidence, and actively participating in later adverse job actions.  (*Id.*)  In effect, in Mr. Wolff's opinion, Mr. Budzik became "an active and direct agent of unlawful retaliation."  (*Id.*, PageID #11314.)  Mr. Wolff concludes by stating that, in his "forty-

plus years of practice," he has "never seen an evidentiary record of retaliation as compelling and troubling as what befell Rebecca Buddenberg." (*Id.*, PageID #11316.) Instead of advising the Board that Mr. Weisdack acted illegally, Mr. Budzik facilitated or ignored the conduct "and in so doing became an active partner in Weisdack's and the Board's retaliation against Ms. Buddenberg." (*Id.*)

### C.1.c. Michael Abouserhal

Ms. Buddenberg retained Mr. Abouserhal to prepare an expert financial report to determine whether the District could have funded Ms. Buddenberg's position as fiscal coordinator position within its 2017 budget. (ECF No. 148-3, PageID #1013.) Mr. Abouserhal is an inactive certified public accountant and has served in various financial roles for various governmental entities for nearly forty years. (*Id.*, PageID #1019.)

No party cites Mr. Abouserhal's report or opinions in any brief, but Mr. Wolff relies on it in his expert report. (ECF No. 210-2, PageID #11287 & #11305.) Mr. Abouserhal opines, to a reasonable degree of professional certainty, that the District did not have budgetary constraints necessitating the elimination of Ms. Buddenberg's fiscal coordinator position in 2017. (ECF No. 148-3, PageID #1014.) He bases this conclusion on an analysis of the District's 2017 unencumbered cash balance, general fund expenditures, savings from attrition, and carryover funds identified in the District's annual financial report. (ECF No. 148-3, PageID #1014–16.)

Relying on Mr. Abouserhal's findings, Mr. Wolff opines that the District's budgetary explanation for eliminating the position of fiscal coordinator was a pretext

for retaliation. (ECF No. 210-2, PageID #11313.) Further, he states that Mr. Budzik was involved in eliminating Ms. Buddenberg's fiscal coordinator position because there were five entries on a privilege log between Mr. Budzik, Mr. Weisdack, and other Board members around the time the District abolished the position. (*Id.*, PageID #11305 & #11313.) As a result of eliminating the position, if Ms. Buddenberg succeeded in appealing her discipline and subsequent demotion, she would have had no position to which to return. (*Id.*, PageID #11313.)

### C.1.d. Mr. Budzik's Expert and Plaintiff's Rebuttal

In the interest of providing a working description of the expert opinions in the record on summary judgment, the Court summarizes the opinions of Mr. Budzik's expert and Plaintiff's rebuttal, even though they are not the subject of a motion.

### C.1.d.i. R. Todd Hunt (Mr. Budzik's Expert)

Mr. Budzik proffers the opinions of Todd Hunt, a partner at Walter Haverfield. (ECF No. 154-1, PageID #1107.) Mr. Hunt has practiced law in the public sector and as in-house and outside counsel for nearly 40 years. (*Id.*, PageID #1107.) He has extensive experience representing public-sector clients through civil service disciplinary matters, personnel disputes, and other litigation. (*Id.*, PageID #1108.)

Mr. Hunt offers three opinions: (1) Mr. Budzik acted within the applicable standard of care and the duties he owed to the District; (2) the District made the decision to discipline Ms. Buddenberg—not Mr. Budzik, who lacked the authority to discipline or alter the terms and conditions of her employment; and (3) Mr. Budzik complied with his ethical obligations and the rules of professional conduct in representing the District. (*Id.*, PageID #1108–09.) Additionally, he offers opinions

on Mr. Budzik's role in conducting the pre-disciplinary hearing.  (*Id.*, PageID #1117.)
He had "no obligation or authority to halt" the hearing because of Ms. Buddenberg's
retaliation claims—the Board could have still disciplined Ms. Buddenberg for any
workplace policy violations.  (*Id.*)  Further, during the hearing, in Mr. Hunt's opinion,
Mr. Budzik played a ministerial role at the hearing that did not exceed his role as
counsel.  (*Id.*, PageID #1118.)  Finally, Mr. Hunt opines that the hearing complied
with the legal requirements for a pre-deprivation hearing.  (*Id.*, PageID #1119
(discussing *Loudermill v. Cleveland Bd. of Educ.*, 470 U.S. 532 (1985).)

Mr. Hunt addresses two other matters.  First, as to advising Ms. Buddenberg
of her right to legal counsel, Mr. Hunt opines that, while the District's personnel
manual uses the phrase "legal representation," "any reasonably intelligent person
would determine the term 'representation' . . . mean[t] "legal representation."  (*Id.*,
PageID #1119.)  Second, he explains at length his opinion that Mr. Budzik complied
with his ethical obligations and the rules of professional conduct.  (*Id.*, PageID
#1126–30.)  Specifically, Mr. Hunt sees no conflict of interest between the roles of
Embleton and Mr. Budzik in representing the District. (*Id.*, PageID #1126.)  He
concludes that their roles were "clearly separated in time and substance," and "each
engagement was entirely different."  (*Id.*)  For this reason, there was no material
impairment of Mr. Budzik's ability to "consider, recommend, or carry out an
appropriate course of action for the District" in violation of Rule 1.7(a)(2).  (*Id.*,
PageID #1127 (cleaned up).)

### C.1.d.ii. Plaintiff's Rebuttal (by Mr. Leahy)

In rebuttal, Plaintiff offered a second report by William Leahy. (ECF No. 156-1.) Mr. Leahy challenges Mr. Hunt's qualifications to opine on legal ethics, stating that "[p]racticing law, or even litigating cases for many years, alone does not qualify one as a legal ethics expert." (*Id.*, PageID #1135.) Beyond that, Mr. Leahy reiterates the facts and conclusions from his initial report and again opines that Mr. Budzik violated the Ohio Rules of Professional Conduct. (*Id.*, PageID #145–46.)

### C.2. Motion to Strike

As against them, the District Defendants (other than the estate of Mr. Weisdack) move to strike the opinions of Mr. Leahy and Mr. Wolff. (ECF No. 270.) In support of their motion, they advance two arguments. First, they contend that Plaintiff "did not comply with Civil Rule 26(a)(2)(B) et seq before offering expert opinions against these Defendants." (*Id.*, PageID #15074.) But the record refutes this claim. Plaintiff timely disclosed these experts and their reports.

### C.2.a. Scope of the Opinions Offered

Second, the District Defendants rely on statements and representations at the depositions of Mr. Leahy and Mr. Wolff. In setting out their assignments in this case, each expert reports an engagement limited to opining about Mr. Budzik. Mr. Leahy states that he was retained "to analyze and evaluate the conduct of Mansour Gavin LPA ("Mansour"), principally Counsel James Budzik." (ECF No. 209-2, PageID #10712.) Similarly, Mr. Wolff reports that he was engaged "to opine, on behalf of Plaintiff Rebecca Buddenberg, regarding the role played by James Budzik, an attorney retained by the Geauga County Health District in January 2017

to advise the Board on certain personnel and disciplinary matters involving Rebecca Buddenberg and her former supervisor Dan Mix."  (ECF No. 210-2, PageID #11285.)

At their depositions, Plaintiff's counsel objected to any questioning by counsel other than Mr. Budzik's counsel "because the opinion is offered against Mr. Budzik and Mr. Budzik alone."  (ECF No. 209-1, PageID #10602; ECF No. 210-1, PageID #11087 (substantially similar).)  Each expert agreed that he had no opinion against any party other than Mr. Budzik.  (ECF No. 209-1, PageID #10607; ECF No. 210-1, PageID #11103.)

In opposition, Plaintiff urges denial of the motion to strike "because the passing references to Robert M. Wolff's and William B. Leahy's expert reports and testimony [in Plaintiff's summary judgment briefing], while not crucial, are relevant to the summary-judgment arguments."  (ECF No. 273, PageID #15084.)  Regarding the objections at the experts' depositions, Plaintiff argues that counsel for the District Defendants proceeded to question each witness.  (Id., PageID #15089.)

The District Defendants filed their motion largely in response to the Court's decision to enforce the expert disclosure requirements on the spoliation issue.  (ECF No. 237, PageID #13102–04.)  Besides the Defendants' complaints about compliance with Rule 26, Plaintiff timely disclosed the reports to all Defendants.  (ECF No. 148, PageID #949 (Plaintiff's expert reports tendered on July 14, 2022).)  The District Defendants were aware of each expert's opinions and the extent to which each expert referenced the District well before summary judgment briefing began.  Neither Mr. Budzik's counsel nor counsel for Mr. Weisdack's estate objected to these reports.

67

As Plaintiff points out, the District Defendants' counsel had an opportunity to depose each expert.   (ECF No. 273, PageID #15089.)

Given the nature of the allegations against Mr. Budzik, it is difficult if not impossible to separate each expert's opinions and strictly limit their application only to him, particularly in the present procedural posture.   Indeed, both the District Defendants' and Mr. Budzik incorporate by reference their respective summary judgment motions.   (*See* ECF No. 258, PageID #14686; ECF No. 268-3, PageID #15022.)   For these reasons, the Court **DENIES** the District Defendants' motion to strike.  (ECF No. 270.)

### C.2.b. Opinions of Experts on the Law

Summary judgment ultimately depends on admissible evidence.   *See North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997); *cf.* Fed. R. Civ. P. 56(c)(2).   The Court has the authority to address preliminary questions of admissibility for evidence.   *See* Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175–78 (1987).   Rule 704 makes clear that expert testimony is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704.   But the Rule does *not* allow experts to opine broadly on the legal issues in dispute.   There is an important difference between admissible expert testimony "that suggest[s] the answer to the ultimate issue or that give[s] the jury all the information from which it can draw inferences as to the ultimate issue" and inadmissible expert testimony on the "ultimate question of liability."  *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (recognizing that Rule 704 does not admit expert testimony on whether police conduct amounts to deliberate indifference

because it embraces the ultimate legal question of liability, not subsidiary issues suggesting the answer to that question).  As an obvious example, an expert may opine that the DNA on a murder weapon belongs to the defendant, but may not opine that that fact proves the defendant's guilt.  Put another way, an expert may not invade the province of the court by conveying or expressing legal standards or terminology to the jury.  *See Torres v. County of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985).

In *Torres*, the Sixth Circuit concluded that a question posed to an expert which asked whether the plaintiff had been discriminated against because of her national origin was improper because the question "track[ed] almost verbatim the language of the applicable statute," and the term "discrimination" had a specialized meaning in the law not commonly understood in its lay use.  *Id.*; *see also Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 592–93 (6th Cir. 2014) (upholding exclusion of an expert report that "reads as a legal brief").  In contrast, expert testimony on the standard of care a professional must exercise in carrying out his obligations may be admissible, so long as the other prerequisites of Rule 702 and the disclosure obligations of Rule 26 are satisfied.  *See, e.g.*, *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019); *see also McGowan v. Cooper Indus. Inc.*, 863 F.2d 1266, 1272–73 (6th Cir. 1988) (noting the admissibility of expert testimony regarding custom and practice within an industry).

Applying these principles here, the bulk of the opinions proffered by the lawyers retained as experts cross the line into impermissible expert testimony.  As an initial matter, the parties largely use their experts as mouthpieces to reiterate

69

their legal arguments and to amplify their briefing on the ultimate legal questions at issue. For example, Mr. Wolff's report repeatedly uses the terms "retaliation," "discrimination," and "pretext" to describe Mr. Budzik's conduct and role. (*See* ECF No. 210-2, PageID #11309–16.) Relying on the report of financial expert Mr. Abouserhal (ECF No. 148-3), Mr. Wolff opines that the District's budgetary explanation for eliminating the fiscal coordinator position was "pretextual." (ECF No. 210-2, PageID #11305 & 11313.) Similarly, Mr. Budzik's expert recounts case law on retaliation and applies it to the facts of the case. (*See* ECF No. 154-1, PageID #1121–22.)

Instead of providing testimony on issues that would allow a reasonable juror to apply the Court's instructions to find that Ms. Buddenberg suffered from discriminatory retaliation or not, the experts do battle as lawyers do. They offer opinions to argue their competing conclusions of liability or not using specialized legal terminology, *Torres*, 758 F.2d at 151, based on their arguments about and interpretations of the applicable legal standards, *Babb*, 942 F.3d at 317. No matter how "uniquely experienced" each expert might be in his respective field, "he is not qualified to compete with the judge in the function of instructing the jury." *Berry*, 25 F.3d at 1354 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992)). Nor is such testimony helpful for the jury within the meaning of Rule 702. *See Woods*, 110 F.3d at 1220–21.

Therefore, on summary judgment, the Court disregards the opinions of the lawyers offered as experts to the extent that they merely restate their understanding

70

of the record and offer competing opinions on whether the District or Mr. Budzik participated in or facilitated discriminatory retaliation. *Id.* at 1353. Overall, these legal conclusions disguised as expert opinions do "little more than tell the jury what result to reach." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997). Moreover, the parties may not create or defeat an issue of fact for trial simply by retaining experts to make their legal arguments disguised as opinions to be offered to a jury. However, these experts may opine on the standard of care applicable to a lawyer in Mr. Budzik's shoes and testify about industry customs and practices and whether the relevant parties acted according to those practices. *Babb*, 942 F.3d at 317–18; *McGowan*, 863 F.2d at 1272–73.

As a final clarifying note, the Court will consider Mr. Abouserhal's expert report in its entirety but disregard Mr. Wolff's interpretation of the findings as leading to a conclusion of pretext.

## ORAL ARGUMENT

Plaintiff requests oral argument on her motion for summary judgment under the Court's Civil Standing Order, which provides for argument as of right when a party certifies that a younger lawyer will present the argument. (ECF No. 221, PageID #12023.) After that certification, the younger lawyer Plaintiff certified would present argument changed firms (*see* ECF No. 225), and Plaintiff withdrew her request for oral argument under the Court's Civil Standing Order (ECF No. 295).

After careful review of the summary-judgment record, the Court exercises its discretion not to hold oral argument. As summarized above, during pretrial

management of this case, the Court held numerous status conferences and hearings on and off the record that provided it with ample familiarity with the parties' respective claims and defenses and their competing views of the facts. Further, the parties' briefs adequately frame the issues for review. And after the hearing on Defendants' motion for sanctions, the Court afforded the parties supplemental briefing to address the matters raised. On this record, the Court finds that ruling without oral argument better serves the interest of judicial economy.

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must then "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson*, 477 U.S. at 250).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts."

72

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court, instead, determines "whether the evidence presents a sufficient disagreement to require submission to a jury" or whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.  In doing so, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgement is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250).  If the evidence, however, "is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.*  The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Anderson, 477 U.S. at 247–48).

"Just as plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.*  (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).

## I. Federal Claims

Plaintiff argues that the prior rulings in this case constrain the Court's inquiry on summary judgment on several "core retaliation issues" as the "law of the case." (ECF No. 221, PageID #12066 n.2 & #12069; ECF No. 269, PageID #15046–47.) Namely, Plaintiff relies on the Sixth Circuit's conclusion in its ruling on Mr. Budzik's interlocutory appeal from the denial of qualified immunity that the First Amendment protects Ms. Buddenberg's speech. (ECF No. 221, PageID #12069 & #12072 (citing *Buddenberg*, 939 F.3d at 739–40).) Further, she points to the Sixth Circuit's ruling that Mr. Budzik was not entitled to qualified immunity and that he took adverse employment action against her. (ECF No. 221, PageID #12075 (citing *Buddenberg*, 939 F.3d at 737, 740).) Also, Plaintiff relies on the Court's ruling that she pled "sufficient facts [in her complaint] to allege that Mr. Budzik was a state actor." (ECF No. 263, PageID #14903 (quoting *Buddenberg*, 2018 WL 3159052, at *4).)

74

The law-of-the-case doctrine precludes a court "from reexamining an issue previously decided by the same court, or a higher court in the same case." *Bowling v. Pfizer, Inc.*, 132 F.3d 1147, 1150 (6th Cir. 1998) (citation omitted). This doctrine is a "prudential practice" rather than a binding rule of substantive law. *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015). "[T]he doctrine merely directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618 (1983) (internal quotations omitted).

A judgment denying a motion to dismiss "does not establish the law of the case for the purposes of summary judgment, when the complaint has been supplemented by discovery." *McKenzie v. BellSouth Telecomms.*, 219 F.3d 508, 513 (6th Cir. 2000) (affirming a subsequent grant of a summary judgment for the defendants under the former *qui tam* whistleblower statute after the Sixth Circuit had previously reversed dismissal under Rule 12(b)(6)). In fact, the Sixth Circuit has "held that the law of the case doctrine does not apply to earlier proceedings where a different legal standard governs." *In re B & P Baird Holdings, Inc.*, 759 F. App'x 468, 477–78 (6th Cir. 2019).

Moreover, a decision on qualified immunity is generally more appropriate at summary judgment rather than on a motion to dismiss given the fact-intensive nature of the inquiry. *See Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (collecting cases). Therefore, a district court may reconsider the applicability of qualified immunity at summary judgment after an initial interlocutory appeal based on a motion to dismiss. *See Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (allowing two interlocutory appeals for qualified immunity from denials of both a motion to

dismiss and summary judgment because "the legally relevant factors bearing" on the determination "will be different on summary judgment rather than on an earlier motion to dismiss"); *see also Buddenberg*, 939 F.3d at 742 ("Budzik is therefore not entitled to qualified immunity *at this phase of the litigation*.") (emphasis added); *Buddenberg*, 2018 WL 3159052 at *4 (finding the qualified immunity determination too premature at the motion to dismiss stage and indicating that it may be raised later if Defendants can "develop[] a factual record to support it").

In the prior decisions, the Court and the Sixth Circuit repeatedly acknowledged that the ruling were based only on the facts alleged.  *See Buddenberg*, 939 F.3d at 738–41; *Buddenberg*, 2018 WL 3159052 at *2, *4.  In the intervening time between the Sixth Circuit's decision and the summary-judgment briefing, the parties engaged in substantial discovery.  This discovery proved some facts alleged in Plaintiff's second amended complaint but also surfaced others that were not pled or not previously known and, therefore, unaccounted for in the rulings made at the pleading stage.  In this procedural posture, then, where the record remains materially unchanged such that the evidentiary record supports the determination made at the pleading stage, the Court applies the law of the case doctrine.  But where discovery supplements the allegations of the pleadings, the law-of-the-case doctrine does not bar the Court's consideration on summary judgment of issues decided at the motion to dismiss stage.  *McKenzie*, 219 F.3d at 513.

### I.A.   First Amendment Retaliation (Count 5)

In certain circumstances, the First Amendment protects the right of a public employee to speak as a citizen on matters of public concern.  *Garcetti*, 547 U.S. at 417.

76

Because government employees often have the best position to know "what ails the agencies for which they work," there is "considerable value" in protecting their speech. *Lane v. Franks*, 573 U.S. 228, 236 (2014) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion)). But the speech of public employees does not receive absolute protection. While public employees do not forfeit all their First Amendment rights by taking public employment, an employer has a competing and strong countervailing interest in the efficient operation of its workplace, which after all discharge duties imposed by law that presumably serve the public interest. *Id.* Therefore, a government worker cannot "constitutionalize the employee grievance." *Connick*, 461 U.S. at 154.

Analyzing such claims involves a three-step inquiry to determine whether the plaintiff engaged in protected speech. *See Connick*, 461 U.S. at 144–54; *Garcetti*, 547 U.S. at 421; *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). If a plaintiff did not engage in protected speech, her First Amendment retaliation claim fails as a "pure" matter of law. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462–464 (6th Cir. 2017). Although these questions might appear to present questions of fact, or at least mixed questions of law and fact, the Sixth Circuit consistently holds that "the protected status of an employee's conduct" presents "solely [a question] of law." *Id.* (collecting cases). In most cases, however, questions regarding the protected status of speech involve no material disputes of fact. *See, e.g., Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011); *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 351 (6th Cir. 2010) ("Even if the question were purely a question of fact

. . . the district court properly granted summary judgment because the factual record presents no genuine issue for trial."). But the parties dispute nearly all factual questions and legal issues in this case, complicating the task here.

### I.A.1. Matter of Public Concern

The Court begins by examining whether the employee's "speech may be fairly characterized as constituting speech on a matter of public concern." *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995) (internal citations and quotations omitted). The framework for deciding whether speech relates to a matter of public concern is "not well defined." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). An individual's motives for speaking are not dispositive on the issue. *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 527 (6th Cir. 2015). A public employee might have self-serving motives (or high-minded ones), but whatever her motives the focus remains on the employee's speech itself. *Mosholder v. Barnhardt*, 679 F.3d 443, 450 (6th Cir. 2012) (quoting *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 575 (6th Cir. 1997)). But banal workplace disputes resulting in "the quintessential employee beef: [that] management has acted incompetently" are not entitled to First Amendment protection. *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 1988).

To determine whether Plaintiff spoke as a matter of public concern, the Court looks to the "content, form, and context of [her] statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. Speech involves a matter of public concern where it can be "fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is

a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241.  Matters of public concern differ from "those only of private interest," and speech that exposes "governmental inefficienc[ies], mismanagement, or misappropriation 'of public money are matters of considerable public significance.'" *Stinebaugh*, 630 F. App'x at 527 (quoting *Garcetti*, 547 U.S. at 425).  Matters of public concern typically include allegations of corruption, government mismanagement, misconduct, and discrimination.  *Kirkland v. City of Maryville, Tenn.*, 54 F.4th 901, 908 (6th Cir. 2022).

Picking up on the distinction between matters of public and private interest, Defendants argue that this case presents a prototypical example of a run-of-the-mill workplace dispute between an employee and her boss that does not present any matter of public concern within the meaning of the First Amendment.  Plaintiff responds that she reported matters of public concern to the Board, including a conflict of interest, sex-based pay disparities, instances of Mr. Weisdack's maladministration and severe mistreatment and abuse of her and other employees, and retaliation. Further, she maintains that Defendants concede this issue, citing the deposition testimony of Mr. Weisdack and various Board members agreeing that these issues constitute matters of public concern.  (*See* ECF 180-1, PageID #2037–38, #2117, #2122 & #2152–53; ECF No. 179-1, PageID #1590–91, #1593–99 & #1605; ECF No. 186-1, PageID #3282 & #3286–87; ECF No. 188-1, PageID #3689–90, #3696 & #3701–03; ECF No. 189-1, PageID #4003–04, #4008–10 & #4012–16.)

As a threshold matter, whether speech involves a matter of public concern presents a question of law. *Connick*, 461 U.S. at 148 n.7; *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543 (6th Cir. 2012) (citing *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008)); *Bonnell v. Lorenzo*, 241 F.3d 800, 809–10 (6th Cir. 2001). Therefore, the testimony and concessions on which Plaintiff relies do not ultimately determine whether Ms. Buddenberg spoke on matters of public concern. Indeed, such testimony is not admissible. *See Torres*, 758 F.2d at 151.

### I.A.1.a. Pay Disparity, Self-Dealing, and Retaliation

Taking the subjects of Ms. Buddenberg's statements to the Board on sex-based pay disparity, the tire contract, and retaliation on their face, the record as a whole leaves little doubt that she spoke on matters of public concern. *See Whitney v. City of Milan*, 677 F.3d 292, 297 (6th Cir. 2012) (allegation of discrimination is a matter of public concern); *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007) (allegation of possible corruption is a matter of public concern); *Bonnell*, 241 F.3d at 817 (allegation of retaliation is a matter of public concern). In this respect, the record bears out Plaintiff's allegations and the conclusion the Sixth Circuit previously reached. *Buddenberg*, 939 F.3d at 739.

### I.A.1.b. Mismanagement

Defendants counter that Plaintiff's personal motivation for reporting to the Board predominates over any interest she had as a member of the public regarding these topics; therefore, her speech does not touch on a matter of public concern. But a public employee's mixed or even selfish motives are not the focus of the analysis. *Kirkland*, 54 F.4th at 908 (holding that a police officer's social media post accusing a

80

sheriff of sex discrimination and political retribution presents a matter of public concern, despite their "long contentious personal history" that might have motivated the speech). What the employee says matters, not why she said it. *Mosholder*, 679 F.3d at 450; *Chappel*, 131 F.3d at 575. To be sure, at times the Sixth Circuit treats an employee's self-interest as removing the speech from the umbrella of addressing a matter of public concern. *See, e.g.*, *Naghtin v. Montague Fire Dist. Bd.*, 674 F. App'x 475, 479–81 (6th Cir. 2016) (holding that a fire chief's statements did not touch on a matter of public concern in part because of the personal benefits he stood to gain by speaking). Such circumstances tend to arise where an employee speaks about morale or internal office politics. *Id.* (collecting cases).

In that respect, Ms. Buddenberg's report of general mismanagement presents a different question. Mere allegations of managerial incompetence or other internal personnel issues do not touch on matters of public concern. *See, e.g.*, *id.*; *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988). "The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 148. Perhaps mismanagement, abuse of employees, or similar matters might be so pervasive or extreme as to rise to the level of a public concern. If so, the generalized grievances Ms. Buddenberg raised fall short of such a standard, even construing the record on summary judgment in her favor.

Plainly, Ms. Buddenberg held Mr. Weisdack in contempt and thought the District would operate more efficiently and provide better services to the public without him. Most of the operational concerns she reported to the Board related to

internal policy decisions Mr. Weisdack made about how to run the District.  These sorts of complaints, even if justified and meritorious, fall outside the protections of the First Amendment.  *See Barnes*, 848 F.2d at 735; *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 414 (6th Cir. 1994) (holding that an employee's press release, complaining about new leadership and other internal office policy, constituted an unprotected "employee grievance").

### I.A.2.  Pursuant to Plaintiff's Job Duties

Next, the Court determines whether the employee spoke as a private citizen and not pursuant to her official job duties.  *Haddad v. Gregg*, 910 F.3d 237, 244 (6th Cir. 2018) (quoting *Mayhew*, 856 F.3d at 462).  The Supreme Court has not "articulate[d] a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  *Garcetti*, 547 U.S. at 424.  Instead, "the proper inquiry is a practical one," *id.*, but still a question of law, *see Mayhew*, 856 F.3d at 462–63 (rejecting argument that job duties presents a mixed question of fact and law); *Fox*, 605 F.3d at 350 (collecting cases).

Both the context and content of the speech matter.  *Fox*, 605 F.3d at 348.  In *Garcetti*, 547 U.S. at 421, the Supreme Court defined speech made "pursuant to" a public employee's job duties as "speech that owes its existence to a public employee's professional responsibilities."  There, this inquiry was straightforward because the plaintiff admitted that his speech was part of his official job duties.  *Id.* at 424.  But most cases, including this one, are not so simple.  Knowledge acquired through public employment does not automatically remove speech from the protections of the First Amendment.  *Lane*, 573 U.S. at 240.  Instead, the issue is whether the employee

speaks pursuant to one's job duties or "merely relay[s] information he learned while on the job in a way that did not affect his duties." *DeWyse v. Federspiel*, 831 F. App'x 759, 762 (6th Cir. 2020) (quoting *Fledderjohann v. Celina City Sch. Bd. of Educ.*, 825 F. App'x 289, 294 (6th Cir. 2020)).

*Garcetti* cautions against construing a public employee's job duties too narrowly, underscoring that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." 547 U.S. at 424–25. Therefore, "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 425. Even *ad hoc* duties can fall within an employee's responsibilities for purposes of determining whether the First Amendment protects her speech. *Davidson v. Arlington Cmty. Sch. Bd. of Educ.*, 847 F. App'x 304, 309 (6th Cir. 2021) (citations omitted).

Under the law of this Circuit, an employee's speech that does not enjoy First Amendment protection receives a narrow construction and is limited to "speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015). Making that determination requires consideration of several factors from a non-exhaustive list, including the goals the speaker sought to advance, whether the speech occurred on the clock or in the workplace, the audience, and its general subject matter. *See, e.g., DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021). In a case such as this, where there is room

for serious debate whether a public employee spoke pursuant to her job duties, the Court is left with an inherently difficult task given the intense fact-specific inquiry needed to answer this legal question. *See Garcetti*, 547 U.S. at 424–25. In doing so, the Court applies the summary judgment standard, construing the record in favor the non-moving party on each cross-motion.

### I.A.2.a. Plaintiff's Job Description and Motivation

Defendants argue that Ms. Buddenberg spoke pursuant to her job duties, motivated by her animosity toward Mr. Weisdack. Plaintiff responds that her job description did not include reporting misconduct to the Board and contends that the public interest compelled her speech, namely her concern as a tax-paying citizen for the proper functioning of the District. Without question, the record establishes that none of Ms. Buddenberg's official job duties explicitly included reporting misconduct to the Board. Also, it leaves little doubt that Ms. Buddenberg performed duties differing from those on her official job description. But these facts do not end the inquiry. As *Garcetti* makes clear, job duties alone do not determine the capacity in which a public employee speaks. Rather, the inquiry is more involved and requires consideration of the broader motivation and context of the speech. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007).

In *Haynes*, 474 F.3d at 361, for example, a police officer was terminated after he complained to his supervisor about cutbacks to a canine training program the officer helped administer. In response to the cutbacks, the police officer wrote a memo expressing his discontent and wrapped his equipment in wrapping paper, attaching a note that read, "Do not open until Christmas"—two actions the officer was not

obligated to perform.  *See id.* at 360–61.  Nonetheless, the Sixth Circuit held that the officer wrote the memo pursuant to his job duties—not because the officer's job description required him to complain to supervisors, but because the complaints arose out of his day-to-day duties as a police officer.  *Id.* at 364.

### I.A.2.a.i. Arising from Job Duties

Like the police officer in *Haynes*, Ms. Buddenberg's reports about the tire contract arose from her day-to-day activities.  In her role as fiscal coordinator, Ms. Buddenberg handled workers' compensation.  (ECF No. 203-1 PageID #8496.) Also, she had responsibility for payments to contractors.  (*Id.*, PageID #8503–04.) Without a formal contract in place for the tire clean up, she would not have been able to fulfill this job responsibility.  (*Id.*, PageID #8566–67.)  In her letter to the Board after the meeting, she stated that she feared discipline had she *not* reported this issue.  (ECF No. 215-1, Page ID #11806.)

If assumed for purposes of summary judgment, rightly or wrongly, that Ms. Buddenberg had no obligation to report misconduct (in the form of a self-dealing contract), the record establishes that she learned about the tire contract through her job duties, and at least its procedural propriety affected the day-to-day performance of her job.  Without a proper contract, she could not authorize payment.  Here, her report "bore all the markers of official action."  *Henderson v. City of Flint*, 751 F. App'x 618, 622 (6th Cir. 2020).

For the gender-pay disparity, the record presents a closer call. Ms. Buddenberg testified that she learned of the issue internally from several individuals, including the female employee and her supervisor.  (ECF No. 203-1,

PageID #8527–29.)   These individuals likely approached Plaintiff because she managed payroll and could verify such a disparity, but also because they expected a sympathetic audience.   Defendants point out that Ms. Buddenberg raised this issue only after she reported the tire contract and the Board asked whether she had any other concerns to raise.   Setting aside the fact that it appears this episode was likely contrived, the Board asked Ms. Buddenberg to provide information about additional grievances—arguably placing her in a position to speak outside the specific issue regarding the tire contract that prompted her report to the Board in the first place. Still, Ms. Buddenberg's speech about the pay disparity and other matters involving Mr. Weisdack's conduct and management arose out of her work as his direct subordinate.  *See Davidson*, 847 F. App'x at 309.  But a public employee may speak outside her job duties even where her knowledge arises pursuant to her job duties. *Lane*, 573 U.S. at 240.

On Defendants' motion for summary judgment, the Court construes the record in favor of Plaintiff and assumes that the Board's invitation to Ms. Buddenberg to speak to matters other than the tire contract took her report outside her job duties, even if her knowledge arose entirely from her work.   Additionally, Ms. Buddenberg's speech on the gender pay disparity does not entirely relate to her job duties. Accordingly, in the Court's view, the procedural posture dictates the conclusion that Ms. Buddenberg spoke, at least arguably, outside of her job duties on the gender pay issue.   With respect to the gender pay disparity, this conclusion reflects the Sixth

86

Circuit's prior conclusion that this report was outside her job duties.  *See Buddenberg*, 939 F.3d at 740.

### I.A.2.a.ii. Moral Obligation

To argue that Plaintiff's speech does not receive protection under the First Amendment, Defendants rely on Ms. Buddenberg's contemporaneous statements in text messages, her draft ethics complaint, and correspondence with the Board that, when she reported to the Board, she was "just doing [her] job."  (ECF No. 205-5, PageID #9366; *see also, e.g.*, ECF No. 195-35, PageID #5275.)  As with the District Defendants' position regarding matters of public concern, the term "pursuant to a public employee's job duties" has a "separate and distinct specialized meaning in the law different from that present in the vernacular."  *Torres*, 758 F.2d at 151 (citing *United States v. Hearst*, 563 F.2d 1331, 1351 (9th Cir. 1977)).  Therefore, the evidence on which Defendants rely is not dispositive on the question whether Ms. Buddenberg spoke pursuant to her job duties.  Indeed, in the current procedural posture construed in Plaintiff's favor, Ms. Buddenberg's statements receive a more colloquial meaning that any citizen in her position would do the same or that she was not undertaking a supererogatory action.

For her part, Plaintiff encourages the Court to construe her speech more broadly—divorced from reference to her job—and on the basis that she spoke on a matter of public concern.  (*See* ECF No. 269, PageID #15047–50 & 15059–62.)  But speaking on a matter of public concern does not take an employee's speech outside of her job duties.  *See Garcetti*, 547 U.S. at 423.

87

Also, Plaintiff emphasizes that because she had not previously reported misconduct to the Board, her speech must lie outside the scope of her job duties. But she provides no authority for this proposition. To the contrary, while "Plaintiff's mission may have been motivated by [her] perceived public interest purpose," "however laudable, Plaintiff's quest" does not remove her reports from the scope of her job duties. *Haddad v. Gregg*, 910 F.3d 237, 249–50 (6th Cir. 2018). Good intentions alone do not shortcut the legal analysis. Because *ad hoc* or *de facto* duties can fall under an employee's official responsibilities, the fact that October 24, 2016 was the first time Ms. Buddenberg made a report to the Board does not compel the conclusion that she spoke as a citizen, *see Mayhew*, 856 F.3d at 465; *Davidson*, 847 F. App'x at 309, particularly because she raised concerns about Mr. Weisdack as the Commissioner.

Additionally, Plaintiff argues that her motivations in speaking to the Board stemmed from her sense of moral obligation—not from her duties as the District's fiscal coordinator. (ECF No. 203-1, PageID #8538–42.) But both can be true at the same time. Ms. Buddenberg could have worried about the ethics, propriety, or appearance of the tire contract, the pay disparity issue, or retaliation, and reporting such misconduct still could fall within her job responsibilities. In the richness of the human experience, people often act with mixed motivations.

### I.A.2.b. Setting and Audience of the Speech

Defendants argue that the setting and audience of Ms. Buddenberg's speech show that she spoke pursuant to her job duties. (ECF No. 217, PageID #11924–25.) Plaintiff's initial report to the Board was made on-the-clock during an executive

88

session.  This factor makes the speech more likely to be unprotected, "speech as a government agent" as compared to protected citizen-speech.  *DeCrane*, 12 F.4th at 596.  On the other hand, the Board determines when it meets and cannot transform the speech of a citizen who happens also to be a public employee into work-related speech simply by holding its meetings during the business day.  And, as discussed, Ms. Buddenberg raised the gender pay disparity at the Board's invitation to step outside her official duties.

Also, Defendants argue that Ms. Buddenberg merely went up the chain of command with her reports of misconduct.  Plaintiff maintains that her reports of retaliation circumvented the chain of command and that it was unusual to report directly to the Board—in fact the Board had not previously convened to interface directly with another employee besides the commissioner.  (ECF No. 188-1 PageID #3682.)  Recently, the Sixth Circuit noted that "internal escalations of concerns or grievances . . . directly relat[ing] to or otherwise concern[ing] an employee's day-to-day activities" suggest that an employee spoke pursuant to her job duties instead of as a private citizen.  *Ashford v. University of Michigan*, ___ F.4th ___, ___, 2024 WL 94275, at *7 (6th Cir. Jan. 9, 2024) (citing *Mayhew*, 856 F.3d at 464–65; *Haynes*, 474 F.3d at 364).

Here, there can be no dispute that the audience of Plaintiff's speech was her supervisors and the Board.  Plaintiff raised the gender pay disparity with Mr. Weisdack five months before speaking to the Board.  For the tire contract, Plaintiff testified that she had discussed it with Mix before reporting to the Board.

(ECF No. 203-1, PageID #8520–21.)  Before going to the Board with a complaint of retaliation, Ms. Buddenberg communicated with Mix, her supervisor.  On October 25, 2016, Mix and Ms. Buddenberg spoke about her treatment from other employees following her report to the Board the day before.  (ECF No. 208-2, PageID #10432.)  In Mix's declaration, he attested that they communicated about her safety following the October 2016 Board meeting given Mr. Weisdack's "volatile" temper.  (ECF No. 194-5, PageID #4594.)  Also, he recounted the "cold treatment from her co-workers" following Ms. Buddenberg's initial report to the Board.  (*Id.*)

Additionally, Defendants argue that reporting to the Board does not go outside the chain of command because Ms. Buddenberg followed the District's grievance procedures.  (ECF No. 258, PageID #14672.)  The policy instructs employees to bring their grievances to the Board if their supervisors and the Commissioner do not adequately address the problem.  (*See* ECF No. 215-1, PageID #11809–10.)  In response, Plaintiff argues that this procedure does not apply to her speech because her speech was not a "grievance" under the manual.  (ECF No. 269, PageID #15050–51.)  On this point, the District's grievance procedures contain an ambiguity.  Unlike in *Mayhew*, for example, where the employee was required to report to management, 856 F.3d at 464–65, here, the District's policies are silent on an employee's obligation when reporting the workplace misconduct of the Commissioner, who otherwise has responsibility for all such reports and discipline.  (ECF No. 195-14, PageID #5135.)

On its face, the policy contemplates a supervisor or the Commissioner being available for purposes of raising an issue or complaint, with the Board serving an appellate function if an employee finds the Commissioner's resolution of an issue unsatisfactory—a different circumstance than reporting to the Board in the first instance because the Commissioner is the source of the complaint or grievance.

In the current procedural posture, there are material questions regarding whether and how the policy would apply to a complaint or grievance against the Commissioner. Therefore, the Court cannot say, when construing the record in Plaintiff's favor (even though she spoke to her supervisor and the Board), that the setting or audience of Ms. Buddenberg's speech removes her report about the gender pay disparity or complaints of retaliation to the Board and individual Board members from the protections of the First Amendment.

### I.A.2.c. Practical Inquiry

When it comes to Plaintiff's motion for summary judgment, Defendants might be right that Ms. Buddenberg spoke to the Board pursuant to her job duties. *Garcetti* instructs that this inquiry must be a "practical" one. 547 U.S. at 424. That practical view might well regard Ms. Buddenberg as speaking pursuant to her job duties for at least two reasons.

*First*, Plaintiff provides no evidence and makes no argument that her speech or its subjects was ever relayed to anyone outside the District or any member of the public more broadly. Plaintiff did not speak to a broader audience than her supervisor or the Board. Instead, she spoke on the gender pay disparity during an executive session and brought her claims of retaliation to Board members

91

individually and the Board privately—conduct not typical for ordinary citizens speaking on matters of public concern.

Plaintiff argues that *Haynes* supports her position because the Sixth Circuit emphasized there that the police officer spoke "solely to his superior" in its determination that he spoke pursuant to his job duties. (ECF No. 269, PageID #15051–52); *Haynes*, 474 F.3d at 364. While Ms. Buddenberg did "go above and beyond her immediate superior" in reporting misconduct (ECF No. 269, PageID #15052), she attributes too much weight to this detail. Where courts find that an employee spoke as a private citizen in this context, usually, the employee directed her speech to a third party or spoke with a broader audience in mind. Such was the case in the recent *Ashford* ruling where a university police officer did not speak pursuant to his job duties where he voiced concerns to a journalist about the department's handling of a sexual assault investigation. *Ashford*, 2024 WL 94275, at *7–8; *see also Aquilina v. Wriggelsworth*, 759 F. App'x 340, 346 (6th Cir. 2018) (holding that a judge engaged in speech as a citizen where she allowed a reporter to view an assault captured on video by courtroom surveillance, because the reporter's involvement implied an eventual public audience); *Westmoreland*, 662 F.3d at 719–20 (holding that a fire-rescue diver's speech enjoyed First Amendment protection because it occurred while he was off-duty, out-of-uniform, and at a public city council meeting even though it concerned policies within his department). Admittedly, the question here is close. But these considerations suggest that Ms. Buddenberg spoke as an employee. *Garcetti*, 547 U.S. at 423 (describing "communications between . . .

government employees and their superiors in the course of official business" as unprotected); *Aquilina*, 759 F. App'x at 345 (describing speech having an "ultimate [public] audience" as falling outside of an employee's job duties).

*Second*, by comparison to Richard Ceballos, the prosecutor in *Garcetti*, Ms. Buddenberg spoke pursuant to her job duties. As a deputy district attorney for the Los Angeles County District Attorney's Office, Ceballos served as a professional with independent obligations of disclosure and candor to the judiciary. Ceballos's speech concerned what he thought to be serious misrepresentations in an *ex parte* affidavit for a search warrant. *Garcetti*, 547 U.S. at 414. Although Ceballos had independent obligations as an attorney, and notwithstanding the *ex parte* nature of the underlying proceeding, the Supreme Court concluded that his supervisors had a "heightened interest in controlling [his] speech" because Ceballos did not speak as a citizen when he raised concerns about the criminal case. *Id.*

In contrast, Ms. Buddenberg operated in a largely administrative position in a county health department. She concedes that she was not a policy maker—she did not exercise much independent discretion or authority. (ECF No. 221, PageID #12036.) Her daily responsibilities included assisting with financial work and budgeting, processing payroll and accounts payable, and coordinating employee benefits. (ECF No. 194-38; ECF No. 180-1, PageID #1980.) On average, these activities carry less significance than a prosecutor's obligations in the administration of justice within another branch of government.

93

None of this is to denigrate Ms. Buddenberg or to imply that her role has any less importance than that of any other government employee. But by comparison, it is difficult to see how she spoke as a citizen if Ceballos did not on the facts presented in *Garcetti*. Taking a practical view of Ms. Buddenberg's statements in light of their setting, audience, and subject matter, her speech "owes its existence to her professional responsibilities" at the District. *Weisbarth*, 499 F.3d at 544 (quoting *Garcetti*, 547 U.S. at 421–22). Therefore, her speech is not protected by the First Amendment and her claim fails as a matter of law. *See id.* "To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Garcetti*, 547 U.S. at 423.

*    *    *

In the present procedural posture, on Defendants' motions for summary judgment, the Court assumes but does not decide that Ms. Buddenberg spoke as a citizen, not pursuant to her job duties, when reporting to the Board on the gender pay disparity and her claims on retaliation. On Plaintiff's motion for summary judgment, construing the facts in favor of Defendants, the Court determines that Ms. Buddenberg spoke pursuant to her job duties such that her speech is not entitled to the protections of the First Amendment. In short, on Plaintiff's motion only, considering the facts and circumstances presented, the First Amendment does not "shield[]" her from discipline and there need not be a "delicate balancing" of her interests in addressing matters of public concern and the District's interests as an employer. *Garcetti*, 547 U.S. at 423–24.

94

### I.A.3. *Pickering* Balancing

But because of the closeness of the question whether Ms. Buddenberg spoke pursuant to her job duties, and because that determination might depend on the procedural posture, the Court undertakes the balancing the Supreme Court articulated in *Pickering* and its progeny to determine whether the employee's interest in "commenting on matters of public concern" outweighs the employer's interests "in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568. Defendants maintain that they had an adequate justification to discipline Ms. Buddenberg because she disrupted the efficient operation of the District. Plaintiff counters that the District has no legitimate interest that outweighs her interest in reporting official misconduct.

### I.A.3.a. Degree of Protection for Speech

The analysis begins "by determining the degree of protection the speech warrants, *i.e.*, the level of importance the speech has in the community." *Bennett v. Metropolitan Gov't of Nashville & Davidson Cnty., Tenn.*, 977 F.3d 530, 538 (6th Cir. 2020). The value of an employee's speech can range from very limited to expression occupying "the highest rung" of protection. *See id.* In *Bennett*, the Sixth Circuit held that the public would have little interest in a racial slur that an employee of a municipal police department posted on social media. *Id.* at 538–39. The court contrasted the employee's post with instances where governmental employees might "expos[e] the innerworkings of government organizations to the public," *id.* at 539—speech arguably enjoying greater protection, *see, e.g.*, *See*, 502 F.3d at 493 (collecting cases) (describing a patrol officer's statement to the FBI exposing possible corruption

95

in the police department as "exactly the type of statements that demand strong First Amendment protections").

Here, Ms. Buddenberg's speech falls somewhere between the social media post in *Bennett* and the patrol officer's statements to federal investigators in *See*, but closer to the latter. Although Ms. Buddenberg did not speak on political or policy matters that lie at the core of the First Amendment's protections, without question, speaking about official misconduct favors the employee's side of the balance. *Lane*, 573 U.S. at 242); *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986). Ms. Buddenberg's report of a gender pay disparity and later of retaliation for making that report address matters of public concern that the law protects. Although Ms. Buddenberg did not report either publicly, at a public Board meeting or to the press as the public's representative, that fact does not alter the *character* of the issues on which she spoke.

All the facts and circumstances in the record on summary judgment, construed in favor of Plaintiff, confirm the importance of Ms. Buddenberg's speech and the degree of protection it receives here. In making this determination, the Court weighs the balance in favor of Plaintiff and disregards any mixed motivations Ms. Buddenberg might have had in going to the Board. In doing so, the Court recognizes that the legitimate interests of the government outweigh the employee's interest in disruptive speech made in furtherance of a "personal vendetta" where public concern is "clearly subordinate." *McMurphy v. City of Flushing*, 802 F.2d 191, 197–98 (6th Cir. 1986). But the parties contest Ms. Buddenberg's motivations, so in

96

the current procedural posture the Court gives her the benefit of the doubt even though a speaker's motivation matters for purposes of *Pickering* balancing.  *See id.*

### I.A.3.b. The District's Interests

Plaintiff primarily relies on the content of her speech to argue that the government has no interest in restricting it.  Specifically, she maintains that the District has an equal interest in "revealing [Mr.] Weisdack's wrongdoing and wanting a properly functioning organization."  (ECF No. 221, PageID #12073.)  In this view, the character of Ms. Buddenberg's speech on matters of public concern outweighs any countervailing interest or motivation for her speech, as the Sixth Circuit previously held.  *Buddenberg*, 939 F.3d at 740.

But Plaintiff's position sweeps too broadly.  Factually, by reporting to the Board, the proper authority with responsibility for oversight of the District, Ms. Buddenberg evinced a recognition that the governmental employer has interests at stake as well.  Legally, Plaintiff cites several cases for the proposition that a speaker's motivation is immaterial for the *Pickering* analysis.  (ECF No. 269, PageID #15060–62.)  However, the cases on which she relies address the relevance of the speaker's motivation in determining whether speech involves a matter of public concern—not its weight in the *Pickering* balancing.  In one, for example, the Sixth Circuit noted that "consistent with the 'content' test of *Connick*, the pertinent question [in the public concern analysis] is not *why* the employee spoke, but *what* he said . . . ."  *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004).  In another, the court distinguished these inquiries: "[O]ur duty [under the public concern analysis prong] is not to discern her underlying motivation, but rather to evaluate her point as it is

presented in the speech." *Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003) (citing *Chappel*, 131 F.3d at 575–76).

This distinction matters because speech might involve a matter of public concern—notwithstanding a speaker's motivations—and still fail under *Pickering*. *See Farhat*, 370 F.3d at 594. In the *Pickering* balance, the Court need not consider Plaintiff's speech "in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Accordingly, an employee's right to comment on matters of public concern is not absolute to the point of compromising the government's interest in "harmony among coworkers," maintaining "close working relationships for which personal loyalty and confidence are necessary," or "the regular operation of the enterprise." *Id.* at 388; *see also Connick*, 461 U.S. at 150.

Here, the record demonstrates that Defendants had real and substantial interests in disciplining Ms. Buddenberg. In addition to those outlined to and by the Board (ECF No. 195-19; ECF No. 204-13), the District has a legitimate interest in maintaining a workplace capable of discharging its public duties effectively and efficiently through its regular operations. Although Ms. Buddenberg raised matters of public concern, by December 2016, the District took steps to address the pay disparity (ECF No. 180-1, PageID #2073–74; ECF No. 197-42, PageID #6784) and hired outside counsel to investigate Ms. Buddenberg's concerns about Mr. Weisdack that she raised during her initial report to the Board (ECF No. 195-1, PageID# 4876; ECF No. 195-2, PageID #4878; ECF No. 196-47, PageID #5995).

Moreover, without question, Ms. Buddenberg and Mr. Weisdack had their personal issues—even before her report to the Board.  Ms. Buddenberg spoke "after a persistent dispute between [her and Mr. Weisdack] over office . . . policy." *Connick*, 431 U.S. at 154.  In this respect, her reports to the Board regarding his conduct threatened his authority, and the Board was within its rights to side with Mr. Weisdack—rightly or wrongly—particularly in the face of several instances of serious misconduct by Ms. Buddenberg.  Among other things, she had personnel files (hers and Mix's) in her office without authorization and acted insubordinately toward Mr. Weisdack in front of other District employees.  (ECF No. 204-13, PageID #8991.)

The timing of Plaintiff's speech bears on the inquiry too.  Ms. Buddenberg learned about the gender pay disparity some five months before she brought it to the Board.  Plaintiff thought it was "appropriate" finally to raise it when she had an opportunity to address other aspects of Mr. Weisdack's conduct—namely, the tire contract.  (ECF No. 203-1, PageID #8483, #8508, #8521–22 & #8541–42.)  She claimed that the "[t]iming on these tires was perfect"—because the issue came to a head as Mr. Weisdack's contract was up for renewal.  (ECF No. 205-5, PageID #9366.)  Plaintiff acted in no small part to prevent the rehiring of Mr. Weisdack, perhaps out of a good-faith belief that the District would be better off without his leadership.  Unlike the police officer in *Ashford* though, this is not a case where Ms. Buddenberg spoke publicly about policy or other matters that brought to light the inner workings of government.  2024 WL 94275, at *7–8.  Instead, she raised personnel matters, admittedly important ones of public concern, within the meaning of the First

Amendment, where the government's interests as an employer are at or near their strongest. *See Lane*, 573 U.S. at 236.

Two remaining points merit a brief mention.

*First*, Plaintiff places great weight on her February 1, 2017 email about Mix's separation from the District. (ECF No. 194-29, PageID #4759.)  In that email, which ran more than six paragraphs, Ms. Buddenberg characterized the end of Mix's employment as a "dismissal" one time and as a resignation another. (*Id.*)  In response, Defendants inexplicably place even greater emphasis on what they argue is the falsity of that statement. (*See, e.g.*, ECF No. 217, PageID #11917; ECF No. 258, PageID #14684.)  In the most technical sense, Defendants might be right—Mix "resigned" from his position at the District. (ECF No. 215-1, PageID #4664.)  Factually, the circumstances of his resignation make clear that he resigned rather than be fired.  In any event, Ms. Buddenberg is entitled to her commonsense opinion that Mix was "dismissed."  Procedurally, construing the facts in favor of Plaintiff, she is entitled to an inference that her opinion, expressed in the workplace, contrary to the official position of the District motivated her discipline at least to some degree.  In any event, she is entitled to her opinion that Mix was fired—notwithstanding the technical label the District used.  Indeed, reasonable minds might disagree about whether he resigned or was fired as a practical matter.

On a different set of facts, where this email provided the only basis for discipline, Plaintiff's interests in speaking might arguably outweigh any countervailing interest on the part of the employer in maintaining an efficient

100

workplace.  In that scenario, as Plaintiff describes it, the Defendants "side of the *Pickering* scale [would be] entirely empty."  (ECF No. 221, PageID #12073 (citing *Buddenberg*, 939 F.3d at 740).)  But that is not the record presented on summary judgment.  Ms. Buddenberg engaged in other instances of serious misconduct that independently warranted discipline—separate and apart from her reports to the Board or the contested email.  For example, she improperly stored personnel files in her office (ECF No. 210-4, PageID #11349–51 & #11356) and was insubordinate when raising her voice at Mr. Weisdack in front of other District employees (*id.*, PageID #11329).   And other less egregious charges support discipline based on Ms. Buddenberg's admissions at the hearing.  (*See id.*, PageID #11331–33, #11343, #11361 & #11369.)   Notwithstanding Defendants' insistence on this email as a justification for Ms. Buddenberg's discipline, these other instances of misconduct tip the *Pickering* balance against Plaintiff.

*Second*, Plaintiff maintains that Defendants have not met their burden in demonstrating the disruptiveness of her speech.  (ECF No. 269, PageID #15063–64.)  But the District did not have to wait for "events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest." *Connick*, 614 U.S. at 152.  Indeed, Mr. Weisdack was aware of the plan that Mix and Ms. Buddenberg had to try to remove him from his position.  (ECF No. 215-1, PageID #11804.)   Even where an employee speaks on a matter of public concern, a governmental employer's reasonable predictions of disruption receive substantial weight. *Gillis v. Miller*, 845 F.3d 677, 686 (6th Cir. 2017) (quoting *Waters*, 511 U.S.

at 673–74 (plurality opinion)).  Actual disruption is not necessary.  But the record shows at least the early stages of insubordination and other misconduct on the part of Ms. Buddenberg that would prompt the District to reasonably act to protect its interests as an employer.  After all, she undermined the Commissioner's authority in front of other employees and had personnel files in her office without authorization. Such actions could reasonably disrupt operations at the District.  *See McMurphy*, 802 F.2d at 198.

On balance, Plaintiff attempts to "constitutionalize [her] employee grievance"—which the law does not allow, regardless of the merits of her grievance. *Connick*, 461 U.S. at 154.  Nor does subjecting the balance of Plaintiff's speech—on the self-dealing tire contract or even Mr. Weisdack's overbearing, intimidating, and harassing management style—to the *Pickering* balance alter this conclusion.  In the end, Ms. Buddenberg's interests in speaking as she did on all these matters does not outweigh the District's interests as an employer and those of its Board.  In its broader context, based on the record construed in Plaintiff's favor on summary judgment, Ms. Buddenberg's speech reflects an unprotected internal personnel dispute and "touch[es] upon matters of public concern in only a most limited sense." *Connick*, 461 U.S. at 152–54.  "Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id*. at 151. For all these reasons, Plaintiff's First Amendment retaliation claim fails as a matter of law.

102

### I.A.4. Remaining Issues

To resolve the parties' cross-motions for summary judgment on Plaintiff's First Amendment retaliation claim, the Court addresses two remaining loose ends.

### I.A.4.a. Plaintiff's *Monell* Claim

On a theory that Mr. Weisdack, the Board, and Mr. Budzik ratified illegal actions against her, Plaintiff brings a claim against the District under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  She argues that the District failed to train Mr. Weisdack and that the District had a custom of tolerating "serial civil-rights violations over seven months against" her.  (ECF No. 221, PageID #12078–80.)  Defendants argue that Plaintiff's *Monell* claim fails because there is no underlying constitutional violation or any pattern of past constitutional violations.

"*Monell* holds that municipalities may be liable for the constitutional violations of their employees only where the municipality's policy or custom led to the violation." *Roberston v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Monell*, 436 U.S. at 694–95).  A plaintiff can demonstrate that a municipality had a policy, practice, or custom that caused the constitutional violation under *Monell* in four different ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Plaintiff's conclusory arguments that Defendants had a custom or practice of violating her civil rights over time or failed to train Mr. Weisdack doubles as a First

Amendment claim against the District.  *See id.*  But there can be no *Monell* liability without an underlying constitutional violation.  *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2020).  Here, because Plaintiff cannot establish her First Amendment retaliation claim as a matter of law, there can be no municipality liability under any of these theories.  *Id.*  "If a person has suffered no constitutional injury at the hands of [an individual officer], the fact that departmental regulations might have *authorized* [unconstitutional conduct to occur] is quite beside the point.*"  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  For these reasons, that claim fails too.

### I.A.4.b. First Amendment Claim Against Mr. Budzik

Plaintiff's inclusion of Mr. Budzik as a Defendant presents additional issues that bear on summary judgment.  As it relates to Plaintiff's First Amendment claim, the parties disagree about Mr. Budzik's role (ECF No. 216-3, PageID #11834; ECF No. 259, PageID #14709–10; ECF No. 263, PageID #14857–60), and the record fails to resolve the matter definitively.  In the current procedural posture, the Court construes the record in Plaintiff's favor in this regard and adopts Plaintiff's factual characterization:  "Budzik went from chaperone to standing in Weisdack's shoes." (ECF No. 263, PageID #14858.)  In this regard, Plaintiff argues that Mr. Budzik became a State actor based on a nexus theory where the private party's conduct is "fairly attributable to the state."  (*Id.*, PageID #14901–06 (citing *Lindsey v. Detroit Ent., LLC*, 484 F.3d 824, 827 (6th Cir. 2007).)

At the pleading stage, the Court held that Plaintiff had sufficiently alleged that Mr. Budzik was a State actor.  *Buddenberg*, 2018 WL 3159052, at *3–4.  Mr. Budzik contends that he is not a State actor as a matter of law because "federal courts have

'emphatically rejected' claims that attorneys may be considered state actors against whom an allegation of deprivation of constitutional rights . . . can be properly lodged." (ECF No. 216-3, PageID #11848–49 (collecting cases).)

A public official is a State actor where he acts in pursuit of fulfilling "governmental duties or [is] cloaked in the [State's] authority," including when his "actions are controlled by the government." *Lindke v. Freed*, 37 F.4th 1199, 1203 (6th Cir. 2022). Generally, attorneys do not become State actors through mere representation of State or local governments. *Horen v. Board of Educ. of Toledo City Sch. Dist.*, 594 F. Supp. 2d 833, 841 (N.D. Ohio 2009); *Freshwater v. Mount Vernon City Sch. Dist. Bd. of Educ.*, No. 2:09-cv-464, 2010 WL 1434314, at *2 (S.D. Ohio Apr. 8, 2010); *see also Polk Cnty. v. Dodson*, 454 U.S. 312, 318–21 (1981) (holding that a public defender employed by the State does not act under color of state law).

Because the Court determined that Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim for the reasons explained, the Court need not wade into the parties' respective arguments on whether Mr. Budzik was a State actor on the record presented in this case. Even assuming he was, Ms. Buddenberg's speech is not protected under the First Amendment as a matter of law; therefore, Mr. Budzik has no liability on that claim in any event. *See Mayhew*, 856 F.3d at 464 (holding that a viable First Amendment retaliation claim requires that the plaintiff engage in constitutionally protected speech).

### I.B.    Other Retaliation Claims (Counts 1 and 3)

Based on her reports to the Board and the EEOC, Plaintiff brings two other federal retaliation claims:  one under Title VII (Count 1) and the other under the Fair

105

Labor Standards Act (Count 3).  Plaintiff does not claim that she was subject to unequal pay based on her sex.  Instead, Ms. Buddenberg raised complaints of discrimination on behalf of a third party, the District's female employee who was paid less than her male counterpart.

Both Title VII and the FLSA protect employees who advocate on behalf of their coworkers.  *See Johnson v. University of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) (Title VII); *Pettit v. Steppingstone*, 429 F. App'x 524, 530 (6th Cir. 2011) (FLSA). Title VII prohibits retaliatory employment actions against employees who oppose, make a charge of, or participate in proceedings relating to workplace practices that violate the statute.  *See* 42 U.S.C. § 2000e-3(a).  Similarly, the FLSA's anti-retaliation provision provides that it "shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter."  29 U.S.C. § 215(a)(3).

The same general legal framework governs both claims.  To prevail, a plaintiff must show either direct or circumstantial evidence of retaliation.  *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (Title VII retaliation); *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (FLSA retaliation).

### I.B.1. Direct Evidence

"Direct evidence is that evidence which, if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action."  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (emphasis added).  Direct evidence is not subject to more than one plausible interpretation and proves the existence of a fact without any inferences or presumptions.  *Kocak v. Community Health Partners*

*of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005).  Only the most blatant remarks revealing retaliatory intent satisfy Plaintiff's burden.  *See Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 235 (6th Cir. 2017) (quoting *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013)).

Plaintiff argues that she has direct evidence of retaliation.  (ECF No. 259, PageID #14745.)  Specifically, she points to her February 1, 2017 email to Ms. Livers regarding Mix's departure from the District.  Within the six full paragraphs of that email, Ms. Buddenberg writes, "I cannot help but believe Dan's dismissal was directly a result of my reporting and his defending me for reporting."  (ECF No. 194-29, PageID #4759.)  In its position statement before the EEOC, the District cites this email as one basis for disciplining Ms. Buddenberg.  (ECF No. 195-36, PageID #5282.)  Plaintiff argues that Defendants' reliance before the EEOC on this email, in which she expressed her opinion regarding the reason for Mix's separation from employment, demonstrates unlawful retaliation as a matter of law because the District admits imposing discipline based on Ms. Buddenberg's speech contained in the email.  (*See* ECF No. 221, PageID #12077–78 & #12091–92.)

Defendants deny that the record contains any direct evidence of retaliation.  (ECF No. 267, PageID #14988.)  They argue that the position statement submitted to the EEOC is not a binding admission and that it contains inadmissible hearsay.  (ECF No. 258, PageID #14687.)  For purposes of summary judgment, the Court treats the District's position statement before the EEOC as an admission of a party opponent.  *See* Fed. R. Evid. 802(d)(2).  Defendants reference no authority that such statements

107

cannot contain admissions or bind a party in later proceedings. In any event, Plaintiff does not offer the email as a statement for the truth of the matter asserted (that Mix did not resign and was fired). Instead, it arguably provides some evidence of retaliation or Defendants' retaliatory motive.

To prevail on a direct-evidence theory, the District's statements must *require* the conclusion that Ms. Buddenberg was retaliated against for reporting retaliation against Mix, which was caused by her reports on the gender pay disparity. *See Abbott*, 348 F.3d at 542. The District's position statement at the EEOC stated that Ms. Buddenberg's opinion about the reason for Mix's separation from employment, communicated to a member of the Board provided an appropriate basis for discipline:

> On February 1, 2017, Ms. Buddenberg sent an email to Board of Health member Christina Livers stating that she believed former Administrator Dan Mix had been terminated due to Ms. Buddenberg's prior report of alleged pay discrimination. A copy of that email is attached as Exhibit I. Mr. Weisdack was not copied on that email and has no knowledge of that email.

> Mr. Mix was not terminated, but rather resigned his employment effective February 1, 2017 in lieu of disciplinary action. Ms. Buddenberg's statement that he was terminated was false and an appropriate basis for discipline.

(ECF No. 195-36, PageID #5282.)

The EEOC position statement does not constitute direct evidence of retaliation. The email at issue details Plaintiff's concerns about retaliation waged against Mix. Without question, reporting retaliation constitutes protected activity under Title VII and the FLSA. Still, citing this email as one basis for disciplining Ms. Buddenberg does not constitute direct evidence. To understand why, consider the case of *Johnson v. Kroger Co.*, 319 F.3d 858 (6th Cir. 2003). There, the Sixth Circuit determined that

four statements about an African American employee did not amount to direct evidence of discrimination because of race.  Those statements included a manager's expression of "concern about the potentially detrimental effect on business of having an African-American comanager" and performance reviews that the employee lacked initiative and ability.  But these statements did not provide direct evidence of discrimination because they required inferential reasoning—for example, that the decisionmakers attributed the employee's lack of initiative to his race and not his actual performance.  *Id.* at 865.  Here, concluding that the email amounts to direct evidence requires additional inferences, for example, that the Board disciplined Ms. Buddenberg because she reported retaliation and not out of a concern about what she was telling her colleagues and co-workers if she articulated to a Board member what the District considered false information and the resulting effect on morale among other employees.

In contrast, direct evidence compels a conclusion that unlawful retaliation was a motivating factor in an employee's discipline.  *See Johnson*, 215 F.3d at 577 n.7 (determining that the statement "[w]e already have two black vice presidents.  I can't bring in a black provost" presented direct evidence of discrimination).  But the question is close.  A supervisor's "specific reference [to the employee's] protected statements as examples of insubordination" when terminating the employee provides direct evidence.  *Yazidan v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015).  Arguably, the District's EEOC position statement meets this standard.  It cites the email containing Ms. Buddenberg's speech as one basis for her discipline.

109

By citing Plaintiff's "protected statements as examples of insubordination," *id.*, a reasonable jury might conclude under the law of this Circuit that retaliation was a "motivating factor" in Plaintiff's discipline, *Abbott*, 348 F.3d at 542.

Even if the position statement provides direct evidence of unlawful retaliation, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346–47 (6th Cir. 2012) (internal quotation marks and citation omitted). Defendants must produce sufficient evidence to remove any genuine issue or doubt that they would have disciplined Plaintiff regardless of any improper motive. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002). Here, the record even construed in Plaintiff's favor leaves no doubt that the District would have imposed the same discipline on Plaintiff regardless of her email. As already discussed, the severity of her other charges—including improper storage of personnel files in her office and insubordination in front of Mr. Weisdack and other employees—demonstrates conduct sufficiently serious as to warrant the imposition of discipline. No reasonable jury could find otherwise. Therefore, even if the District's position statement to the EEOC and its reliance on Ms. Buddenberg's email to Ms. Livers on February 1, 2017, treated as admissible for purposes of summary judgment, presents direct evidence, Plaintiff's claims of retaliation under Title VII and the FLSA based on direct evidence fail as a matter of law.

### I.B.2. Circumstantial Evidence

Because Plaintiff fails to prove her claims with direct evidence of retaliation, the Court continues the analysis by applying the burden-shifting framework of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775–76 (6th Cir. 2016).  Under that framework, the plaintiff must first present a *prima facie* case of retaliation.  *Id.*

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must demonstrate that:  (1) she engaged in activity protected by Title VII; (2) the defendants knew that she engaged in protected activity; (3) the defendants took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.  *Laster*, 746 F.3d at 730 (citations omitted).  Similarly, to establish a *prima facie* case of retaliation under the FLSA, an employee must establish:  (1) participation in an activity that the Fair Labor Standard Act protects; (2) the employer's knowledge of the employee's exercise of this right; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Adair*, 452 F.3d at 489.

Here, the District Defendants do not dispute that Plaintiff engaged in protected activity when she reported the gender pay disparity and retaliation to the Board and that the District was aware of her reports.  Defendants dispute only factors three and four—that Ms. Buddenberg experienced an adverse employment action and the causal connection between any such adverse action and her protected activity.

### I.B.2.a. Adverse Employment Action

Defendants argue that Plaintiff did not suffer an adverse employment action because she resigned before any constructive discharge, her "planned demotion" does not qualify as an adverse action, and she failed to exhaust her internal appeals.  (ECF

111

No. 217, PageID #11925–27 & #11931.)  Further, they add that the other matters Plaintiff cites as evidence of retaliation, like Mr. Weisdack's generally rude behavior, are too trivial to qualify as "adverse."  (*Id.*, PageID #11933–34.)  Plaintiff responds that "[u]nder any standard," she faced a series of adverse employment actions.  (ECF No. 221, PageID #12088–91.)

### I.B.2.a.i. Plaintiff's Demotion

Under Title VII, demonstrating a "materially adverse employment action" requires a showing that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster*, 746 F.3d at 731 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The context of any retaliation act matters, and the Court must consider the "constellation of surrounding circumstances, expectations, and relationships" involved.  *Burlington N.*, 548 U.S. at 69.  The same general principles apply to determining whether a plaintiff suffered a materially adverse action under the FLSA. *Id.* at 66.

Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Adair*, 452 F.3d at 490.  Here, Plaintiff has presented evidence that she was demoted to a lesser position, suffered a pay cut, and lost accrued sick leave and vacation time. (*See* ECF No. 204-13, PageID #8990–92; ECF No. 31, ¶ 124, PageID #396; ECF

No. 37, ¶ 86, PageID 467; ECF No. 195-14, PageID #5074.)  Plaintiff has established that she suffered a "materially adverse employment action" because a reasonable jury could find that her demotion "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster*, 746 F.3d at 731.

Defendants' argument that Plaintiff's harm never manifested because she resigned before ever working in her demoted position is unavailing.  Most of the controlling case law on which they rely deals with discrimination claims.  Proving an adverse action under a retaliation claim is "less onerous" than in the discrimination context because, for retaliation, a plaintiff need only clear a "relatively low bar." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595–96 (6th Cir. 2007).  Under the law of this Circuit, the more liberal definition of an adverse action for retaliation claims "permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Id.* at 596.  For example, a "supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight," but under certain circumstances, that exclusion could amount to a materially adverse retaliation action. *See Burlington N.*, 548 U.S. at 69.

Defendants rely on *Kocsis v. Multi-Care Management Inc.*, 97 F.3d 876 (6th Cir. 1996).  (ECF No. 217, PageID #11931; ECF No. 258, PageID #14685.)  There, the Sixth Circuit held that a nurse did not suffer a materially adverse employment action after being transferred to a new unit, partly because she never made a "real attempt to compare the two positions before she filed her discrimination claim." *Id.* at 887.  But *Kocsis* is distinguishable from Plaintiff's case for two reasons.  First, it was a suit

for discrimination—not retaliation—under the Americans with Disabilities Act, so the nurse's alleged adverse actions had to satisfy a higher standard. Second, the nurse's new position came with the "same (or a greater) rate of pay and benefits, and her duties were not materially modified." *Id.* at 886–87.

Here, Plaintiff's demotion came with a pay cut and loss of certain benefits, and her duties became more clerical. She suffered more than a "*de minimis* employment action." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). It is immaterial on this record that Plaintiff never worked a day in her new position nor received a paycheck at the decreased rate. Plaintiff's demotion clears the "relatively low bar" needed for her retaliation claim. *Michael*, 496 F.3d at 584.

Plaintiff alleges that she suffered from a slew of other adverse actions, including the change in her work hours, Mr. Weisdack and other employees' treatment of her, the disciplinary charges and pre-disciplinary hearing, and the Defendants' treatment of Mix. (ECF No. 221, PageID #12088–90.) But because she has established her *prima facie* case for the adverse employment action on other grounds, the Court need not decide whether these other actions qualify as materially adverse. *See Adair*, 452 F.3d at 490.

### I.B.2.a.ii. Exhaustion of Internal Appeals

Next, Defendants argue that Plaintiff failed to exhaust the internal appeals process within the District before pursuing this lawsuit; therefore, her demotion cannot be "an adverse employment action until those [appeals] are exhausted." (ECF No. 217, PageID #217 (citing *Benison v. Ross*, 765 F.3d 649, 655 (6th Cir. 2014).) *Benison* involved a First Amendment retaliation claim of a college professor who was

denied a promotion. The Sixth Circuit held that, because the professor still had "several layers of internal review" for the denial of her promotion, she had not suffered an adverse action. *Id.* at 659–60. *Benison* is distinguishable from Plaintiff's case on two bases. First, the standard for a First Amendment retaliation claim is "distinct from the adverse-action used in traditional employment discrimination claims, and the court must tailor the analysis . . . to the circumstances of this specific retaliation claim." *Id.* at 659 (cleaned up). Second, the denial of the professor's promotion was a "non-binding 'intermediate decision.'" *Id.* at 659–60. No facts of record here suggest that Plaintiff's demotion and pay cut were not final decisions. Indeed, the District implemented the disciplinary actions that the Board approved.

While Plaintiff did prematurely dismiss her appeals, she was under no obligation to pursue them further. Plaintiff exhausted her administrative remedies under Title VII when she timely filed her charge with the EEOC and received a right-to-sue letter. *See Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1486 (6th Cir. 1989). (ECF No. 213-1, PageID #11742; ECF No. 213-2, PageID #11743.) The FLSA has no exhaustion requirement or other procedural barrier to filing suit in federal court. *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981). Therefore, a failure to exhaust her administrative appeals does not defeat Plaintiff's *prima facie* case.

### I.B.2.a.ii. Constructive Discharge

Plaintiff does not raise a separate constructive discharge claim. Instead, she characterizes her "constructive discharge" as part of the adverse employment action needed to fulfill her *prima facie* case. (*See generally* ECF No. 31; ECF No. 221,

115

PageID #12065; ECF No. 259, PageID #14733–35.) On the other hand, Defendants treat Plaintiff's allegations of constructive discharge as a separate claim, which carries a higher burden.  (*See* ECF No. 217, PageID #11925.)  Some courts treat constructive discharge claims as satisfying the element of the *prima facie* case for retaliation requiring that a plaintiff experience an adverse employment action.  *See, e.g., Jemison v AFIMAC Global*, 645 F. Supp. 3d 781, 799–800 (N.D. Ohio 2022). Whatever the case, the record on summary judgment construed in Plaintiff's favor allows Plaintiff to carry her burden on this element of her *prima facie* case based on her demotion, change in duties, and reduction in responsibilities and salary. Therefore, the Court need not decide whether she suffered a constructive discharge.

### I.B.2.b. Causation

Turning to this element of Plaintiff's *prima facie* case, the parties start by disputing the burden each bears on summary judgment.  Plaintiff argues that, at the summary judgment stage, the question is whether Defendants can rule out "a causal connection between any particular set of acts," not whether she can prove her *prima facie* case.  (ECF No. 259, PageID #14744.)  In response, Defendants argue that any plaintiff has the burden to "set forth facts showing that there is a genuine issue for trial." (ECF No. 267, PageID #14987 (citing *Celotex Corp.*, 477 U.S. at 331).)  Further, they maintain that Plaintiff's "shotgun pleading approach" prevents her from establishing a *prima facie* case of retaliation.  (ECF No. 217, PageID #11934–36.)

Under the *McDonnell Douglas* framework, the plaintiff always carries the initial burden of proving her *prima facie* case.  *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (2008).  Because of that initial burden, a defendant can

demonstrate that it is entitled to judgment as a matter of law by pointing out that there is "an absence of evidence to support the [plaintiff's] case." *Celotex Corp.*, 477 U.S. at 325. In the Court's view, these standards are not in tension. Under longstanding summary-judgment practice, a defendant need not eliminate or rule out issues of fact to prevail. Instead, as Defendants suggest, Plaintiff must produce or point to specific facts in the record demonstrating a genuine issue for trial. *See Anderson*, 477 U.S. at 247–48. For these reasons, Plaintiff's burden on the elements of her *prima facie* case, including causation, and on summary judgment when Defendants point to an absence of evidence align.

### I.B.2.b.i. Plaintiff's Burden

Based on the parties' arguments, one might fairly, but mistakenly, analyze the causation element of Plaintiff's *prima facie* case on either her Title VII or FLSA claim through the lens of the extensive record on summary judgment on Plaintiff's First Amendment retaliation claim. To prove causation in a Title VII or FLSA retaliation case, a plaintiff must show that the employee's protected activity was a "but-for cause" of the employer's adverse action against him, meaning the adverse action would not have occurred absent the employer's desire to retaliate. *University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013*)* (Title VII retaliation); *Mansfield*, 706 F. App'x at 236 (FLSA retaliation). Put simply, the Title VII retaliation claim requires a Title VII causation analysis. And the FLSA claim requires an FLSA causation analysis. Each of which differs from that for a First Amendment retaliation claim. After all, a First Amendment retaliation claim requires that a defendant's retaliatory acts must have been "motivated in substantial

117

part by a desire to punish an individual for exercise of a constitutional right" and that the plaintiff's protected activity proximately caused the adverse actions. *See King v. Zamiara*, 680 F.3d 686, 694–95 (6th Cir. 2012) (citations omitted).

In other words, the focus of the Title VII inquiry is whether Defendants took an adverse employment action against an employee because of certain, specified protected criteria—in this case, because of sex. *Nassar*, 570 U.S. at 352. Plaintiff must have suffered an adverse action because she opposed sex discrimination affecting another employee. 28 U.S.C. § 2000e-3(a). And that statutorily protected activity must be the but-for cause of Defendants' retaliation. Similarly, the focus of the FLSA inquiry is whether Plaintiff suffered an adverse action because of her complaints about Defendants' unfair labor practices. *See Pettit*, 429 F. App'x at 530; 29 U.S.C. § 215(a)(3). At bottom, these two inquiries depend on the enforcement of the rights that these statutes protect, which are separate and distinct from the rights that the First Amendment secures. These different statutory and constitutional protections have different causation requirements.

Here, no specific evidence in the record demonstrates that Defendants took retaliatory actions against Ms. Buddenberg based on her opposition to sex discrimination. Put another way, the record on summary judgment has an absence of evidence that Ms. Buddenberg's report to the Board of a gender pay disparity was the but-for cause of any of the actions by Defendants of which Plaintiff complains. Similarly, no evidence shows that Defendants took any adverse employment action because of Ms. Buddenberg's complaints about pay practices or unfair wages.

Plaintiff argues that her direct evidence of retaliation, the EEOC position statement, constitutes an admission of a causal connection between the adverse employment actions she experienced and her reports to the Board. (ECF No. 221, PageID #12091–92.) Although the question whether the District's EEOC position statement constitutes direct evidence of retaliation presents a close call, Plaintiff's reliance on it as an admission of causation under the *McDonnell Douglas* framework does not defeat Defendants' motion for summary judgment. Even if the EEOC position statement serves to satisfy her burden of production for purposes of Plaintiff's *prima facie* case, practice under Rule 56 requires a plaintiff to point to specific facts in the record to withstand summary judgment. Because the District's EEOC position statement sweeps broadly and responds to a litany of charges, the majority having nothing to do with sex discrimination or unfair labor practices, pointing to it fails to identify specific facts for trial on these claims. Doing so amounts to little more than pointing to the extensive record in this case and arguing that it must contain a triable issue somewhere. In the end, when it comes to causation on her Title VII and FLSA retaliation claims, Plaintiff points to no disputed facts to rebut Defendants' argument that the record contains an absence of evidence to support the causation element of her *prima facie* case.

### I.B.2.b.ii. Intervening Cause

Under the law of this Circuit, an intervening cause between protected activity and an adverse employment action dispels any inference of causation. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 450 (6th Cir. 2020). In this case, Ms. Buddenberg engaged in other (mis)conduct leading to six other disciplinary charges. All occurred

119

after her initial report to the Board, and four came after her email to Ms. Livers on February 1, 2017. None relates to activity protected under Title VII or the FLSA.

Even if the Court assumed that Plaintiff established her *prima facie* case based on the reference to her protected activity in the District's EEOC position statement, the record contains no evidence that Defendants would not have disciplined Ms. Buddenberg based on the independent reasons the District advanced, including for "insubordination," "malfeasance," and "neglect of duty." (ECF No. 195-19, PageID #5169–70.) Put another way, regardless of her protected activity, the record provides every reason to believe that the District would have disciplined Ms. Buddenberg based on any one of a number of legitimate grounds. Moreover, no evidence in the record suggests that Ms. Buddenberg would have suffered any adverse action if the February 1 email were the *only* basis for discipline—and Plaintiff points to no facts that would raise a dispute about the point. For these reasons, the evidence of intervening causation in the record dispels any inference of causation, entitling Defendants to judgment as a matter of law.

Two last points on this issue.

*First*, in the EEOC position statement, the District describes Ms. Buddenberg's statement in her February 1, 2017 email to Ms. Livers about the reason for Mix's separation from employment as "an appropriate basis for discipline." (ECF No. 195-36, PageID #5282.) Plaintiff characterizes this statement as an admission that this email was the "sole basis" for her discipline. (ECF No. 221, PageID #12078.) This argument fails because substantially similar language accompanied the other

120

disciplinary charges, describing each as an "appropriate basis for discipline" (or words to the same effect).  (*See, e.g.*, ECF No. 258, PageID #14686–88.)  If anything, this language confirms that the District disciplined Ms. Buddenberg for multiple reasons and demonstrates the lack of a but-for causation related to Plaintiff's reports of a gender pay disparity and related retaliation.  *See Kenney*, 965 F.3d at 450.

*Second*, Plaintiff relies on the entirety of the summary judgment record, which she contends demonstrates "ample evidence of a causal connection between her protected activities and several of the Defendants' retaliatory acts."  (ECF No. 259, PageID #14745.)  Such an argument is not proper in summary judgment practice.  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).  Even so, the record on the causation element of Plaintiff's *prima facie* case for her Title VII and FLSA claims shows that Plaintiff only relies on a direct evidence theory.  (*See* ECF No. 221, PageID #12091–92.)

In the end, the parties do not contest that Ms. Buddenberg engaged in activity that Title VII and the FLSA protect, and the record demonstrates that she received discipline that, as a matter of law, constitutes a materially adverse employment action.  But these determinations alone do not suffice for Plaintiff to establish her *prima facie* case.  Plaintiff's direct evidence theory fails to establish a causal connection, and the other disciplinary charges constitute intervening actions, dispelling any inference of causation.  Because Plaintiff fails to demonstrate that her protected activity was the but-for cause of her adverse employment action, she has

not met her burden to come forward with evidence supporting a *prima facie* case of retaliation, and Defendants are entitled to summary judgment on these claims. *Kenney*, 965 F.3d. at 451.

### I.B.3. Other Retaliation Claims Against Mr. Budzik

Plaintiff does not bring her Title VII claim against Mr. Budzik.  (*See* ECF No. 31, PageID #398.)  But she does assert her FLSA retaliation claim against him. (*Id.*, PageID #403.)  Mr. Budzik argues that Plaintiff cannot maintain an FLSA claim against him because he was not an "employer" as defined under that statute.  (ECF No. 216-3, PageID #11845–48.)  Plaintiff counters that Mr. Budzik qualifies as an employer under the statute under the "broad" definition of that term.  (ECF No. 263, PageID #14895.)

As with Plaintiff's First Amendment retaliation claim against Mr. Budzik, the Court need not decide whether he was an "employer" within the meaning of the Fair Labor Standards Act.  Plaintiff's FLSA retaliation claim fails as a matter of law because she cannot establish her *prima facie* case.  Therefore, she cannot separately maintain this claim against Mr. Budzik either.

## II.    State-Law Claims

"When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). Pursuant to 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction."  Because comity to State courts is a substantial interest, there

is "a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed." *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011). The Court should retain jurisdiction "only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law issues." *Id.* (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)).

The discretion to decline supplemental jurisdiction over State-law claims extends to all stages of litigation, including summary judgment. *See Booker v. City of Beachwood*, 451 F. App'x. 521, 523 (6th Cir. 2011) (citing *Nails v. Riggs*, 195 F. App'x 303, 313 (6th Cir. 2006)). In exercising this discretion, the Court may consider the convenience to the parties and judicial economy in resolving the case. *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 761 (6th Cir. 2000). Here, given the length of time this case has been pending, the complexity of the record, and the effort and resources that the parties invested in developing the record and briefing the merits of the State-law causes of action, the Court finds that judicial economy, convenience to the parties, avoiding needlessly prolonging the litigation of this dispute, and fundamental fairness outweigh the interest of comity and overcome the strong presumption against the exercise of supplemental jurisdiction after adjudication of the federal claims. For these reasons, the Court exercises its discretion to proceed to the State-law claims presented.

### II.A.  Ohio Retaliation Claims (Count 2 and Count 4)

Section 4112.02(I) of the Ohio Revised Code makes it an unlawful discriminatory practice for "any person to discriminate in any manner against any

other person because that person has opposed any unlawful discriminatory practice defined in this section." This language mirrors that of Title VII. *See* 42 U.S.C. § 2000e–3(a). Because of the statutes' similar language and origins, courts recognize that federal law provides the applicable analysis for reviewing retaliation claims under Section 4112.02(I). *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541 (6th Cir. 2003) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128 (1981)). Accordingly, Defendants are entitled to a summary judgment on Plaintiff's claim under Section 4112.02(I) (Count 2) for the same reasons explained above—Plaintiff failed to establish a *prima facie* case as a matter of law under Title VII.

Ohio's Minimum Fair Wage Standards Act prohibits sex-based wage discrimination. Ohio Rev. Code. § 4111.17(A). Section 4111.17(D) creates a cause of action to enforce the rights protected under the statute. Defendants contend that the protections of this statute do not extend to employees reporting unequal pay practices on behalf of their coworkers. (ECF No. 217, PageID #11939.) Plaintiff responds that there "is no statutory warrant" for restricting "the class of employees" covered by this statute. (ECF No. 259, PageID #14755.) Ohio courts look to interpretations of the Fair Labor Standards Act when interpreting the State's Minimum Fair Wage Standards Act. *See Birch v. Cuyahoga Cnty. Probate Court*, 392 F.3d 151, 161 (6th Cir. 2004). Therefore, the Court reads the Ohio statute to protect third-party wage discrimination claims to the same extent as the FLSA. *See Pettit*, 429 F. App'x at 530. Like Plaintiff's claim under Section 4112.02(I), her State-law wage claim rises

and falls with its federal counterpart. *Birch*, 392 F.3d at 161. Therefore, because Plaintiff's *prima facie* case under the FLSA fails as a matter of law, so too does her claim under Section 4111.17(D) (Count 4).

## II.B. Discrimination, Ohio Rev. Code §§ 4112.02(J) & 4112.99 (Count 9)

Section 4112.02(J) of the Ohio Revised Code makes it unlawful for any person "to aid, abet, . . . the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice." Section 4112.02(J) extends liability to any person who aids or abets an unlawful discriminatory practice. Accordingly, employees may "be held liable for aiding and abetting [their] employer's discriminatory or retaliatory practices." *Siwik v. Cleveland Clinic Found.*, No. 1:17-cv-1063, 2019 WL 1040861, at *27 (N.D. Ohio Mar. 5, 2019) (citing *Hauser v. Dayton Police Dep't*, 140 Ohio St. 3d 268, 2014-Ohio-3636, 17 N.E.3d 554, ¶ 12 (recognizing that Ohio law "holds individual employees liable for their participation in discriminatory practices")). Section 4112.99(A) creates a private right of action for a violation of Section 4112.02.

Defendants maintain that they are not liable under this statute because more than a mere "failure to act" is required. (ECF No. 217, PageID #11940 (citing *Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1088 (S.D. Ohio 2022).) Plaintiff responds that Mr. Weisdack, his assistant, and Board members each "assisted" in retaliating against her in violation of Section 4112. (ECF No. 221, PageID #12095–96.)

But Section 4112.02(J) is predicated on underlying discrimination or retaliation. *See Oster v. Huntington Bancshares Inc.*, No. 2:15-cv-2746, 2017 WL 2215462, at *22 (S.D. Ohio May 19, 2017) (holding that, if a plaintiff can survive summary judgment on her gender discrimination and retaliation claims, her allegations of aiding and abetting by individual defendants "pass muster too"). In other words, employees cannot be held liable for aiding or abetting conduct that does not violate the law. *Lloyd v. Greater Cleveland Reg'l Transit Auth.*, No. 1:18-cv-01557, 2020 WL 5077009, *13 (N.D. Ohio Aug. 27, 2020) (collecting cases) (holding that "if a plaintiff fails to establish any underlying unlawful discriminatory conduct, his or her aiding and abetting claim also fails"). Because Plaintiff's State-law retaliation claims do not survive summary judgment, neither does her claim for aiding and abetting discrimination.

### II.C.   Civil Liability for Criminal Acts (Count 6, Count 7 & Count 8)

Counts 6 through 8 assert claims under Section 2307.60 of the Ohio Revised Code for civil liability for various alleged criminal acts. That statute allows "[a]nyone injured in person or property by a criminal act" to "recover full damages in[] a civil action," including attorneys' fees and costs. Ohio Rev. Code § 2307.60(A)(1). As the Ohio Supreme Court held on the certification of State-law questions in this case, the "plain language of the statute does not require a criminal conviction" as a prerequisite for civil liability. *Buddenberg*, 2020-Ohio-3832, at ¶ 11. Therefore, the fact that no Defendant has been convicted—or even charged—with any of the underlying offenses has no bearing.

126

At the pleading stage, the Court noted that "neither party cited any caselaw discussing what burden of proof applies" to these claims.  *Buddenberg*, 2018 WL 3159052, at *5.  Despite discussion of the issue early in the life of this case, on summary judgment the parties still fail to address the issue.  Ohio courts appear to assume that a plaintiff can prevail on a claim under Section 2307.60(A)(1) if she proves her claim by a preponderance of the evidence and that, to establish civil liability, the statute does not require proof beyond a reasonable doubt as would a criminal conviction.  *See, e.g.*, *Sonis v. Rasner*, 2015-Ohio-3028, 39 N.E.3d 871, ¶ 43 (8th Dist.); 1 Ohio Jury Instructions, *Civil* § 455.01 ("Before you can find for the plaintiff, you must find all of the following by the greater weight of the evidence[.]").  For his reason, the Court analyzes Plaintiff's claims under Section 2907.60(A)(1) against this backdrop.

### II.C.1. Intimidation, Ohio Rev. Code § 2921.03 (Count 7)

Section 2921.03(A) of the Ohio Revised Code sets forth the elements for the offense of intimidation, a felony of the third degree.  As relevant here, the statute makes it an offense for a person, "by . . . otherwise using a materially false or fraudulent writing," to intimidate or hinder a public official in the discharge of her duties.  In its entirety, the statute provides:

> No person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, a party official, or an attorney or witness involved in a civil action or proceeding in the discharge of the person's [*sic*] the duties of the public servant, party official, attorney, or witness.

127

Ohio Rev. Code § 2921.03(A).

This statute presents several open questions of statutory interpretation. For example, Section 2921.03(C) creates civil liability for violation of the statute, potentially making it largely or entirely repetitive of Section 2307.60(A)(1), under which Plaintiff brings her claim. She did not bring this claim under Section 2921.03(C) or allege an "unlawful threat of harm." (ECF No. 31, ¶¶ 193–201, PageID #412–13.) As one further example, it is not clear how a person can "knowingly"—the state of mind requirement that the third word of the statute applies to each element that follows—intimidate someone in a "reckless manner."

The parties did not brief these issues, and the Court need not decide them. Plaintiff is correct that Section 2921.03(A) does not apply by its own terms only to threats of violence or to those who witnessed crimes. (ECF No. 263, PageID #14922–23.) Indeed, amendments to the statute over time make its broader purpose and application clear. But summary judgment turns on the element of the offense requiring that the writing at issue be "materially false or fraudulent." In this case, Plaintiff proceeds against Mr. Weisdack and Mr. Budzik, contending that the notice of disciplinary action and resulting disciplinary order are materially false and fraudulent. (*Id.*; ECF No. 31, ¶¶ 196 & 197, PageID #412.) At the pre-disciplinary hearing, however, Ms. Buddenberg admitted the truth of certain charges, including insubordination and mishandling her own and Mix's personnel files. (ECF No. 210-4, PageID #11329, #11349–51 & #11356.) Even assuming for purposes of summary judgment that certain of the charges are materially false or fraudulent,

128

Ms. Buddenberg's admissions to conduct that independently supports the discipline imposed make her unable to carry her burden on this claim, and no reasonable finder of fact could conclude otherwise.

One final procedural point regarding this claim—Plaintiff asserts Count 7 against Mr. Weisdack and Mr. Budzik.  Both move for summary judgment on all claims against them, but only Mr. Budzik develops an argument regarding Plaintiff's intimidation claim.  (ECF No. 216-3, PageID #11867–68.)  A district court can enter a summary judgment *sua sponte*.  *See Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 104–06 (6th Cir. 1995); *Celotex Corp.*, 477 U.S. at 325.  Plaintiff had an adequate opportunity to respond to Mr. Budzik's arguments against the applicability of this statute, and her arguments apply generally to both him and Mr. Weisdack.  Because these two Defendants are similarly situated with respect to this claim, Plaintiff's arguments generally apply to both, and to a degree this claim raises similar legal and factual issues more fully addressed elsewhere in this ruling, the Court applies this ruling to both Mr. Budzik and Mr. Weisdack.  Further, judicial economy counsels doing so.

For all these reasons, Mr. Weisdack and Mr. Budzik are entitled to a summary judgment on Plaintiff's claim for civil liability for criminal intimidation.

### II.C.2. Retaliation, Ohio Rev. Code § 2921.05 (Count 6)

In the alternative, Plaintiff brings this claim against all Defendants.  (ECF No. 31, PageID #411.)  Under Ohio law, criminal retaliation, which is also a third-degree felony, requires "purposeful" action "by force or by unlawful threat of harm" against a public servant.  In its entirety, the statute provides:

No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness.

Ohio Rev. Code § 2921.05(A).

### II.C.2.a. "Involved in a Proceeding"

Primarily, the parties debate whether the phrase "involved in a civil action or proceeding" applies only to "an attorney or witness" or to each of the types of persons in the list the statute covers, including a "public servant"—such that the statute applies only to criminal retaliation against a public servant involved in a proceeding as opposed to performing her general duties.

Defendants argue that this statute does not apply because Plaintiff was not a "public servant" who was "involved in a civil or criminal action or proceeding" when any alleged retaliation occurred.  (ECF No. 217, PageID #11938–39.)  They rely on *Hensley v. Wester Chester Township*, No. 1:21-cv-373, 2022 WL 4621432, at *15 (S.D. Ohio Sept. 20, 2022), where the court dismissed the claims of former police officers because the officers were not involved in a civil or criminal action or proceeding when the alleged First Amendment retaliation occurred.

Similarly, in *State v. Merriman*, 2021-Ohio-1403, 2021 WL 1573920, ¶ 9 (Ohio Ct. App.), the court applied the "action or proceeding modifier" to every victim listed in the statute, like the Southern District of Ohio in *Hensley*.  The *Merriman* Court held that the "state must prove that [the defendant] purposely threatened harm to the judge and police officers who were involved in a civil or criminal action or

130

proceeding as a result of discharging the duties of a public servant." *Id.* Based on this interpretation, the court ultimately vacated the defendant's conviction under the statute because he did not direct his conduct at individuals involved in prior or current proceedings against him. *Id.* at ¶ 13.

Plaintiff maintains that the phrase "who was involved in a civil or criminal action" only applies to attorneys or witnesses under the statute, and it does not apply to "public servants." (ECF No. 259, PageID #14751–52.) She points to *State v. Matthews*, 2013-Ohio-2183, ¶ 11 (Ohio Ct. App.), which analyzed the text and determined that the "placement of the comma before 'or an attorney or witness' in the context of this sentence clearly establishes the third category of potential victims of retaliation encompasses attorneys or witnesses who were involved in civil or criminal actions or proceedings."

The Court need not weigh in on this split of authority or make its best guess how the Ohio Supreme Court would resolve the issue because Plaintiff's claim fails for another reason.

### II.C.2.b. "By Force or by Unlawful Threat of Harm"

The statute requires retaliation "by force or by unlawful threat of harm." Ohio Rev. Code § 2921.05(A). Plaintiff makes no argument, and presents no evidence, that any Defendant used force (within the meaning of this statute) against her. *See* Ohio Rev. Code § 2901.01(A)(1) (defining "[f]orce" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing"); ECF No. 259, PageID #14751–53. That leaves only the option of "an unlawful threat of harm" to support Plaintiff's claim under this statute. In this respect, Plaintiff's

131

argument on her criminal intimidation claim is telling.  That claim also makes an unlawful threat of harm one basis for liability.  On her intimidation claim, however, Plaintiff proceeded on a theory of a false or fraudulent writing—not an unlawful threat of harm.  Regardless, there is no unlawful threat of harm to Ms. Buddenberg on the facts presented.

Enactment of the criminal retaliation statute "was described as [an expansion of] current law concerning intimidation."  *State v. Lambert*, 2d Dist. Montgomery No. 16667, 1998 WL 288957, at *4.  "The distinguishing characteristic between intimidation and retaliation was said to be that intimidation occurs before a judicial decision, whereas retaliation occurs after a judicial decision has been rendered."  *Id.* "The retaliation statute, therefore, was intended to correspond to the intimidation statute in its effect."  *Id.*

Interpreting the phrase an "unlawful threat of harm" in a related intimidation statute, the Ohio Supreme Court held that a threat is unlawful where "it violates established criminal or civil law."  *State v. Cress*, 112 Ohio St. 3d 72, 2006–Ohio–6501, 858 N.E.2d 341, ¶ 42.  Therefore, an unlawful threat requires proof the elements of a predicate offense.  *Id.* at ¶ 43.  Ohio courts apply this definition of an "unlawful threat of harm" to Section 2921.05.  *State v. Yambrisak*, 2013-Ohio-1406, ¶ 15 (Ohio Ct. App.).

Broadly, Plaintiff argues that "Defendants engaged in numerous acts of retaliation against" her.  (ECF No. 259, PageID #14752.)  She maintains that these retaliatory acts "constitute 'the unlawful threat of harm' the section criminalizes."

132

(*Id.*)  While "harm" might not necessarily need to be physical under the statute—*but see* Ohio Rev. Code § 2901.01(A) (defining "[p]hysical harm to persons" as "any injury, illness, or other *physiological* impairment, regardless of its gravity or duration," but omitting emotional, psychological, or other similar injuries from any definition)—Plaintiff's argument is wholly circular.  It makes unlawful retaliatory acts (assuming there are any, in a legal sense) the predicate acts to support the element of an unlawful threat in a claim for criminal retaliation.

Moreover, construing the record in Plaintiff's favor and taking the disciplinary notice as a threat, it was not "unlawful" as the Ohio Supreme Court defines the term. The notice contained several charges of serious workplace misconduct, and Plaintiff admitted to the factual basis for many.  Additionally, because Plaintiff's retaliation claims fail as a matter of law, they cannot serve as a predicate offense to satisfy this element.  *See Cress*, 2006–Ohio–6501, at ¶ 45 (concluding that lawful threatened acts do not constitute an "unlawful threat of harm").  Plaintiff's alternative claim for civil liability for criminal retaliation fails as a matter of law.

### II.C.3. Civil Rights, Ohio Rev. Code § 2921.45 (Count 8)

Ohio law makes it a crime, a first-degree misdemeanor, for a public employee to deprive a person of her civil rights.  The statute provides:

> No public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right.

Ohio Rev. Code 2921.45(A).  Defendants argue that they are entitled to summary judgment on this claim because they "did not deprive [Plaintiff] of any constitutional or statutory right."  (ECF No. 217, PageID #11939.)  Plaintiff counters that she has

shown that Defendants "deprived her of both types of rights."  (ECF No. 259, PageID #14754 (emphasis removed).)  Because the Court has determined that Plaintiff's federal and State law claims fail as matters of law, there is no underlying deprivation of a constitutional or statutory right to satisfy this statute and provide Plaintiff with a remedy.  Therefore, Plaintiff's claim for interference with civil rights fails.

### II.D. State-Law Claims Against Mr. Budzik

To a significant degree, Plaintiff's State-law claims against Mr. Budzik allege ethical violations relating to his conduct during and after the pre-disciplinary hearing and in his work for the District.  Indeed, the three experts the parties designate (two by Plaintiff and one by Mr. Budzik) focus on these issues.  Mr. Budzik maintains that any claims arising from his provision of legal services "must be construed as malpractice" and that third parties to the attorney-client relationship, like Ms. Buddenberg, lack standing to assert such claims against him.  (ECF 216-3, PageID #11863–66.)  Also, he claims qualified immunity as an attorney under Ohio law.  (*Id.*, PageID #11864–66.)  Plaintiff argues that Mr. Budzik enjoys no immunity because he engaged in "extra-legal" and "bad faith" conduct.  (ECF No. 263, PageID #14918.)  She relies extensively on her two experts, who opine that Mr. Budzik violated the Ohio Rules of Professional Conduct.  (*Id.*, PageID #14916–21.)

At the pleading stage, the Court held that Mr. Budzik could assert the qualified privilege for attorneys acting on behalf of clients.  *Buddenberg*, 2018 WL 3159052, at *6.  However, accepting Plaintiff's allegations as true, the Court held that Plaintiff sufficiently plead malice, removing his conduct from the protections of Ohio's qualified immunity defense pending discovery.  *Id.*

134

### III.D.1. Qualified Immunity for Attorneys Under Ohio Law

With the benefit of discovery and extensive briefing on the issue, the Court undertakes the analysis in two steps. First, the Court must decide whether Mr. Budzik can assert qualified immunity. Second, if he can, the inquiry shifts to whether Plaintiff presents sufficient evidence to rebut the presumption of immunity such that she can proceed on a claim under State law against Mr. Budzik. *See Kim v. Randal A. Lowry & Assocs.*, 2021-Ohio-51, 166 N.E.3d 146, ¶ 16 (Ohio Ct. App.).

### III.D.1.a. Mr. Budzik's Provision of Legal Services

Under Ohio law, the type of claim a third party asserts against an attorney has no bearing on the availability of qualified immunity. *Silveous v. 5 Starr Salon and Spa, LLC*, 2023-Ohio-841, 210 N.E.3d 1020, ¶ 39 (Ohio Ct. App.) (collecting cases). "A claim against an attorney for actions taken in his professional capacity is a claim sounding in legal malpractice no matter how artfully the pleadings attempt to raise some other claim." *Omega Riggers & Erectors, Inc. v. Koverman*, 2016-Ohio-2961, 65 N.E.3d 210, ¶ 22 (Ohio Ct. App.). An "indispensable element" of a malpractice claim is an attorney-client relationship, therefore, an "attorney is immune from liability to third persons arising from his performance as an attorney . . . unless such third person is in privity with the client, or the attorney acts maliciously." *Id.* at 219–20 (quoting *Scholler v. Scholler*, 10 Ohio St. 3d 98, 103, 462 N.E.2d 158 (1984)). An attorney's obligations to his client supplies the rationale for this rule: "the obligation of an attorney is to direct his attention to the needs of the client, not to the needs of a third party not in privity with the client." *Simon v. Zipperstein*, 32 Ohio St. 3d 74, 76, 512 N.E.2d 636 (1987).

135

While the scope of Mr. Budzik's representation is disputed, the District retained Mr. Budzik, in some capacity, in connection with civil service issues, including Ms. Buddenberg's discipline. (ECF No. 183-1, PageID #2701.) Without question, Mr. Budzik had no attorney-client relationship with Ms. Buddenberg, and she was not in privity with a client of his. (ECF No. 216-3, PageID #11865; ECF No. 263, PageID #14918.)

Plaintiff maintains that lawyers may be sued in Ohio for claims other than malpractice (ECF No. 263, PageID #14913–14)—and that is true. But where the claims arise from the attorney's provision of legal services—regardless of whether the plaintiff is the attorney's client or a third party—Ohio law dictates that the Court analyze the claims through the lens of legal malpractice. *See Omega Riggers & Erectors*, 2016-Ohio-2961, at ¶ 22. Therefore, to the extent Mr. Budzik's provision of legal services gives rise to Plaintiff's claims against him as a third party, the Court must presume that he enjoys qualified immunity. *Silveous*, 2023-Ohio-841, at ¶ 40, 210 N.E.3d at 1033; *Buddenberg*, 2018 WL 3159052, at *6. To the extent Mr. Budzik stepped into the shoes of Mr. Weisdack and assumed his role or acted on his behalf without providing legal services, then his liability is co-extensive with that of Mr. Weisdack on Plaintiff's State-law claims.

### III.D.1.b. Mr. Budzik's Direct Conduct Affecting Plaintiff

If Mr. Budzik otherwise stepped outside his role as a lawyer, the only conduct directly attributable to him involves his limited interactions with Plaintiff during and after the disciplinary hearing. It is undisputed that Mr. Budzik had no authority or control over Plaintiff's day-to-day work activities and that the Board ultimately

136

disciplined Ms. Buddenberg.   (ECF No. 203-1, PageID #8654–55 & #8658.)
Mr. Budzik made a recommendation to the Board, which they considered over a day
and a half and largely, but not entirely, adopted.  (ECF No. 195-17, PageID #5154–55;
ECF No. 204-13, PageID #8990–92.)

Plaintiff claims that Mr. Budzik was intimidating and aggressively
interrogated her during the hearing and that his behavior constituted retaliatory
conduct.   (ECF No. 263, PageID #14908 (citing *Buddenberg*, 939 F.3d at 740
(construing the facts Plaintiff alleged in her complaint as true).)  But the audio
recording of the hearing tells a different story.  In *Scott*, 550 U.S. at 378–81, the
Supreme Court addressed how to handle disputes of fact on a motion for summary
judgment in the face of video and photographic evidence.  Although courts must
ordinarily construe the record on summary judgment in favor of the non-moving
party, "[w]hen opposing parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could believe it, a court should
not adopt that version of the facts for purposes of ruling on a motion for summary
judgment." *Id.* at 380.

Such is the case here.  Although Plaintiff's claims are not implausible, as in
*Scott*, the audio recording (and transcript) of the hearing blatantly contradict her
story to the point where no reasonable jury could believe it.  Mr. Budzik did not
aggressively question Ms. Buddenberg—he read each disciplinary charge, allowed
her to respond, and occasionally asked follow-up questions calmly and evenhandedly.

Nor do Plaintiff's interactions with Mr. Budzik during their off-the-record conversations during and after the disciplinary hearing suffice to avoid his immunity. In these discussions, the record leaves no doubt that Mr. Budzik acted on his client's behalf to reach a settlement with Ms. Buddenberg. (ECF No. 203-1, PageID #8677; ECF No. 204-1, PageID #8938–39; ECF No. 184-1, PageID #3033 & #3047.) The fact that Ms. Buddenberg's interests were (and continue to be) adverse to the District does not render Mr. Budzik's conduct "extra-legal." But even if these discussions are construed, on summary judgment, as "extra-legal" acts of retaliation, the viability of Plaintiff's State-law claims against Mr. Budzik rises and falls with those against the other Defendants, as already discussed.

Finally, any testimony or opinion to the contrary from Plaintiff's proffered experts necessarily fails for two reasons. First, Plaintiff uses her expert witnesses as mouthpieces to reiterate her summary judgment briefing and arguments on retaliation. Second, as a matter of law, Plaintiff suffered no retaliation under federal or State law as she claims. Therefore, there is no genuine dispute of material fact, and no reasonable jury could return a verdict against Mr. Budzik on this record.

### III.D.2. Malice

In the face of the qualified immunity that Mr. Budzik enjoys as an attorney, Plaintiff only has standing to bring any claim against him, sounding in malpractice, through a showing of malice. *Omega Riggers & Erectors*, 2016-Ohio-2961, at ¶ 23. In the absence of malice, even if Mr. Budzik violated the Ohio Rules of Professional Conduct, only the District as his client has standing to pursue those claims. *See Scholler*, 10 Ohio St. 3d at 103. There is little Ohio law "identifying what set of facts

138

is necessary to constitute malice as a substitute for an attorney-client relationship."
*Omega Riggers & Erectors*, 2016-Ohio-2961, at ¶ 31.  Mr. Budzik asserts that malice
requires showing an ulterior motive "separate and apart from the good-faith
representation of the client's interests."  (ECF No. 216-3, PageID #11865 (quoting
*Sprouse v. Eisenman*, 2005-Ohio-463, ¶ 12 (Ohio Ct. App.).)  Plaintiff responds by
arguing that malice can include a showing of ulterior motive but is not limited to such
evidence alone.  (ECF No. 263, PageID #14919–20.)

The Sixth Circuit has held that plaintiffs may struggle establishing malice at
the pleading stage; therefore, when accepting all accusations as true, a plaintiff's
general allegations of malice will usually suffice to state a claim.  *Vector Rsch., Inc.
v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 700 (6th Cir. 1996).  On summary
judgment, however, Plaintiff must do more than rely on her general accusations of
fraud, bad faith, and collusion.  Instead, showing malice requires evidence that
Mr. Budzik acted with "hatred, ill will, or a spirit of revenge" or with a "conscious
disregard for the rights and safety of other persons that has a great probability of
causing substantial harm."  *Omega Riggers & Erectors*, 2016-Ohio-2961, at ¶ 31
(quoting *Preston v. Murty*, 32 Ohio St. 3d 334, 336, 512 N.E.2d 1174 (1987)).

Where an attorney acts with "conscious disregard" for the rights of others, the
harm inflicted must be "beyond that which legal action necessarily may inflict."
*Omega Riggers & Erectors*, 2016-Ohio-2961, at ¶ 35.  Malice can include a showing
that the attorney took willful actions to hurt someone else without justification or
operated with an "ulterior motive separate and apart from the good-faith

representation of the client." *Ryan v. Wright*, 2007-Ohio-942, ¶¶ 19 & 20 (Ohio Ct. App.).  The factual circumstances leading to a finding of malice are usually extreme. For example, a reasonable jury could find that an attorney acted with malice when filing a lawsuit on behalf of a party without the party's knowledge or consent, subsequently dismissing the lawsuit with prejudice, and agreeing to a release of future claims, *see Tye v. Beausay*, 2017-Ohio-7943, 98 N.E.3d 970, ¶ 20 (Ohio Ct. App.), even if—remarkably—such conduct does not give rise to attorney discipline.

Plaintiff alleges that Mr. Budzik demonstrated ill will by the "way he gaslit and berated her about the reasons for Dan Mix's departure during the hearing and the way he lied repeatedly under oath about knowing about Ms. Buddenberg's EEOC charge." (ECF No. 263, PageID #14921.)  As discussed, Plaintiff's attempt to create material disputes of fact regarding Mr. Budzik's conduct at the disciplinary hearing does not hold up in the face of the recording of it.  At most, construing the record in favor of Plaintiff's with the benefit of her experts' opinions as well, Mr. Budzik might have breached a standard of care in his dealings with Ms. Buddenberg—that is, acted negligently, perhaps even grossly negligently—but that conduct falls far short of malice under Ohio law.  *See Ryan*, 2007-Ohio-942, at ¶ 20.

In a footnote, Plaintiff argues that a reasonable jury could infer that Mr. Budzik had an ulterior motive to "ingratiate himself with the District retaliators in the hope of being handsomely compensated and receiving more work." (ECF No. 263, PageID #14921 n.10.)  Assuming that this argument is not waived, *see Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 612 n.2 (6th Cir. 2013), Plaintiff

provides no factual support in the record for this claim.  Instead, she relies on the opinions of her experts.  But without facts in the record to underpin such testimony, it amounts to no more than speculation, which the Court disregards.  *See Andrews v. Lecats Ventriloscope LLC*, No. 5:19-cv-01792, 2022 WL 704578, at *8 (N.D. Ohio March 9, 2022).

As for the claim that Mr. Budzik lied during this litigation about knowing Ms. Buddenberg filed a charge with the EEOC, after repeatedly denying that he knew of the charge, Mr. Budzik submitted errata to his deposition admitting that he was copied on an email providing notice of the charge but, even then, he did not recall receiving it.  (ECF No. 184-1, PageID #3115.)  This record is subject to any number of possible explanations and interpretations, ranging from entirely innocent (he received notice of the charge four years before the deposition by being copied on an email) to less flattering.  Even assuming the worst, as the Court must in the present procedural posture, Mr. Budzik's position on the matter in this litigation does not constitute malice as a matter of law.  In this litigation, Mr. Budzik is a party and a fact witness.  When defending against Plaintiff's claims in this case, he was not counsel or Mr. Weisdack's designee.  On this record, misrepresentations—if that is what they were—in subsequent litigation have no bearing on Mr. Budzik's mental state during and immediately after the disciplinary hearing.

"An attorney should not suffer potential liability to third parties for advising and pursuing a client's non-criminal goals, even if those goals will subject the client to potential civil liability."  *Omega Riggers & Erectors*, 2016-Ohio-2961, at ¶ 32.  As

141

a matter of law, the record presents facts would not support a jury's finding of malice. Therefore, Plaintiff lacks standing to pursue claims against Mr. Budzik.

## III.    The Crime-Fraud Exception and Spoliation

Beyond the merits, but not wholly unrelated, the parties raise certain conduct-related issues, which are also fully briefed for a ruling from the Court.  Plaintiff raises, again, the crime-fraud exception to the attorney-client privilege seeking to compel further discovery from Mr. Budzik.  Defendants contend that Ms. Buddenberg spoliated certain text messages and other electronically stored information.

### III.A. Plaintiff's Motion to Compel

Plaintiff argues that the crime-fraud exception warrants discovery of privileged materials because she has made a *prima facie* showing that the District Defendants used Mr. Budzik's advice to further crimes and a fraud.  (ECF No. 283, PageID #15461–62.)  She argues that the Defendants have committed a crime under Section 2921.45 of the Ohio Revised Code by knowingly violating her statutory rights by changing her working schedule and bringing baseless disciplinary charges against her—including a charge for speaking to the Board about Mix's departure from the District.  (*Id.*)  Also, she argues that the Court should have a "reasonable basis to suspect" that the Defendants committed crimes by issuing her a baseless disciplinary notice—a "false writing" in violation of Section 2921.03—and retaliating against her for her reports to the Board, in violation of Section 2921.05.  (*Id.*, PageID #15465–66.)  She argues that the Board enforced her discipline at the advice and direction of Mr. Budzik.  (*Id.*, PageID #15467–71.)  Further, she asserts that he became an active participant in unlawful retaliation, thereby subjecting him to criminal liability.  (*Id.*)

142

Defendants oppose Plaintiff's motion because it is untimely and procedurally improper.  (*See generally* ECF No. 292.)  They also move to strike it.  (*Id.*)

The Court need not consider the merits of Plaintiff's arguments on the crime-fraud exception because her motion to compel is procedurally improper and no good cause supports reopening discovery at this late date.  In any event, Plaintiff's arguments directed to further discovery based on the crime-fraud exception fail on the merits as well.

### III.A.1. Procedural Propriety

It is well settled that district courts have broad discretion to manage discovery and determine the timeliness of a motion to compel.  *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642–43 (6th Cir. 2018).  Denials of motions to compel are reviewed for an abuse of discretion and reversed only upon "a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant."  *Id.* at 642.

Rule 37(a) permits a party to move to compel discovery, but the rule does not impose a deadline for filing such motions.  Courts generally treat Rule 37 as operative "during the discovery process."  *Cunningham v. Hamilton Cnty.*, 527 U.S. 198, 208 (1999).  Accordingly, a district court operates well within its discretion to deny a motion to compel filed after the close of discovery.  *Pittman*, 901 F.3d at 642–43 (collecting cases) (holding that there was no abuse of discretion where a district court denied a motion to compel five months after the close of discovery); *Craig-Wood v. Time Warner N.Y. Cable LLC*, 549 F. App'x 505, 508 (6th Cir. 2014) (affirming the

district court's denial of a motion to compel filed two months after the discovery cut-off and after the defendant moved for summary judgment).

Two additional rules limit the ability of a party to bring a motion to compel. First, Local Rule 37.1(b) requires the filing of any motion to compel within ten days after the close of discovery. *See Salem v. City of Akron*, No. 5:18-cv-1754, 2020 WL 1233953, *4 (N.D. Ohio, Mar. 13, 2020) (collecting cases applying the time limit under Local Rule 37.1(b) to deny untimely motions to compel). Second, before moving to compel, Local Rule 37.1(a)(1) obligates the parties to undertake good efforts to resolve any discovery dispute before filing a motion with the Court. Further, the Court's Civil Standing Order contains additional prerequisites, which the Court strictly enforces, to avoid unnecessary motion practice over discovery disputes. *See* Civil Standing Order § 6.A. In short, to conserve the resources of the parties and the Court, before any party may file a discovery motion, the parties must reach impasse in efforts to resolve the issue *and* involve the Court in further efforts short of motion practice. Only then, with the Court's authorization, may a party bring a discovery motion. *See id.*

### III.A.1.a. Timeliness

Without question, Plaintiff's motion is untimely. She filed her motion a year and a half after discovery closed and after briefing on summary judgment and spoliation was complete. Nevertheless, Plaintiff argues that Defendants cannot be surprised by her motion to compel because they were on notice that she would be seeking discovery related to privileged materials under the crime-fraud exception. But this argument cuts both ways. Given the amount of time that passed following

144

the close of discovery (some 547 days after discovery closed on January 31, 2022), Defendants (and the Court) could fairly have assumed the issue was resolved, abandoned, or not worth the time and resources.  Even after July 14, 2022, when Plaintiff represented that the issue warranted briefing, more than a year passed before Plaintiff filed a motion.  Again, during that time, Defendants and the Court could fairly assume that further action on the issue was not necessary or not a priority.

Additionally, on June 15, 2022, the Court resolved disputes over claims of privilege of certain documents Mr. Budzik listed on a privilege log and found that the crime-fraud exception did not apply.  (ECF No. 142, PageID #937–38.)  Nor did Plaintiff explore any of those issues during Mr. Budzik's deposition before the Court on April 29, 2022.  (*Id*.)  This additional attention to the issue by the parties and the Court reinforces the determination that any motion should have come far sooner than it did.

### III.A.1.b. Exhaustion of Efforts

Further, Defendants' awareness of potential privilege issues does not excuse Plaintiff's failure to exhaust efforts under Rule 37, the Local Rules, or the Court's Civil Standing Order before moving to compel.  Plaintiff argues that Defendants attempt "to gaslight" the Court into believing that her motion was "unauthorized and procedurally improper."  (ECF No. 293, PageID #15594.)  In support, Plaintiff points to the Court's November 30, 2022 Order stating that privilege-related issues would be dealt with on "parallel tracks" with summary judgment and spoliation as authorization to file her motion to compel.  By then, the record shows that Plaintiff's

145

efforts to obtain discovery of privileged matters from Mr. Budzik had long since passed.  Even if they had not, however, Plaintiff still waited until after briefing on the spoliation issue closed before filing a motion—by definition, not a parallel track. Moreover, Plaintiff consistently raised disputes about privilege and the crime-fraud exception, even after the Court found that the exception did not apply, but at no time requested a briefing schedule or put Defendants or the Court on notice of an impasse.

*　　*　　*

Accordingly, the Court denies Plaintiff's motion to compel because it is untimely and fails to abide by Local Rule 37.1 and the Court's Civil Standing Order. *See Pittman*, 901 F.3d at 642–43; *Mohney v. USA Hockey*, 5 F. App'x 450, 459–60 (6th Cir. 2001) (affirming a district court's denial of a motion to compel for failure comply with Local Rule 37.1).

### III.A.2. Reopening Discovery

Under Rule 16(b), a district court may amend a scheduling order establishing deadlines for matters such as discovery on a showing of "good cause."  Fed. R. Civ. P. 16(b)(4).  The Sixth Circuit identifies different considerations for determining whether "good cause" exists to modify a scheduling order to reopen discovery.  *See, e.g.*, *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010) (citing the length of the discovery period, the moving party's diligence, and when the moving party learned of the issue that is the subject of discovery); *Morgan v. Gandalf, Ltd.*, 165 F. App'x 425, 431 (6th Cir. 2006) (citing the specificity and relevance of the request and prejudice to the nonmoving party).  Regardless of how articulated, "[t]he

primary measure of Rule 16's 'good cause' standard is the moving party's diligence . . . ." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (citation omitted).

Based on the record in this case, the Court declines to exercise its discretion to reopen discovery and finds that Plaintiff has not made a showing of good cause to do so. Based on the volume of the record on summary judgment, it is difficult to see any matter that the parties did not already discover. More discovery will not, in the Court's judgment and experience, materially change the record.

Because the Sixth Circuit places great weight on a party's diligence, the Court addresses that consideration briefly. Plaintiff's counsel diligently and vigorously represented his client and left no stone unturned in doing so. As applied here, the Court understands reasonable diligence of a party to mean efforts used to obtain further discovery of matters that the attorney-client privilege protects. In that respect, the delay in filing a motion directed to the issue, even if procedurally proper, speaks to a lack of good cause to reopen discovery. These issues have been known to Plaintiff, if not since the onset of litigation, at least since early 2022. Even after the close of discovery, Plaintiff had ample opportunity to obtain the information she seeks now—including *in camera* review of documents, directions to confer with opposing counsel about the privilege issue, and allowing her to depose Mr. Budzik a third time.

Moreover, reopening discovery at this late date would upend the case management schedule under which the Court and the parties have long operated, invariably create numerous discovery disputes, and require a do-over of summary

judgment briefing—all to the prejudice of Defendants and out of all proportion to the needs of the case.

For these reasons, the Court finds no good cause to reopen discovery now and declines to do so.

### III.A.3. Rule 56(d)

Construing Plaintiff's motion to compel as a motion under Rule 56(d) for additional discovery to oppose summary judgment does not change the disposition of the motion. *See Doe v. City of Memphis*, 928 F.3d 481, 490–91 (6th Cir. 2019). Here, Plaintiff's 150 pages of opposition briefing and her motion for summary judgment refute the need for additional discovery to oppose Defendants' summary judgment motions. Moreover, nowhere in that briefing or in her motion to compel does Plaintiff identify what material facts the discovery she seeks might reveal or how new information would support her claims beyond the existing record.

### III.A.4. *De Novo In Camera* Review

The attorney-client privilege "is narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit." *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997) (citing *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996)). The privilege "applies only to the extent that it serves 'the broader public interests'"—meaning, "[i]t has no application to legal advice in aid of a fraudulent scheme or criminal activity." *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992) (citing *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986)). On a showing by a preponderance of the evidence, the crime-fraud exception applies where:  (1) the client was engaged in or planning a criminal or

fraudulent scheme when it sought the advice of counsel to further the scheme; and (2) the documents containing the privileged materials bear some relationship to the alleged crime or fraud. *See In re Antitrust Grand Jury*, 805 F.2d at 164. An attorney need not take part in or even know about the crime or fraud for the exception to apply because the client's purpose controls. *United States v. Skeddle*, 989 F. Supp. 890, 902 (N.D. Ohio 1997).

With the benefit of the record on summary judgment, the parties' briefing on the merits, and Plaintiff's motion to compel, the Court conducted another review of all materials previously submitted for *in camera* review. Because of the peculiar circumstances of this case, which involve claims under State law for civil liability for criminal acts and questions about the role that lawyer, Mr. Budzik, played in the discipline of Ms. Buddenberg, the Court finds that Plaintiff, again, has made a sufficient *prima facie* showing justifying *in camera* review. *See United States v. Zolin*, 491 U.S. 554, 572 (1994). Based on this re-review, the Court remains of the view it previously expressed: the crime-fraud exception does not apply, and Mr. Budzik (or, more accurately, the District as the client and holder of the privilege) properly withheld from discovery the privileged materials at issue. (*See* ECF No. 142, PageID #937–38.) The documents and information at issue contain no indicia of fraud or any crime. The Court's *in camera* review revealed, again, only the ordinary communications between a client (and its agent) and its counsel. Nor do the materials contain a smoking gun establishing the liability of the District Defendants or Mr. Budzik.

149

\*     \*     \*

For all these reasons, the Court **DENIES** Plaintiff's motion for discovery of materials and information within crime-fraud exception to the attorney-client privilege (ECF No. 283).  Further, based on the record as a whole, the Court finds that the motion at issue sought either additional briefing on summary judgment, beyond the already generous page limits, or to counterbalance the record after Defendants raised their claim of spoliation.  Because no other basis comes close to supporting the discovery Plaintiff seeks in her motion to compel, the Court need not consider the matter further.

### III.B. Rule 37 Sanctions

Pursuant to Rule 37(e), Defendants request that the Court sanction Ms. Buddenberg for claimed spoliation of evidence in anticipation of this suit and during discovery.  (ECF No. 256, PageID #14643.)  They also maintain that Rule 37(b)(2) (failure to obey a discovery order), Rule 37(c)(1) (failure to supplement a discovery response), and the Court's inherent authority provide a basis for sanctions. (*Id.*, PageID #14643 & 14646.)  Their motion focuses largely on text messages lost— unintentionally or deliberately—from Ms. Buddenberg's cellphone.  Plaintiff opposes the motion and argues that Defendants have not met their burden to prove spoliation and that sanctions are unwarranted.  (ECF No. 276.)

### III.B.1. Findings of Fact

On Defendants' motion for sanctions, the Court makes the following findings of fact only for purposes of that motion.  In ruling on the parties' respective motions for summary judgment, the Court gave these findings no consideration.  To ensure it

150

did not consider these findings, the Court concluded its analysis of the parties' summary judgment motions before turning to the record on Defendants' motion under Rule 37. With respect to the motion for sanctions, the record includes more than 100 pages of briefs, over 1,200 pages of evidentiary materials, and two days of testimony at a hearing spanning nearly 400 pages of transcript.

### III.B.1.a.  Ms. Buddenberg had difficulty hiring a lawyer but had counsel about a year before filing this lawsuit.

In February 2017, after filing her charge with the EEOC, Ms. Buddenberg started trying to hire a lawyer. (ECF No. 238, PageID #13177.) She had difficulty finding an attorney to represent her. (*Id.* at PageID #13177–78.)

Although Ms. Buddenberg did not have a lawyer present at the disciplinary hearing (*id.* at PageID #13185–86), during that hearing held on March 3, 2017, she stated that she learned about a document allegedly threatening to fire Mix that was left open on a computer. (ECF No. 210-4, PageID #11333). She learned about that document because, "[a]ctually to [her] attorney it was presented." (*Id.*) At the latest, she had counsel by mid-April 2017. (ECF No. 238, PageID #13178; *see also id.*, PageID #13186–87; ECF No. 276, PageID #15379.) Whenever Ms. Buddenberg had counsel, she was contemplating litigation against the District by the date of her disciplinary hearing and was represented about a year before filing this lawsuit on March 6, 2018. (ECF No. 237, PageID #13024.)

### III.B.1.b.   By April 2017, Ms. Buddenberg knew she needed to preserve evidence, including text messages.

Ms. Buddenberg knew that she needed to preserve evidence for use in this case. (ECF No. 237, PageID #12987.)   Further, she "[a]bsolutely" understood that this obligation included information on her phone, which encompassed text messages. (*Id.*)   The litigation record confirms that Ms. Buddenberg texted with Mix and Andrews about the retaliation she experienced.  (ECF No. 276, PageID #15378.)

During the times relevant to the underlying events, from October 2016 to April 2017, Ms. Buddenberg used an iPhone 6.  (ECF No. 238, PageID #13193, #13202, #13206 & #13223.)  In June 2017, she traded in that device through Verizon for an iPhone 7 Plus.  (*Id.*)  When she did, she relied on Verizon to transfer data from the old device to the new one.  (ECF No. 238, PageID #13224.)  At these times, she had her phones set to backup to iCloud for which she had a paid subscription.  (*Id.*; ECF No. 237, PageID #12983–86.)

### III.B.1.c.   Ms. Buddenberg provided altered text messages with Dan Mix and Darla Andrews to counsel.

By April or May 2017, Ms. Buddenberg was working with her counsel.  (ECF No. 227-17, PageID #12301; *see also* ECF No. 208-2, PageID #10455; ECF No. 238, PageID #13178.)  From the beginning of the litigation, Ms. Buddenberg knew that Mix and Andrews would be important witnesses for her.  (ECF No. 237, PageID #12980 & #13038–40.)

To offer background to her counsel, Ms. Buddenberg started providing text messages to her lawyers.  (ECF No. 238, PageID #13182.)  She did this by taking screenshots of what she considered relevant text messages, which she printed out at

home and gave to her counsel.  (*Id.*, PageID #13188–89 & #13209.)  She did not know of any other way to share text messages with her lawyers.  (*Id.*, PageID #13190 & #13209–10.)  Some text threads she altered by making "it so that it was more concise with dates" to fit on a single page to print.  (*Id.*, PageID #13188 & 13300.)  She saved the original screen shots and the altered photos of them.  (*Id.*, PageID #13188 & #13210.)  These screenshots were created within a one-hour window on May 6, 2017. (ECF No. 237, PageID #13128 & #13143.)  Two days later, she provided them to her counsel.  (ECF No. 208-2, PageID #10455.)

### III.B.1.d.  She also deleted other text messages.

Ms. Buddenberg did not provide her attorneys with "everything," just the electronically stored information she thought was relevant.  (ECF No. 238, PageID #13189.)  She admitted to deleting text messages with Mix:

> Q.   Did you purposely delete any Dan Mix text messages off your phone?
>
> A.   I did not purposefully delete any text messages that I felt to be relevant.

(ECF No. 237, PageID #12988.)  Similarly, Ms. Buddenberg admitted to deleting text messages from Andrews.  (*Id.*, PageID #12989–90.)  This testimony in court stands at odds with Ms. Buddenberg's denials in deposition of deleting *any* text messages. (ECF No. 205-1, PageID #9050–51.)

Based on her qualified answers to these questions on the witness stand in March 2023, along with her demeanor at the hearing, the Court finds that Ms. Buddenberg deliberately deleted text messages with Mix and Andrews.  The documentary record supports this finding too.  Despite the volume of text messages

ultimately produced between Ms. Buddenberg and Mix, the first text message between the two produced at any time during this litigation is dated October 25, 2016—the day after Ms. Buddenberg's report to the Board.  (ECF No. 227-17, PageID #12278.)  That text appears to start midstream, "That is a relief."  (*Id.*)  Assuming the date makes the context clear, and even accounting for the proximity of the offices of Mix and Ms. Buddenberg such that extensive texting was not necessary, the Court finds it not credible that the two did not text at all before October 25, 2016, at the very least on the date Ms. Buddenberg went to the Board or in the days leading up to her report to the Board.

### III.B.1.e.  Counsel produced the text messages that Ms. Buddenberg provided.

In June 2018, the parties filed a report of their planning meeting pursuant to Rule 26(f).  (ECF No. 39; *see also* ECF No. 227, PageID #12150.)  In the recommended discovery plan, Ms. Buddenberg represented that she had "identified personal devices" containing discoverable electronically stored information.  (ECF No. 39, PageID #490.)

On her initial disclosures, Plaintiff listed Mix and Andrews as individuals with discoverable information.  (ECF No. 41, PageID #497 & #499.)  Also, she identified text messages with Mix and other District employees as documents supporting her claims.  (*Id.*, PageID #502.)  She even produced some, totaling 17 pages of screenshots of text messages, with her initial disclosures.  (ECF No. 227-3; ECF No. 227-5.)  These text messages consist of 55 text messages with Mix and 54 with Andrews.

In discovery, Defendants requested relevant communications, specifically including text messages. (ECF No. 227-6, PageID #12208; *see also* ECF No. 227-7, PageID #12216–17.) In response, Plaintiff produced no new documents and referred Defendants to the documents produced with her initial disclosures. (*Id.*) In July 2021, Plaintiff made a supplemental production that included 5 additional text messages from Mix and 16 from Andrews. (*See* ECF No. 227-8; ECF No. 227-9.)

### III.B.1.f. After the close of discovery, supplemental productions of numerous text messages led to further investigation.

In January 2022, Ms. Buddenberg traded in her iPhone 7 Plus for an iPhone 13. (ECF No. 227-29, PageID #12696; ECF No. 238, PageID #13226.) Again, she relied on Verizon to transfer the data from her old device to the new one. (ECF No. 238, PageID #13226.)

After the close of discovery, the day before the conclusion of the deposition of the Board's chair, Plaintiff made a supplemental production of emails that Mix and Ms. Buddenberg exchanged on their personal accounts. (ECF No. 227-10.) This production triggered ongoing discussions between counsel to identify the reason for the production and to ensure its completeness. (*Id.*; ECF No. 227-11; ECF No. 227-12.)

By the end of February 2022, Plaintiff produced 132 new documents, including over 100 text messages with Mix and nearly 90 with Andrews. (*See* ECF No. 227-13; ECF No. 227-14; ECF No. 227-15.) Plaintiff's counsel explained the circumstances of these productions. (ECF No. 227-15.) Specifically, Ms. Buddenberg provided a document to counsel that counsel had not previously seen. (*Id.*, PageID #12273.)

That document prompted a new search of Ms. Buddenberg's email account, which turned up additional information to produce that Ms. Buddenberg had not previously provided to her lawyers and further discussions between counsel.  (*Id.*; ECF No. 227-19.)

In March 2022, Plaintiff made another supplemental production of 92 pages of text messages with Mix containing over 1,300 messages and 117 pages of texts with Andrews containing over 300 messages.  (ECF No. 227-17; ECF No. 227-18.) Plaintiff's counsel explained that a "text-extraction program was used to extract and produce all texts between Ms. Buddenberg and Dan Mix, and Ms. Buddenberg and Darla Andrews."  (ECF No. 227-19, PageID #12487.)  But this production raised further concerns for defense counsel because some of the texts produced in Ms. Buddenberg's previous discovery responses were missing from this extraction. (ECF No. 238, PageID #13291–92.)  Subsequent discussions between counsel resulted in an agreement in April 2022 for additional forensic searches for electronically stored information, including of Ms. Buddenberg's personal cell phones and other devices, by Vestige Digital Investigations.  (*See* ECF No. 137, PageID #916.)

### III.B.1.g.  Ms. Buddenberg attempts to frustrate the Court's Order by obstructing forensic imaging and review of her devices.

According to the parties' agreement, which the Court entered as an order, Ms. Buddenberg was to make her devices available to Vestige for forensic imaging. (ECF No. 137, PageID #916.)  When she did so, her iPhone 13 was in factory reset mode.  (ECF No. 229-1, PageID #12931; ECF No. 237, PageID #13085.) Ms. Buddenberg testified that her iPhone 13, which she acquired a few months

earlier, became unresponsive shortly before Vestige was scheduled to image it. (ECF No. 238, PageID #13231.) A Verizon customer service agent talked her through a reboot and sent her to an Apple store to fix the issue. (*Id.*, PageID #13231–34.) In the meantime, so as not to be without a phone, Verizon activated Ms. Buddenberg's phone number on an old rose gold iPhone 7 that belonged to her stepdaughter. (ECF No. 238, PageID #13235–26.)

A few days before she was scheduled to turn her devices over to Vestige, Ms. Buddenberg had an appointment with Best Buy which she scheduled through Apple. (ECF No. 238, PageID #13238.) When she arrived, Ms. Buddenberg claims that she informed the technician that she could not lose any data because of this litigation. (ECF No. 238, PageID #13240.) She signed a form acknowledging that "IT IS MY RESPONSIBILITY . . . TO BACK UP DATA" and waived any claim for loss of data. (ECF No. 226-1, PageID #12134.) Ms. Buddenberg testified that she signed the form but did not read it. (ECF No. 237, PageID #13090.) The technician took her phone to a back room for about an hour. (ECF No. 238, PageID #13242–44.) When he returned, the technician said he could not fix the iPhone 13 and returned it. (*Id.*, PageID #13244.)

When Ms. Buddenberg provided her iPhone 13 to Vestige, she also brought the rose gold iPhone 7 she had been using and her iPad. (*Id.*, PageID #13250.) Like the iPhone 13, the rose gold iPhone 7 and iPad contained no usable relevant data. (ECF No. 237, PageID #13133.) Ms. Buddenberg did not connect these devices—the rose gold iPhone 7 and the iPad—to iCloud to synch them to the information she had

backed up there.  (*Id.*, PageID #13083 & #13133.)  Accordingly, Ms. Buddenberg appeared at the forensic examination with devices that yielded nothing of value to this case.  (*Id.*, PageID #13133.)

Based on her testimony at the hearing, and the opportunity to observe her on direct and cross-examination, the Court finds that Ms. Buddenberg's errata executed five weeks after her deposition (ECF No. 227-29) amounts to little more than a self-serving affidavit submitted in response to a motion for summary judgment and, accordingly, discounts it.  Further, the Court finds that Ms. Buddenberg displayed a lack of candor about the circumstances involving the loss of data from her devices.

### III.B.1.h. Fortuitously, Defendants obtain access to Ms. Buddenberg's iCloud account.

Vestige obtained none of the information subject to the protocol for forensic searches for electronically stored information that the Court entered as an Order from Ms. Buddenberg herself.  (ECF No. 137.)  But some information came to light.  At Vestige's request, a law clerk at the firm representing Ms. Buddenberg provided access to her iCloud account, including the most recent backup of it.  (ECF No. 238, PageID #13250.)

From review of the iCloud data (ECF No. 237, PageID #13132–35), Vestige recovered 43 screenshots of texts from Ms. Buddenberg to Mix (ECF No. 227-26) and 74 screenshots of texts from her to Andrews (ECF No. 227-27).  Many of these text messages had not been previously produced.  They show that Ms. Buddenberg deleted relevant text conversations that bear directly on the parties' respective claims and defenses.

### III.B.1.i.    Ms. Buddenberg deleted relevant text messages.

To illustrate the point, the Court uses just two examples.

*First*, on March 6, 2017, the day before Ms. Buddenberg filed a charge of retaliation with the EEOC, she texted with Mix.  She produced the following version of that text conversation with her initial disclosures:



(ECF No. 227-3, PageID #12191.)  This version of the text exchange provides evidence directly supporting Ms. Buddenberg's claim of retaliation.

Vestige recovered three different versions of screenshots of this same text conversation (with boxes showing deletions and arrows pointing to where that content should be):



ECF No. 227-26, PageID #12535    ECF No. 227-26, PageID #12536    ECF No. 227-26, PageID #12568

The right most text message is the one produced with the initial disclosures. At minimum, these alterations to the text thread present material for further investigation. At worst, they show Ms. Buddenberg intentionally altering content to make her case appear stronger or even manufacturing facts to support her claims. In between these extremes, lie a host of other possible explanations.

*Second*, on November 2, 2016, Ms. Buddenberg texted with Andrews. She produced the following text exchange, among others, with her initial disclosures:



(ECF No. 227-5, PageID #12201.)  Again, this text message provides direct support for Ms. Buddenberg's version of events.

Vestige retrieved another version of it (the version produced with Plaintiff's initial disclosures appears on the left):



ECF No. 227-27, PageID #12587



ECF No. 227-27, PageID #12630

The second version recovered shows that Ms. Buddenberg altered the content of this exchange sometime after 2017 when she first provided it to her counsel by deleting certain texts.

These are just two of the many examples of such text messages at issue.

### III.B.1.j.    Ms. Buddenberg also failed to produce relevant electronically stored information.

Vestige's analysis of the data stored in the iCloud identified 43 screenshots of text conversations between Ms. Buddenberg and Mix and 74 between Ms. Buddenberg and Andrews, including 43 messages with Mix that were not previously produced and 28 with Andrews.  (ECF No. 227-26; ECF No. 227-27.)

162

Technologically, Plaintiff's expert identified only one way individual text messages could be deleted.  (ECF No. 228, ¶ 3(a), PageID #12922.)  It requires intentional action by a device's user to select particular messages to delete. Additionally, the record contains evidence of Ms. Buddenberg using this method to delete particular text messages.  (ECF No. 227-27, PageID #12583–85, #12619–20 & #12625–26; ECF No. 227-26, PageID #12544–45.)

There is much more to the technological ins and outs associated with the parties' respective positions on Ms. Buddenberg's electronically stored information. The Court has it reviewed it all, several times, and worked through it.  The Court will not get into all the technical parameters associated with data storage, its retrieval, and how Ms. Buddenberg went about it here.  Based on its review, and in the interest of clarity, the Court limits its discussion of those matters to the following finding: although there might be any number of innocent or inadvertent occurrences that would explain a discrepancy here or there, or even categorical ones based on date or the like, particularly for a technology user of typical or average competence for a person of her age, as Ms. Buddenberg is, no such explanation accounts for the sheer number of missing or deleted text messages in the record.

### III.B.1.k.   For Ms. Buddenberg, the ends justify the means.

The Court addresses one last factual matter based on the opportunity to observe Ms. Buddenberg and listen to her testimony over a protracted period of time at the hearing in March 2023.  During her testimony, Ms. Buddenberg was asked on cross-examination about her deposition on July 8, 2022, in which she was questioned about the deletion of text messages.  She and counsel sparred over whether

Ms. Buddenberg should have anticipated and been prepared to address that topic. (ECF No. 238, PageID #13295.)  Ms. Buddenberg testified that she "went in[to] it knowing that I knew my truth, I know that I didn't do anything wrong, and I knew that I could answer questions." (*Id.*, PageID #13296.)

This testimony was not an isolated incident.  For example, when discussing what she considers false charges giving rise to her discipline, Ms. Buddenberg became quite emotional and testified:  "I offered so much fact to demonstrate that none of the stuff that they were accusing me of was real, and I believed, I trusted that Mr. Budzik was going to take that information and use the truth that I was giving him." (*Id.*, PageID #13184.)

Watching Ms. Buddenberg's testimony on these and other occasions leaves the Court convinced that she feels wronged by the events at issue in this lawsuit.  The Court has no doubt that Ms. Buddenberg believes, perhaps with justification, that Mr. Weisdack was an abusive and poor manager for the District and that Mix or others would better serve the District, its employees, and ultimately the public.  That is the "my truth" to which she spoke.  And she believes this version of the truth, her truth, so strongly and so righteously that the Court finds that Ms. Buddenberg took it upon herself to make sure the facts aligned with her truth.  That is, when she had difficulty finding a lawyer, Ms. Buddenberg edited text messages to make her truth appear unassailable.  Without doing so, she might not have found any lawyer to take up her cause.  When ordered to turn her devices over for forensic investigation, she did what she could to ensure they were useless.  And she took steps along the way to

curate the record, to make it more favorable to her or to ensure that it reflected her truth.

In this regard, Ms. Buddenberg can testify, truthfully from her perspective, that she "did not purposefully delete any text messages that [she] felt to be relevant" (ECF No. 237, PageID #12988) or that she did not intentionally delete any messages to help her legal case (ECF No. 238, PageID #13210).  But the objective facts do not bear out her testimony or this version of events.  When asked at the hearing about missing text messages, Ms. Buddenberg's pauses, lengthy at times, showed knowledge of the reason for the missing or altered messages and the need to articulate a plausible explanation consistent with "her truth."  Similarly, when asked whether she ever wrote anything in a text that would benefit her if deleted, her lengthy pauses spoke volumes.  Accordingly, the Court finds that the physical evidence and Ms. Buddenberg's dissembling when confronted with the actual truth or with facts that contradict or call into question "her truth" leave little doubt about the events that transpired with Ms. Buddenberg's devices.

### III.B.2.  Conclusions of Law

An amendment to Rule 37(e) in 2015 worked major changes to the availability of sanctions for a party's spoliation of or failure to preserve electronically stored information.  Accordingly, cases interpreting or applying previous versions of the Rule have little application outside of certain limited areas, such as when a party has a duty to preserve or what amounts to prejudice.  As the movants, Defendants bear the burden of establishing whether sanctions are warranted on the record presented.  *Courser v. Michigan House of Representatives*, 831 F. App'x 161, 188 (6th Cir. 2020).

Titled "Failure to Preserve Electronically Stored Information," Rule 37 provides for sanctions where such information is lost, if it cannot be restored or replaced through additional discovery.  Fed. R. Civ. P. 37(e).  Specifically, the Rule applies to "electronically stored information that should have been preserved in the anticipation or conduct of litigation."  *Id.*  And its unavailability must result "because a party failed to take reasonable steps to preserve it."  *Id.*  Therefore, "the routine, good-faith operation of an electronic information system" presents a relevant consideration in evaluating whether a party failed to take reasonable steps to preserve information.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Reasonable steps to preserve do not require perfection.  *Id.*  In particular, individual litigants might have less familiarity with preservation obligations than those experienced in litigation.  *Id.*

Where the loss of information results from a failure to take reasonable steps to preserve it, "upon a finding of prejudice to another party from loss of the information," a court "may order measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).  Even then, "the initial focus should be on whether the lost information can be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Under subsection (e)(1), a finding of prejudice requires "an evaluation of the [lost] information's importance in the litigation."  *Courser*, 831 F. App'x at 187–88 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).  The more severe sanctions available under Rule 37(e)(2), including an adverse-inference jury instruction, may be imposed only

on a finding of specific intent "to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

Although Defendants seek sanctions under Rule 37(b)(2) and Rule 37(c)(2) in addition to Rule 37(e), the Court limits its analysis, at least for now, to Rule 37(e) for two reasons.  First, the failure to obey a discovery order—in this case, the parties' agreement, which the Court entered as an Order (ECF No. 137)—presents a narrower and more limited issue that is a subset of the Rule 37(e) motion on this record. Accordingly, addressing Rule 37(e) will subsume all the relevant conduct instead of just part of it.  So too with Rule 37(c)(1) and Plaintiff's failure to supplement.  In any event, these provisions of Rule 37 carry many of the same sanctions potentially available under Rule 37(e).  Second, a basic rule of statutory interpretation is that the specific controls the general.  *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29 (1957).  Here, Rule 37(e) specifically governs a party's failure to preserve electronically stored information.  This specific rule governs the analysis, not the more general provisions in other parts of Rule 37, because it regulates the particular circumstances at issue.

Finally, a word about inherent authority.  A federal district court has inherent authority to sanction bad-faith conduct.  *First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 (6th Cir. 2002) (quoting *Runfola & Assocs. v. Spectrum Reporting II*, 88 F.3d 368, 375 (6th Cir. 1996)).  "[F]ederal courts have the inherent power to impose sanctions to prevent the abuse of the judicial process."  *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 502 (N.D. Ohio 2013).  Where a party litigates in

167

bad faith or for oppressive reasons, a court may invoke its inherent authority to impose sanctions. *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)). In the Court's view, Rule 37(e) displaces resort to inherent authority as a basis for sanctions in all but the most egregious of cases, at least with respect to a failure to preserve electronically stored information. Nonetheless, some courts still invoke their inherent authority after the 2015 amendment, *see e.g., Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 579–80 (S.D.N.Y. 2017). But the detailed provisions of the rule "foreclose[] reliance on inherent authority . . . ." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see also Newberry v. County of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018). Accordingly, the Court also need not address inherent authority at this time.

### III.B.2.a. Should Have Been Preserved

Rule 37(e) only applies where electronically stored information "should have been preserved in the anticipation or conduct of litigation." Where a party destroys or fails to preserve evidence in anticipation of litigation, a court may impose sanctions for spoliation. *Applebaum v. Target Corp.*, 831 F.3d 740, 744 (6th Cir. 2016) (citing *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc)). Rule 37(e) does not create a duty to preserve evidence, instead it is based on the common-law duty to preserve. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. "[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information, including [electronically stored information], when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence

may be relevant to future litigation.'" *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). Any number of events put a party on notice of a duty to preserve:  demand letters, hold notices, preservation requests, litigation threats, or a party's own decision to pursue a claim. *Gomez v. Metropolitan Gov't of Nashville & Davidson Cnty.*, No. 3:19-cv-00026, 2021 WL 3406687, at *2 (M.D. Tenn. Aug. 4, 2021) (citation omitted).  Some courts consider the filing of an EEOC charge a sufficient trigger for the duty to preserve evidence.  *See Chatman v. Truegreen Ltd. P'ship*, No. 22-cv-2705, 2023 WL 8284401, at *3 (W.D. Tenn. Nov. 30, 2023) (collecting cases).

Here, the record leaves no doubt that by April 2017 (at the latest)—about a year before commencing this lawsuit—Ms. Buddenberg had a duty to preserve her electronically stored information and should have preserved text messages with Mix and Andrews.  By her own admission, she was contemplating litigation as of the date of her disciplinary hearing and knew the importance of each of these witnesses. Within a month or so of that hearing, at the latest, Ms. Buddenberg had counsel. Shortly after having counsel, she provided text messages to her lawyers, recognizing their importance.  Ms. Buddenberg had a duty to preserve and should have preserved her text messages with Mix and Andrews, as well as other electronically stored information in anticipation of litigation.  In this regard, the fact that no Defendant requested production of electronically stored information until 2022 has no legal significance.  (ECF No. 227, PageID #12150.)  Ms. Buddenberg had a duty to preserve nonetheless.

### III.B.2.b. Reasonable Steps to Preserve

For a movant to obtain sanctions under Rule 37(e), the loss of electronically stored information must be "because a party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e).  Therefore, "the routine, good-faith operation of an electronic information system" presents a relevant consideration in evaluating whether a party failed to take reasonable steps to preserve information.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Reasonable steps to preserve do not require perfection.  *Id.*  In particular, individual litigants might have less familiarity with preservation obligations than those experienced in litigation.  *Id.*

On the one hand, Ms. Buddenberg backed up the contents of her iPhone to the cloud.  Without more, such a reasonable step might ordinarily foreclose the availability of Rule 37(e) sanctions.  But here there is more.  The record shows that Ms. Buddenberg curated the text messages she provided to her counsel—she sent certain threads, not everything, and selectively edited their content.  Then, she failed to produce the electronically stored information backed up in the cloud in discovery or even provide it to her counsel.  When ordered to produce her devices for imaging, they contained no usable information, and her primary phone was in factory reset mode.  Although relevant data still resided in the cloud, Ms. Buddenberg did not download it or provide it to Vestige or her counsel.

This conduct on the part of Ms. Buddenberg shows a failure to take reasonable steps to preserve electronically stored information for use in litigation consistent with her duty to preserve this evidence and her obligations in discovery to produce it.  *See Schnatter v. 247 Group, LLC,* 3:20-cv-00003, 2022 WL 2402658, at *10–11 (W.D. Ky.

March 14, 2022) (finding that a plaintiff did not take reasonable steps to preserve evidence where he deliberately deleted some text messages, even though other electronic evidence was backed up to the cloud); *see also Adamczyk v. School Dist. of the City of Hamtramck Pub. Schs.*, No. 2:20-cv-12450, 2023 WL 2733385, at *14 (E.D. Mich. Mar. 31, 2023) (finding that a school's superintendent did not take reasonable steps to preserve electronically stored information when he turned his phone over in factory reset mode rather than "as is").

Plaintiff argues that there "was no reason she would have thought to save *every* message" between herself, Mix, and Andrews.  (ECF No. 276, PageID #15395.)  A litigant has no duty to retain every document in her possession.  *United States v. Florence*, No. 2:13-cv-00035, 2020 WL 1047377, at *4 (M.D. Tenn. Mar. 4, 2020) (citations omitted).  But this is not a case of a party or court insisting on the preservation or production of every scrap of paper or every electron, as the case may be.  To the contrary, the Court is *not* focused on marginal or *de minimis* gaps in the production or the odd missing text here or there.  This record shows a limited, curated production and a wholesale effort to avoid any further discovery.

Further, Plaintiff contends that "[s]he was required to preserve only documents she knew were relevant to future potential litigation."  (ECF No. 276, PageID #15396 (emphasis removed).)  But Ms. Buddenberg admitted that her text messages with Mix and Andrews were relevant.  In any event, her duty extends beyond what she knew—it extends to evidence which she should reasonably have known had relevance.  *See Florence*, 2020 WL 1047377, at *4.

Finally, this part of Rule 37(e) focuses on the reasonableness of a party's steps to preserve electronically stored information considering her sophistication and level of technological knowledge and familiarity. Without question, Ms. Buddenberg is not sophisticated when it comes to technology, unlike a professional plaintiff or corporation with its own information technology department. She possesses the average technological skills of a person of her age. But the record shows that she has enough technological knowledge to delete individual text messages and take screen shots of them. Also, she knew enough to have the contents of her phone backed up to the cloud. This level of knowledge suffices to show that Ms. Buddenberg knew how to take steps to preserve and produce her electronically stored information. She failed to do so not out of inadvertence, neglect, or even based on something outside her control, such as the crash of a server, but instead through intentional actions and deliberate decisions.

### III.B.2.c. Restoration or Replacement of Information

Before considering sanctions, Rule 37(e) focuses on whether electronically stored information can be restored or replaced through additional discovery. Here, the record shows, and the Court finds, that it cannot. Indeed, the parties undertook efforts to restore the information by imaging Ms. Buddenbeg's iCloud backup. Those efforts failed to locate relevant information and data, for example, text messages between Ms. Buddenberg and Mix on or before October 24, 2016. Moreover, discovery from Mix or Andrews cannot provide those texts. When Mix left the District, he lost access to the work content of his phone, and he testified that even its personal contents were lost. (ECF No. 208-1, PageID #10267.) When she was deposed in

August 2022, Andrews testified that she no longer had text messages with, or other documents related to Ms. Buddenberg.  (ECF No. 212-1, PageID #11469–70.)  She checked her phone at the deposition, and it had no text messages with Ms. Buddenberg.  (*Id.*, PageID #11470–72.)  No party contends that either Mix or Andrews still has relevant text massages that could be recovered.

Plaintiff contends that she preserved the text messages produced with her initial disclosures, which provided an alternative means for discovery of any evidence spoliated during the conduct of this litigation—namely, the initial disclosures themselves.  (ECF No. 276, PageID #15391.)  This argument misses the mark.  The initial disclosures are not true and accurate copies of the relevant text messages, which Ms. Buddenberg curated and edited before providing them to her counsel.  They are not even all the relevant text messages.  The fact that Defendants could use the screenshots from the initial disclosures "cannot compensate for [their] inability to obtain a complete record" of Plaintiff's cell phone data.  *See Schnatter*, 2022 WL 2402658, at *12 (citation omitted).  And the record makes that fact clear.

Moreover, a party typically images or otherwise preserves electronically stored information within a reasonable time after a duty to preserve arises in a separate mirror image file or other copy of the device or data.  In such circumstances, whatever that party does with the organic messages on her phone or email matters little if at all because the imaged copy exists for use in the litigation.  But that did not happen here.  Ms. Buddenberg did not provide her phone or iCloud back up to her counsel until 2023.  Consequently, as she altered content—innocently, accidentally, or

173

otherwise—she was altering the only source of the electronic evidence in this case as her actions overwrote her iCloud backup.  In any event, Plaintiff's argument fails to account for the loss of electronically stored information and its manipulation in 2017, including the key events in the case and the period when Ms. Buddenberg provided some, but not all, of her relevant texts and emails to her counsel.

Finally, Plaintiff's expert on electronically stored information opines that the deletions Ms. Buddenberg made "are likely irretrievable."  (ECF No. 228, ¶ 5, PageID #12922.)  For all these reasons, the record demonstrates, and the Court finds, that the electronically stored information at issue cannot be restored or replaced through additional discovery.

### III.B.2.d. Prejudice

Prejudice requires "an evaluation of the [lost] information's importance in the litigation."  *Courser*, 831 F. App'x at 187–88 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).  Plaintiff maintains that Defendants have not suffered any prejudice because they merely "fantasize" about the content of the allegedly spoliated messages and produced no evidence that the messages were relevant.  (ECF No. 276, PageID #15404).  For purposes of spoliation, some courts allow a showing of prejudice to be made with "plausible, concrete *suggestions* as to what [the destroyed] evidence *might have been.*"  *Prudential Defense Sols., Inc. v. Graham*, No. 20-11785, 2021 WL 4810498, at *8 (E.D. Mich. Oct. 15, 2021).  Before the 2015 amendment to Rule 37(e), the Sixth Circuit recognized that circumstantial evidence suffices.  *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504,

514 (6th Cir. 2014).  Obviously, no one can know what evidence that no longer exists might show.

Defendants easily establish prejudice from the loss of the electronically stored information at issue.  At the outset, the prejudice in this case does *not* necessarily result from the late disclosure of the electronically stored information, the normal costs and burdens of litigation, or even the efforts the parties undertook to recover what data and information they could.  Instead, the information at issue materially alters the presentation of this case and the claims and defenses available to the parties—to the prejudice of Defendants.  And the record shows as much.  One example of the electronically stored information actually produced illustrates the point.

On Saturday, November 5, 2016, Ms. Buddenberg spoke with Ms. Livers by phone and advised her, as a representative of the Board, of the retaliation she experienced.  (ECF No. 197-3, PageID #6050; ECF No. 203-1, PageID #8617–19.)  On its own, this fact provides support for Plaintiff's claims.  After the close of discovery, however, Ms. Buddenberg's counsel located and produced additional responsive electronically stored information.  (ECF No. 227-15.)  That production included an email that Ms. Buddenberg sent from her personnel email account to Mix earlier in the day on November 5, 2016, before she called Ms. Livers.  (ECF No. 208-4.)  In that email, Ms. Buddenberg proposes to Mix building a case to present to the Board to "show them some ideas on how we can function without [Mr. Weisdack so] they may feel more confident."  (*Id.*, PageID #10537.)  "We know we will be fine without [Mr. Weisdack] but the board doesn't know it until we show them."  (*Id.*)

175

This email materially changes the context and character of Ms. Buddenberg's phone call with Ms. Livers later the same day. Without it, Ms. Buddenberg appears to be taking an appropriate step to report retaliation to a member of the Board responsible for supervising, hiring, and firing the Commissioner. With this additional information, Ms. Buddenberg's conversation with Ms. Livers appears contrived for ulterior motives. To be clear, even then, the email does not disprove Ms. Buddenberg's claim of retaliation. Two things can be true at once: she was in fact retaliated against, and she worked to secure Mr. Weisdack's ouster for that and/or other reasons. If her claims otherwise survived summary judgment, the parties could present and argue their respective positions on these (and other) facts to a jury. But Ms. Buddenberg may *not* manipulate the record by withholding or delaying production of this email, deleting some text messages, and curating the content of others.

Based on this example, which is representative of how the loss of electronically stored information changes the complexion of the case, the Court finds that the loss of electronically stored information, and in particular the text messages between Ms. Buddenberg and Mix and Andrews at important times during the relevant events, prejudices Defendants.

### III.B.2.e. Intent to Deprive

Under Rule 37(e)(2), "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation" may a court impose more serious sanctions for the spoliation of electronically stored information. Based on the record in this case, the Court makes this finding. Ms. Buddenberg's conduct

goes beyond gross negligence or recklessness. She attempted to frustrate the forensic investigation of her devices. She actively deleted specific text messages. During the litigation, she altered the content of others. The facts show Ms. Buddenberg's active efforts to deprive Defendants of facts and information that they might be able to use against her. Further, her testimony on the stand—including her demeanor, carefully evasive answers, and pregnant pauses—bolsters this finding.

### III.B.2.f. Unclean Hands

Finally, Plaintiff contends that the doctrine of unclean hands precludes Defendants from carrying their burden to warrant any sanction under Rule 37(e). (ECF No. 276, PageID #15407.) Factually, Plaintiff points to a litany of bad acts on Defendants' part to support this argument. (*Id.*, PageID #15407–08.) Several of these instances overlap with conduct at issue in Plaintiff's claims on summary judgment.

At bottom, this argument turns on the contested authenticity of an email to Andrews that Mr. Weisdack denies authoring and that the District did not produce in discovery. (ECF No. 194-6.) For purposes of summary judgment, the Court already assumed the authenticity of this email, construed it in Plaintiff's favor, and considered it. As a defense to sanctions under Rule 37(e), this email has no weight for two reasons. Factually, at best, it presents a single instance of spoliation over which the parties' have good-faith disputes. Legally, Plaintiff directs the Court to no authority that a party must have clean hands before seeking sanctions under Rule 37(e). Each of the cases on which she relies relates instead to the general proposition that a party may not obtain injunctive or other equitable relief with unclean hands. But the Federal Rules of Civil Procedure abolish the distinction

between law and equity in favor of one cause of action.  Fed. R. Civ. P. 2.  Therefore, is difficult to see how the equitable doctrine of unclean hands can bar the availability of sanctions for which the same Rules make allowance in Rule 37(e).  On a practical level, permitting actionable conduct to defeat Rule 37(e) sanctions would make the Rule categorically unavailable in a broad swath of litigation—a nonsensical result at odds with the plain text of the Rule and its purpose.

### III.B.3. Appropriate Sanction(s) (Rule 37(e)(1)–(2))

If "the party acted with the intent to deprive another party of the information's use in the litigation," a court may order more serious sanctions, including instructions to the jury or dismissal.  Fed. R. Civ. P. 37(e)(2).  "A showing of negligence or even gross negligence will not do the trick."  *Applebaum v. Target Corporation*, 831 F.3d 740, 745 (6th Cir. 2016) (citation omitted).  But the party's intent is enough; no finding of prejudice is necessary.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  In using the more serious sanctions available under Rule 37(e)(2), courts must exercise caution.  *Id.*  Such remedies should not be used where lesser measures, including those available under Rule 37(e)(1), would suffice to redress the loss of the information at issue.  *Id.*

Application of Rule 37(e)(2) "requires a finding," which "may be made by the court when ruling on a pretrial motion . . . or when deciding whether to give an adverse inference instruction at trial" under Rule 104(b).  Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment; *see also United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991) (applying Rule 104(b) in the context of a spoliation claim in a criminal case).  Although the advisory committee's note allows a court to

178

make findings for purposes of summary judgment, as already noted, the Court did not do so in the interests of ruling on the merits.

Because the Court finds that Ms. Buddenberg acted with the intent to deprive her adversaries of electronically stored information, including her text messages with Mix and Andrews, to help her case, a sanction under Rule 37(e)(2) might be appropriate, subject to the limiting principle of Rule 37(e)(1).  At the hearing, the parties requested the opportunity for additional briefing on any sanction or remedy following the Court's findings.  (ECF No. 238, PageID #13333–36; *see also* ECF No. 256, PageID #14647.)  Accordingly, determining the appropriate sanction remains a matter for another day, and the Court will schedule additional proceedings to address the matter at an appropriate time.

As a final note on the issue, the Court emphasizes that nothing in the record supports any sanction against counsel.  To the contrary, Plaintiff's counsel acted with reasonable diligence upon learning of the issues with electronically stored information, cooperated within the bounds of the Rules in their investigation, and aggressively defended their client.  Whatever sanction(s) the record might ultimately necessitate, they are not appropriate against Plaintiff's counsel and do not result from counsel's efforts on behalf of their client.

### FINAL JUDGMENT AND INTERLOCUTORY APPEAL

A grant of summary judgment constitutes a final judgment, which may be appealed.  But further proceedings remain to determine the appropriate sanction for Ms. Buddenberg's spoliation, including the prospect of a case-dispositive sanction

179

under Rule 37(e)(2).  In that respect, the Court's ruling on Defendants' motion under Rule 37(e) remains interlocutory.  Moreover, the imposition of a sanction short of dismissal with prejudice constitutes an interlocutory order.  *See Mohawk Indus. v. Carpenter*, 558 U.S. 100, 111 (2009).

Nonetheless, the interlocutory character of the Court's ruling on Defendants' motion for sanctions does not affect the finality of the summary judgment ruling because any sanction under Rule 37(e) is collateral to the merits.  Any such sanction does "not signify a district court's assessment of the legal merits" of a party's claims or defenses.  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990).  Even a "case-dispositive sanction that operates 'on the merits' under Rule 41(b)" remains collateral.  *See Ben E. Keither Co. v. Dining Alliance, Inc.*, 80 F.4th 695, 700 (5th Cir. 2023) (considering the issues for jurisdictional purposes) (citing *Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005), among other cases).

Notwithstanding these formalities, the Court believes that it and the parties would benefit from appellate review of the entirety of this ruling and all issues in the case at one time.  Though the Court finds that there is no just reason to delay an immediate appeal of its ruling under Rule 37(e), that motion does not present an independent cognizable claim for relief.  *See Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7 (1980).  Therefore, Rule 54(b) does not permit certification of an immediate appeal.  *General Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994).

However, a district court may also certify an order for interlocutory appeal under 28 U.S.C. § 1292(b). *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 36 (1995). Certification under Section 1292(b) is granted sparingly and only in exceptional cases. *Kraus v. Board of Cnty. Rd. Comm'rs for Kent Cnty.*, 364 F.2d 919, 922 (6th Cir. 1966). Certification is appropriate where (1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion exists regarding the correctness of the decision; and (3) an immediate appeal may materially advance the ultimate termination of the litigation. *West Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis (In re City of Memphis)*, 293 F.3d 345, 350 (6th Cir. 2002) (citing 28 U.S.C. § 1292(b) and *Cardwell v. Chesapeake & Ohio Ry. Co.*, 504 F.2d 444, 446 (6th Cir. 1974)).

With respect to Section 1292(b), the Court finds that the issue of sanctions under Rule 37(e) in this case presents an exceptional matter that warrants immediate appeal because of the procedural history of the case, including two previous interlocutory appeals, the closeness of the legal questions (on the underlying merits, which a sanction under Rule 37(e) might affect), and the matters of public concern that they implicate. Further, the Court finds that an immediate appeal will materially advance the ultimate resolution of this litigation, either by bringing it to finality (or close to it) if the Sixth Circuit affirms or by allowing one trial on all issues following remand.

As for the controlling questions of law that the Rule 37(e) issues present, there are many. The Court sees them falling into three broad categories. First, since

enactment of the amendment to Rule 37(e) in 2015, there are few appellate cases explaining the correct legal standards attending application of the amended Rule. Indeed, some courts continue to apply case law that predates the amendment, potentially creating a trap for unwary courts and litigants when evaluating the availability of sanctions for spoliation of electronically stored information. And few cases apply Rule 37(e)(2) at all. Second, the parties have substantial differences of opinion regarding whether Ms. Buddenberg had a duty to preserve electronically stored information, the availability the doctrine of unclean hands as a defense to sanctions, and what sanctions might be available based on the interaction of Rule 37(e)(1) and (2). Third, the Court and the parties will benefit from the Sixth Circuit identifying the correct legal standards that govern a finding of intent to deprive under Rule 37(e)(2), in particular, the allocation of responsibility between judge and jury under Rule 104(b). Indeed, little case law explains how, if at all, the Court's finding of intent to deprive operates or applies at trial when it comes to conditional relevance under Rule 104(b). There is substantial ground for disagreement on these issues. Indeed, the parties disagree on many, if not all, of them. Accordingly, the Court certifies its Rule 37 Order for interlocutory review under Section 1292(b).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Mr. Budzik's motion for summary judgment (ECF No. 216); **GRANTS** the District Defendants' motion for summary judgment (ECF No. 217); **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for partial summary judgment (ECF No. 218; ECF No. 221; ECF

No. 221-1); **GRANTS** Defendants' joint motion for sanctions and will schedule further proceedings by separate order at a later date to determine the appropriate sanction (ECF No. 256); **GRANTS** the District Defendants' motion to strike (ECF No. 270); **DENIES** Plaintiff's motion for discovery of materials and information within the crime-fraud exception to attorney-client privilege (ECF No. 283); and **DENIES AS MOOT** Defendants' joint motion to strike (ECF No. 292).  Further, pursuant to 28 U.S.C. § 1292(b), the Court **CERTIFIES** its Order under Rule 37 for interlocutory review.

  **SO ORDERED.**

Dated:  January 16, 2024

_____
   J. Philip Calabrese
   United States District Judge
   Northern District of Ohio